# EXHIBIT 1
# Part 1 of 2

COURT OF COMMON PLEAS
DIVISION OF DOMESTIC RELATIONS   FILED
CUYAHOGA COUNTY, OHIO

**LARRY ELLIOT KLAYMAN**  :  Case No: DRO9316840   2010 JUN -9  A 9: 02

        **Petitioner**  :  GERALD E. FUERST
                            CLERK OF COURTS
                Judge:  DIANE M. PALOS  COUNTY

     - vs -  :

**STEPHANIE ANN LUCK**  :  **MAGISTRATE'S DECISION**

      **Respondent**

      This matter came on for hearing on June 29th, and June 30th, July 2nd, October 23rd, 26th, 27th, 28th and 29th, November 3rd, 4th, and 5th, as well as December 1st, 2nd, 3rd and December 4, 2009, before Magistrate Lawrence R. Loeb upon the Petitioner's Motion For Allocation of Parental Rights & Responsibilities, Motion No. 246178: Petitioner's Motion For Attorney Fees, Motion No. 246180; Petitioner's Motion To Show Cause, Motion No. 247721; Respondent's Motion Motion to Modify Divorce Decree (denominated by the Court as Modify Existing Order Of Court), Motion No. 249314; Respondent's Motion For Attorney Fees, Motion No. 253120; Respondent's Motion For Sanctions, Motion No. 253121; Respondent's Motion To Show Cause Noncompliance With Judgment Entry, Motion No. 260457; Respondent's Motion For Attorney Fees, Motion No. 288236 and Respondent's Motion For Attorney Fees, Motion No. 290239.

      The Petitioner (herein after referred to as "Plaintiff"), Larry Elliot Klayman, appeared along with his counsel, Roger L. Kleinman, and the Respondent (hereinafter referred to as "Defendant"), Stephanie Ann Luck, appeared with her counsel, Suzanne Jambe and James Rollison. In addition, the Guardian ad Litem, Jennifer Malensek, appeared on behalf of the parties' minor children. The Court Reporters were Sharon Deka, Karen Lamondola, Kathleen Kuznek, Cynthia Stanton, Ria Sobolewski and Terri J. Moroney.

**THE MAGISTRATE MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:**

      The Magistrate finds that service upon said motion(s) was duly and properly made; that notice containing the date and time of this proceeding was mailed to counsel of record or, if unrepresented, to the parties themselves; and that the fact of such mailing was journalized in the *Domestic Relations Hearing Journal* maintained by the Clerk of Courts and is evidenced by a notation on the Docket.

      The present round of litigation began on July 5, 2007 when the Plaintiff filed a Motion to Modify Parental Rights and Responsibilities, Motion No. 246178. Between then and June 29, 2009 when trial began the parties filed an additional eighty-seven (87) motions (which excludes motions for continuance). On April 1, 2008 the Court issued the following order:

Petitioner's Motion for Attorney Fees # 247722 is hereby consolidated with Petitioner's motion fro Attorney Fees # 246180. All issues raised in any of the foregoing motions shall be considered under motion # 246180.

Respondent's Motion for Attorney Fees # 258440 and # 258139 are hereby consolidate (sic) with Respondent's Motion for Attorney Fees # 253120. All issues raised in any of the foregoing motions shall be considered under motion no # 253120.

Twenty-three days later the Court issued another entry consolidated Petitioner's Motions for Attorney Fees, Motion Nos. 260506, 260660 and 260597 into his Motion for Attorney Fees, Motion No. 246180 adding that all issues that could be raised under the three motions would be considered under Motion No. 246180. At the same time, the Court consolidated the Respondent's Motions for Attorney Fees, Motion Nos. 260302, 260305, 260459 and 260470 into Motion No. 253120 adding as it had in the past that all issues that could be raised under the four motions would be considered under Motion No. 253120.

In addition to those actions the Court also consolidated the Respondent's Motion to Temporarily Suspend Visitation, Motion No. 249315, with her Motion to Modify Divorce decree, Motion No. 249314. It also consolidated the Petitioner's Motion to Show Cause, motion No. 260596, with another Motion to Show Cause, Motion No. 247721. As it had in every other case, the consolidations were followed by the language allowing all evidence to be considered under the motion into which the others were consolidated. Finally, the Court stayed the matter pending the decision of the Court of Appeals in case Nos. 08-091298 and 08-0901317.

On June 18, 2008 the Court issued another order, which in part consolidated other pending motions. Specifically, the Court consolidated the Respondent's Motions for Attorney Fees, Motion Nos. 262456 and 261617, into her Motion for Attorney Fees, Motion No. 253120. It also consolidated the Respondent's Motions for Sanctions, Motion No. 260303 and 260458 with her other motion for sanctions, Motion No. 253121, adding that all issues that could have been raised under the later motions would be considered under the motion into which they were consolidated.

During the course of trial the Plaintiff maked Exhibits Nos. 1 to 108, but then withdrew Nos. 37, 54, 60, 62, 71, 84 and 85. All of the Plaintiff's remaining exhibits, with the exception of No. 104, were admitted into evidence. The Defendant marked Exhibits A through I I I I, all of which were admitted into evidence.

It is possible to argue that the opening act of the drama that culminated in eighteen days of trial arose out of a not uncommon childhood accident; the youngest child's fall on July 3, 2007 that resulted in a broken arm. The child was Lance Klayman, the party's son who was born November 14, 1999. He had been climbing the diving board at a public pool when he slipped and fell to the concrete. His mother wasn't there at the time, a point that the Plaintiff would hammer at over and over starting the next day when the Defendant called the Plaintiff to notify him of the accident. While the incident was supposedly the *casus belli* for the battle that

DR-H733

followed, the trial would reveal that tensions had been building over the preceding two years to the point that it is unlikely that the parties could have avoided the bitter struggle that consumed so much of their time and treasure for much longer.

The only questions were when would the war break out and how brutal it would be once it started. If there was any surprise it was not that war would come, but that when it did it would be fought with such intensity on so many different fronts. Ultimately, the fight would become one of apocalyptic proportions, a struggle between the forces of good versus the forces of evil. From the parties' perspective, who would wear those mantles would depend upon which of them was testifying at the time. Every custody battle evidences some aspect of the Zorastrian struggle between the forces of light and darkness. In this case, those elements came to dominate the fight between these parties to such an extent that no compromise was possible and may never be. Many of the battles would be procedural, but ultimately all of them would impact the final decision in this case. It is, however, neither possible nor appropriate to consider the merits of the motions that were outstanding at the time the parties began trial on June 29, 2009 without first reviewing the history that brought them to that point.

That record reveals that the parties, who had apparently met when the Defendant worked for the Plaintiff, were married in Washington, D.C. on July 6, 1996. They subsequently had two children born as issue of that union: Isabelle Natalie Klayman (DOB 12/15/1997) and Lance William Klayman (DOB 11-14-1999). In 2003 the Plaintiff filed a Bill of Complaint in the Circuit Court for the County of Fairfax, Virginia seeking a divorce from the Defendant. On June 11th of that year, after the Defendant had raised a number of concerns about the Plaintiff's behavior with the children, they entered into a Marital Settlement Agreement that, among other things, provided for custody and visitation of the minor children. Specifically, the parties agreed in pertinent part:

> .... that the welfare and best interests of their children is the paramount consideration of each of them. The Wife shall have legal and physical custody of the children and shall have full control and supervision of their care, guidance, maintenance and education, subject to the Husband's rights of reasonable access and visitation as more particularly described below.
>
> . . .
>
> The Husband shall have visitation with the minor children as is reasonable, particularly since the parties agree that the Wife and children may move to Cleveland, Ohio, and the Husband resides in Florida and the Washington, D.C. Metropolitan area. The Husband shall be permitted to have visitation with the minor children on the first and third weekends per month on Saturday from at least 9:00 a.m. until 8:00 p.m. and on Sunday from at least 10:00 a.m. until 5:00 p.m. **The Wife shall have the final decision regarding the children staying overnight with their Father, and the Wife shall not unreasonably withhold her consent. Subject to the Wife having the final say regarding the children staying**

overnight with their Father, the Husband shall have the right to request that the children visit with him away from Cleveland and for reasonable summer vacation and the Wife shall not unreasonably withhold her consent. (Emphasis added)

. . .

PRIVATE SCHOOL.  Subject to modification by a court of competent jurisdiction in the event of changed circumstances, the Husband agrees to be responsible for and to pay the reasonable tuition expenses for the private elementary and secondary school education of each of the minor children of the parties not to exceed the sum of five thousand dollars ($5,000.00) per academic year per child, and he further agrees that he shall pay same on a timely basis.  The parties shall consult and reach agreement as to the private school for the children, but the Husband's consent to the Wife's choice shall not be unreasonably withheld.

In addition to those terms, the Agreement provide that the Plaintiff would pay the Defendant the sum of $1,800.00 per month for the support and maintenance of the minor children as well as to be responsible for and to pay reasonable tuition expenses for private elementary and secondary education for each child not to exceed $5,000.00 per academic year per child.  As to private school, the parties further agreed that they would consult and reach agreement as to the private school for the children "...with the Husband's consent to the Wife's choice shall not be unreasonably withheld".  Finally, the parties agreed that: "the validity, enforceability and interpretation of this Agreement shall be determined and governed by the laws of the State of Virginia" (Plaintiff's Exhibit 1).

The Plaintiff, who would prove loquacious on almost every other subject about his ex-wife and her parenting, never explained why he entered into an agreement that gave her discretion over whether he could have the children overnight. She did, testifying that the Plaintiff wanted custody of the children, but gave up the fight rather than submit to a psychiatric evaluation.

The parties presented the Marriage Settlement Agreement to the Court on June 11, 2003, which, after finding that the Plaintiff and Defendant had lived separate and apart for more than a year, granted the Plaintiff a divorce from the Defendant and effectively ordered the terms of their Marriage Settlement Agreement into effect.  Finally, the Virginia Court sealed the record in the case.  As the parties had contemplated, the Defendant moved to University Heights sometime in 2004, first living with her mother and then moving into her own residence on Kerwick Road, University Heights, Ohio. The geographic distance between the parties did nothing to improve their relationship.

Emails between them as well as correspondence between their attorneys indicate that they began sparing starting sometime in 2005 over the Plaintiff's access to the children and his failure to pay support. (Plaintiff's Exhibits 33-56, 57, 58, 59 61-64 and 66-70 for example and

4

Defendants Exhibits A-G).  By late 2006 the situation had escalated to the point that the parties were back in court in Fairfax, Virginia over the Plaintiff's failure to pay spousal support, medical bills, tuition to Gesu school where the children were enrolled and a lump sum owed to the Defendant for the Plaintiff's interest in Judicial Watch, an organization that the Plaintiff ran at the time. On October 11, 2007 the Circuit Court for Fairfax County issued an order finding that the Plaintiff was in contempt of an order dated December 28, 2006 that found him in contempt and ordered him to pay the Defendant $ 78,015.00 plus interest and attorney fees in the amount of $ 4,957.69.

The October 11, 2007 order provided that the Plaintiff could purge his contempt and thereby avoid having to serve a 30 day sentence if he paid those two sums. In addition, the Virginia order provided that:

> The Plaintiff shall dismiss, with prejudice, the lawsuit which is pending against the Defendant, Michael Deluca and Gisela Luck in the 11[th] Judicial Circuit in Dade County, Florida, within ten (10) days of the date of this order. (Defendant's Exhibit V)

On December 26, 2007 the Plaintiff sent the Defendant's Virginia lawyer a letter to which he attached two checks totaling $ 84,091.56. The remitter of both checks was Diana Yazbeck, the Plaintiff's wife at the time, who noted on both documents that they were loans from her to the Plaintiff (Defendant's Exhibit V)

On July 5, 2007, the Plaintiff filed a Motion To Modify Parental Rights And Responsibilities, a Motion To Modify Child Support and Motion For Attorney Fees (Motion Nos. 246178, 246179 and 246180 respectively). Attached to the Motion to Modify Parental Rights and Responsibilities was an affidavit that the Plaintiff had signed in Florida on July 3, 2007 in which he declared that his reason for seeking to modify parental rights and responsibilities was:

> .... that there has been a change in circumstances which necessitates this Court to modify the allocation of parental rights and responsibilities, as set forth in the parties' marital agreement.

> AFFIANT states further that it would be in the best interest of the parties' minor children, Isabelle Natalie Klayman, born December 15, 1997; and Lance William Klayman, born November 14, 1999, that this Court allocate the primary responsibility of the parties' minor children to Affiant.

There was no mention in either the Plaintiff's Motion to Modify Parental Rights and Responsibilities or in the supporting affidavit of Lance's fall that would play such an integral part in the Defendant's effort to obtain custody of the minor children nor could there be since the Plaintiff could not have known about the fall when he signed the affidavit. In an email sent to the Defendant on July 4th the Plaintiff asked to meet with her in an effort to resolve the various

DR-H733

"matters" that had arisen since the divorce, including the Virginia case. The email then went on to impose a deadline along with a threat, the Plaintiff telling the Defendant:

> Please let me know today, and no later, whether you will agree to postpone all legal actions from both sides so we can meet and try to resolve all issues. I am very upset but trying to write this email without emotion. Lance could have been killed and you were not there to supervise him.

> If you will not so agree, I cannot wait to take legal actions. **The kids safety is at stake, my visitation schedule this summer and otherwise is being destroyed as usual, I cannot talk to the kids on the phone on a regular basis, and their (sic) are other enumerated issues, such as spankings, alcohol, cigarette (sic), religion, cohabitation and other related issues,** to name just a few. (Emphasis added) (Defendant's Exhibit AA)

Whatever other claims he might raise in the following months, the topics the Plaintiff outlined in that email were the basis of his Motion to Modify Parental Rights and Responsibilities.

At the same time he filed his Motion to Modify Parental Rights and Responsibilities the Plaintiff also filed a Petition to Register Foreign Decree as well as a Motion to File Judgment Entry Under Seal (Motion No. 246181). On August 28, 2007 this Court granted the former, but denied the latter. Nine days later the Plaintiff filed a Motion to Temporarily Suspend Visitation/Modify Visitation, Attorney Fees and For a Psychological Evaluation (Motion Nos. 249315, 249314 and 249316 respectively). The Defendant's Motions to Modify Child Support and For Attorney Fees were never given motion numbers.

By this point the Cuyahoga County Department of Children and Family Services (hereinafter CCDCFS) was involved with the family as a result of a call the Plaintiff made to 696-KIDS on July 12, 2007 in which he complained that the Defendant's fiancé had abused Lance by spanking him and offering him cigarettes and beer (Court's Exhibit 2). The call, coincidently, was made the day before the Defendant and her fiancé were to be married.

Two weeks later the Plaintiff filed a Complaint in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, against the Defendant, her husband and the Defendant's mother, Gisela Luck. The complaint alleged that the Defendant "in conspiracy and concert with the other Defendants" promised that if the Plaintiff would pay for expenses and expenditures beyond those he was obligated to pay under the final divorce decree the Defendant would allow the Plaintiff to exceed the visitation schedule in the divorce decree. The Plaintiff went on to claim that those expenses exceeded     $ 15,000.00.

The Plaintiff also alleged that: (1) the Defendant had seized and converted Amigo cell phones that he had purchased and given to the children so that he could talk to them as well as gold Christian Crosses with Stars of David on them that he had given to the children and that the Defendant had not sent the children to Florida at an agreed upon time even though the Plaintiff

6

DR-H733

had purchased non-refundable tickets for them. In paragraph twelve the Plaintiff alleged that the Defendant had been cohabitation with Mike DeLuca for at least two years prior to the complaint being filed on July 26, 2007 and as result, the Defendant has effectively cheated him because she continued to collect alimony from him over that period. He also claimed in the same paragraph that the child support that he paid was misappropriated and misused and converted for the Defendant's and Mr. Deluca's use.

Those allegations were laid out in the first twelve paragraphs of the Plaintiff's Complaint or reiterated in the six other counts pursuant to which the Plaintiff alleged he had a right to recover from the Defendants on the grounds of promissory estoppel, breach of contract, conversion, civil theft, fraud in the inducement, and violation of privacy (Exhibit B attached to Defendant's Motion to Modify Divorce Decree). The Florida action was still pending when, on September 11, 2007, this Court appointed Eric Laubacher to act as attorney and guardian ad litem on behalf of the minor children. The Court also scheduled the various that were then pending motions for a week of trial in April 2008.

The day before the Court appointed Mr. Laubacher to act as guardian and attorney for counsel, CCDCFS issued a letter to the Defendant's current husband, Michael DeLuca, advising him that the Department had determined that the allegation that he spanked his stepson and offered him cigarettes to smoke and beer to drink were unsubstatiated because no evidence of abuse was found. The Hot Line Referral Form that an Agency completed when the Plaintiff called on July 12, 2007(Court's Exhibit 2) indicates that Plaintiff told the individual answering the Hot Line that Lance had had a diving board accident on July 3rd and had been taken to the hospital, but that the Defendant refused to tell him what injuries Lance sustained as a result of the fall.

The parties' testimony and the exhibits they introduced would reveal that was absolutely no substance to that claim. While it is true that the Plaintiff was not immediately told after Lance's accident that he had fallen or that he had been taken to the hospital or that he had suffered a broken arm he was advised of the incident as well as the child's injury the following morning. The Plaintiff knew that when he called the Hot Line because he emailed the Defendant at 8:37 p.m. on July 4th, telling her:

> **This morning at 8 30 am you called me and told me that Lance
> had broken hisarm (sic) yesterday while going swimming.**
> (Emphasis added) (Defendant's Exhibit AA)

The news may not have reached the Plaintiff as quickly as he wished, but there is no question from his email and the Defendant's testimony as well as his own that the Plaintiff knew early the next morning exactly what injuries Lance had sustained. That was eight days before he called the Hot Line to accuse the Defendant and her fiancée of abuse. Under the circumstances, for the Plaintiff to have told the Hot Line worker that the Defendant refused to tell him what injuries Lance sustained was not just disingenuous: it was a complete fabrication.

It was one that the Plaintiff would not let go of as he testified two years later that the Defendant failed to notify him of the diving board accident until a day and a half after the

DR-H733

incident occurred. He later embellished the accusation in a complaint he filed in a Florida Court on August 8, 2008 against Gesu, the children's school. In paragraph 7 of that pleading he wrote that:

> Recently, Plaintiff's name also was removed as a contact person if an emergency results with the children. Such an emergency resulted last summer, when Lance, then 7 years old, fell of (sic) a high diving board from eight feet, in what could have been a fatal accident. Plaintiff was not timely notified by his former wife, despite the fact **that Lance sustained severe injuries, including but not limited to a broken arm.** (Emphasis added) (Defendant's Exhibit TT)

The idea that Lance had sustained severe injuries in addition to a broken arm was not just a matter of hyperbole; it was what would prove to be another instance of an allegation made without any connection to the real world.

There is no evidence whatsoever that Lance sustained any injury other than a broken arm, much less a severe one. While some fractures may be severe, there is nothing to suggest that Lance's fell into that category. Rather, the Magistrate is driven to he opposite conclusion based on the testimony of the child's pediatrician who described the break as a "mild injury" that had healed by July 25, 2007. Like his claim that the Defendant didn't tell him what injuries Lance sustained; the idea that the child suffered other, severe injuries as a result of the diving board accident is a fantasy that exists only in the Plaintiff's imagination.

The accusation was no accident; the word "severe" no malapropism. It was a deliberate choice made by a man who was trained in a law school to use words as tools. They are his stock and trade. Obviously people make mistakes, substituting one term for another that they meant to use. Lawyers are not immunized against that condition by their training. The Plaintiff's language was no accident, though. He deliberately chose to employ the word "severe" in an effort to make the incident appear worse than it was so that the Defendant's culpability would seem all the greater.

It is worth noting that when he spoke with Lance the morning after the accident Lance told him he was "OK". The Plaintiff continued to press Lance for answers, noting in a subsequent email to the Defendant that "... Lance would get testy and would not answer any other questions" (Defendant's Exhibit AA). That he would not had nothing to do with Lance or the Plaintiff. Instead it was the Defendant's fault because: "I got the impression that I was on speaker phone..." implying that the Defendant was listening in so that Lance was afraid to answer his questions. In the next sentence he went further, accusing the Defendant of telling Lance "... not to discuss what happened" (Defendant's Exhibit AA).

While there is no evidence of that, the Defendant admitted that she was in the room when Lance and his father spoke on July 4th. The conversation, as she described it, was "upsetting". She heard Lance saying to the Plaintiff that it wasn't the Defendant's fault, it was an accident, something that the Plaintiff was not willing to accept because he pushed Lance to the point that

DR-H733

8

Lance threw the phone across the room and told the Defendant that the Plaintiff said that she was a bad mom and that she doesn't care about him.

The conversation with Lance followed one between the parties in which, according to the Defendant, the Plaintiff berated her; telling her that the accident was her fault that Lance could have been killed, that she would have his blood on her hands and that she should not be around children. The Defendant also testified that Lance did not want to speak with the Plaintiff after the two spoke that morning. She repeated the same story to Ms. Blue, a social worker who would enter the picture on July 12, 2007 when the Plaintiff called the Cuyahoga County Department of Child and Family Services (CCDCFS).

Under other circumstances it would be easy to disregard the Defendant's testimony as nothing more than partisan propaganda because it comes from a party in the midst of a custody battle. There is no reason to do so in this case and every reason to consider her description of the events of the morning of July 4th both accurate and credible. It not only find corroboration in the testimony of her husband, but it mirrors the Plaintiff's accusations about the Defendant's failure to be present when Lance fell as well as his constant exaggeration of the child's injury and focus on how terrible the situation might have been, i.e Lance could have been killed. The Plaintiff is no position to challenge that conclusion as he made the same claim about Lance possibly being killed in an email to the Defendant (Defendant's Exhibit AA) and when he spoke with Sister Linda (Defendant's Exhibit KK). Further, the allegation fits into the Plaintiff's overall view of the Defendant; that she is cold, unaffectionate and doesn't care about the children.

He was correct, though, that the Defendant's then fiancée (later husband), Mike DeLuca, had spanked Lance because Mr. DeLuca admitted during the trial that he had given Lance a swat on one occasion. There is, however, absolutely nothing in the record to suggest, let alone establish by a preponderance of the evidence, that he physically disciplined the child more than that one instance or that the discipline was unreasonable or abusive. If there was anything unusual about what happened it was the irony of the situation: Mr. DeLuca gave Lance a swat because he had hit a playmate on the back with a toy sword. None of the adults associated with this matter seemed to have grasped the paradox of swatting a child as punishment for hitting a friend, but that doesn't matter. The only thing that is important is that there is no evidence that Mr. DeLuca abused Lance when he spanked him that one time and absolutely none to support the Plaintiff's allegation that Mr. DeLuca offered beer and cigarettes to Lance.

That there is no such evidence did not deter the Plaintiff who continued to make the same allegations when he testified two years later. He was especially incensed that Mr. DeLuca had spanked his son. While the Plaintiff's attitude is understandable, there in no law in Ohio (and the Plaintiff did not point to any Virginia statute) that forbids a stepparent or even a live-in boyfriend or girlfriend from disciplining a child. Neither is there any provision in the party's divorce decree that declares that they and only they can physically discipline the children. In the absence of any such law or agreement between the parties Mr. DeLuca did nothing wrong when he gave Lance a swat. By the same token, the Defendant did nothing wrong by not chastising Mr. DeLuca for disciplining Lance.

This is not to say that a parent or a stepparent can physically discipline a child to the point that it is abuse. The State of Ohio for sure (and probably the State of Virginia also) recognizes that there is a line between legitimate physical discipline and abuse. In spite of the Plaintiff's repeated claims that Mr. DeLuca abused Lance by spanking him he offered no evidence to support those claims or ever made any effort to; either in or out of the court room. The allegation, like so many of his other claims, was simply a mantra that the Plaintiff repeated over and over as if by doing so he could make someone else believe what he had come to accept as the truth. In the absence of any evidence to support those claims Ms. Blue did not believe them and neither does the Magistrate. Instead, the undersigned concludes that the allegations against Mr. DeLuca, especially those that he offered beer and cigarettes to Lance are utterly baseless.

For all of his complaints about the Defendant and Mr. DeLuca, when the Plaintiff called CCDCFS, the Hot Line Referral Form states that he told the worker who answered the phone that:

> The basic needs of the children are being met as far as the caller knows. However, the caller has been told by a third party that the children have played outside unsupervised, but no other details were known. (Court's Exhibit 2)

On the bottom of the same form the worker wrote:

> Note: The caller stated that he is an attorney. He requested that our agency expedite an investigation, because the mother is marrying her paramour tomorrow. They will be going on a honeymoon, and the caller does not know who will care for the children. (Court's Exhibit 2)

The Defendant believed that this was the impetus for the Plaintiff's call to the Hot Line; a calculated effort to use the Agency to ruin her wedding. Considering the timing of the call, the fact that the Plaintiff never indicated when Mike DeLuca was supposed to have spanked Lance or offered him beer and cigarettes, a void that the Plaintiff never made any effort to fill, and the request that CCDCFS expedite the investigation because of the impending wedding, the Magistrate shares her suspicion.

The Plaintiff, of course, would never admit that he called CCDFS on July 12, 2007 for those reasons. He, in fact, testified that he called CCDCFS the week before, but the record clearly does not support that statement. The call was made the day before the wedding. At that point he had not spoken with Lance since the Morning of July 4th. There is absolutely nothing in the record that hints much less establishes that the two discussed anything other than Lance's fall the day before. The Plaintiff never mentioned learning at that time that Mr. DeLuca had spanked Lance or allegedly given him beer and cigarettes. He certainly can not argue that he was unaware that Mr. DeLuca had spanked Lance since the two men had discussed the issue the night of the Gesu Christmas Pageant the previous Christmas. In view of the record it is difficult to accept any explanation for the Plaintiff's call to 696-KIDS other than to disrupt the impending wedding of which he was well aware.

DR-H733

The Plaintiff would change his opinion about the children's needs being met when he testified during the trial. It was a necessary step taken in order to make his claims about the Defendant during the period leading up to his call to CCDCFS credible. To do that he disavowed telling the Hot Line worker that: "The basic needs of the children are being met..." when he testified. The statement, he told the Court, was a "word choice" by the person who wrote up the report. Incredibly, he added that he did not know what the words "basic needs" mean. It was an utterly implausible statement from a man who graduated from both college and law school; a man who has two children and spoke proudly of what he did for them while at the same time was highly critical of his ex-wife's parenting abilities and who has repeatedly expounded at length on her faults as a parent and her failure to provide for the children's needs.

Given the Plaintiff's accusations it is simply unfathomable that he was not able to define the phase "basic needs" as it applies to his children. The Magistrate finds, instead, that the Plaintiff's "ignorance" and his attempt to disavow a statement that undercut his position are part of a pattern; one that leads the undersigned to afford his words little if any credibility.

It is of interest that in raising the alarm about Mr. DeLuca's alleged misconduct the Plaintiff was all too willing to believe whatever the children supposedly told him. He adopted the same stance with regard to many of the allegations that he lodged against the Defendant. Yet, when the Defendant claimed that the children complained in any way about him, the Plaintiff denounced those claims; asserting that those were either blatant lies made up by the Defendant in order to win the custody fight he launched or words that she put into the children's mouths for the same purpose. It never seems to have occurred to the Plaintiff that he cannot have it both ways.

The children cannot be 100% truthful when they support him and 100% lying when they don't. That especially cannot be the case where in almost every case there in is no extrinsic evidence to corroborate the statements the child allegedly made about Mr. DeLuca and their mother. The Defendant likewise adopted the same position, but more often than not she was able to produce independence evidence to support her claims of what the children said. Her testimony, in other words, is far more credible that the Plaintiff's.

As required by law, the Plaintiff's complaint was referred to a CCDCFS social worker, Ms. Blue, who investigated the matter. As part of her investigation the social worker interviewed each child separately as well as the Defendant and her new husband, Mr. DeLuca. In her report Ms. Blue noted that:

> Mom reports that the children's father has called Lance at least twenty-five times questioning him about the diving board accident. Mom reports that Lance has tried to explain the best he knows how, but this is not good enough for Dad. Mom reports that the child is refusing to talk with his Dad because he is tired of talking about the same thing over and over again. Mom reports that Dad was very abusive to her both physically and verbally throughout the marriage. Mom reports that she is still frightened of the children's father because he is a lawyer and she never knows what

DR-H733

11

> to expect from his abusive behavior…SW asked Mom is she has
> been letting the children visit with their father, she said no because
> she is afraid that Dad will not return the children to her, and he
> would turn the children against her…mom kept telling SW that the
> children father is an attorney and she fears what he is using this
> interview for. (sic) (Court's Exhibit 2)

The investigation also involved a face-to-face interview with the Plaintiff on September 10, 2007 in which he advised the social worker that Lance had been left in the care of an underage babysitter when the accident that resulted in his broken arm occurred. It was an allegation that the Plaintiff would make over and over, at one time stating that the babysitter was only 12. He offered not one iota of evidence to support that assertion, either to Ms. Blue or to the Court. In addition, he reiterated his claim that Mr. DeLuca offered Lance cigarettes and beer and added that his:

> …ex-wife leaves the children unsupervised and the children run
> across the street in University Heights. He said that University
> Heights is a high motor cycle area and is very dangerous in
> University Heights. He also said that there is a lot of sexual
> offenders in the area and his ex-wife lets the children walk around
> unsupervised. He then reported once again that his ex-wife has cut
> off all ties with his regarding his children…He said that he had his
> daughter videotaped and she was getting in a convertible car
> without a seatbelt. He said his ex-wife has a lack of concern about
> safety, health, and supervision.

And even though slightly more than two months had passed since he filed his motion to modify parental rights and responsibilities the Plaintiff told Ms. Blue that:

> … the children's mother is mentally abusing the children by saying
> that he is trying to take them away from her, and that is not the
> case. (Court's Exhibit 2)

It is an astounding statement from someone who had just launched a battle to gain control of the children so he could remove them from their mother's house because of her alleged unsuitability as a parent.

In spite of the Plaintiff's repeated claims that his ex-wife and her husband were abusing and neglecting the children, Ms. Blue ultimately concluded that those allegations were unsubstantiated, writing that she did not find anything that would lead her to conclude that any physical abuse had occurred in the Defendant's home. She went on to add that:

> Step dad (Michael DeLuca) appears to be a positive
> role model for the children as evidenced from the
> conversation that was held between the SW and
> Alleged Offender. This Assessment Rating for this

DR-H733

12

family is low.  Safety Assessment Rating for this
case finds the children safe in the home.  The Case
Disposition for this case is Physical Abuse Unsub,
this case will be closed without further involvement.
(Court's Exhibit 2)

Besides her conclusions and noting what the parties told her, Ms. Blue's report is
significant because of her description of the Defendant's home and the children's relationship
with their mother and Mike DeLuca.  Those findings would significantly undercut the Plaintiff's
allegations about the children's view of Mr. DeLuca as well as provide valuable evidence of the
children's interaction and interrelationship with their parents and their adjustment to home.

Ms. Blue added little to what was already in her report when she testified.  One of the
things that she did mention was that when she first interviewed Isabelle at the family home in
University Heights, Isabelle was sort of frightened and sat on her mother's lap.  The situation
changed radically when the social worker returned on September 20, 2007; at which time
Isabelle, who had been playing with some friends in the front yard, walked up to the social
worker and spoke with her without any apparent reticence.  Ms. Blue also testified that when she
initially spoke with Isabelle the child did not express any fear of her father, but added that she
did recall Isabelle saying that she was afraid that her father would take her away from her
mother.

Although she was there to investigate an entirely different allegation, Ms. Blue asked
Lance if he had ever been sexually abused.  It was, she testified, a standard question that she is
supposed to ask in all investigations.  Lance, she reported, responded in the negative to the
question (Court's Exhibit 2, Pg 17).  When she testified at trial Ms. Blue stated that Lance not
only said that he had never been sexually abused, but also told her that no one had touched him
inappropriately.  That was not true, as Lance had told his parents at separate times that Eduardo, a
10 year old boy, had performed oral sex on him or had touched him inappropriately when he
abused Isabelle while the family was living in Virginia.  Finally, Ms. Blue told the Court that the
Defendant never said that the Plaintiff was sexually abusive of the children.  That said, the
Defendant did tell Ms. Blue that she was not allowing the Plaintiff to see the children because
she was afraid that he would take them from her.  On cross-examination the Defendant would
subsequently acknowledge that the Plaintiff had always returned the children.

While Ms. Blue was conducting her investigation, the Agency opened a second one on
September 12, 2007 as a result of a phone call it received from the children's pediatrician, Dr.
Kelley Joyce.  She had been the children's physician since they moved to the greater Cleveland
area from Virginia in 2004.  Dr. Joyce's notes from November 2004 revealed that Lance became
"combative" when she attempted to examine his genitals.  He was, however, cooperative
throughout the rest of the exam and, according to the Defendant, had not displayed any such
behavior either at school or at home where he was cooperative (Court's Exhibit 4).  Dr. Joyce's
notes further indicate that she saw Lance twice in November 2005, once in 2006, and on
March 9, 2007, before she received a phone call from the Defendant on September 12th of that
year informing her that the night before Lance had disclosed that the Plaintiff had kissed him all

over and while he, Lance, was in the bathtub the Plaintiff had played with his privates. Dr. Joyce had the Defendant bring Lance to her office the next day where she examined the child.

According to the Hot Line Referral Form, which was part of the record created by the Agency (Court's Exhibit 1):

> The mother, Stephanie Luck, called the referent after her son, Lance Klayman, disclosed last night that his father had sexually abused him. While they were getting ready for bed, Lance tried to phone his father, as he usually does. He did not answer. Lance told his mom he is glad that his dad is not part of their family. She told him he is. Then he said he doesn't like his dad. When his mom asked why, he said, dad has secrets with me. She told him it was okay to tell her, and that he is safe with her. He said that his dad had played with his privates. It happened in Cleveland, but the time frame is unknown. He said he was in the bathtub and his dad was in the bathroom. The mother asked him was he washing you, and he said no. He played with them. He said his dad showed him his privates too, and they had hair on them. Lance also told his mom that he does not like to spend time with his dad because he kisses him all over.

> The caller did an exam, but there was nothing found. Lance was reluctant to show the referent his privates. He said it was gross, but his mother persuaded him too. The referent questioned Lance alone, saying that at this age, she typically speaks to the kids alone. She said sometimes when kids are reluctant to show their bodies, someone has done something to them. She asked if anyone had. He denied it. He did not have good eye contact and was fidgety. She spoke to him about other things. Then she asked about his dad. He said he doesn't like him because he is mean to his mom. He sued her.

> The caller states the father, Larry Klayman is a well-known attorney. He has sued Bill and Hillary Clinton and was Jennifer Flowers attorney. He even sued his mother. When they were divorcing five years ago, he was trying to get custody. When the court ordered a psychiatric evaluation, he agreed to give the mom custody and just have visitation.
>
> . . .

> He showed up at Lance's school the other day. The mother had already told them that he is not allowed to take him. Out of nowhere, he told the head nun at the Gesu school, that Lance was given oral sex by another child when he was 2.
>
> . . .

14

DR-H733

The mother said something about her daughter, Isabelle, 10, being fondled by her dad when she was 4 or 5. It is unknown if it was investigated. She got her into play therapy. It came out then. She said her dad had taken baths with her and she was made to wash his privates. He would sleep with her in her bed, and when she would wake up in the morning, she would feel his erection on her back.

. . .

The mother left the dad because he was physically and verbally abusive toward her.

The case worker to whom the matter was referred, Ms. Wingler, conducted an extensive investigation that included speaking with the children's counselor, Dr. Karen Bardenstein (who didn't testify). Ms. Wingler's report of her contact with Dr. Bardenstein (Court's Exhibit 1, page 100) states that:

.... most of what she had been told so far about this case has been from the mother. She said she has seen Lance four times and Isabelle once. She said she has been addressing with him allegations involving the father touching him inappropriately and said Lance was uncomfortable to talk about this but has wanted his mother to tell her what he has reported. She said "both of the children seem to be quite frightened of their father and quite estranged from him. She said they seemed to feel very safe and appear to be very attached to their mother and step father. She said she had no contact with Mr. Klayman. **She said she had spoken to one of the children's previous therapists, Dr. Gil in Washington, who she said has a national reputation on counseling abused children and said Dr. Gil had contact with the father and reported many concerns based on her contact with the kids and the father. She said the father was supposed to be psychiatrically evaluated some time ago but has not as of yet. She said that she supports this taking place.** (Emphasis added)

There is something for both parties in that portion of Ms. Wingler's report. For the Defendant, there is corroboration of her claim that the Plaintiff gave up the battle for the children rather than submit to a psychiatric examination as well as corroboration that she had genuine reasons to be concerned about the Plaintiff's behavior. For the Plaintiff there is evidence that the allegation that he had improperly touched Lance came from his mother, not the child who refused to say that the Plaintiff did anything improper. There might have been more had the Plaintiff chosen to participate in the investigation.

DR-H733

15

If he had, he could have shown Ms. Wingler the pictures of he and the children that he introduced during the course of the trial; pictures that show happy children (Plaintiff's Exhibits 2,3,4,5,12,13-21, 28, 29 and 102)). [Of those pictures, two were baby pictures of Lance (Nos. 19 and 29) while three from Exhibit 102 depict Isabelle swimming with a dolphin.] They fail to evidence any of the fear or reticence to be with the Plaintiff that Dr. Bardenstein noted or to which the Defendant or her husband testified.

After interviewing Isabelle, Ms. Wingler wrote:

> SW asked her about how her relationships were with her family members and she said, "I have really good relationships with everyone in my family except my dad." SW asked her when was the last time she saw her father and she said, "the week he came to my school and gave me a suitcase full of toys and I don't like it when he comes to my school. He was mean to my principal and he made me very upset when he came to my school. I don't want him coming to my school to see me. I don't want him coming to see me at all." SW asked her why she felt this way about seeing her father and she said, "he is just mean to everyone. My mom, Mike, my principal, me, Lance, and he tries to kiss us (her and Lance) all over our bodies and we don't like that." She then reported remembering going to see a counselor years ago, when she was living in another state, because she said she remembered "something" about washing her dad's privates but could not recall any details of this for SW. SW asked her if this happened once or more than one time and she said she wasn't sure. SW asked her if her father had ever touched her body in a way that made her feel uncomfortable, other than the kissing she reported, and she said, "I can't really remember but I know I washed his privates when I was little because my mom told me that's what I told the counselor and I believe her because she wouldn't lie to me about this." SW asked her where she and Lance would sleep while visiting with her father and she said, "mostly in bed with him and we didn't want to. He only would wear his underwear and we would tell him we didn't want to sleep with him but he would make us anyway." SW asked her if anything would happen while they were in bed together that made her feel uncomfortable and she said she didn't think so but couldn't remember for sure. SW asked her if she would ever take showers or baths while visiting her dad and she said, "sometimes." SW asked her if she would bathe alone and she said yes. She then said, "I really just don't want to see my dad anymore. I don't want to talk to him on the phone. I don't ever want to live with him and I want him to stop hurting all of us." She denied any other incidents of sexual abuse. (Court's Exhibit1)

DR-H733

Again, there was something for both parties in Isabelle's conversation with Ms. Wingler. For the Plaintiff, there was proof in Isabelle's statement that she didn't remember anything and that whatever she was repeating came from the Defendant who, the Plaintiff alleged, had manufactured the allegations with which she had tried to smear him during their divorce. For the Defendant, there was confirmation of what she had called the Plaintiff's "bizarre" behavior in her recitation of how he would sleep with Isabelle while in his underwear and kiss her and Lance all over, which they didn't like.

Ms. Wingler also interviewed Lance, writing afterward:

> SW asked him about his relationships with those he lives with and he said, "good." SW asked him about his father and he looked down and then proceeded to get up out of his chair and then kneeled on the ground and laid across the chair, facing away from SW. SW asked him if he felt more comfortable talking to SW while he sat on the floor and looked away and he said yes. SW asked him again about his dad and when was the last time he saw him and he said, "at school and he was no mean to my principal. He made my cry. He told my principal to stop giving him all this nonsense!" SW asked him what that meant and he said, "I don't know but he said it really mean!" SW asked him about his relationship with his father and he said, "I don't like him. He is so mean to everyone. He slammed my mom against the window and he hurts everybody." SW asked him if he ever told his mother that he and his father "have secrets" and he said, "yes I did because my dad have secrets with me that are so mean and nasty." SW asked him to explain that and he said, "he was touching my privates." SW asked him where his "privates" were on his body and he said, "the part I pee out of." SW asked him when this happened and he said, "I think in Florida but I don't know for sure if it was just in Florida. I think in Cleveland it happened too." SW asked him if Isabelle was around when he was touched by his father and he said, "yes, she was there but not around us. He did it once in the bed and she wasn't in the bed with us. He slept naked and I saw his privates and he touched me in the bathtub and he wasn't washing me when he did it!" He then went on the report when his dad touched him in the bathtub, his father was also not wearing any clothing and that neither of them said anything to each other. (Court's Exhibit 1)

At the conclusion of her investigation Ms. Wingler completed the "SUMMARY OF INVESTIGATION" form, checking the boxes that read: "INDICATED SEXUAL ABUSE, CIRCUMSTANTIAL EVIENCE NEEDING FURTHERCONFIRMATION". On January 2, CCDCFS issued a letter notifying the parties of that conclusion, which was reached without any direct input from the Plaintiff who scrupulously avoided being interviewed. Although the Plaintiff would tell Ms. Wingler in an email dated January 28, 2008 that: It was never my

17

DR-H733

intention not to meet with you…" the record indicates otherwise. Specifically, Ms, Wingler noted on January 2, 2008 that:

> Father resides in Florida. SW has had numerous phone and e-mail contacts with him since October 2007 regarding him coming to Ohio to be interviewed. SW offered him the opportunity to do this via phone call but he stated he wanted to be interviewed in person with his attorney. SW gave him numerous opportunities to schedule an appointment which he did and then canceled. SW emailed him schedule for the weeks of December 10th and 17th 2007, giving him specific days and blocks of time SW was available and his attorney, Roger Kleinman responded to SW on 12-11-07 stating "he would get back to SW re: appt. for interview. As of 1-2-08 SW has not heard from father or his attorney. (Court's Exhibit 1, page 196)

Even though there is no question from that paragraph or the correspondence in Ms. Wingler's records (Court's Exhibit 1) that the Plaintiff didn't speak with her about the children's allegations at any time prior to January 2, 2008 the Plaintiff nonetheless testified that he did talk to Ms. Wingler before she issued her report and that he told her the sex abuse didn't happen. After reviewing the Agency's records the Magistrate concludes that the Plaintiff's assertion to the contrary, he did not speak to Ms. Wingler before or after she made her determination that abuse was indicated and that he deliberately chose not to be interviewed.

The Plaintiff successfully appealed the indicated finding; the supervisor who was in charge of the review deciding that the report was unsubstantiated. She informed Plaintiff's counsel of her decision on May 2, 2008, telling him that:

> The question for this appeal is whether, based upon the totality of the information, this matter should be considered as an "indicated report" or an "unsubstantiated report." While reasonable minds could differ in circumstances when a young child recounts an event which occurred some time ago, my conclusion is that the allegations in this particular circumstance must be deemed "unsubstantiated". (Plaintiff's Exhibit 22)

The Plaintiff would trumpet the child's denial that he had been touched in his private area as well as CCDCFS' final determination as evidence that the Defendant created the allegation out of whole cloth in an effort to forestall his attempt to modify parental rights and responsibilities and to slander him in revenge for his having filed that motion. He also touted the September 17, 2008 decision by the Assistant Prosecuting Attorney to whom the matter had been referred by the detective from the County Sheriff's Department who was investigating the alleged incident that in the prosecutor's opinion there was insufficient evidence to present a case to the Grand Jury at that time because he felt:

DR-H733

The disclosure of possible sexual abuse is very limited and appears
to occur during normal bathing on a single occasion. The
Department of Children and Family Services originally ruled the
allegations indicated but after further review ruled that the
allegations were unsubstantiated. (Plaintiff's Exhibit 23).

Neither the Assistant Prosecuting Attorney nor the senior supervisor from CCDCFS
testified during the course of the trial with the result that is it impossible to determine what
material either individual considered during their reviews or the thought process that led them to
their respective conclusions. It is clear from the material compiled by Ms. Wingler, though, that
she found more than sufficient evidence to support her conclusion that the allegations were
indicated.

Since the social worker's conclusions were ultimately overruled by her supervisor and
because he was not prosecuted, the Plaintiff triumphantly concluded that he had never sexually
abused his children and that, in fact, the Defendant had made up the allegation as part of the
"trial strategy" that she employed in this matter. It was a theme to which he would return over
and over during the course of these proceedings; accusing not just the Defendant of fabricating
the allegations against him, but her counsel of acting inappropriately and unethically as well
because her counsel failed to adequately investigate the allegations and not only conclude that
they were false, but continued to press them herself and allow the Defendant to press them as a
basis for denying Plaintiff access to his children. (See for example Plaintiff's December 24, 2008
email to Dr. Mark Lovinger, Defendant's Exhibit EEE.)

The issue of what the Department of Children and Family Services did or did not do or
the conclusions that its personnel arrived at is a complicated one for many reasons. As indicated
earlier in this discussion, the supervisor who was assigned to conduct the appeal of the
investigating social worker's conclusion that the allegations of abuse were indicated did not
testify so it is impossible to know on what she based her decision to overturn the social worker's
conclusions. The only thing of which there is absolute certainty is that the Defendant and her
counsel were excluded from the appellate process. The Plaintiff was present, but he remained
silent throughout the proceeding. It was in keeping with the strategy he had followed from the
beginning of the investigation.

Instead, he pointed to his son's failure to disclose to the pediatrician that he had been
touched inappropriately as well as the statement his daughter made to the social worker that her
mother told her that her father had touched her and the result of the polygraph test that he took in
October 2007 to establish both his innocence of the charge that he inappropriately touched his
son and that the Defendant made up the allegation in a deliberate effort to keep him from seeing
his children. Those factors played no part in the conclusion by the investigating social worker
that the allegation of abuse was indicated. It is not clear from the supervisor's decision
overruling the social worker's finding how much weight, if any, she gave to those factors.

The important point is not that the Cuyahoga County Department of Children and Family
Services initially determined that the allegations of abuse were indicated and then subsequently
determined that they were not, but rather that this Court is not bound by any determination the

19

Agency may make. It doesn't matter if CCDCFS concludes that the allegations in a particular case are indicated or substantiated or unsubstantiated. Where the parties are before the Domestic Relations Court, as they are in this case, it is the Court's obligation to conduct an independent analysis of the evidence as determined by the Court and reach an appropriate conclusion based upon that evidence. That process involves looking not just at what the parties did or said during the course of the Agency's investigation, but also reviewing the allegations against the background that preceded the alleged disclosure by Lance in September 2007 and the testimony and exhibits presented during the course of trial.

The Plaintiff sought just such a review because he believes that it would not only exonerate him since it would establish beyond any question that not only is he innocent, but it would also prove that the Defendant either made up the allegation or coerced the child into making the statement. He should not have been so quick to seek such an examination.

One of the reasons he should have been more cautious is that the results of the polygraph, which may have played a significant role in the supervisor's decision to overturn the initial conclusion that the abuse allegations were unsubstantiated, are not entitled to any weight whatsoever. The Magistrate takes judicial notice that the results of polygraph examinations are not ordinarily admissible in Ohio as well as in most jurisdictions in the United States for a number of reasons that need not to be discussed at this time. It is enough to note that the system, which is designed to measure certain physical changes in an individual's body in response to certain questions, has yet to pass the Daubert test (Daubert –vs- Merrell Dow Pharaceuticals, 509 us 579, 113 S CT 2786, 125 L Ed 2d 469, 1993).

Beyond questions centering on the test's validity, there are issues concerning the examination that the Grievant underwent. Specifically, he was asked if he had "sexually abused" either his son or his daughter and whether he had ever "touched their private parts in an inappropriate manner". Both sets of questions allow the Plaintiff to interpret the words such that if he did not believe what he did was inappropriate or constituted sexual abuse he could answer "No" even though he had touched Lance's penis and the test might very well show no deception.

This brings up the other problem with the exam, which is that the examiner provided the answers to just four questions. He did not submit the raw data so it cannot be independently interpreted. More importantly, neither the Court nor anyone from CCDCFS nor the Detective who investigated the matter have any idea what was discussed between the Plaintiff and the examiner prior to the beginning of the test. The undersigned takes judicial notice that an individual does not simply walk into a polygrapher's office and begin answering questions without an extensive interview first taking place. The interview tells the examiner how to phrase the questions comprising the test.

It is especially key in this case to know exactly what the conversation was between the two in view of the way the questions were phrased, but also whether the examiner was aware of the background of the Plaintiff's relationship with the children, which would have required that he speak not just with the Plaintiff, but also consider outside materials and sources as well. That should have included speaking with the Defendant or at least reviewing the notes she made during the period leading up to the Virginia divorce. She submitted them to the social worker

DR-H733

who was assigned to investigate the abuse allegations (Court's Exhibit1). Read as a whole they reveal that on more than one occasion the Plaintiff act in a grossly inappropriately manner with the children. His conduct may not have been sexual in the sense that he intended to or did derive any sexual pleasure from it or that he intended that the children would. That, however, does not mean that he didn't engage in those acts or that his behavior was proper.

In that regard it is important to note that the Plaintiff has always loudly declared that he had never sexually abused the children. However, he never denied in Court that he engaged in the conduct outlined in the Defendant's notes or that he touched Lance's genitals when he bathed him. Further, for all of his breast beating about his innocence the record reveals that the Plaintiff scrupulously avoided being questioned by anyone from the Cuyahoga County Department Of Children and Family Services or from the Sheriff's Department about the allegations.

And for all his protestations of innocence; for all of his claims that he has never done anything inappropriate with the children; never behaved in an inappropriate fashion with them or touched them in an inappropriate manner the Plaintiff admitted while on the witness stand that he repeatedly invoked his Fifth Amendment right against self incrimination when he was deposed: refusing to answer whether he had ever slept naked with the children, whether he had ever touched Lance's private parts in the bathtub, if he had ever touched Lance's privates in the bed, if he had ever taken a shower with the children, if he had ever insisted that one or both sleep in bed with him and whether the children protested that his kisses them too much. Even more disturbing, the Plaintiff invoked his Constitutional right against self-incrimination when asked what he thought inappropriate touching was. It was, by any measure, a simple question; one that called for the Plaintiff to define what most adults would consider a commonly understood phrase. It was an easy task, yet the Plaintiff steadfastly refused to undertake it.

During the course of the trial the Plaintiff acknowledged that he had invoked his Fifth Amendment right not to answer those questions, but then added that he first denied those allegations and then and only then invoked his Fifth Amendment right against self-incrimination. The Magistrate can put no credence in that statement.

The Plaintiff is a lawyer licensed to practice in two or three states and the District of Columbia. He is proud that he has been involved in major cases including suits against powerful domestic and international adversaries as well as the government. It is impossible to believe that someone with his experience, with his training and his background would not have known that once he answered the questions, once he denied engaging in any of the activity he was asked about he could not invoke his Fifth Amendment right against self-incrimination because he had waived it. It is especially impossible to believe that he would not have been aware that he would have waived the privilege once he denied the allegations as his web site at the time proclaimed that one of the firm's areas of expertise was criminal law (Court's Exhibit 1).

The Plaintiff had every right to invoke his Fifth Amendment right against self-incrimination. If his were a criminal proceeding, that would be the end of the matter. Neither the Court nor a prosecutor could comment on or draw any inference from the Plaintiff's decision not to answer questions. This, however, is a civil proceeding. The rules that control the response to a party invoking his or her Fifth Amendment right against self-incrimination in a criminal case do

DR-H733

not apply here. Instead, the Court may draw an adverse inference from a party's decision not to respond to legitimate questions, and there is no way for the Plaintiff to argue that the Defendant was not pursuing a legitimate line of inquiry when her counsel asked about his behavior with the children. The Plaintiff chose not to answer those questions. That was his right. The Magistrate has the right to be concerned about that decision. And, as noted in the preceding paragraph, the Magistrate finds the Plaintiff's failure to define what he believed constituted inappropriate touching especially unsettling.

In view of all of the evidence in this matter the Magistrate must conclude that throughout the period of time while the Sheriff's Department and the Department of Children and Family Services were investigating the complaint that he had inappropriately touched Lance and while he was appealing the indicated determination as well as when he was deposed in 2008 the Plaintiff scrupulously avoid answering any questions concerning his behavior toward the children. In view of that history as well as Miss Wingler's findings and the material she cited in support of those findings, the undersigned concludes that the Plaintiff's protestations of innocence to the contrary, the Defendant had legitimate reasons to be concerned about the children's safety and the Plaintiff's conduct towards them, especially in light of his history as memorialized in her notes that were part of Miss Wingler's records (Court Exhibit 1).

The Defendant's notes along with Lance's allegation indicate that the Plaintiff acted inappropriately at times because of poor boundaries coupled with a sense of entitlement. Those attitudes are reflected in a series of letters between the parties' respective counsel beginning on November 22, 2005 and continuing through March 5, 2007. In the first of those Defendant's counsel complained that the Plaintiff:

> ... refuses to acknowledge certain boundaries and limitations with regard to his former wife. As such, I am hereby requesting that you advise Mr. Klayman that he is no longer welcome to enter Ms. Luck's residence.

After passing on the Defendant's complaints about the Plaintiff's repeated telephone calls, especially between 7:00 and 8:00 a.m., Defendant's counsel wrote:

> The most serious issue which we need to discuss involves Mr. Klayman's sleeping arrangements. Apparently, Mr. Klayman has a one-bedroom apartment. He sleeps in the same bed with both Isabelle and Lance when the children spend the night at his residence. It is my further understanding that this practice also occurs in Florida, although there are two bedrooms at Mr. Klayman's condominium.

Finally, Defendant's counsel noted:

> Unfortunately, until such time as Mr. Klayman obtains suitable sleeping arrangements, Ms. Luck will not agree to any further

DR-H733

22

overnight visits by the children.  Should Mr. Klayman dispute my client's decision…

Finally, Mr. Klayman has, once again, provided Isabelle with a cellular telephone.  Ms. Luck has repeatedly told Isabelle that she is welcome to use the telephone with Mr. Klayman, or when she is in his home; however, Ms. Luck does not believe that an 8 year old child should have a cellular telephone and, as such, will not allow the telephone to be operational when Isabelle is in her custody. (Defendant's Exhibit G)

The issue of the cell phone would loom large for the Plaintiff who would use the Defendant's "confiscation" of the cell phones as one of the basis for the suit he filed against the Defendant, her husband and her mother in a Florida court.

Twenty-four days later Defendant's counsel sent a second letter to Plaintiff's counsel regarding the Plaintiff's behavior.  In that one the Defendant's counsel wrote:

**Unfortunately, it appears that Mr. Klayman simply will not honor or respect Ms. Luck's wishes with regard to her home, and her privacy.**  Specifically, it is my understanding that when Mr. Klayman picked up the children last Friday (December 9, 2005), and **when he returned the children on Sunday evening, Mr. Klayman insisted on coming into to Ms. Luck's home, lingering around the home and refusing to leave** when asked to do so by my client…

Additionally, there will be no further tolerance of Mr. Klayman's trespassing onto my client's property; please advise Mr. Klayman that if he steeps into Ms. Luck's home, the police will be notified and further legal action will be taken.

**I am disappointed at Mr. Klayman's total lack of respect for Ms. Luck.** (Emphasis added) (Defendant's Exhibit F)

A little over five months later Defendant's counsel sent yet another letter to Plaintiff's counsel in which, along with discussing Isabelle's upcoming Communion, she demanded that Plaintiff's counsel:

Please also remind Mr. Klayman that he is not to come to Ms. Luck's home after the First Communion.  Unfortunately, based on Mr. Klayman's most recent conduct, he is not welcome to attend the celebration at my client's residence.  Please inform Mr. Klayman that if he does return to the property, the police will be summoned and charges will be pursued.  (Defendant's Exhibit E)

DR-H733

23

On March 5, 2007, Defendant's counsel wrote directly to Plaintiff about certain events that she alleged took place at the Defendant's residence when the Plaintiff last had the children. Specifically, Defendant's counsel wrote:

> Ms. Luck has relayed to me a number of unfortunate incidents which apparently occurred while Isabelle and Lance were last with you in Florida. Apparently, you have provided "R" rated movies to the children, encouraged them to not be "prudish" and to watch the movies, and urged the children not to tell their mother about the movies. Specifically, it is my understanding that you have provided the children with a "Geisha" movie as well as "Miami Vice." Additionally, an incident was relayed to my client when your friend, Alice, took your young daughter to Victoria's Secret and purchased thong underwear for her. It was also relayed to my client that your friend and you encouraged Isabelle to wear this underwear as her current underwear was "old ladyish" and "pulled up to (her) neck."
>
> While these are only a few of the incidents relayed to me, Ms. Luck is extremely concerned about your choices for the children and what you, apparently, deem appropriate parental behavior. As such, Ms. Luck is hereby requesting that you enroll in a parenting class to assist you in learning what is age appropriate for your children, and to assist you in your parenting skills.
>
> Unfortunately, until there is some assurance that your choices as a parent are more appropriate, Ms. Luck is not comfortable in allowing the children to proceed to any type of overnight visitation with you. (Defendant's Exhibit D)

A little over two months later the Defendant reversed herself, her counsel noting that Defendant had agreed that the children would spend Memorial Day weekend with him, but specifying that he had to pick the children up from Pizzazz, a restaurant in Fairmount Circle in University Heights. In spite of previous letters from Defendant's counsel complaining about Plaintiff entering her home without permission and refusing to leave, the Plaintiff seemed unable to comprehend why he couldn't come to the house to pick up the children, writing the Defendant that:

> I intend to exercise my visitation rights next weekend and pick them up in the only place that you will allow me to, the public parking lot of Pizzazz **(another method of trying to harm and humiliate me as previously documented)** ... (Emphasis added) (Plaintiff's Exhibit 101)

In simple terms, he saw himself without fault. Instead, the Defendant's decision to exclude him from the house had absolutely nothing to do with his behavior, but was simply

24

DR-H733

another indication of her animus toward him and an example of her efforts to marginalize his role as the children's father. When he subsequently testified about the Defendant's decision to prohibit him from coming to the house to pick up and drop off the children the Plaintiff was visibly angry, making it clear to the Court that he felt put upon that he had to pick them up and drop them off at a nearby restaurant.

The Defendant's decision to continue overnight visitation was based on being convinced that:

> ...appropriate sleeping arrangements are in place for the children, and that the other issues which have previously been topics of discussion are no longer at issue (that is, the children viewing "R" rated movies, inappropriate and disparaging remarks about Ms. Luck, etc.) (Defendant's Exhibit C)

The Defendant's complaints about the Plaintiff's lack of boundaries, his disrespect for her, and his sense of entitlement outlined in the preceding paragraphs mirror many of the complaints that the Defendant made about the Plaintiff in the notes she typed in 2002 and 2003 that she turned over to the social worker who was investigating Plaintiff's inappropriate touching of Lance. A review of those records (Pages marked 156-173 of Court's Exhibit 1) reveal that Plaintiff, according to the Defendant, repeatedly entered her home without her consent, repeatedly refused to leave and physically assaulted her. Of greater significance, her notes contain numerous incidents of alleged inappropriate behavior reported by Isabelle to her mother.

These include Plaintiff wanting to kiss Isabelle on the lips and then trying to make her feel guilty when she wouldn't (Page 157), Isabelle telling her mother that the Plaintiff slept with her in his underwear and T-shirt and that his "belly" was poking out and sticking out of his underwear (Page 158), Isabelle telling her mother that she sees her father's belly all the time as well as seeing him get dressed and go to the bathroom and that she touches his belly in the bath with her feet, telling Isabelle that she is luscious and that her "Pop Pop i.e. her grandfather is in the hospital because he hurt his pee pee", telling Isabelle that she is a "babe" (Page 165), that Isabelle had to "learn how to kiss a boy", and that she reported to her mother that she washes her father's back, tummy and privates when they're in the bath together (Page 166). Specifically, the Defendant's notes contain the following entries:

4.          5/26/02 - day LEK physically hits me.

. . .

> I tell him I am living in a prison and that no one would put up with it. I tell him that he needs help - he is crazy.

> He says he would think I would thank him for security and that I am an "ungrateful bitch."

Isabelle is in back seat crying to stop. He then grabs my arm and than puts his arms around my neck and shakes me and bangs my head repeatedly against the window. He says "You really are a fucking bitch. I hate you. You are nasty."

I tell him he is hurting my neck, it's hard to breathe. Isabelle screams "Don't hurt my mommy. Don't kill my mommy. He said "Mommy made me do it."

Isabelle says "No, Daddy, God saw you and you are bad."

He releases me and starts driving home. We pull in the driveway and he puts his hand through the car radio, breaking it. He says he controlled himself because he really wanted to "beat the shit out of me."

We get inside and he shakes his bloody hand at me and makes me tell Isabelle is was half my fault. I do this so he will stop. I take Isabelle and Lance upstairs and lock my bedroom door. He tries to open it with a knife but gives up and leaves the house.

He returns later and tells Isabelle "Daddy probably broke his hand. Poor daddy, he has to go to the hospital. Will you kiss Daddy's hand. Look Isabelle, Daddy's hand is hurt and swollen. Will you take care of your Daddy."

5/27/2002

. . .

We go down and I put a Little Bear video on for the kids. LEK says he is leaving. Isabelle puts blocks on the steps and she will block him in. LEK says "if you kiss me on the lips I won't leave." Isabelle says "No, I do not want to kiss your lips. I'll kiss your cheek."

LEK says "No, I want a kiss on the lips, no on my cheek." Isabelle says angrily "I said no kissing your lips Daddy. Mommy says I don't have to." LEK tells her "Fine, Daddy is leaving because you hurt Daddy's feelings."

I can't bear it anymore and I tell him why don't you take what you can get - she offered a kiss on the cheek. Now she feels bad. Why are you doing this to her?"

DR-H733

26

LEK says "Why do you interfere in everything I do with my daughter. That is how I play with her. I know you have no sense of humor and never understood how I play with my daughter. You think you know it all when it comes to kids. You never once told me I did anything right with them. Have I? Have I?" He is spitting in my face.

I say "Ok, yes you have."

LEK says "Name one instance, can you?"

I say "NO" He spits on me and leaves.

5/28-5/29/2002
He calls me and is laughing that his hand is broken. He says "Let me tell Isabelle my hand is broken, she will get a kick out of it."

8/5/2002
LEK comes over and gets close to my face and tells me "you better not have sex with some guy on the couch in front of our kids."

Isabelle comes back from spending night with LEK. Tells me Daddy slept with her in his underwear and T-shirt and his "belly" was poking out and sticking out of his underwear.

9/3/2002
Isabelle punches Larry and gives him bruised eye. He was "kissing me to (sic) much Mommy."

9/7/2002
Isabelle tells me she sees Daddy's "belly" all the time. She sees him get dressed and go to the bathroom. (See notes).

9/8/2002
Isabelle tells me about Eduardo in the evening.

9/9/2002
I call CPS in morning. Larry has police come.

10/2/2002
After school - Isabelle tells me she touches Daddy's "belly" in the bath with her feet.

10/4/2002
. . . He follows us there and runs after Isabelle with bug spray. She tries to run away because he is spraying it in her eyes. She is crying

27

DR-H733

and asks him to stop. I tell him to stop, the circus is inside. He tells
Isabelle that "she could die if a mosquito bit her." She said she will
never go outside again.

10/5/2002
We are still under quarantine. He is going to Seattle for a trial. We
are not to leave the house today or tomorrow under any
circumstances. Tells me to watch out for malaria, make sure my
doors and windows are locked at all times, the alarm is always on. I
tell him Isabelle has a bday party. He tells me he will take legal
action against me if I take her out of the house before the sniper is
caught.

10/6/2002
LEK tells me if I send Isabelle to her preschool he will take legal
action against me. We are not to leave the house until the VA sniper
is found. My bodyguards will bring us all the food we need.

10/8/2002
. . . LEK calls me a "liar" and tells me I will pay for "disobeying"
his rules.

10/10/2002
Quarantined . . .

10/11/2002
I take Isabelle to school against LEK's wishes.

10/16/2002
LEK calls in the morning and asks "Why in God's name are you
sending her to school again. You are a terrible mother." Tells me
the bodyguards are to form a human circle/shield around Isabelle
when she goes into building. . .

10/20/2002
We are outside playing and LEK walks up. Tells me their Red Flyer
tricycles are a "piece of shit" in front of the kids. He tells me to stay
on the left side of the driveway when playing - shield them from
street. . . Isabelle says "Daddy, can I take the garbage cans down
with you like I do with Mommy?" LEK screams "NO" at Isabelle. .
. Isabelle is crying and saying "stop yelling at Mommy. You always
do"

10/22/2002
. . . He tells me "if you ever talk about me fucking someone you and
your mother will be so fucking sorry for the rest of your life."

DR-H733

28

10/23/2002
Telephone call in the morning from Larry. He repeatedly threatens
me.


11/1/2002
LEK calls. He will pick up kids. I tell him I have a hair appt. but
my brother Tim will be here with the kids. He says "Please tell me
if you are leaving my kids alone with Tim. I have a right to be
there. I have a right to know. He has no experience with kids.
Make sure he knows the rules. I don't want him taking care of my
kids like your brother, Chris.

11/3/2002
8:30 am - LEK drops kids off because he has a "national" radio
show. He can't take them . . . They don't behave in public and it is
all my fault.

5:30 pm - LEK returns and just walks in the house. Says "Who
want to go to the candy story?" Isabelle realizes I am not going and
starts screaming and kicking Larry who is holding her. She does not
want to go without me and want "help". He tells me to "kiss his
ass" and walks out with her and just leaves Lance.

11/9/2002
In the morning I tell LEK my brother, Oliver, is here. He accuses
me of plotting legal strategy against him. Isabelle cries for 3 hours.
Does not want to go to "clubhouse."

12/4/2002
Tells Isabelle she is 'LUSCIOUS." He tells her that her pop pop is
in the hospital because he hurt his pee pee.

12/5/2002

. . .


LEK says to Isabelle "You are a babe." Isabelle says "I am not a
baby." LEK says "I know, you are a babe."


Before Isabelle goes to bed she asks me if Lance ever hurt Daddy's
eye. She said she hurt his eye once in Florida when he said
something to her she didn't like. She said she is "scared of him
sometimes." I ask why. She said "he is so big"

12-14-2002

29

DR-H733

Isabelle says to me "I am scared of Dad. I feel safe with you." She tells LEK she does not want to go to the clubhouse tomorrow. LEK says "I am not impressed Isabelle."


12/16/2002

. . .


I say to leave me alone and stop tracking me please. He says he is not tracking me. LEK tells me we live in the kind of world of smallpox, anthrax, and dirty bombs going off in malls.

I tell him to stop being paranoid and talk to a shrink. He tells me to think about the well being of the kids, not how much I hate him . . .

12/20/2002
LEK says it might be good for Isabelle to "learn how to kiss a boy." See notes. He asks Lance if he goes pee pee on the floor. Lance says no, in my diaper.

12/23/2002
Before LEK comes over I have Isabelle and Lance in the tub. Isabelle was washing Lance's back with a washcloth and said she loves to wash people. She says "I wash my Dad - back, tummy, privates." I ask her when she does this and she says "only at the clubhouse and that's Daddy's secret." I ask her why and she says "because I like it."

I ask if he has any clothes on. She says sometimes he wears a bathing suit or underwear . . .

7:40-8:15 pm LEK

. . .


2-It is not OK for people to tell her not to kiss her Dad. That daddies and daughters kiss each other all the time and that is normal and what you are supposed to do.

3-He loves her so much, protect her, always be with her.

4-They have their own special relationship.

12/26/2002
LEK follows me and Isabelle upstairs. Tells me, "I am not trying to be difficult but I talked to your mom yesterday about putting knives away and they are still out." I tell him we have taken the butter

30

DR-H733

knives out of the drawer and put them out of the childrens reach a long time ago.

LEK tells me Lance charged at him with a plastic screwdriver from his toy bench and says "can you imagine if that was a knife and he hurt Isabelle. Lance is out of control."

12/28/2002
LEK walks in at 9:00 am to interview a potential babysitter.

. . .

LEK tells babysitter that Isabelle was molested in her own house by a boy.. Tells her doors are kept locked, stay in house, keep knives hidden (Lance is out of control - charged at him with a plastic screwdriver).

. . .

She should also get to know the local police dept. as it is a dangerous world.  She should know an escape route/bombs/terrorism/very concerned about security and guard go with kids everywhere

Jan 2, 2003
Isabelle is playing with her dolls.  LEK tells her that they had to get her out of Mommy with a crowbar and that she "pooped in Mommy's tummy".  He continues that she was hard to get out and Mommy had to squeeze her out.  He wants to show her a video of her birth.  He says Lance came out easy, he just "slid out of Mommy" and calls Lance "poopie-face"

1/5/2003
Returns with kids at 1:40 pm.  Claims he does not sleep in bed with kids anymore.  Isabelle says not true.

1/7/2003
. . . Calls Lance "poo poo head", "poo pee puss" and "puss head"

ISABELLE TELLS ME DADDY SMELLS HER DIRTY UNDERWEAR . . . Daddy does a lot of things in the bathroom.  He's a little weird."  I ask what things?  And she says she does not want to talk about it.

1/8/2003

DR-H733

LEK enters home and says "Hi Poopster" to Lance. He goes upstairs and ask (sic) where his picture is?

. . .

In front of Isabelle LEK tells me I caused all this. It is my fault he has a problem with her. All girls have pictures of their Dad in their rooms . . . We are in her room and he pulls open her desk and tries to find paper. She is crying to stay out of her artwork . . . Isabelle goes to bed crying and says her heart is broken in two.

Jan. 26/2003 - Larry tries to remove kids from house and hits me.

. . .

He asks me again if I agree to answer the phone at all times. I say NO, there are times when I simply cannot answer the phone. He can leave a message and I will call back.

In that case, he says he will take the kids right now and he goes toward the tub to get Lance out. He pulls the kids out of the tub naked with no towel. They are crying and Isabelle is screaming "no Daddy, don't steal me away . . . I try to get to the door to get out so I can get a phone. He slams it and blocks it. I ask him to move and he refuses and slaps me across the face. He tell me if I do not answer the phone every time he calls within 10 minutes he will call the police every time. He says he will go to court first thing in the morning and take the kids away from me and remove them from the house. He says he can prove it because I leave knives out, doors open, Isabelle was molested and I have a racist mother.

I ask him again to leave or I will call the police. He goes downstairs and comes back up with knives in his hand and he is waiving the knives in my face. I am afraid he will cut me or the kids I am holding. He waves the knives around me and the kids and says it will be "exhibit A" for the court in the morning and he leaves. Isabelle sleeps with me that night and wakes up several times scared of knives and Daddy.

2/2/2003
LEK leaves for California. Calls 23x

2/7/2003
LEK back in town. Calls 17x

2/15/2003

32

DR-H733

LEK picks up Lance and tells me it was an abomination how Isabelle treated him last night and I better do something - that this is unacceptable. I better intervene and support him instead of just sitting there like a "dumb ass" I better take some responsibility or else.

3/6/2003
. . . "That is no way to treat your dad when he as a gift for you." I turn off the video and try to get her to talk to him before he blows up. She does not want to. He says "Fine, Isabelle, I am leaving, you are not nice to your dad" and storms out. I tell him to call before he walks into the house, he does not live here anymore. He says "Go to hell bitch" in front of Isabelle. Isabelle walks around house saying "go to hell bitch"

3/16/2003
Lance is in the bath and says to me "I have little boobies like Daddy. That's what Daddy says in the bathtub."

3/22/2003
LEK calls at 10:30 am. He tells me Isabelle told him a story "Once upon a time there was a daddy who kept kissing his little girl. The little girl asked him to stop and stop, but the Daddy could just not control his lips." LEK asks me "Where do you think she got this from? . . . I tell LEK that I witnessed many, many times him kissing her, she says stop, he says "I just can't control myself. I love you too much." LEK says not true.

3/29/2003
. . .

LEK comes back at 6:30 p.m. with Sandy, Jose and their 7 year old grandson David. LEK tells Isabelle "David is already in love with you. He thinks you are beautiful. He is really handsome. He can be your **Latin lover**."

5/24/2003
LEK returned with Isabelle at 5:00 pm. Isabelle tells me Daddy kept telling her "I know you love me the best."

5/26/2003
. . . He tells Isabelle how beautiful she is "I can't believe my girl is so beautiful. I just love you so much. I know you love your Dad.". . . Lance looks at me and says "Daddy can't help himself." I ask Lance about what and Lance says "He can't stop kissing me all over my head. Daddy love me so much."

33

DR-H733

8/31/2003
Isabelle is taking a bath in the pm. She says "Mommy, privates are yucky. Like Daddy's when I was 4 his privates hung out of his underwear and I played with his privates in the bathtub."

I ask Isabelle where she was when it happened and she says "Daddy's clubhouse." I ask her what else happened at Daddy's clubhouse and she tells me she pulled hairs of out his body because he asked her to. I ask her where and she says all over his legs and his "boobies" I start to cry and she says "don't cry mommy, I didn't hurt him."

I have talked with Isabelle about what is right and wrong touching.
(Emphasis in the original)(Court's Exhibit 1)
.....

The Plaintiff would repeatedly refer to those allegations as "smears" created by the Defendant and her attorney. He did not comment in the interview as to specific allegations, but they cannot be ignored because they lend credence to the complaints the Defendant made through her counsel from November 22, 2005 through March 2007 and to the Plaintiff's behavior up to the time the trial ended.

There are three incidents that took place over that period of time that are especially worth noting. The first took place on September 10, 2007 when the Plaintiff and his then wife, Diana, appeared unannounced at Gesu, the children's school, with two suitcases of gifts; one for each child. The Plaintiff told the school secretary to have children brought in so he could talk to them. The secretary, in turn, summoned the principal, Sister Linda Martin. She testified that when she went to Lance's second grade room to take him to his father, Lance did not want to go. After being assured by Sister Linda that she would remain with him, Lance went with her to meet his father and Diana in the front hall of the school. Sister Linda went on to testify that Lance showed no emotion when his father hugged him.

She also stated that although the Plaintiff had brought a number of gifts for Lance, which he showed to the child and which Sister Linda calculated cost at least $150.00 without the suit case, Lance showed no interest in any of the items and asked to go back to his classroom. At that point, according to the notes that Sister Linda made of the incident (Defendant's Exhibit KK), the Plaintiff pulled Lance to him and hugged him and asked for a kiss; telling him that he loved Lance and he was Lance's real daddy. He also said that he was not trying to take Lance away from his mother and again reiterated that he was his real father. He also asked Lance how his arm was.

Diana Klayman then asked if the Plaintiff could see Lance alone. Sister Linda stated from the stand that she told the Plaintiff that Lance had told her he wanted to have her present while his father was there. She further testified that in response the Plaintiff called her a liar in front of Lance, who she sent back to class (see also Defendant's Exhibit KK). She subsequently had a second conversation with the Plaintiff that began with him apologizing for calling her a liar. At

34

the end of the conversation, during which Sister Linda's testimony and notes reveal the Plaintiff spent considerable time "tearing down the mother" and telling her why the Defendant was a "bad mother", he kissed her on the cheek. Asked why he did that the Plaintiff told the Court that he was trying to "show her affection". He then went on to describe how this was acceptable in his wife's culture. (He testified that she is of Columbian descent.)

The incident is particularly revealing for two reasons. The first is that the Plaintiff crossed the line when he kissed Sister Linda. Whether it is true that kissing a nun is acceptable in Columbian culture, and there is absolutely no evidence that it is, the Plaintiff wasn't in his wife's culture. More importantly, neither was Sister Linda. The Plaintiff had just met her for the first time that day and yet he saw nothing wrong with kissing her, albeit on the cheek. It was an invasion of her personal space, one that was unwanted and unwarranted. Sister Linda clearly found the Plaintiff's act disturbing, but he didn't. He, in fact, seemed to have no understanding why she, a nun, would be upset by a male she just met kissing her.

This brings up the second and more significant point, which is that the Plaintiff would not recognize let alone acknowledge that he had acted inappropriately. There is no question from both the Plaintiff's testimony as well as his demeanor when he testified that in his mind he had done nothing wrong when he kissed Sister Linda. His attitude, as he made manifest by his words and bearing, was that as long as he felt justified in what he did he had every right to act in the fashion that he did and there was no reason for him to apologize for his actions. If there was a misunderstanding or a problem it lay not with him, but with Sister Linda.

The other reason to focus on the incident is the Plaintiff's attack on Gesu School in general and Sister Linda's character in particular. She was someone who stood in his way when he attempted to see his children at school. For that she earned his enmity which manifested itself in his accusation that she was prejudiced, telling her and later the Court that she had looked down on his wife because of the color of her skin. Except for the Plaintiff's word, which is extremely suspect, there is no evidence of any kind to support the allegation. If anything, Sister Linda's testimony as it relates to her involvement with a program in Honduras belies the notion that she is prejudiced in any way toward people whose skin is darker than hers.

Having made the claim of bias based on his wife's skin color, the Plaintiff subsequently undercut it when he wrote in another lawsuit involving the Defendant and her counsel that Diana Klayman is "not dark skinned" (Defendant's Exhibit IIII). If she isn't then there was obviously nothing to distinguish her and no basis for Sister Linda to look down on her because of her skin color, an allegation for which there is absolutely no basis in reality.

The Plaintiff's contention that Sister Linda that was silently bigoted would metamorphosize into a much broader attack on her when, on August 8, 2009 he filed suit against Gesu in a Miami, Florida Court (Defendant's Exhibit TT). In Paragraph 6 of his complaint the Plaintiff alleged that:

> Anti-Latin remarks have indeed been published by Sister Linda
> Martin about Plaintiff's wife, who is a U.S. citizen but also proudly
> of Columbian origin.

DR-H733

How the Plaintiff came to that conclusion is an absolute mystery as it is an allegation without any support whatsoever. There is no evidence that has ever been introduced in this proceeding or anywhere else the Plaintiff could point to that established that Sister Linda ever commented about Diana Klayman after she compiled her notes let alone "published anti-Latin remarks". The Plaintiff expanded his attack on Sister Linda later in his testimony, declaring that she behaved in a way that was not only racist, but anti-Semitic as well. Again, it is impossible to discern much less understand the thought process that lead the Plaintiff to conclude from Sister Linda's actions on the day they met that she was anti-Semitic.

It would be one thing if she had been wearing an SS uniform complete with swastika or that she was carrying a placard that read "Death to all Jews", but she wasn't. There was absolutely nothing about her demeanor or dress or words as the Plaintiff described them that would lead a rational person to conclude that she was anti-Semitic. The Magistrate finds, instead, that those claims are simply another example of the Plaintiff demonizing those who do not agree with him or who refuse to allow him to act as he believes that he has a right to

That penchant took a decidedly absurd turn later on in Paragraph 6 when the Plaintiff declared that:

> The head clergy (at GESU), which (sic) strangely call themselves "Reverends," including but not limited to Rev. Lorn J. Snow, exhibit the demeanor of being outwardly gay... (Defendant's Exhibit TT)

It is no surprise that the Plaintiff never offered to describe the priests' behavior or provided any explanation of what he meant when he said that "Reverend" Snow's demeanor was outwardly gay. It may be that he felt that such specifics were unnecessary because the phrase conjures up a picture that is recognizable by everyone. If that was what the Plaintiff thought, he was wrong. His comment is stereotyping of the worst order. It would not be the last time, though, that he would accuse someone who he viewed as standing in his way as a homosexual.

The Florida complaint goes on to allege that Sister Linda "confiscated" the gifts that he brought the children and that the school teaches that Jews don't go to heaven and "other anti-Semitic" doctrines. The latter is a particularly strange allegation since 2007 was not the first year that the children had been attending Gesu. Somehow, though, the Plaintiff would have the Court believe that he didn't become aware of the school's alleged doctrines regarding Jews until then. The only other possible explanation for the failure to raise the issue earlier is that he didn't care what the school taught until he launched his attempt to obtain custody of the children. He also alleged that he was concerned:

> ....about the potential for child abuse, particularly in this parish of the Cleveland Diocese, which is infamous for its tolerance of pedophilia by many of its priests, whose names have been secret kept (sic) from the media....(Defendant's Exhibit TT)

36

DR-H733

As of the time he testified the Plaintiff failed to offer anything to back up those assertions or to even tell the Court when his concern about the children's potential contact with pedophile priests arose.

Equally disturbing, but in another way is the Plaintiff's claim that Sister Linda "confiscated" the presents that he brought the children and that she stood in the way of his seeing them. The Magistrate finds that the Plaintiff was incapable of comprehending that by showing up unannounced at the school and demanding to see the children as well as bringing them presents he would disrupt their day. That lack of understanding is another pattern that repeats itself throughout these proceedings.

So too is the Plaintiff's misrepresentation of events. He repeatedly accused Sister Linda of "confiscating" the gifts that he brought for the children. The word means to seize something, which is not what happened. The children refused to take the suitcases and the gifts. It was their decision not Sister Linda's. She didn't rip them out of the children's hands or take them away from them or tell the children that they could not take them. She eventually held them at the school, but only after talking to the children who had refused to take them. The Plaintiff knew that she had no hand in that because he was standing in front of the children when they refused to take the gifts. There is absolutely nothing in the Plaintiff's testimony that contradicts that sequence of events. Sister Linda eventually handed the suit cases along with the gifts back to the Plaintiff when he returned a second time. In the face of that history, only the Plaintiff's imagination could conclude that Sister Linda had confiscated the suitcase and presents.

By the same token, there is absolutely nothing besides the Plaintiff's suspicions that:

> .... Plaintiff's former wife gets special treatment from Gesu Parish
> School because of (sic) her family has donated money to the
> affiliated church, causing Gesu Parish School to discriminate
> against plaintiff and his Latin wife, Diana.

While the testimony established that the Defendant and her family have been members of Gesu Parish for years, there is no evidence that they are heavy contributors or even that whatever monies they have donated won them special status with Sister Linda.

If she did not behave toward the Plaintiff as she did toward the Defendant, it wasn't because of money. Rather, her testimony reveals it was the Plaintiff's behavior which included calling her a liar in front of Lance in the hallway, kissing her, disparaging the Defendant and failing to understand why trying to see the children at school during the school day was not, in her opinion, a good idea because it would interfere with their learning environment that caused her to view the Plaintiff in a less favorable light than she viewed the Defendant.

The second example of the Plaintiff's failure to observe proper boundaries occurred late in the trial when the undersigned found him in contempt for failing to follow the Court's instructions. It was a step taken only after the Plaintiff was given every opportunity to comply with the Magistrate's instructions. By way of explanation for why he held the Plaintiff in contempt the undersigned found:

DR-H733

.... that the Plaintiff is an attorney who has been or is licensed to practice in the States of Florida, Virginia and Pennsylvania and in the District of Columbia. The Magistrate further finds that the Plaintiff was repeatedly admonished, especially while he was on cross-examination, that he was to only answer the questions that were put to him and not to go beyond the questions by testifying to issues that were not raised by the question or were beyond the scope of the question or by making comments about the Defendant or her counsel.

The Magistrate further finds that at one point after again being admonished by the Magistrate to only answer the questions put to him the Plaintiff argued with the Magistrate, telling the Magistrate that he had a right while under cross-examination to explain his answers. He was explicitly told that he did not and was again told to only answer the questions that were put to him. He was further told at that time as he had been advised before that if his counsel deemed it necessary to go into those matters he would have an opportunity to do so on redirect examination.

The Magistrate further finds that after numerous attempts to force the Plaintiff to adhere to the rules of court he advised the Plaintiff on October 27, 2009 while the Plaintiff was still under cross-examination that if he again failed to answer a question that was put to him while on cross-examination and instead tried to elaborate on the answer he would be held in contempt.

The Magistrate further finds that in spite of that warning and being further advised that he should only answer the questions as they were asked of him the Plaintiff continued to ignore the Magistrate's instructions and answer as he liked, testifying to things that were beyond the scope of the question that he was asked.

The Magistrate further finds that just before the Defendant's counsel was to start her recross-examination of the Plaintiff the Magistrate explicitly warned the Plaintiff that he was only to answer the questions that were put to him and not to add anything else.

The Magistrate further finds that in spite of that warning and in spite of all of the prior instructions and admonitions from the Court the Plaintiff failed and refused to follow the Magistrate's instructions and warnings and continued to testify as he pleased.

DR-H733

The Plaintiff, in other words, refused to recognize that he was bound by the rules. Further, he made it clear to the Court by his facial expressions in reaction to the Magistrate's repeated admonitions that he considered his behavior not just appropriate, but justified and the Magistrate wrong to challenge him. In simple terms, he wanted to change the rules of the game to suit himself and refused to acknowledge that someone could tell him he couldn't or that he did anything wrong when he repeatedly tried to.

The third, and far more disturbing example of the Plaintiff's attitude, occurred at 10:10 p.m. on Saturday, July 26, 2008 when the Plaintiff sent his picture along with an email message that read: "Boo!" to the Defendant's counsel (Defendant's Exhibit M). Given an opportunity to explain why he sent the message the Plaintiff told the Court that he was just trying to "create some humor". The idea that sending Defendant's counsel his picture and the word "Boo" late on a Saturday night was funny is so utterly absurd, so ridiculous that it is not worthy of any consideration whatsoever. The Magistrate finds, instead, that it was a deliberate violation of the April 10, 2008 order by this Court that:

> .... so long as Mr. Klayman is represented by counsel, only his counsel may question and cross examine witnesses, make objections, present arguments and **communicate with opposing counsel.** (Emphasis added)

There is nothing complicated or obtuse about that phrase. Neither is there anything confusing about the language. The words are simple, straightforward and easily understood; especially by someone with the Plaintiff's education. They unequivocally declare that the Plaintiff is to have no direct contact with the Defendant's counsel. In spite of that admonition he did and then tried to justify his violation of the order by claiming that he thought it only forbid communicating with her while the two were in court.

Besides the obvious misreading of the entry the Plaintiff subsequently sent an email to Defendant's counsel on November 10, 2008 that completely undercut that claim. In it the Plaintiff implicitly acknowledged that the ban applied to him regardless of location by telling Defendant's counsel that "Roger is on vacation, so I am communicating directly with you....". (Defendant's Exhibit DDD) Obviously, if the Plaintiff really believed that the April 10, 2008 entry only prohibited him from communicating with the Defendant's counsel when the two were in court he would have had no reason to try to justify his violation of the order on the basis that his counsel was unavailable.

The April 10, 2008 entry grew out of the Defendant's effort to clarify the Plaintiff's role. At that point he was claiming a dual status; pro se and co-counsel. After considering the issue Judge Russo concluded that so long as he was represented by counsel he could not also participate in the capacity of a pro se litigant. Rather than accept the Judge's decision, the Plaintiff filed an interlocutory appeal on April 15, 2008 challenging it. Six day after he filed that action he filed a second appeal in which he alleged that the trial court erred when it unsealed the records of the parties' Virginia divorce. On November 13, 2009 the Court of Appeals for the Eight Appellate District rejected both arguments (Court of Appeals Nos. 91298 and 91317).

DR-H733

As to the Plaintiff's claim that he could act as co counsel and pro se, the Appellate Court noted that Attorney Roger Kleinman had appeared on the Plaintiff's behalf on December 4, 2007. Of greater significance the Court of Appeals noted that:

> The record shows that appellant interrupted his own
> attorney during depositions and, in some instances, instructed a
> deponent on how or when to answer. Appellant obstructed
> reasonable discovery requests by filing countless motions to quash
> and by failing to produce documents.

While that observation was not the sole basis for the Court of Appeal's opinion, it obviously played some part in the panel's decision to support Judge Russo's determination that the Plaintiff could not act as pro se co-counsel.

The rulings could not have been clearer, yet the Plaintiff refused to accept that they applied to him, emailing the Defendant's counsel as late as February 17, 2009 that:

> ...... I am not prohibited from communicating with you. I have
> First Amendment rights and I am co-counsel, not withstanding the
> court's order that I cannot participate at trial, which is before the
> Ohio Supreme Court (Defendant's Exhibit R) (The Ohio Supreme
> Court denied the Plaintiff's appeal)

The two sentences highlight the theme that runs throughout so much of this case, which is the Plaintiff's belief that so long as he engages in the behavior he is justified in whatever he does.

On June 26, 2009, just three days before this matter was scheduled to go to trial, the Plaintiff opened yet another front in the war by filing an action in the Federal District Court for the Northern Division against Magistrate Mills and the Honorable Anthony J. Russo. Captioned "Complaint For Equitable And Legal Relief" and docketed as Case No. 09 CD 1459, the Plaintiff maintained that his was an action for declaratory judgment in which he maintained, among other things, that neither Magistrate Mills nor Judge Russo had taken any action for nearly two years to enforce the marital agreement which requires visitation and contact between the Plaintiff and the children (Defendant's Exhibit III).

The fact that his initial counsel's schedule precluded a quick trial on the merits of the dispute and that his interlocutory appeals stopped the Court from proceeding doesn't seem to have crossed the Plaintiff's mind. His complaint about the delay is yet another example of the Plaintiff's belief that everyone else other than him is responsible for the predicament in which he found himself. The ensuing five and a half pages of the federal action are a rehash of the allegations that the Plaintiff had been making since he filed his Motion to Modify Parental Rights and Responsibilities on July 5, 2007.

DR-H733

By way of remedy, the Plaintiff demanded that the Federal Court enjoin Magistrate Mills and Judge Russo from presiding over the ongoing custody case and, in addition, vacate all of the orders issued by the Domestic Relations Court up to that time. In essence, the federal complaint amounted to an attempt to appeal the Domestic Relations Court's rulings to the Federal Court, which, if Plaintiff were to be successful, would take jurisdiction of the matter.

Less than two months after he filed his federal complaint the action was over, the Federal District Court determining that it did not have jurisdiction over the subject matter of the dispute. In so doing Judge Patricia Gaughan, to whom the matter was assigned, concluded that the Plaintiff was in essence seeking an appellate review through the District Court of the Domestic Relations Court's rulings to that date. Ultimately, after a five page analysis Judge Gaughan dismissed the Plaintiff's action and then declared:

> The court certifies pursuant to 28 U.S.C. Section 1915(a)(3), that an appeal from this decision could not be taken in good faith. (Defendant's Exhibit JJJ)

The Plaintiff's suit was successful in one respect. Judge Russo recused himself following which the matter was reassigned by the Administrative Judge who referred the matter to the undersigned for trial. At the commencement of the hearing on June 29, 2009, Plaintiff's counsel notified the Court that Plaintiff had fired him, which the Plaintiff confirmed. The Plaintiff then mistaking Judge Russo's decision to recuse himself as evidence that he had been vindicated, moved to set aside all of Judge Russo's orders as well as the orders issued by Magistrate Mills and continue the case. After considering the merits of the Plaintiff's claim, the undersigned denied the Plaintiff's motions and informed Plaintiff's ex-counsel that while he could remain in the room as an observer since it was a public forum, he could not sit at the trial table and could not assist the Plaintiff in the presentation of his case.

At that point the Plaintiff asked for a short recess so he could confer with his ex-counsel. The undersigned granted the request and the two men went into the hallway only to return a short time later at which time Plaintiff's counsel announced that he had been rehired by the Plaintiff. He then proceeded to make an opening statement on behalf of the Plaintiff following which both the Defendant's counsel and the Guardian ad Litem reserved the right to open later. It is no surprise given what was at stake, the intensity with which the parties fought and the number of prospective witnesses on each parties' witness list that the trial was not completed within the time originally allotted for it.

The undersigned subsequently issued a Magistrate's Order on July 9, 2009, that declared that the trial would resume on October 23, 2009, and continue through November 5, 2009, and that in the event that it was not complete by 4:30 p.m. that day, it would resume on December 1, 2009, and continue day to day until complete. Although the order declared no further continuances would be granted, the Court granted Plaintiff's counsel a continuance for the November 5th hearing because of miscommunication between the Court and Plaintiff's counsel prior to the entry of the July scheduling order.

DR-H733

On October 15, 2009, the undersigned issued yet another scheduling order, this one providing that if the trial was not complete by November 5, 2009, it would resume on December 1, 2009, and continue through December 11, 2009. The trial continued through November 4th and recessed until December 1st. On November 25, 2009 at 4:07 p.m. the Plaintiff filed a Motion for Continuance, Motion No. 290904, in which he requested that the Court:

> ...continue the trial scheduled for December 1, 2009 at 9:00 a.m. for the reason that Plaintiff is involved in negotiations in Washington D.C. in a nationally publicized case. Negotiations for the matter will run into next week. Additionally, Plaintiff has no funds to come to Cleveland other than what he may receive from the settlement of the foregoing case. Interruption of the negotiations will work unreasonable hardship on Plaintiff.

The motion was denied.

When the trial resumed on December 1, 2009 the Plaintiff was not present. His counsel orally renewed his motion to continue the hearing, reiterating the reasons that were set forth in his written motion of November 25, 2009. Those included that the Plaintiff's financial position was so precarious that the Plaintiff was forced to live with his client in the Washington D.C. area because he could not afford to live on his own and that he did not have the funds available to travel to Cleveland and stay here for the trial. The undersigned again denied the motion.

The Plaintiff did not appear for trial on Wednesday December 2, 2009. At the start of trial on Thursday, December 3, 2009 the Magistrate informed Plaintiff's counsel:

> If your client is not here by the time Ms. DeLuca finishes her case today or 4:30, whichever comes first, I will dismiss his motions.

At the time the Guardian had yet to present her case on behalf of her wards. That would have included her examination of the Plaintiff, which was critical to her ward's position. For purposes of continuity the Guardian had waived the right to cross-examine the Plaintiff in lieu calling him as if under cross-examination in her case in chief. The Defendant rested at approximately 4:20 p.m. on December 3, 2009. The Plaintiff had not appeared for trail by that time. As a result, the Magistrate notified the parties that the Plaintiff's motions were dismissed. At that point Plaintiff's counsel renewed his request that the Court continue the matter to allow his client to appear and that no hardship would occur because the trial was set for the entire following week. The Magistrate again denied the Plaintiff's motion to continue the matter.

The Court finds that the Plaintiff was on notice as early as July 9, 2009 of the days on which this matter would be tried and that no continuances would be granted. Even though he was forewarned he failed to appear on December 1st, 2nd, and 3rd because, according to his counsel, he was:

> ...involved in negotiations in Washington, D.C. in a nationally publicized case. The negotiations for that matter will run into next week. Additionally, Plaintiff has no funds to come to Cleveland

42

other than what he may receive from the settlement of the foregoing case.

The Plaintiff was well aware of what his obligations were, but chose to ignore them in favor of some other matter. That was his decision.

This Court did not create that conflict. If one existed, it was strictly the fault of the Plaintiff who decided that the negotiations in Washington were more important than pressing his claims in this Court. He had more than adequate notice of the dates that this matter would be tried and elected to attend to another matter. It was a strange decision from someone who has complained bitterly for over two years that he has systematically been denied parenting time with his children and that the Court has stood by and let it happen. That, however, was his choice; not the Court's. It is especially strange in view of the fact that the Plaintiff was in the middle of trial in this matter when he decided that it was more important to be in negotiations elsewhere.

There is nothing to suggest that those negotiations could not have been postponed a few days in order to allow the Plaintiff to finish what he would have the Court believe was the most important thing in his life; his children's welfare and the need to rescue them from their mother and her machinations. Yet, in spite of every assertion he made about the Defendant's lack of fitness as a parent and her perfidy as well as the duplicity and malice of the people surrounding her he was willing to forego the latter for the former.

What the Plaintiff apparently wanted the Court to do was to indefinitely suspend the trial until such time as he could amass sufficient funds to return to the fight. In view of what his counsel told the Court that might not happen for a significant period of time, if it were to ever happen. There is no statute, no rule of procedure no appellate ruling that requires that a court must indefinitely stay proceedings until a party either condescends to appear or has the financial wherewithal to do so. If anything, the opposite is true. A court has an obligation to regulate its docket to insure that all of the parties have a full opportunity to be heard in as expeditious manner as possible and that the process is not turned into a mechanism by which one party can harass the other party by manipulating the court's schedule.

The Plaintiff's failure to appear in December caused the Defendant and the Guardian to lose the opportunity to cross-examine him and, therefore, adversely impacted their cases. Of greater significance, the Plaintiff's decision to attend to some other matter in another forum instead of appearing and pursuing his claims in this Court leads the Magistrate to conclude that he failed to prosecute his motions.

Even if the Plaintiff's Motion to Modify Parental Rights and Responsibilities had not been dismissed, he would not have prevailed. It doesn't matter whether this Court applied Ohio law as the Defendant argued it should or Virginia statutes as the Plaintiff maintains, the result would be the same; his attempt to be named the "custodial parent" would have failed and failed miserably. Before reviewing why the effort would have come to naught it is necessary to understand why the Plaintiff argued so insistently that this Court should apply Virginia law in this matter.

43

DR-H733

The Plaintiff's position is based on two premises. The first, and most important from the Plaintiff's point of view, is that Virginia law supposedly releases him from the obligation of paying child support because the Defendant denied him access to the children. The second is that because the Virginia divorce decree declares that:

> The validity, enforceability, and interpretation of this Agreement shall be determined and governed by the laws of the State of Virginia.

this Court has no alternative but to apply the laws of that state. Neither argument is persuasive; and of the two, the former is the more deficient.

It is actually not a separate claim, but rather an offshoot of the Plaintiff's claim that Virginia law controls the outcome of this case. The argument comes down to the proposition that because the Defendant deliberately denied him access his children he was relieved of the obligation of supporting them. There are two flaws with that claim. The first and most obvious is that it can't stand alone. If Virginia law doesn't apply the Plaintiff cannot evade his obligation to pay child support because Ohio does not have an escape clause for parents who refuse to support their offspring. The second, and more fatal defect in the Plaintiff's position is that Virginia law, the Plaintiff's arguments to the contrary, does not permit an obligor to evade his responsibility to pay child support if he is not afforded parenting time with the minor children. His claim that he cannot be forced to pay child support is predicated on one just case, <u>Hartman v. Hartman</u>, 1994 L 1031136.

While it is true that the Virginia court held that the father in that case could not be forced to pay support because he was denied the opportunity to have time with his son, the facts that lead to that conclusion are so extraordinary and so dissimilar from the ones in this case that the Virginia decision has no relevance whatsoever to the matter under consideration. The reason it don't is that in <u>Hartman</u> the mother not only cut off the father's access to the child, but told the child that someone else was his father and hid the child for years from the real father. It was that exceptional set of circumstances that led the Virginia court to hold that Mr. Hartman could not be forced to pay back child support. There is nothing remotely akin to that situation in this case. The desire, however, to avoid paying child support appears to lie at the heart of the Plaintiff's claim that Virginia law controls in this matter because he made no other reference to Virginia law as it relates to the modification of parental rights and responsibilities.

As to the Plaintiff's primary claim, that the terms of the parties' settlement agreement provides that Virginia law controls, the undersigned finds the arguments set forth in the Defendant's brief with regard to the choice of law the Court should apply compelling. In a sense it really doesn't matter whose law the Court applies, Virginian's or Ohio's because the outcome would have been the same had the Plaintiff's motions not been dismissed the same; the Plaintiff could not have prevailed on his motion to modify parental rights and responsibilities. The reason that it doesn't matter whose law is applied is that the factors outlined in Section 20-124.3 of the Virginia statutes that a Virginia court must consider when determining where the best interests of a child lie are very close to those outlined in Section 3109.04 (F)(1) of the Ohio Revised Code.

DR-H733

If there is a difference between the laws of two forums, it appears to be that the Virginia code lacks the language in Section 3109.04 (E) which declares that a court shall not modify a prior decree allocating parental rights and responsibilities unless it finds, based on facts that have arisen since the prior decree, that a change of circumstances has occurred in the child's life or the life of the residential parent and the modification is in the best interests of the child. Based on the evidence the Plaintiff could not have possibly met that standard even if his motion to modify custody had not been dismissed. Neither could he have satisfied the standards outlined in the Virginia Code.

The Plaintiff's focus wasn't on Virginia statutes or case law, though, but on the language of the Virginia Settlement Agreement in which the parties agreed that the validity, enforceability and interpretation of the Agreement would be governed by the laws of the State of Virginia. When the Plaintiff filed to change custody he raised an issue other than the validity of the decree or its enforceability or its interpretation. Modification of the decree is not synonymous with any of those terms or their effect. It falls into an entirely different category. Applying one of the basic principles of contract interpretation, *expressio unis est exculsio alterius* (to include one thing is to exclude all others) means that parties' failure to mention modification of the decree in the list of situations that Virginia law would control takes it out from underneath the language of the Settlement Agreement.

Even if that were not the case, the undersigned finds that under the terms of the Uniform Child Custody Jurisdiction and Enforcement Act (Article 3127 of the Ohio Revised Code) the Plaintiff's decision to register the decree in Ohio after the Defendant and the children had been residents of this state for two and perhaps three years while the Plaintiff had been a resident of Florida for at least as long invested this Court with the authority to apply Ohio law to determine if the Plaintiff should prevail on his motion to modify the allocation of parental rights and responsibilities.

Before seeking to resolve that question, it is necessary to dispose of the issue of Plaintiff's failure to permit Dr. Schwartz, a psychologist in Miami, Florida who saw the Plaintiff, to release his records. It is settled law in Ohio that when a party seeks to modify the allocation of parental rights and responsibilities his mental and physical health becomes an issue that the court must consider when deciding whether to grant or deny the motion. Based on that premise the Eighth Appellate District Court of Appeals in Gill v. Gill (Jan. 16, 2003) Cuyahoga App. No. 81463, effectively required that a party seeking to modify a prior custody decree must turn over his or her medical records whether they relate to his physical health or mental health.

The Plaintiff announced that he would not allow Dr. Schwartz to release his records because, in his opinion, they weren't relevant since he had only seen Dr. Schwartz along with his wife (Diana Klayman) for marital counseling. Since the Plaintiff also testified that he has seen Dr. Schwartz since 2003 there is reason to question that statement. Regardless of the length of time that he has been a patient of Dr. Schwartz, the Court only has the Plaintiff's word for the reason he has been consulting him and he has shown little reason over the term of this conflict for the Magistrate to put much, if any faith in what he has to say.

45