# EXHIBIT 1
# Part 2 of 2

Of greater significance, it is not for the Plaintiff or any party to determine what is or is not relevant once he puts his physical and mental health at issue by contesting the allocation of parental rights and responsibilities. Rather, it is for the Court to decide. It may very well be that if the Plaintiff permitted Dr. Schwartz to produce his records they might have added little or nothing to the discussion. On the other hand, the records may have contained information that would have been of significant assistance to the Court in determining where the best interests of these children lie. The Plaintiff's decision to withhold that information allows the undersigned to draw an adverse inference from his refusal to release his records. For reasons that will be discussed below, the issue did not disappear when the Plaintiff failed to prosecute his motion. Even if he had finished the trial, even if his motion to modify custody had not been dismissed there is more than adequate reason to question Plaintiff's suitability as a parent.

Those factors manifested themselves throughout the Plaintiff's attempt to wrest control of the children from the Defendant. His effort was based on three interlocking premises. The first is that the Defendant is not only an unfit mother, but a malicious individual who will stop at nothing to destroy his relationship with his children. That one is connected to the second which is that the Defendant deliberately embarked upon a course of action designed to remove him as influence in the children's lives which, in turn, leads to the third premise which is that the Defendant fabricated the claim that the Plaintiff sexually abused Lance and continued to pursue that claim in spite of all evidence to the contrary.

At the same time he pursued those lines of attack the Plaintiff sought to portray himself as a warm, affectionate parent who deeply loves his children and who wants nothing more than to provide for them and to spend time with them. While the Magistrate has no doubt that the Plaintiff loves his children in his own way, the bulk of his claims, especially those relating to the Defendant both as a person and a parent, are so devoid of the factual content as to amount to fantasy.

The Plaintiff had no problem cataloguing the Defendant's faults as a parent, telling the Court during the course of his testimony that she should be stripped of custody because:

1. She permits the children to ride their bikes without supervision on the sidewalk, which was dangerous because the houses are jammed together and a car could pull out and kill them;

2. She allowed them to walk around in the dark alone;

3. She allowed Isabelle to sit in a convertible without her seatbelt on;

4. She does not adequately supervise the children;

5. She allows the children to use the "F" word every other word;

6. She doesn't show real affection to them, is very cold towards them and doesn't kiss them;

46

DR-H733

7. She hasn't protected them;

8. She allows the children to run out and play in the streets;

9. She lets the children run around unsupervised and there are 37 sexual offenders in the area;

10. Even though he admitted the Defendant's house is in a nice neighborhood, there are rough areas around it;

11. She and her mother don't respect him in front of the children;

12. When Lance fell off the diving board, he was being accompanied by a 13 year old. (Later the allegation was that he was under the supervision of a 12 year old);

13. The Defendant farms the kids out, leaving them all over the neighborhood;

14. The Defendant and her present husband misappropriate the child support that he paid for the children, spending it on themselves;

15. The Defendant did not provide him with advanced notice of events in the children's lives so that he could participate in them;

16. She would schedule things on his weekends so he either did not have adequate time to get there or would interfere with his time;

17. She would not allow him to come to her house for Isabelle's First Communion party;

18. She would unilaterally schedule vacations when she knew he would not be able to travel;

19. She confiscated presents that he bought for the children including cross with Stars of David on them and Amigo phones;

20. The Defendant totally cut him off from the children;

21. She allowed the children to call him Larry;

47

22. She turned the children against him so that Isabelle is now afraid of him when she never was before;

23. The Defendant would not allow the children to see the Plaintiff's mother who died in early 2008;

24. The Defendant refused to provide him with any information about Lance's diving board accident.

Leaving aside the Plaintiff's allegation that the Defendant systematically interfered with his contact with the children and those that fall into the same category, the Magistrate can find no support for the rest of the Plaintiff's allegations which, because they are without any foundation, say more about Plaintiff's imagination and view of the world than they do about the Defendant's parenting abilities or her as a person.

This is especially evident with regard to the claims the Plaintiff made concerning the Defendant's alleged lack of supervision of the children and the danger posed by the neighborhood. The Defendant, her mother and her husband all credibly and convincingly testified that Defendant's house is located on a quiet residential street away from a major intersection in what would be considered a "good neighborhood". There is nothing to suggest, as the Plaintiff testified, that there are "rough areas" around the neighborhood where the Defendant's house is located. If there are any such rough areas, the Plaintiff was unable to point to any of them on a map or name any of them or introduce any evidence whatsoever of their existence.

By the same token, while there might be some registered sexual offenders living in the area as the Plaintiff maintained, he ultimately admitted that the area he was talking about was the zip code within which the Defendant's house is located. If the Plaintiff had any idea how many people live within that zip code or how large a geographic area it covers, he did not see fit to share that information with the Court. Interestingly, although he has taken the children to California as well as to where he was living in Florida, the Plaintiff never mentioned if he had checked to see how many registered sex offenders were in the neighborhoods where he was living. He also did not mention if he determined how many sex offenders were living around the building he occupied while he was living in Cleveland.

To be fair to the Plaintiff, he did not so much stress the danger to the children caused by where they live as by what he saw as the Defendant's abject failure to supervise them or even care enough about them to take the time to supervise them. By way of proof of her lack of concern for the children the Plaintiff alleged that she allowed them to ride their bikes without supervision on the sidewalk, allowed them to walk around after dark and allowed them to run out and play in the street. These failures, as the Plaintiff made clear, present a clear and present danger to the children because a car backing out of a driveway might strike and kill them or they might be struck by a car while they are in the street. It is not clear why the Plaintiff was concerned about the children being out after dark because he never provided a reason. It could be a general concern that they might get hurt or he might have worried that some pervert could

48

snatch them. Whatever the reason, the Magistrate can find no substance to that charge or any of the other complaints listed above.

The Defendant's residence, contrary to the Plaintiff's depiction is not located in an area where the houses are cheek by jowl and the property lines demarked by dense hedge rows. If anything, the opposite is true. The houses, as evidenced by Defendant's Exhibit RRR and her testimony and the testimony of her husband, are spaced relatively widely far apart with few having bushes along the driveway. Based on the evidence the Magistrate finds that the Defendant's residence is located in a safe neighborhood; one in which children of Lance and Isabelle's ages ought to be able to ride their bicycles on the sidewalk without an adult standing next to them the whole time.

Even assuming for the sake of argument that the Plaintiff was referring to a time when the children were much younger, as when they first moved to the Kerwick residence, doesn't make his allegation that the Defendant allowed them to ride their bikes on the sidewalk without supervision any more credible. In a pattern that would be repeated over and over in this matter the Plaintiff was unable to offer any evidence of any kind to support that claim. There might have been some, but if there was he did not see fit to bring it to the Court's attention. He has no one to blame for that than himself as he was given every opportunity to do so.

Leaving aside the fact that there is absolutely no support in the record for the Plaintiff's claims about the children riding their bikes on the sidewalk without adult supervision or that they were allowed to cross the street unaccompanied by an adult when they were at least eight years old doesn't prove that the Defendant ignored her duty to protect the children. Clearly children need to be protected, but they cannot be cocooned and must not be. They have to have an opportunity to explore the world and to learn which means that at times they must be free from constant supervision. It is not a concept that the Plaintiff appears to understand.

Rather than condemning the Defendant, the Plaintiff's allegations including those about the number of registered sex offenders living in the same zip code as the Defendant and his claim that the neighborhood has rough areas around it lead the Magistrate to conclude that the Plaintiff sees the world as a dark and dangerous place, one in which the children need to be under constant adult supervision less something terrible befalls them. That conclusion finds support in the notes the Defendant made in 2002 and 2003 concerning the Plaintiff's demands and actions during the period when the D.C. sniper and West Nile Virus were in the news.

They also find support in the Defendant's testimony and that of her husband with regard to Isabelle's response to the Plaintiff telling her that she was unsafe in her neighborhood and in her mother's care and that there are people who climb through windows and steal kids and her mother wouldn't care. As a result of those conversations both the Defendant and Mr. DeLuca testified that Isabelle slept with the windows closed during the summer. As with the Defendant's statements relative to Lance's reaction to his father's questioning and his attempt to convince the child that his mother was somehow to blame for his broken arm, it would be easy to dismiss the Defendant's testimony about Isabelle as nothing more that hyperbole offered in an attempt to buttress her position in this case.

49

DR-H733

The Plaintiff's testimony, his emails and his complaints to CCDCFS , though, don't permit the Magistrate to do that. His views, as encapsulated in his charges against the Defendant, lend credence to her testimony. It is not hard to see that someone who is worried about the number of registered sex offenders who live in the same zip code as the children or who could be concerned about children of Isabelle and Lance's ages riding their bikes on the sidewalk without constant adult supervision would convey those concerns to the children by both word or deed. There is, in fact, every reason, given the Plaintiff's view that their mother was cavalierly ignoring their safety and refusing to protect them, that he would have conveyed those concerns to the children.

That conclusion finds corroboration in the testimony of Dana Ginley, a friend of the Defendant's who has children a little younger that Isabelle and Lance. Ms. Ginley testified that in 2005 the Defendant asked her to go trick or treating with her and the children because the Plaintiff was there. The Defendant, she said, told her that she was afraid of the Plaintiff and did not want to be alone with him. More telling was her description of the Plaintiff's behavior that night, stating that at every house "he interrogated" every neighbor. She went on to say that he even walked into a couple of houses uninvited to look around.

He was, in her view, very suspicious, which made for a tense evening. In addition, she described the Plaintiff as being "all over the kids"; telling them don't go here, don't go there, don't run. Even though she is a close friend of the Defendant's, the Magistrate finds her testimony credible. Her description of the Plaintiff's behavior fits the pattern laid out in the Defendant's pre-decree notes (Court's Exhibit 1) as well as in the nature of the allegations that the Plaintiff made about the Defendant. And as in so many other instances, Ms. Ginley's testimony says more about the Plaintiff's outlook and view of the world than it does about the Defendant's alleged lack of concern for the children's safety.

It is, however, possible that the Plaintiff simply made up some the allegations about the Defendant as part of an effort to persuade the Court to view his ex-wife in the worst possible light. Such appears to be the case with Plaintiff's claim that the Defendant "farms" the children out and that she doesn't show them real affection or that she and her husband use the child support, when the Plaintiff paid it, for their own ends and that she does not provide for the children who are forced to eat rice and beans. The Plaintiff offered not one shed of evidence, called not one witness, elicited not one statement on cross-examination and did not present one document to substantiate any of those claims. All of the evidence, in fact, points in the exact opposite direction. No one at Gesu where the children attend school, neither Ms. Wingler nor Ms. Blue, the social workers who interviewed the children, nor anyone who has seen the children ever reported that they were not adequately cared for or showed signs of neglect or were malnourished or underfed or even hungry or were ill clothed.

There was some evidence about rice, but it doesn't help the Plaintiff. It is found in Ms. Blue's notes of her July 27, 2007 interview with Lance in which he told her, among other things, that his favorite foods are spaghetti and rice (Court's Exhibit 2). He also told her that he gets enough to eat. Ms. Blue didn't doubt the child's statements and the Magistrate can find no reason from the record as a whole to question either one.

The Plaintiff also failed to produce even one witness who could support his claim that the Defendant "farmed out" the children. The phrase is deliberately pejorative; designed to covey the Plaintiff's belief that the Defendant cares so little for the children that she would send them anywhere rather that have them with her. While the idea neatly fits into the Plaintiff's view of the Defendant, it finds no support anywhere in the record. Not one witness came forward to substantiate the Plaintiff's charge against the Defendant. Rather, as in so many other cases, the testimony points in the opposite direction.

The Plaintiff did not contest the fact that the Defendant is a stay at home mother or that she volunteers at the children's school or that she has enrolled them in and takes them to baseball and dance or that she walks them to school or that she has a meal for them every night. That someone other than her was with Lance at the pool on July 3rd doesn't alter that picture as the law does not require that a parent spend every waking moment with his or her children and the fact that they don't doesn't mean that he or she "farmed out" the children as the Plaintiff alleged the Defendant did. To do that the Plaintiff would have had to do more than just make the accusation. He would have had to do something to support that claim. He couldn't, which leads the Magistrate to find that there is no truth to it.

It is worth noting that while the Plaintiff alleged that Lance was under the supervision of a 12 or 13 year old when he fell off the ladder to the diving board he failed, as he had in so many other instances, to substantiate that allegation. He also failed to show how, if the Defendant had been present, or if he had for that matter, Lance would not have fallen. The only way the accident could have been avoided was if Lance was forbidden to go off the diving board or the child was encased in some kind of protective material and under the eye of an adult who, as he ascended each rung of the ladder, told him to "watch your step". Even then there is no guarantee that Lance would not have fallen. Children have accidents. They cannot be protected from everything. That Lance fell is not an indictment of the Defendant or evidence that the children's best interest lies with giving custody to the Plaintiff.

It is of interest that the Plaintiff's claim that whatever monies he sent for child support were taken over by the Defendant and her husband for their use and not used on behalf of the children who were forced to eat rice and beans was something that emerged during the course of trial. As noted earlier in this discussion, the Plaintiff told the Hot Line social worker with whom he spoke on July 12, 200, that the children's basic needs were being met. Though he clumsily attempted to dance around the subject, the Magistrate finds that he did, in fact, make that statement and he made it because he knew at the time he uttered those words that the children were being adequately cared for by the Defendant. Even if had never made the statement to the Hot Line worker the allegation that the Defendant and her husband squandered the child support payments on themselves and not on the children is another one of those claims for which there is there no proof other than the Plaintiff's imagination.

It doesn't seem to have occurred to the Plaintiff that in spite of the fact that he stopped paying child support long before the trial began that the children's needs continued to be met. They live in what appears to be a nice house in a safe neighborhood, attend private school, were enrolled in dance and baseball and appeared well nourished and appropriately clothed. If, as the Plaintiff alleged, the Defendant and her husband appropriated his child support payments then

51

there should have been some indicia that the Plaintiff could have pointed to that the children's lives were diminished by the Defendant's alleged greed and lack of concern for the children. There was none. Certainly neither Ms. Wiggler nor Ms. Blue, the social workers who were involved with the family, mentioned any problems and the children didn't report any to them (Court's Exhibits 1 and 2). In the end, the allegation, like so many of the others that the Plaintiff made with depressing repetition, proved utterly baseless.

Likewise, the Plaintiff failed to establish that the Defendant lets the children play in the street or that she lets them walk around in the dark alone. The Plaintiff offered absolutely nothing other than his word to support either allegation. Even if he could have demonstrated that the children were out of the house after dark he would have had to present evidence that allowing them to be out was somehow harmful to them. By way of example, he would have had to tell the Court where they were, where the Defendant and her husband were and what the children were doing at the time. Were they near the house? Were they around the block? Were they with another adult? Were they with other children? Were they catching fireflies? Those were question for which the Plaintiff should have provided answers if he wanted the Court to accept that the children being out of the house after dark was proof that the Defendant was not adequately protecting them as he alleged.

Perhaps the most bizarre allegation that the Plaintiff leveled against the Defendant is that she doesn't show real affection for the children. She is, he alleged, very cold towards them and doesn't kiss them. As with so many of the Plaintiff's other complaints about the Defendant and her parenting ability, there is absolutely nothing to support this claim either. Certainly, the Plaintiff offered nothing but his word to substantiate those allegations. The Defendant's witnesses, on the other hand, including not just her husband and her mother, but her friends and Sister Linda as well paint a totally different picture of the Defendant.

Mary Blue, the social worker who came to the house to investigate the Plaintiff's allegations of Mr. DeLuca's abuse noted that Lance is bonded with his mother, grandmother and sister. Her notes also reveal that the first time she spoke with Isabelle the child was so afraid of her that she sat in her mother's lap during the interview. While Ms. Blue felt that the child's reaction was unusual, she did not note that the Defendant was cold or unaffectionate toward Isabelle (Court's Exhibit 2). The Magistrate finds that the fact that the child sough solace from her mother at a time when she was afraid is evidence that Isabelle considered her mother to be someone who cared for and would protect her; the antithesis of how the Plaintiff described the Defendant.

Dana Ginley, a friend who lives in the same neighborhood as the Defendant was especially effusive in her praise of the Defendant; telling the Court that in her opinion the Defendant is an outstanding mother whose first concern is the safety of her children. She also stated that the Defendant knows where her children are at all times and that she walks them to school.

Further, the undersigned had an opportunity to observe her demeanor when the Defendant testified about her children and her relationship with them. The only conclusion that the Magistrate can reach from the record is either that Plaintiff has an utterly perverse view of

the Defendant, one rooted in fantasy not realty, or he deliberately hurled this calumny at her as a means of striking out against her. It is also possible that the Plaintiff's description of the Defendant as cold and unaffectionate is a way of comparing her failure to constantly hug and kiss the children all over their bodies as they reported the Plaintiff did. Whatever the case, it bears repeating that the evidence unequivocally and overwhelmingly establishes that the Defendant is a warm, caring and affectionate parent.

Like his other allegations, there is absolutely no support for the Plaintiff's claim that the Defendant and her mother didn't respect him in front of the children and were constantly putting him down. The best that the Plaintiff could come up with to support that allegation was that apparently in response to a question from Isabelle the Defendant told the child that the Plaintiff was too old to have children. That one instance, if the plaintiff accurately reported the child's words (and there are good reasons to doubt that he did), does not establish the Defendant and her mother disrespected him in front of the children or that she was constantly putting him down. If anything, the Defendant's claim seems to be one of projection as evidenced by Sister Linda's notes (Defendant's Exhibit KK) and testimony concerning her meeting with the Plaintiff and his wife during the course of which the Plaintiff made every effort to disparage the Defendant. The record is utterly devoid of any hint that the Defendant engaged in similar behavior.

The Plaintiff also complained that the children called him Larry, evidence in his mind that the Defendant had told them to or at least countenanced their disrespect of him in order to marginalize him and substitute her new husband for him. In other circumstances allowing a child to call a parent by his or her first name might be a cause for concern, but not here because the Plaintiff seems to have encouraged the children to do so or at least sent them mixed messages about how to address him. Those came from the cards that he sent them which he signed "Larry" (Defendant's Exhibits SSS, TTT and UUU). The Plaintiff, in other words, may have invited the children to call him by his first name. Having opened that door he cannot lay the blame for what followed on the Defendant.

There is also no basis to believe, as the Plaintiff maintained, that the children were "using the "F" word every other word" requiring that he teach them not to use it. Like the rest of the allegations discussed in the preceding paragraphs, the Plaintiff offered nothing to substantiate that claim. Considering the number of emails that he sent to the Defendant on almost every other subject and his utter lack of respect for her as a parent, it is absolutely stunning that there is not one mention in any of those emails about the children's use of the "F" word or criticizing her for allowing them to use the "F" word. Since the Plaintiff had no problem documenting the Defendant's other faults, his failure to note this one leads the Magistrate to conclude that like so many of the Plaintiff's other claims, it is without any foundation in reality.

The same is true of the Plaintiff's claim that the Defendant allowed Isabelle to sit in a convertible without a seatbelt on. At one point the Plaintiff maintained that he had video tape to support that allegation. He also told Sister Linda that he had surveillance tapes (Defendant's Exhibit KK). He told the Defendant the same thing in an email he sent to her on September 2, 2007 in which he advised her that:

53

> I have documented your, Mike's and your mother's conduct for
> four years, I have surveillance testimony and video which will be
> produced as evidence in court and more proof than I need to have
> the children removed from your collective custody, topped off by
> Lance's near fatal accident recently when you left him with a child
> babysitter at a public pool. (Plaintiff's Exhibit 93)

In spite of what he told Sister Linda; in spite of the threat he made to the Defendant the Plaintiff never produced the tapes or anyone who could corroborate his claims, which, like so many others proved to be without any substance.

He also claimed that the Defendant failed to provide him with advance notice of the children's activities so he could participate in them. The only evidence in the record that might support that claim is an email dated Wednesday, January 11, 2006 in which the Defendant's attorney at the time advised the Plaintiff that she had just learned of a father-daughter Brownie square dance that was to take place on Sunday, January 15th. If the Plaintiff had evidence of other such occurrences, he kept them to himself.

That one instance is not sufficient by itself to substantiate the Plaintiff's claim that the Defendant repeatedly failed to provide him with advance notice of the children's activities so he could not participate in them. It especially doesn't given the Plaintiff's failed attempt to convince the Court that the Defendant had deliberately kept him in the dark concerning Isabelle's First Communion so he would not be able to attend the ceremony. As mentioned earlier in this discussion, the record unequivocally establishes that the Defendant notified the Plaintiff almost a month in advance of that event.

In a corresponding allegation the Plaintiff complained that the Defendant would schedule activities for the children on his weekends so he either did not have adequate time to get there or they would interfere with his time with the children. The only evidence of the latter is an exchange of emails between the parties in June 2007 in which the Plaintiff complained that the Defendant was trying to take up his weekend with "your desired activities for the kids". In response the Defendant pointed out that the "desired activities" were Isabelle's "Gala dance performance" and Lance's baseball game, which would be preceded by pictures. Isabelle she pointed out had been in dance for more than a year and Lance had a summer baseball league "as he does every summer". She also complained that the Plaintiff had not given her "more than one day notice" when he intended to exercise visitation (Defendant's Exhibit EE).

That brought a tough response from the Plaintiff who asserted that he had given the Defendant "notice by email and text message more than once in the last two weeks and well in advance of this morning" of his intent to visit with the children. He also accused her of listening in when he told the children that he would be coming for Father's Day. Finally, he demanded to know when he could have the children for that summer as he had "asked her several times over the last several weeks". He then added: "This is documented as well." If there were such documents, the Plaintiff neglected to bring them to Court. Of the 108 exhibits that he marked for identification, not one deals with the period around June 15, 2007. There is, in fact, a ten month

54

DR-H733

gap between the email dated October 15, 2006 (Plaintiff's Exhibit 90) and the next one he introduced (Plaintiff's Exhibit 91), which is dated August 15, 2007.

That said, there apparently was some discussion regarding the Plaintiff's summer visitation with the children as the Defendant's counsel wrote to the Plaintiff on June 22, 2007 to notify him that:

> At the request of your former wife, I would like to clarify the upcoming schedule for your time with the children.
>
> Although you have traditionally spent time with the children for two (2) weeks during the month of August, it appears that, due to your trial schedule, this date (sic) will need to be modified. As such, Ms. Luck has agreed to reschedule your time for two weeks beginning on July 25th and ending on August 8th. (Defendant's Exhibit B)

At best, the exhibit indicates that the parties did discuss the Plaintiff's time with the children that summer. It does not, however, fill the gap between October 15, 2006 and August 15, 2007 when the Plaintiff claims that he informed the Defendant by email(s) that he would be coming to see the children on Father's Day. He may have assumed she would know that he would be in Cleveland that weekend, but that is not the same as proving that he notified her in advance as he claimed. Further, given the Plaintiff's almost complete lack of credibility, his failure to produce those emails leads the undersigned to question whether they were actually ever sent.

Whatever else that can be discerned from counsel's June 22nd letter, it does not prove, as the Plaintiff intimated, that the Defendant ignored his messages and set in motion plans to limit his time with the children. As she pointed out none too pleasantly in one of the June 15th exchanges, the children were getting older and they have activities in which they want to participate. The Defendant did not set their dance or baseball schedules, but she was demanding on their behalf that the Plaintiff not just allow them to participate in those activities, but insure that they did.

To be fair to the Plaintiff, he was caught in a classic dilemma. He could have said "no"; that he would not take the children to their activities which almost certainly would have caused a fight with the Defendant and worse, disappointed the children who would have been angry at him for taking them away from something that they really wanted to do. On the other hand, he could have accepted that the children had those two activities and done what the Defendant suggested, proudly watch them participate. The important point is the fact that the Plaintiff found himself in that predicament through no fault of the Defendant's. That however, did not stop him from blaming her for the situation or accusing her of setting a plot in motion to minimize his contact with the children.

There is absolutely no evidence that she had anything to do with arranging the children's activity schedules or that she deliberately put them in those activities because she checked in advance and determined that dance and baseball were the two most likely to adversely impact the

DR-H733

Plaintiff's ability to spend time with his children. Finally, it bears repeating that there is no evidence beyond the June 15, 2007 emails that the Defendant ever scheduled things on the Plaintiff's weekend so as to interfere with his time with the children.

Defendant's Exhibit B is noteworthy for another reason; it reveals that instead of unilaterally scheduling vacations when the Defendant knew the Plaintiff could not travel, as he alleged, she was attempting to accommodate his trial schedule. A review of the emails covering the period from December 13, 2004 through February 7, 2008 that the Plaintiff identified during the trial fails to reveal even one instance other than the one noted above when it could remotely be argued that the Defendant made a unilateral decision regarding the Plaintiff's vacation time with the children (Plaintiff's Exhibits 32 through 101). A review of the emails that the Defendant marked and admitted during trial yields the same result; absolutely no evidence that the Defendant dictated the Plaintiff's vacation schedule (Defendant's Exhibits H through U, AA through EE, UU and ZZ). That, however, did not stop the Plaintiff from repeatedly making the allegation.

If there is little evidence to support the Plaintiff's claim that the Defendant dictated his vacation schedule to him, there are only emails dated January 12, 2008 and January 27, 2008 that speak of the Defendant refusing to allow the children to see the Plaintiff's mother before she died (Plaintiff's Exhibits 97 and 99). The Plaintiff testified, though, that he specifically asked the Defendant to let him take the children to see their grandmother in 2007. There is no documentary evidence to support that claim: no emails, no letters, no memos; nothing. Since there is little evidence that the parties were communicating by phone in 2007 there is little reason to credit the Plaintiff's allegation that he specifically asked the Defendant to have the children so they could see his mother. Instead, it appears that what the Plaintiff is complaining about is that he could not take the children to see his mother because the Defendant terminated his visitation in September or October 2007.

At the time Isabelle was 9 and Lance 7. The Plaintiff never mentioned where his mother, who he admitted suffered from Alzheimers, was residing in 2007. It is not a blank that the undersigned can easily fill in because of an email that the Plaintiff sent to an attorney in February 2008 in which he put the lawyer and his clients on notice that he would be contesting:

> ....any monies paid out under the 1998 alleged will and conservatorship to you, and other interested persons, including heirs, until the issue of my mother's incapacity and the misappropriation of my grandmother's assets, among other relevant issues, is adjudicated.
>
> I will be retaining local counsel to assist me in this....
> (Defendant's Exhibit H)

Since the Plaintiff was licensed to Practice in Florida at the time, the reference to local counsel may mean that his mother was not a resident of that state. By the same token, the reference to her "incapacity" raises questions about how far the disease had progresses by September 2007. Was it to the point that his mother would not have recognized her

DR-H733

56

grandchildren? Would any such visit have been traumatic for the children? Those were questions that the Magistrate would have liked the Plaintiff to have addressed, but he made no effort to.

Of greater significance, the Plaintiff testified that the children had never seen his mother. They had been to Florida for extended periods with the Plaintiff who testified to trips to theme parks and restaurants and the children going shopping or playing in his office. Never once did he mention taking the children to visit his mother. The Plaintiff testified that was the Defendant's fault. In response, she stated that she first met the Plaintiff's mother in 1995 when she and the Plaintiff were engaged. She went on to say that the two got along well and that the relationship was nice. Finally, she told the Court that after the Plaintiff became involved in a law suit with his mother he forbid the Defendant to speak with her.

The Plaintiff never directly challenged that testimony. It would have been difficult for him to do so in view of the "Newsweek" article that appeared in 1998 that reported on the $ 40,000.00 claim he made against his mother for monies she allegedly owed him for taking care of her mother (Exhibit E attached to the Defendant's Motions to Modify the Divorce Decree and to Temporarily Suspend Visitation). It is noteworthy that in failing to dispute the Defendant's testimony the Plaintiff never mentioned when he last saw him mother. That is an important piece of information that the Court should have had because if he wasn't seeing his own mother their estrangement would lend credence to the Defendant's statements. On the other hand, if the Plaintiff had testified to having a warm loving relationship with her that was characterized by frequent contact the Magistrate would have to doubt the Defendant's testimony. Although he had the opportunity to do so, the Plaintiff never touched on the subject.

Instead, as with so many other situations, the Plaintiff refused to take responsibility for the children never seeing his mother. Thus, where the Defendant maintained that the Plaintiff was solely responsible for the children not seeing the Plaintiff's mother he blamed the Defendant who, he testified, banned him from allowing the children to meet his mother. It is an incredible assertion; one entitled to no credibility whatsoever. The Plaintiff is a lawyer who has aggressively pursued every possible line of attack in these proceedings; not just in this Court but in the appellate courts of this State and in the Miami courts and those in Alabama as well as in federal court.

He has also shown no fear of the Defendant, threatening her with "legal hell to pay" if he could not talk to the children and if she did not stop confiscating the cards and gifts that he sent them. (Defendant's Exhibits R and GGG) He also issued a none too veiled threat when she mentioned trying to get her share of the monies due her under the divorce settlement from Judicial Watch, telling her that: "As for Judicial Watch, proceed at your own risk, which is substantial." (Plaintiff's Exhibit 77). Finally, he told her in an email dated August 15, 2007 that:

> Stephanie, your conduct necessitates lawsuits and this is just the beginning. I will treat you legally as I treat others who behave the way you have. …: Please be advised that you Mike and your mother will be held legally accountable… (Plaintiff's Exhibit 91)

DR-H733

This is the same man who wants the Magistrate to believe that he was so cowed by the Defendant that he never once took the children to see his mother, not even when he had possession of them more than a thousand miles away from the Defendant. It is an unbelievable contention. The Plaintiff's behavior since July 2007 coupled with his admission that the children never met his mother leads inexorably to the conclusion that the Defendant did not prevent the children from seeing the Plaintiff's mother before she died. If she was deprived of the opportunity of seeing her grandchildren, it was the Plaintiff's doing not the Defendant's. That, however, did not stop him from blaming her.

He also accused her of "confiscating" the gifts that he sent to the children, especially the. Amigo cell phones that he bought for them and the Crosses with the Stars of David on them. He also maintained that she failed to give the children the cards as well as other gifts that he sent them. With the exception of the crosses and the cell phones, the evidence that the Defendant confiscated the clothes and presents that he sent the children and that she refused to give them the cards and pictures is spotty at best. The Plaintiff made a lot of allegations, but was unable to really back up any of them.

The one piece of clothing that there is no dispute that Lance received and that the Defendant would not let wear is a black tee shirt with three drunk frogs standing over a caption that reads: "TOADILY WASTED" (Defendant's Exhibit Z). The Plaintiff initially denied sending it, but then added that if he had he did not see what was on it. In almost the next breath, however, he mentioned that Lance likes frogs. It was not a performance that inspired confidence in the Plaintiff's credibility.

The Plaintiff either sent the shirt or he didn't. His credibility is so bad that the undersigned finds his denial unconvincing. Further, for him to argue that he somehow picked out a black tee shirt with three inebriated green amphibians cavorting over a caption that reads "TOADILY WASTED" and didn't see what was on it when the pictures and the words take up the middle of the shirt is absurd. It is especially impossible to believe that the Plaintiff did not pick out the shirt and send it to Lance when he testified that Lance likes frogs. His testimony indicates that the Plaintiff knew exactly what he was doing when he sent the shirt to Lance. The Defendant believed that it was a completely inappropriate gift for a child and refused to allow Lance to wear it. The Magistrate cannot and will not fault her for that.

It is easy to understand why the Plaintiff would have wanted to distance himself from the shirt. Because it was inappropriate for a child, it is another example of the Plaintiff's lack of boundaries. It is the kind of thing that the Magistrate would have expected carousing college students and vacationing adults to wear, not a child and the Plaintiff should have realized that. Of equal importance, the shirt supports the Defendant's claim that the Plaintiff mocked Isabelle's underwear and sent her with a woman friend who purchased a pair of thong underwear for her following which he encouraged her to wear it (Defendant's Exhibit D). At the time, Isabelle was only 9. The Magistrate finds that such clothing was grossly inappropriate for her.

The Plaintiff adamantly denied that he had done any such thing or that the underwear that was purchased for Isabelle was inappropriate for a little girl. There are a number of reasons not to believe the Plaintiff. The initial one is that the Plaintiff never explained why his female friend

58

would have taken Isabelle to purchase underwear in the first place. The Plaintiff never answered that question. There is no testimony or any other evidence in the record to suggest that the children did not have adequate clothing when they went to visit the Plaintiff. Certainly the Plaintiff never complained about the children's clothing or lack of it. The second reason is that dressing Isabelle in thong underwear fits into the pattern of behavior described in the notes the Defendant made before the divorce. Although the Plaintiff referred to them as "smears", implying that the Defendant created them out of whole cloth, he never explained why he gave up the custody fight or why he agreed that the Defendant could limit his overnight contact with the children.

The Plaintiff would certainly like the Court to believe that the conduct described in the Defendant's notes are smears, but there is at least one incident that that he admitted to that corroborates one of her entries. According to the Defendant's January 18, 2003 note, the Plaintiff came into her house and went upstairs where he looked to see if his picture was in Isabelle's room. When he couldn't find it he became upset. During the course of his testimony the Plaintiff admitted that he would go into the Defendant's house and put his pictures there only to return later to look for them, always discovering that the pictures would be gone.

Their disappearance, apparently, is what lies at the heart of the Plaintiff's claim that the Defendant confiscated the pictures that he sent to the children. (If the Plaintiff is referring to the picture of him that he emailed to the Defendant asking her to give it to the children (Defendant's Exhibit A), there is no evidence that she didn't. The important point is not that the Defendant put the pictures away, assuming that she did, but that the Plaintiff refused to acknowledge that the parties' separation and subsequent divorce created a line between them that he was not supposed to cross.

In addition, the comments attributed to the Plaintiff about Isabelle in the Defendant's notes (Court's Exhibit 1) are in keeping with purchasing thong underwear for her. Finally, and most importantly, the Magistrate has repeatedly concluded that the Plaintiff's testimony is simply not credible. He has demonstrated a pattern of making allegations, such as that the Defendant did not tell him about Lance's accident for a day and a half or that he did not have notice of Isabelle's First Communion well in advance of the event or that Sister Linda confiscated the suit cases and gifts that he brought for the children as well as the numerous allegations that he lodged against the Defendant, only to have to confront evidence that his version of events had no foundation in reality. In every case he continued to maintain his position regardless of the lack of evidence to support his statements or in the face of evidence to the contrary.

The tee shirt and the thong underwear are no different. For the reasons set out above the Magistrate finds that the Plaintiff knowingly purchased and sent the "TOADILY WASTED" tee shirt to Lance and also allowed a woman friend to purchase thong underwear for Isabelle and then encouraged her to wear it.

There is no question that the Defendant would not allow the children to have the cell phones while they were in her possession. She did not believe that children of Lance and Isabelle's ages needed the phones. Their purpose, as the Plaintiff made clear was to enable him

DR-H733

59

to contact the children whenever he wanted. (Plaintiff's Exhibits 77 and 78) The Defendant did not want the Plaintiff to call the children while they were getting ready for school. (Plaintiff's Exhibit 45) He, in turn, maintained that he had called them every morning for the preceding three years and there was no reason that he should not be allowed to continue the practice, especially since the children liked to talk to him in the morning.

He also introduced a message that Mike DeLuca left on his answering machine in 2006 in which Mr. DeLuca stated that there is no reason he can't talk to the kids (Plaintiff's Exhibit 106). It is not clear why the Plaintiff introduced that exhibit as it doesn't contradict the Defendant's position that he could call the children, but that she did not want him to call while she was trying to get the kids off to school. It simply says that the Plaintiff can call the children. Except for trying to limit the early morning calls on school days and complaining about the repeated calls the Defendant never said that the Plaintiff could not call the children. In view of the record, Mr. DeLuca's message is a non sequitur and, therefore, entitled to no weight.

With regard to the issue of morning phone calls on school days, there is merit to both positions. The Plaintiff spoke of calling the children in the morning on a daily basis for two to three years. From his perspective there was no reason that the practice could not continue. From the Defendant's point of view, the calls disrupted the morning routine. Considering the Plaintiff's lack of candor and the Defendant's need to get the children to school the undersigned cannot conclude that if there was a practice such as the Plaintiff described the Defendant did not violate the terms of the parties' divorce decree or abuse her position as custodial parent when she advised the Plaintiff not to call in the mornings on school days.

By the same token, the fact that the Defendant refused to allow the children to have the cell phones while they were in Cleveland doesn't make her a bad parent or provide grounds to change custody. It especially doesn't in the face of evidence of some of the Plaintiff's conversations with the children. Specifically, in response to some communication with the Defendant in which the Plaintiff told her that he wants her to get the children to have "long and meaningful conversations" with him she emailed back:

> Remember, they are not adults yet, they are 5 and 7 years old. I cannot always get to the telephone, which you do not understand. In the past, you have sent the police to my house when I was not available by telephone. Please do not call here in the morning on school days anymore, as I will not answer the telephone. This is a very busy and hectic time, as I am trying to get the children off to school. (Plaintiff's Exhibit 45)

In another email sent the same day the Defendant pointed out that the Plaintiff had called the house seven times that day before 10:30 a.m. and that he sometimes called 10-15 times a day.

The Defendant's complaint's about the Plaintiff's failure to understand that children of Lance and Isabelle's ages don't have long, meaningful conversations with adults is echoed in an email the Plaintiff sent the Defendant on January 12, 2006 in which he complained that he didn't:

60

DR-H733

... have a chance to talk to the kids yesterday as they were
"preoccupied" when I called, Thanks for having them ready
tonight to talk with me without distractions. (Plaintiff's Exhibit 59
and Defendant's Exhibit U)

The children, in other words, were being children; something the Plaintiff either could not
understand or accept.

More damaging to the Plaintiff's position is the testimony of the Defendant, Mike
DeLuca, Gisela Luck, the Defendant's mother, and Dana Ginley with regard to the children's
reactions to the Plaintiff's calls. Like the Plaintiff, the Defendant as well as her husband and her
mother have a lot to gain or lose depending on the outcome of these proceedings. For that reason
it is natural to be suspicious about what each side has to say about the other. Nevertheless, the
Magistrate finds that the Defendant's testimony credible with regard to Lance becoming so upset
with the Plaintiff when the two spoke after Lance's accident that the child threw the phone across
the room.

The reason he did is that the Plaintiff was pushing him to say or at least believe that the
accident was the Defendant's fault. Mike DeLuca reported the incident in much the same way,
testifying that he heard Lance say "No dad, that's not what happened." and "It wasn't her fault."
more than once before he threw the phone across the room out of anger. Since that was a mantra
that the Plaintiff began chanting on the morning of July 4th when he learned of the accident and
has not stopped repeating since then, the Magistrate finds that Mike DeLuca's and the
Defendant's description of both the nature of the Plaintiff's conversation with Lance and the
child's reaction to the Plaintiff credible.

Ms. Ginley testified that she was in the house approximately 10 times when the Plaintiff
called the children. About half of those calls went well. The other half were problematic with the
children telling the Plaintiff that they were playing and didn't want to talk. They would hang up
only to have him call back 2 to 3 times. The children, in her opinion were often frustrated by the
calls. She also testified to the children's demeanor during the calls, telling the Court of their
resistance at times when the Plaintiff was calling and that their demeanor was defensive.

Another friend of the Defendant's, Molly Yohann, also testified that she had been present
several times when the Plaintiff was on the phone and the children did not want to speak with
him. She further stated that the Defendant would try to encourage the children to at least say
hello to him, but they refused to. Even though both women are close friends of the Defendant,
the undersigned finds their testimony about the children's reaction to the Plaintiff's calls and the
children's reactions to him credible.

By the same token, in spite of the obvious bias that Mike DeLuca must be presumed to
have as the Defendant's husband the Magistrate nonetheless finds his testimony, not just as it
relates to the children's reaction to the Plaintiff's calls in particular, but the rest of his testimony
in general credible. During the course of his time on the witness stand Mr. DeLuca spoke of his
efforts to facilitate the Plaintiff's contact with the children even to the point of driving them out

61

to the airport where the Plaintiff was staying or going downtown to pick them up. He also testified to his efforts to act as a go between the Plaintiff and the Defendant. It was during that period that the Plaintiff told him that the Defendant's mother was a Nazi who put words into the Defendant's mouth and that the Defendant had mental problems and wasn't a good mother.

It would be easy to ignore those claims coming as they do from the man who married the Defendant except that the Plaintiff has repeatedly told anyone who would listen; the Hot Line worker, Sister Linda, Ms. Blue and the Court the same things about the Defendant. The claim that the Defendant is a compliant creature without a mind of her own is also nothing new. The idea that she cannot act or think for herself lies at the heart of the Plaintiff's attack on Ms. Jambe who, he believes, orchestrated every aspect of this case including telling the Defendant to confiscate the necklaces that he sent the children (Defendant's FFF).

Mr. DeLuca also credibly recounted the problems he witnessed when Isabelle and her father were talking. According to Mr. DeLuca, the conversations would start out cordially and sometimes stay that way. At other times she would become emotional, get upset and run into the bathroom and lock the door. Even though she did, he could hear her shouting at him. He also reported that he has disciplined Isabelle when she was disrespectful to the Plaintiff and cursed him. On the other hand, he also recounted that the phone call between the Plaintiff and the children the weekend before he testified went well. Lance briefly talked to his father and then took the phone upstairs to Isabelle who also spoke with the Plaintiff.

In the face of all of the evidence the Magistrate finds that the Defendant neither had to permit the children to have the cell phones that the Plaintiff gave them nor did anything wrong by not letting the children have them. Further, the evidence doesn't support the Plaintiff's claim that the Defendant would not let him talk to the children. He had access, but the record is convincing that it was he and the way he dealt with the children that caused the problems, not the Defendant.

There is also no proof that the Defendant confiscated the Crosses with the Stars of David that the Plaintiff sent the children or that she refused to give them the gifts and cards that he sent. The crosses took on special significance for the Plaintiff who saw them tied up with his "Jewish heritage", which comes from his mother who was Jewish. He was, however, raised a Christian. He told the Court that he attends Christian services at Ted Baer's house in California and goes to an Orthodox service in Beverly Hills. While he may have attended Jewish services during his marriage to the Defendant, he did not take the children with him. He also failed to mention that he took the children to Jewish services whenever they were with him in Florida or when he lived in Cleveland. Further, there is no evidence that he has celebrated any of the Jewish holidays with the children, discussed what it means to be Jewish with them or introduced them to Jewish history or culture.

Against that background, there is no question that Lance and Isabelle were baptized in the Catholic Church, have attended services at Gesu and were enrolled in Gesu school. That doesn't mean, though, that they should not know that their grandmother was Jewish or what being Jewish means for their father. There is simply no evidence that the Plaintiff ever made that effort up to the time of trial.

62

DR-H733

Nonetheless, the Plaintiff intimated that Lance knew enough about his background that when he, Lance and Mike DeLuca were in church Lance "screamed out" "Am I Jewish Mike?" in response to which Mr. DeLuca "screamed' "You're Christian.". The Magistrate doesn't believe that either Lance or Mr. DeLuca "screamed" anything. Instead, the Magistrate finds given the Plaintiff's almost total lack of credibility and his repeated efforts to paint almost everyone in the worst possible light that his description of his son's and Mr. DeLuca's behavior is nothing more than another attempt to depict events not as they happened, but as he wants the Court to believe that they did.

Whatever the decibel level that night, Mr. DeLuca's response to Lance's question upset the Plaintiff who told Mr. DeLuca to mind his own business. Later on the Plaintiff remembered the story differently, telling the Court that the incident occurred at the Christmas pageant (at Gesu). He entered the church at which time Lance was sitting with the Defendant's mother. Lance asked to sit with him, which he did. While they were sitting there before the pageant started the Plaintiff told Lance that had gotten him the Star of David with the Cross on it.

It was at that point that Lance turned to Mr. DeLuca and asked if he was Jewish to which Mr. DeLuca responded that he was Christian. The Plaintiff further testified that Mr. DeLuca wanted him to go outside and fight. Not surprisingly, Mr. DeLuca remembered the story somewhat differently. It started, according to Mr. DeLuca, when the Plaintiff demanded to know why he was telling the children that they were not Jewish. He did acknowledge telling the Plaintiff that they should go outside, but that was only to avoid the obvious scene that the Plaintiff was causing because he was loud. Neither man went outside and the night ended with the Plaintiff asking if he could take the children to Geraci's and the Defendant agreeing that he could. On the witness stand, Mr. DeLuca acknowledged telling Lance in response to a question that he was Roman Catholic. He added that he was talking about the religious aspects not his heritage. Under all of the circumstances known to the Court the Magistrate can neither fault Mr. DeLuca for his answer nor find in it the denial of the Plaintiff's Jewish heritage that he sees.

There is one another point that the Plaintiff repeatedly attempted to make, which is that the Defendant turned the children against him so that Isabelle is now afraid of him when she wasn't before. There is no question from the testimony of two of the Plaintiff's witnesses and the pictures that he introduced (Plaintiff's Exhibits 1-28 and 102) that prior to September 2007 the children did not display any outward concern about the Plaintiff to third parties or appear to be afraid of him while they were in public. The Defendant, her mother and Mike DeLuca all related a different story.

They testified of the children's reluctance to go with the Plaintiff and the children's reticence to speak with him. In that regard both Ms. Luck, the children's grandmother, and Mr. DeLuca spoke of Isabelle hiding under the bed when the Plaintiff came to pick up the children. Ms. Luck went on to add that over time Isabelle's reticence seemed to disappear. What didn't and what both Mr. DeLuca as well Ms. Luck also testified to was witnessing the children's discomfort from the Plaintiff kissing them all over and hugging them excessively. It was something they both mentioned that the children obviously didn't like and that they would tell the Plaintiff to stop, but he wouldn't. Isabelle told the same thing to Ms. Wingler when she

63

interviewed the child (Court's Exhibit 1). The Plaintiff denied that he excessively kissed the children, but the undersigned finds his denial unconvincing.

As has been pointed out earlier in this discussion, the Magistrate concluded that the Plaintiff has repeatedly exhibited a poor understanding of other people's boundaries. His demonstrated failure to recognize where the boundaries lie has not only led him to repeatedly transgress them, but also in his unsuccessful efforts to deny that he did anything wrong. The same pattern is apparent in his excessive kissing and hugging the children. It is not just that he kissed the children too many times that Isabelle and the other witnesses spoke of, but that he kissed them all over their bodies (in Isabelle's words) that again points to the Plaintiff's lack of boundaries and his utter failure to recognize, much less understand the impact of his actions.

The second reason for finding the Plaintiff's denial unconvincing is his almost total lack of credibility. The Plaintiff has given the undersigned too many examples of his lack of veracity to put little, if any stock in what he has to say unless there is some independent corroboration of his words. The final reason for concluding that Isabelle's declaration that: "... he tries to kiss us... all over our bodies and we don't like that." is an accurate description of the Plaintiff's behavior is that it came out in the same interview in which she told Ms. Wingler that the Defendant told her that she had told her counselor that she had washed her father's privates.

The Plaintiff pilloried the Defendant for that, arguing that there was no truth to that or any of the other allegations that she lodged against him. The Defendant, not surprisingly, denied that she had said any thing of the sort to Isabelle. The problem for the parties is that the Magistrate cannot pick and choose from among Isabelle's statements to Ms. Wingler. There is no objective standard that would allow the undersigned to do that. The result is that the Plaintiff may have his victory as it applies to Isabelle's statement concerning what her mother told her, but for the same reasons he cannot escape the conclusion that she told the truth when she told Ms. Wingler that he kissed her and Lance all over their bodies and they did not like it. By the same token, while the Defendant can take solace that the Magistrate finds Isabelle's statement about the Plaintiff excessively kissing her and Lance credible, she has to live with the concomitant conclusion that Isabelle told Ms. Wingler the truth when she said that the Defendant had told her that she washed the Plaintiff's genitals.

The Magistrate finds that regardless of anything else, the Plaintiff's decision to seek custody of the children and his attacks on their mother turned Isabelle against him. In yet another example of his failure to grasp the impact of his actions the Plaintiff blamed the Defendant for that, repeatedly alleging that the Defendant told the children he was going to kidnap them. The first time the Plaintiff made the accusation was in a long email that he sent to the Defendant on December 20, 2007 (Court's Exhibit 1, Pgs. 174-175). He made the same claim to Ms. Wingler the following month (Court's Exhibit 1, Pg. 182). That would not be the last time he raised that hue and cry. As often and as strenuously as he made the claim, though, he was unable to produce anything to support it. The Defendant certainly denied that she ever told the children that the Plaintiff was going to kidnap them.

The undersigned is well aware of how difficult it is to determine which of two parties is telling the truth in a "he said she said" battle. In this case, there are two documents, both created

by the Plaintiff that support the Defendant's claim of innocence. The first is an email dated September 2, 2007 from the Plaintiff to the Defendant in which he documented his conversation with Isabelle the night before and in which he essentially accused the Defendant of poisoning the children's minds. As to his conversation with Isabelle, the Plaintiff wrote:

> Yesterday, I called at around 5pm and per chance Isabelle answered the phone. Since I called at a time which is different than most times that I call, I assume this is why you did not succeed at cutting thermoff (sic) from talking with me, as you do routinely.

> I opened the conversation by telling Isabelle, as always, that I love her, miss her and that she is my favorite little girl. Characteristically, she always responds " Dad, I love you and miss you too" This time, However, She responded abruptly by saying " I doubt that" I then repeated what I had said, and she responded "Yeh, Yeh, Yeh!"

> **I then asked Isabelle why she felt that way and she replied, "Because you are trying to take me away from mommy, my friends, my school and Cleveland."** She added that I had not paid for her school. When I told her that that was not true, and it is not true, she said " Dad, I don't believe you anymore. You have ruined my life. I'm just a little girl." She repeated this many times during our conversation and was very agitated and would not let me talk much. (At the end of our conversation, she hung up while I was speaking.) **She even said emphatically that she would call 911 if I ever tried to take her to Florida to live.** To quiet her down, I told her she could like where she wants. (Emphasis added) (Plaintiff's Exhibit 93).

It is noteworthy that while the Plaintiff stated that he told Isabelle that she could live anywhere she wanted, the promise wasn't true. The Plaintiff only mouthed the words in order to placate the child. Of greater significance, while Isabelle let the Plaintiff know in no uncertain terms how she felt, she never used the word "kidnap".

She also didn't use it when she and the Plaintiff spoke on February 7, 2008. The discussion covered a number of areas including the following exchange as memorialized by the Plaintiff:

> LK then told IK that he missed her and Lance and loved them very much. LK added "Do you miss your Dad." (sic) IK then responded "I'm not sure Dad." LK then asked "Do you love your Dad?" IK responded "I don't know Dad." LK then reminded IK of all of the good times they used to have going around Cleveland and in

65

Miami during vacations. IK responded, "Dad that was the past. Now is the future."

LK then asked IK what she meant. She responded, "**I am happy where I am and don't want to be taken to Florida and away from my friends and school.**" (Emphasis added) (Plaintiff's Exhibit 101)

As was the case when the two talked the preceding September, Isabelle used the term "taken" to describe what her father was trying to do. She never mentioned the word "kidnap" or said that the Plaintiff was trying to kidnap her and Lance. Based on those emails the Magistrate finds that it is the Plaintiff's word, one that he not Isabelle or Lance used. The corollary of that finding is that there is no evidence that the Defendant told the children that the Plaintiff was trying to or was going to kidnap them.

That said, there was one instance when the children were scared because the Plaintiff and Diana Klayman were driving around the neighborhood in 2007 looking for them. That they were afraid doesn't mean that the Defendant told the children that their father was going to kidnap them. It appears that at the time of the incident Isabelle, at least, knew that the Plaintiff had filed for custody. According to the Defendant, Isabelle learned of the Plaintiff's decision to seek custody when a process server attempted to serve her while she and Isabelle were sitting outside the house. The Defendant further testified that the process server read the caption to her while Isabelle was present. It was apparently from those few words that the Defendant would have the Magistrate conclude that Isabelle was able to figure out that her father had launched a custody fight.

That may or may not be true. There is no question, though, that Isabelle knew too much about the conflict between her parents. By way of example, the Plaintiff complained in an August 15, 2007 email that Isabelle accused him of forcing the Defendant to spend $ 3,000.00 because of lawsuits (Plaintiff's Exhibit 91). Of greater significance, she knew that the Plaintiff wanted to take her and Lance to Florida (Plaintiff's Exhibits 93 and 101). The Plaintiff doesn't believe that the Defendant was solely at fault for that. He also blamed her husband and her mother who, he believed, actively plotted to alienate the children and keep him away from him. (Plaintiff's Exhibit's 91 and 93) because she and her mother:

"... are very bitter and vindictive people and Mike has his own very serious problems which places the childfen (sic) at significant risk..." (Plaintiff's Exhibit 93).

It came as no surprise that the Plaintiff never explained why the Plaintiff and her mother were bitter or what Mike's problems are.

The point, though, is that Isabelle was aware of the Plaintiff's intentions and understood the ramifications of a victory by him. She left no doubt that she did not want to leave Cleveland, did not want to leave her friends, did not want to leave her school and did not want to leave her mother. The Plaintiff seemed unable to grasp that his decision to seek custody could have any

DR-H733

66

impact on his relationship with the children. He also failed to appreciate that his repeated questioning of the children could have a negative impact on the children and his relationship with them.

The Defendant's, Mike DeLuca's and Diana Ginley's descriptions of the children's reactions are consistent and credible; especially as it relates to the conversation between Lance and his father the morning after he fell off of the diving board (Ms. Ginley was not present at that time). The Plaintiff's insistence that Lance put the blame for the incident on his mother angered the child to the point that he threw the phone across the room and refused to speak with him for a significant period of time.

He was also upset that the Plaintiff verbally attacked Sister Linda when he and Diana brought the suitcases to Gesu. Lance ultimately made his feelings about his father known to Ms. Wingler, telling her that:

> I don't like him. He is so mean to everyone. He slammed my mom
> against the window and he hurts everybody." (Court's Exhibit 1)

Ms. Wingler gave the Court no reason to doubt the accuracy of her recollection of what Lance told her or the child's sincerity at the time. Lance's declaration had nothing to do with the Defendant.

The Plaintiff vehemently argued otherwise, maintaining that until he filed to modify the allocation of parental rights, which lead the Defendant to file the false allegations that he sexually abused Lance he had a wonderful relationship with his son who deeply loved him. As evidence of that relationship he pointed to how happy Lance is in the pictures that he introduced. The Magistrate has no reason to conclude that Lance's is other than happy in the photographs. That does not mean, however, that the child's attitude did not change based not on what the Defendant did, but rather on his (the Plaintiff's) actions.

There is one interesting piece of evidence regarding the children's attitude. It is contained in a voice mail that was left on the Plaintiff's answering machine (Plaintiff's Exhibit 27). There is no date on the message and the Plaintiff did not supply one. The Plaintiff testified that the message was from Isabelle who called after he left several messages for her to call him. The message is so garbled, though, that it sounds like the voice identified the caller as Lance. Regardless of which child called, the only parts of the message that are understandable are a voice saying first: "Hi Larry" and then at the end: "You can't blame this shit on us". Everything in between is unintelligible, with the result that it is impossible to discern what led to that final statement.

The Plaintiff sees the hand of the Defendant in the message. To the extent that the Plaintiff means that the Defendant told Isabelle (assuming that it was her on the phone) to say that or told her that their father couldn't blame them for this "shit", he was unable to provide any evidence to support that claim. On the other hand, the Magistrate has no doubt that Isabelle, at least, knew too much about what was going on between the parties.

67

The message is important for three other reasons. The first is that it corroborates Mr. DeLuca's testimony that he would discipline Isabelle when she cursed her father. The message is evidence that the child could behave in that fashion. The second is that the message reveals that whoever made the call was angry with the Plaintiff and was openly declaring that he or she was not about to allow him to blame them or their mother for whatever had happened. Third, the call fits with an incident that occurred when the Plaintiff took the children to see Dr. Lovinger. The Plaintiff testified that while they were all in the room with Dr. Lovinger Isabelle got up, came over to where he was sitting and hit him in the face hard enough to knock his glasses off. The Plaintiff reported that when Dr. Lovinger asked Isabelle why she had done that the child said: "I hate my dad. He hurts my mommy." If Isabelle could do that she could just as easily have confronted her father on the phone, especially if she felt that he was wrongly accusing her or Lance or her mother of something.

Isabelle's explanation for why she hit the Plaintiff while they were in Dr. Lovinger's office was not the first time she had said something like that. She had made a similar statement to Ms. Wingler, telling her that: "I don't want to ever live with him and I want him to stop hurting all of us". (Plaintiff's Exhibit 24, Court's Exhibit 1, Pg. 97). Ms. Wingler also reported that Lance said much of the same thing, her records reporting that he told her:

> ... my dad keeps suing my mother and my grandma and Mike-he wants to have us and take us from our mom and wants us to live with him but we never want to live with him-ever! (Plaintiff's Exhibit 24, Court's Exhibit 1, Pg. 106)

The Defendant admitted telling the children about the litigation as well as that the Plaintiff had sued her. She did not recall, though, if she had told them that their father had sued their grandmother, but someone did because that was the only way that Lance would have known that the Plaintiff had brought the Defendant's mother into the action.

The undersigned cannot countenance the Defendant's decision to discuss the litigation with the children. It doesn't matter if she deliberately set out to tell them about the ongoing custody battle or she simply answered their questions. In either case she was wrong to talk to the children about the ongoing battle. On the other hand, they were bound to find out about the fight because the Court took the step of appointing a guardian for them. It would have been almost impossible for the guardian to have explained why the children were talking to him/her without giving some indication of the fight over them. That they might have ultimately learned of the battle, though, doesn't excuse the Defendant's decision to talk to the children about litigation.

That she did doesn't mean that she was solely responsible for Isabelle's reaction or, from the Plaintiff's point of view, her complete change of attitude toward him. The Plaintiff launched this battle on July 5, 2007 when he filed the motion to modify parental rights and responsibilities that is pending before the Court. At the time Isabelle was nine and one-half years old. She knew that her father was living in Miami, Florida while she and her brother had been living in University Heights for the better part of their lives. It is impossible to conclude that once she learned of the nature of the litigation that she would not have grasped that the Plaintiff wanted to remove her and Lance from what was their home, their school, their friends and their mother.

DR-H733

That clearly upset her (Plaintiff's Exhibit 101). And while the Plaintiff may not think so, the Magistrate finds that Isabelle was capable of forming her own opinions.

In that regard she told Ms. Wingler on September 20, 2007, long before the episode with Dr. Lovinger, that her father:

> "...is just mean to everyone. My mom, my principal, me, Lance,
> and he tries to kiss us ...all over our bodies and we don't like that.
> (Court's Exhibit 1, Pg. 97)

Even ignoring Isabelle's inclusion of her mother and Mr. Deluca in that list, she had reasons to believe that the Plaintiff had been mean to her principal, Sister Linda, as well as Lance and her. And it is impossible to ignore her complaint about being kissed all over her body. Those were her opinions based on her experience. The Plaintiff cannot blame the Defendant for that. Neither can he blame the Defendant for Lance's opinions.

The Magistrate, as noted earlier in this decision, finds credible and persuasive the Defendant's description of Lance's reaction to the Plaintiff's attempt to push him into saying that July 4th accident was his mother's fault. The Defendant certainly did not plant that idea in his head. By the same token, Lance had been present when the Plaintiff had called Sister Linda a liar. There is no reason to question the accuracy of the testimony regarding that incident or its impact on him. In the same vein, he told Ms. Wingler that the Plaintiff pushed the Defendant against the window. Having witnessed his father's actions Lance concluded, as his sister had, that the Plaintiff was mean and that "he hurts everyone".

The Plaintiff never spoke to that allegation. It would be possible to argue that Lance was too young when the event occurred to remember it, but for one thing: the Plaintiff's testimony about Lance's disclosure that he had been sexually abused at the same time as his sister. The incident occurred when the Defendant and the children were living in Virginia. Lance was approximately two to three years old at the time. The Plaintiff told the Court that sometime in 2006 while he had the children in the car bringing them home from his Cleveland residence Lance blurted out "The same thing happened to me" meaning that he too had been abused. As a predicate to that story the Plaintiff mentioned that Isabelle would talk about the boy who had abused her.

The Plaintiff never indicated that Lance was not telling the truth when he made that disclosure. Further no one presented any reason to believe that Lance was not abused and did not recall being abused. By the same token, the Plaintiff failed to provide any reason why the Magistrate should conclude that Lance did not recall seeing his mother "... slammed against the window ..." by his father (Court's Exhibit 1, Pg. 97). The point is that regardless of what the Defendant may have told the children about the ongoing litigation, they had their own legitimate reasons to be angry with the Plaintiff.

Isabelle also expressed other opinions when she and the Plaintiff spoke on February 5, 2008; opinions that the Plaintiff would like to lay at the Defendant's feet, but cannot. To do that the Magistrate would be to treat Isabelle as a lump of clay who was molded at will by the

DR-H733

69

Defendant. Instead, the February 8th conversation reveals that Isabelle had carefully thought about what was happening in her life and was struggling to deal with the situation as well as that she had come to some conclusions based on how the outcome of the litigation would affect her and her brother. That much is clear from the following exchange as memorialized by the Plaintiff:

> LK then told IK that he missed her and Lance and loved them very much. LK added "Do you miss your Dad. (sic)" IK responded that "I'm not sure Dad." LK then asked, Do you love your Dad?" IK responded, "I don't know Dad." K then reminded IK of all of the good times they used to have going around Cleveland and in Miami during vacations. IK responded, "Dad that was the past. Now is the future"
>
> LK then asked Ik what she meant. She responded, "I am happy where I am and don't want to be taken to Florid and away from my friends and school."
>
> IK then went into a discussion of her school saying "Dad I don't want you to come to my school anymore. It is embarrassing and Sister Linda does not like it." LK then responded that the time he came was the only way to see her and Lance, since Mommy would not let LK and DK see or talk with them. IK responded, "I don't care dad. I don't want you to come to my school." LK replied that if that was the case, maybe IK should go to another school. (Plaintiff's Exhibit 101)

The conversation is significant for a number of reasons. The first is that it demonstrates that Isabelle was struggling with her feelings about her father. Her responses to his questions were not canned, but rather represent the efforts of a 9 year old to understand what was going on and why it was going on. The second is that she had, what to her was a legitimate reason for asking the Plaintiff not to come to her school. The third is that the Plaintiff was either unable or unwilling to respect her position. He then made the situation worse by telling Isabelle that he might take her out of Gesu, which she had already told him she did not want to leave. In telling her that maybe she should go to another school the Plaintiff effective let her know that her feelings weren't legitimate or that he didn't cared how she felt.

Actually, the Plaintiff was totally unconcerned with what Isabelle wanted or how she felt about her school as he left no doubt that if his bid to obtain custody of the children had been successful he intended to pull them out of Gesu. The gay clergy, the school's presence on a "gay friendly" web site, the Cleveland diocese's alleged tolerance of pedophile priests and Gesu's position that Jews don't go to heaven because they are not baptized were more than sufficient reasons for him remove the children from the school as soon as possible. The Plaintiff, of course, did not tell Isabelle how he felt about her school or his plans to the children's education when he took custody away from their mother. He is smart enough to have realized that if he did he would have driven an almost insurmountable wedge between them.

70

DR-H733

Children don't always get what they want. That is part of growing up. They sometimes have to leave a school they love because of events over which they have no control as is the case if their parents get divorced or one is forced to take a job in another city. Those are legitimate reasons that force changes on the children that they may not like, but have to accept. The Plaintiff's reasons for demanding that the children leave Gesu don't fall into that category. The Magistrate finds it would not be in the children's best interest to remove them from Gesu for the reasons the Plaintiff expressed. Most are his personal prejudices that have nothing to do with the children.

While the Plaintiff may have chosen to ignore Isabelle's feelings and opinions, the undersigned cannot. The Magistrate can find no reason to question their legitimacy. Isabelle, as noted earlier in this discussion, had valid reasons to want to stay in University Heights and want to stay in Gesu and want to stay with her mother. She also had legitimate reasons to be upset with her father. She was clearly able to voice those opinions as well as give him reasons for them. That the Plaintiff chose to disregard them or at least downplay them doesn't mean that the Magistrate must.

She certainly expressed her views after the Plaintiff and his father sent her a silver engraved necklace at Christmas in 2008 (at another point in his testimony the Plaintiff mentioned that he also sent a bracelet to her the same time). When he asked Isabelle if she liked it she allegedly replied either that it looked like a Mafia necklace or that it made her look like a gangster. The Plaintiff left no doubt who he thought was responsible for Isabelle's comments, telling the Court that in the past they (the children) said "thank you", but not since this started. Since the children had changed, the Plaintiff wanted the Court to know that it was the Defendant who was responsible for the change because she had not taught the children to respect him.

The undersigned agrees that Isabelle should have just said thank you and let the matter drop. That would have been the polite thing to do. That she didn't (if the Plaintiff can be believed) doesn't mean that the Defendant was teaching the children to disrespect their father or that she put it in Isabelle's head that the necklace was somehow less than pretty. The Magistrate takes judicial notice that children develop their own opinions about dress and style early. Except in schools like Gesu where the students are required to wear uniforms, elementary schools are filled with children wearing different styles of clothing. They have their own tastes and styles. Some, it is true, follow the trend set by others because they want to blend in. Others, though "do their own thing".

All of this is simply a predicate to saying that the Magistrate never saw the necklace or Isabelle or has any way to know what she liked or didn't like. She had an opinion, which she expressed in not very subtle terms. There was no evidence that Isabelle's opinion wasn't her own or that she was mindlessly repeating what someone else told her to say. The Magistrate will accept that she may have been less polite than she should have been. Even if that were not the case, the fact that she expressed an opinion did not make it someone else's.

By the time she received the necklace she had been expressing her own views for some time as evidenced by the February 6, 2008 conversation with her father in which she told the Plaintiff in no uncertain terms that: "I am really angry. I don't want to come to Florida. I want to

71

stay here!" That led the Plaintiff to tell her that neither he nor Diana were trying to take her away from Cleveland. They only wanted to see and talk to her and her brother and "... know that they are safe". According to the Plaintiff's notes of the conversation (Plaintiff's Exhibit 101) Isabelle then asked the Plaintiff when he decided to sue her mother. His records show that he told her:

> ... it was after Mommy would no longer let us speak with you and Lance or see you both. This LK added, was after Dad married Diana and Lance got hurt.

This was a nice piece of propaganda, but the statement wasn't completely true as the Plaintiff well knew. He had filed suit on July 5, 2007, the day after Lance's accident. The affidavit that accompanied his motion, however, had been notarized in Florida on July 3rd, the day before the accident. Lance's fall, as the Plaintiff well knew, had absolutely nothing to do with his decision to seek custody of the children. That had already been made sometime before July 3, 2007.

Of greater significance, his alleged lack of contact with the children was only one of many grievances that he had with the Defendant. As he made manifestly clear during his testimony he considered her unaffectionate and so consumed by self interest that she didn't care what happened to the children, exerted no effort to insure their safety and spent money meant for their support on herself and Mr. DeLuca. He also believed that the area in which the children lived posed a danger to them and the school they attended a potential danger because of the presence of homosexual clergy as well as that it was instilling beliefs in them that were hostile and demeaning to his Jewish heritage. These were not new grievances that arose after the Plaintiff filed his motion. These were conditions that predated the filing of his motion. He did not tell Isabelle that or the extent of his complaints.

The memo that the Plaintiff prepared of his conversation with Isabelle goes on to note that he reminded the child that she only has one dad. When she didn't respond he asked her if she had a father to which he noted she replied: "I don't know". According to the Plaintiff's writing Isabelle then turned back to the litigation, asking the Plaintiff "... how long he was going to keep this trial?" That led the Plaintiff to ask her how she knew about the trial. Isabelle then told him that someone had come to the house and "handed it (the motion) to my Mommy..." who read it to her. The Magistrate has no reason to doubt the Plaintiff's recollection of his conversation with Isabelle as it relates to the Defendant reading the papers to her.

The Plaintiff's notes go on to indicate that Isabelle again asked the Plaintiff why he sued the Defendant to which he again responded that he took that step because the Defendant was not letting him see her. At that point, according to the Plaintiff's notes, the following exchange took place:

> IK then asked, "Why didn't you try to sit down and resolve things with Mommy before?" LK replied that he had, but that Mommy didn't want to resolve things, but told Dad to go to Court if he did not like it." LK then praised IK for having a good idea and told IK to ask Mommy and Mike to sit down and discuss things and try to

72

work thing out so everyone could be happy. (Plaintiff's Exhibit 101)

The Plaintiff's side of the conversation makes for good reading, but again it is not the whole truth. The Defendant had told the Plaintiff to go to court, but that was on June 15, 2007 in one of a series of emails dealing with the Plaintiff's visitation and the children's activities, which the Plaintiff felt the Defendant had deliberately scheduled in order to interfere with his time with the children. The emails reveal that both parties were angry at and frustrated with the other. Before telling the Defendant that he would: "… not be pushed and jerked around any longer. I have had enough!", the Plaintiff wanted to know when the Defendant her mother and Mike would be available so he could depose them (Defendant's Exhibit EE). These were not the words of someone who was willing to sit down and talk.

The Plaintiff did make that offer in the email that he sent on July 4, 2007, telling the Defendant that she had until the end of the day to agree to put all legal proceedings on hold and sit down to discuss the many outstanding issues or he would take legal action because "…the kids safety is at stake". The Defendant did not respond and the Plaintiff initiated the present litigation. What he did not tell Isabelle is that on October 2, 2007 he left a voice mail in which he told the Defendant that: "I'll enjoy taking you and the rest of your family legally apart." (Defendant's Exhibits II and GGG). He also did not tell her that he advised the Defendant in an email dated September 7, 2007 that he intended to take the legal proceedings to a conclusion (Plaintiff's Exhibit 93). Finally, he didn't mention the call in which he told the Defendant that he was willing to settle, but not now (Defendant's Exhibit I I).

The Plaintiff could argue that he was always willing to halt the battle if only the Defendant would stop interfering with his time with the children. That, at least, is how he made it appear to Isabelle. He did not tell her the rest of his complaints about her mother, though. It is doubtful that if he had the child would have listened to him or believed him. Because he only told her a small part of the story he sent her on a fool's errand. She was to go to her mother and tell her that she had to sit down and discuss things with the Plaintiff. That was not going to happen and the Plaintiff had to know that it was not going to happen. By the time he spoke with Isabelle in February 2008 too much had happened, too many allegations had been leveled by each party against the other for this matter to settle outside of a court room.

The result is that Isabelle, if she had gone to the Defendant as the Plaintiff's messenger would have been in a no win situation, thrust into the middle of her parent's battle. The Defendant cannot escape censure for telling Isabelle about the litigation or for reading the motion to her, but neither can the Plaintiff escape condemnation for attempting to use Isabelle as his messenger. As a lawyer the Plaintiff knew that if he wanted to halt the litigation and try to reach an out of court resolution of the issues all he had to do was call his counsel and arrange a meeting with the Defendant and her counsel. Instead, he chose to put the burden on his daughter. That possibly would have led to a confrontation with her mother or opened the door for the Defendant to draw the child deeper into the fight. Whatever the outcome might have been, the Plaintiff had no more right to place Isabelle in that position than the Defendant did by providing her with details of the battle in which her parents were so heatedly engaged.

73

With regard to the remainder of the Plaintiff's allegations, is true that the Defendant would not allow the Plaintiff to come to her house for Isabelle's First Communion party. It is, however, difficult to see how her failure to invite him to the house is evidence of anything other than the Plaintiff's failure to understand the nature of the parties' relationship at that point or that there were boundaries that he should not and could not cross. By the time of Isabelle's party the Plaintiff had been told in no uncertain terms that he wasn't to come to the house because of his behavior up to that point, which included walking uninvited into the house when he picked up and returned the children in December 2005 and refusing to leave when told to (Defendant's Exhibit E and F).

The parties were not on the friendliest of terms by the time of Isabelle's party and had not been for years. To expect that under those circumstances he would have been invited into the Defendant's home even if he had not engaged in the conduct described above indicates that the Plaintiff had absolutely no grasp of how his behavior affected those he dealt with. It is also yet another indicia of his inability to understand, much less accept that he could have done anything wrong.

While it is obvious to the undersigned that there is absolutely no substance to almost all of the claims discussed in the preceding paragraphs, the Plaintiff relentlessly repeated them as if by doing so he could convince the Court of their validity. Repetition, however, does not constitute evidence, nor by uttering the same complaints over and over again was the Plaintiff able to meet, let alone satisfy, the requirement of Section 3109.04 (E) O.R.C that in order to justify a modification of parental rights and responsibilities the moving party must be able to demonstrate: (1) that a change has occurred in the circumstances of the children or the children's residential parent (2) that the modification is necessary to serve the best interest of the children and (3) that the harm that the children will likely experience as a result of a change of environment outweighs the advantages of the change of environment.

As discussed in the preceding paragraphs of this decision, even if the Plaintiff's motion to modify parental rights and responsibilities had not been dismissed it would have been denied. He was unable to establish that a change had occurred in the children's lives or the Defendant's. He also failed to prove that the modification was necessary to serve the best interest of the children. Finally, the nature of the Plaintiff's claims along with his inability to prove them by so much as a preponderance of the evidence leads inexorably to the conclusion that the harm likely to be done to the children by modifying parental rights and responsibilities as the Plaintiff requested to make him the primary residential parent would do far greater harm to the children than would be done by leaving them in their present environment with the Defendant.

The Magistrate further concludes that if the matter had proceed to the point that the undersigned would have had to consider the factors listed in Section 3109.04 (F)(1) O.R.C. that with one exception they would have overwhelmingly established that it would not be in the children's best interest to modify the prior decree allocating parental rights and responsibilities for the care of the children to the Defendant. That conclusion would not change even if this Court were to apply Virginia law as the Plaintiff claims it must because Section 20-124.3 of the Virginia statues requires that a court consider almost the identical factors found in Section 3109.04 (F)(1) O.R.C. when determining what is in a child's best interest.

74

By way of example, the Magistrate finds that:

(a) The Plaintiff wishes to be designated the residential parent and legal custodian of the children while the Defendant wishes to continue in that role. The Plaintiff testified that if he was awarded custody of the children he would move to the Cleveland area and place the children in some private school other than Gesu. Beyond that broad statement, the Plaintiff offered no evidence with regard to where he would live or how he would live here or what school the children would attend if he had custody of them. It was the Plaintiff's obligation to supply that information, not the Magistrate's to fill the void by guessing.

(b) While the children were not interviewed in chambers regarding their wishes and concerns, there is more than adequate evidence in the record to lead the Magistrate to conclude that they do not want the present custody arrangement to change. Isabelle made that abundantly clear to the Plaintiff in a conversation that he memorialized in a memo that was marked Plaintiff's Exhibit 101. She also made it clear to him in a September 1, 2007 conversation in which she told the Plaintiff, according to his email to the Defendant, that he was trying to take her away from her mother, her friends her school and Cleveland. Isabelle went so far as to tell the Plaintiff that she would call 911 if he tried to take her to Florida (Plaintiff's Exhibit 93).

(c) The children have a good relationship and interaction with their mother and stepfather as well as with their grandmother. Their relationship with their father is more problematic. There are times when the children have clearly enjoyed being with him. Many of those times appear to have been at restaurants, amusement parks or parties. There is also evidence from one of the Defendant's witnesses that the children did not seem to be afraid of the Plaintiff when she saw them together in public. On the other hand, there is just as much if not more evidence that the children are very troubled by aspects of their relationship with the Plaintiff, especially his constant questioning of them as well as kissing them all over their bodies, which he would not stop even when they asked him to.

(d) The evidence of the children's adjustment to their home, school and community is overwhelming positive. They have attended Gesu since they moved her from Virginia in 2004. Their school records (Court's Exhibit 1 and Defendant's Exhibit MM ) reveal that both Isabelle and Lance are excelling in school. Isabelle is an honor's student and Lance has progressed rapidly since entering school. Her mother reported that Isabelle, who is in the sixth grade, is a "pal" to younger students. There is nothing in the record to suggest that they have had any problems in school or have displayed any reticence about attending the school. The children also attend church at Gesu, which is where their mother and grandmother are also members and where Isabelle had her First Communion.

75

DR-H733

The children, as evidenced by some of the emails between the parties, have friends in the neighborhood as well as at school. Lance has played baseball, tackle football and takes swimming and tennis lessons. Isabelle has participated in dance class and had been in Brownies, plays volleyball and also takes tennis lessons. In addition she is in the choral club a Gesu. The evidence indicates that the children enjoy those activities. Isabelle has made it clear to her father that she wishes to remain in Gesu. The Plaintiff has made it just as clear that if he were allocated the parental rights and responsibilities of the minor children he would remove them from Gesu. He is convinced that the presence of gay clergy and the school's teaching regarding Jews is so inimical to their well being that they cannot be left in that school. There is noting in the record, however, to suggest that he ever looked at any other schools or had any idea what schools he could enroll the children in or even considered how the change in schools would impact the children or that he even cared how it would.

There is obviously a pool in the community that the children seemed to enjoy going to. Finally, there is nothing to suggest that the children are not adjusted to their home. The Defendant is a stay at home mother who also volunteers at the school. The children have accepted Mr. DeLuca as an adult figure in their lives and from his testimony as well as the Defendant's and Ms. Blue's there is no reason to doubt that he has anything but a good relationship with them. And except for the Plaintiff's allegations, about Mr. DeLuca offering Lance beer and cigarettes and spanking him, he never produced any evidence that the children didn't have a good relationship with Mr. DeLuca. The Plaintiff did challenge the Defendant's fitness as a parent and also alleged that she is cold and doesn't display real affection toward the children, but as noted earlier in this discussion, not only is there no evidence to support those allegations everything points in the opposite direction.

(e) The evidence reveals that the children are healthy. Lance's arm has healed without any problems. While the Plaintiff testified to some health problems, neither he nor the Defendant suffer from any debilitating physical problems. Each party raised questions about the other's mental health. The record indicates that the Plaintiff hired Michael Leach, Ph.D. and the Defendant Mark Lovinger, Ph.D. to conduct custody evaluations that would have involved psychological testing. Neither Dr. Lovinger nor Dr. Leach submitted a report nor testified in this matter. The Plaintiff also refused to authorize Dr. Schwartz to release his records from which the Magistrate could draw an adverse inference. The Plaintiff did admit that he had been prescribed Zimbalta, an anti-depressant, and a tranquilizer that he took every day. There was no other evidence of either party's mental health.

(f) The Plaintiff has not paid child support since sometime in 2008. He is also not paid the tuition for the children's school as he is required to do under the parties' divorce decree.

(g) Neither parent has been convicted of or plead guilty to any criminal offense involving any act that resulted in a child being abused or neglected.

76

DR-H733

(h) The Defendant has lived in the same house since 2004. During the course of the trial the Plaintiff testified that he was sleeping on the floor of his office in California. He also testified that he was essentially bankrupt. His counsel informed the Court in December 2009 that the Plaintiff had so little money that he was living with his client in Washington D.C. and did not have sufficient fund to enable him to travel to Cleveland to finish the trial and wasn't sure when the Plaintiff would have the necessary funds to do so. The Defendant did indicate that if he were to obtain custody of the children he would move to Cleveland, but he had no concrete idea where he would live.

Taken together, those factors along with the numerous unsupported allegations that the Plaintiff made concerning the Defendant that were discussed earlier in this decision would have lead the Magistrate to conclude that there was absolutely no basis whatsoever to warrant modifying the order of the Virginia Court granting the Defendant sole custody of the minor children. The only reason that the Magistrate is relieved of writing those words is that the Defendant's motions were dismissed due to his failure to prosecute them.

Not one to recognize the obvious, the Plaintiff argued that he not only presented more than adequate evidence to establish that it was in the children's best interest that he be named their residential parent and legal custodian based on the allegations outlined in the preceding paragraphs, but also because the Defendant, with calculated malice, made a false allegation of sexual abuse against him in an effort to thwart his attempt to wrest control of the children away from her and then continued to make that claim and use it as a basis for withholding the children from him even though she knew it was false. It is an intriguing argument for a number of reasons, not the least of which is the Plaintiff's claim that the timing of the allegation is proof of both the Defendant's perfidy as well as that the allegation was a calculated gambit deliberately played to defeat his attempt to gain custody of the children.

What makes the Defendant's claim that the timing of the allegation evidence of its falsity so interesting is that the same charge can be leveled against him since he contacted 696-KIDS on July 12, 2007, the day before the Defendant and her fiancé were to be married. Applying the Plaintiff's logic means that he knew that there was no substance to the allegations that he leveled against the Defendant's fiancé and only called 696-KIDS in an effort to disrupt the marriage and perhaps take Mr. DeLuca completely out of the children's lives and, therefore, out of the Defendant's.

The issue, though, is not whether the Plaintiff attempted to wreck the Defendant's marriage, but whether she deliberately made and continued to press a false allegation. There is no question that the Defendant believed both that the Plaintiff touched Lance while the child was in the bath tub and that she believed that when he did he sexually abused the child (Court's Exhibit 1, Pg 174). As noted earlier in this discussion, the social worker who investigated the complaint, which was called in by the child's pediatrician, concluded after an extensive investigation, that the allegations of abuse were indicated; which means that the investigator found circumstantial or other isolated indicators of child abuse or neglect (Court's Exhibit 1, Pg 193). She had reasons for that conclusion, which she was able to support by her observations and by those of the child's pediatrician.

77

DR-H733

Both observed similar behavior. The detective from the Sheriff's Department who interviewed Lance on June 19, 2008 noted in his report (Defendant's Exhibit OO) that:

> While observing the coloring book lance (sic) was given prior to the start of the interview, I noticed a change in his coloring pattern. It appeared more aggressive and he in fact rubbed the marker into the book so hard that he broke through the pages into the table. I observed this to be an indication of the child being aggressive and/or disturbed and clearly uncomfortable.

During the course of his testimony the detective added that when Lance became upset he began crayoning in circles on to the table leading the officer to conclude that the child was upset by the topic of conversation.

From the detective's notes and testimony it is clear that Lance was upset with the Plaintiff who he characterized as mean as well as stupid and a" geek" and a "nerd". The officer's notes go on to state that Lance defined a nerd "… as a weird person who does weird things" (Defendant's Exhibit OO). The record also reveals that Lance told the detective about the time that his father came to Gesu, the detective's notes revealing that Lance told him:

> …. his father was really mean to the principal at the school and she is really nice. He displayed pleasure as he said she eventually kicked his father out. Lance indicated that he enjoyed it when the principal kicked his father out of the school.

While he could remember that incident, which had happened less than a year before the interview, he was not willing to talk about the good times that he had with his father.

On the key issue of whether his father touched him and how, Lance could not recall exactly where or when it happened, but he was consistent with regard to what happened; telling the officer that he had been in the bathtub when his father, who had been washing him, put the soap and washrag down and touched his privates. Lance did not know why his father had done that but he was adamant that he father was neither washing nor drying him off at the time.

The pediatrician testified that Lance was compliant when she examined him in 2004 until she tried to examine his genitals. Then he became combative. The pediatrician went on to testify that she found Lance's behavior out of the ordinary and, in retrospect, a red flag. On the other hand she testified and her notes also reveal that Lance was initially reluctant to allow the pediatrician to examine his genitals on September 12, 2007, but agreed to when his mother was in the room. He also exhibited poor eye contact and told the doctor that his father "hurts my mom". Finally, he gave a "negative response" when asked if he had been touched in his private area (Court's Exhibit 5). It was apparently those observations plus her own that lead Ms. Wingler to conclude that the abuse accusation was indicated. It is true that her determination was eventually overruled by a senior social worker at the end of some kind of process in which

78

DR-H733

neither the Defendant nor her counsel was allowed to participate and in which the Plaintiff himself did not speak, although he was present.

Although the Plaintiff was irate over what he believed was the Defendant's deliberate attempt to paint him as someone who sexually abused his son in spite of evidence to the contrary, he was even more outraged by her counsel who he repeatedly attacked on the grounds that her conduct was morally, ethically and legally corrupt. The Plaintiff's distain for Defendant's counsel reached such a fevered pitch that his wife's conduct became secondary in his eyes. She comes off as almost a puppet manipulated by Ms. Jambe for the express purpose of forestalling him from obtaining custody of the children or seeing them or talking to them.

That attitude and his contempt for Ms. Jambe permeated his testimony and was obvious in the complaint concerning her alleged unethical and unprofessional conduct that the Plaintiff sent to the Ohio Disciplinary Counsel on January 26, 2008 (Defendant's Exhibit AAA) as well as in the letters he sent to Magistrate Mills (Defendant's Exhibit BBB) and to the Director of the Court's Legal department (Defendant's Exhibit CCC). Not only did he believe that she was unethical and immoral, but he also accused Ms. Jambe of engaging in criminal acts because she allegedly obtained documents that Diana Klayman allegedly stole from his house (Defendant's Exhibit CCC).

He also accused Ms. jambe of fraud, conversion, invasion of privacy, intentional infliction of emotional distress and civil theft in the complaint which he and Diana Klayman filed against Baker & Hostetler as well as two managing partners and her co-counsel, Mr. Rollinson (Defendant's Exhibit IIII). In Paragraph 48 of that complaint, which is dated June 11, 2008, the Plaintiff alleged:

> Defendants, each and every one of them also intended and have inflicted emotional distress on Diana Klayman in ways which include but are not limited to: 1.) Making false, outrageous and now disproved charges against her husband, Larry Klayman, concerning his children, just after they were married. 2.) Making false statements to the children, which were then repeated to Diana Klayman and Larry Klayman that they intended to kidnap the children and that Larry Klayman is too old to have other children with his new wife, Diana. 3.) Threatening Diana Klayman with being joined as a party to the custody case and, even though no such joinder has occurred, sending her pleadings to her residence in Miami-Dade County, Florida, that do not relate to her at all, just to continue the threatening conduct intended to inflict emotional distress; (see Exhibit F which are (sic) incorporated by reference) 4.) Browbeating and demeaning her at deposition; 5.) Treating her in condescending, threatening and abusive way as a result of prejudice and racism toward her Latin ethnicity and her heritage, age and gender; 5.) Publishing false information about her and other actions which will be uncovered more fully in discovery.

79

During the course of the Plaintiff's testimony, he told the Court that Diana Klayman had been involuntarily hospitalized because of her addiction to pills and for what the Plaintiff described as a nervous breakdown. Although he had every opportunity to do so, the Plaintiff failed to make any mention of Ms. Jambe's actions or the Defendant's as a cause of his second wife's hospitalization or that they or the proceedings in this Court had anything whatsoever to do with the deterioration of her mental state.

The Plaintiff was really in no position to make that assertion in view of the complaint he filed against Diana Klayman (who he identified as Diana Yazbeck Mejia), her ex-husband, her Miami divorce attorney, his attorney, the Miami Police Department and other individuals in 2009 because in Paragraph 10 of that complaint he alleged:

> Defendant Mejia's highly unstable mental state, which prevented
> her from making an informed and reasoned consent to marry
> Klayman particularly in light of her continued love for Defendant
> Yazbeck...(sic) (Defendant's Exhibit HH)

Diana Klayman, in other words, had suffered from significant mental problems that pre-existed her contact with this Court or Ms. Jambe. This is the same woman whose praises the Plaintiff had earlier sung; the woman to whom he was going to entrust the children. The testimony and exhibits as well as the record lead the Magistrate to conclude that there is absolutely no substance whatsoever to support any of the claims the Plaintiff made in Paragraph 48 of the complaint he initiated against Baker & Hostetler and Defendant's counsel.

A review of the Florida action reveals that Plaintiff was particularly incensed that Defendant's counsel was able to obtain copies of records from Colonial Bank, records that the Plaintiff claimed had absolutely no relevance whatsoever to these proceedings. Judge Russo disposed of that argument on June 23, 2008, finding that because the Plaintiff had filed a motion to modify child support, his income and his household income were both relevant to this proceeding. Of equal significance, Judge Russo also found:

> ... blatant misrepresentations in a Motion to Quash filed by
> Petitioner and his spouse in Alabama. They alleged that the
> subpoena was issued at a time that this Court did not have
> jurisdiction due to a pending interlocutory appeal (not true).
> Petitioner also characterizes this as a "child custody proceeding",
> alleging that financial matters are not at issue. However, he failed
> to disclose to the Alabama Court that his own Motion to Modify
> Support was pending at all relevant times, wherein the disclosure
> of financial information is required.

In an attempt to skirt the impact of that ruling the Plaintiff subsequently dismissed his motion to modify child support. Even if he hadn't taken that step his income would still be relevant because his motion to modify parental rights and responsibilities continued to pend.

DR-H733

If he was successful in obtaining custody of the children then the Court would have had to enter a new support order, which would have required that it have a full account of the Plaintiff's income. Since the Magistrate dismissed the Plaintiff's motions, it is unnecessary to take that step. The Colonial Bank records (Defendant's Exhibits W & X) are still relevant, though, because a review of those documents along with checks written on Sun Trust Bank (Defendant's Exhibit Y) and the Plaintiff's testimony lead to questions about his credibility and his use of Ms. Yazbeck and others to shelter income. (The Plaintiff testified at one point that his organization paid her $ 85,000.00 at a time when he earned nothing.) The Plaintiff's credibility in that area is further undercut by the fact that he couldn't remember if he filed tax returns in 2007 and 2008. It is simply inconceivable that the Plaintiff, a lawyer with the reputation he purports to have, could not recall in mid to late 2009 if he filed 2007 or 2008 tax returns.

He showed the same lack of candor numerous other times during the course of his testimony, declaring at one point that the Defendant did not notify him until the day before Isabelle's First Communion of the upcoming event in order to keep him from appearing and participating in the ritual. On May 3, 2006 he complained to his lawyer at the time that until he received a copy of the letter from the attorney who was then representing the Defendant he was unaware that Isabelle was having her First Communion that weekend. He went on to add that as of that date he still did not know the date time or place of the rite (Plaintiff's Exhibit 87). That wasn't true.

When confronted during the trial with an email from the Defendant dated April 3, 2006, advising him that Isabelle would make her First Communion at Gesu Church on Sunday, May 7th at 2:00 p.m. (Defendant's Exhibit T) the Plaintiff told the Court that the date on the email was fake! There is nothing to establish that the date of the email is anything but genuine. The Plaintiff had to deny that it was, though, because to acknowledge that it was genuine would have ruined his carefully built-up fantasy that the Defendant deliberately kept him in the dark about the children's activities in order to marginalize his role in their lives.

The Defendant did not deny that she refused to allow the children to keep the Amigo cell phones that the Plaintiff purchased for them. She did not believe that it was appropriate for the children of Lance and Isabelle's ages at the time to have cell phones and so advised the Plaintiff (Defendant's Exhibit U) That is a far cry, however, from establishing that the Defendant cut off all of his phone contact with the children. What she did complain about, and asked him to stop, was calling the house over and over and over again in a short space of time so that he could speak to the children even though neither they nor she was at home.

At one point the Defendant counted thirteen calls within thirty minutes on a Saturday and an additional twelve the following morning (Defendant's Exhibit CC and Plaintiff's Exhibit 76), all while the family was out of the house. At another time she accused him of calling "continuously throughout the day, sometimes ten or fifteen times in a row...." (Plaintiff's Exhibit 44). While the Plaintiff admitted to having some recollection of the Defendant complaining that he was calling too much, he failed, as so often he did, to acknowledge that he had done anything wrong and instead put the onus on the Defendant for not allowing him to talk to the children early in the morning (Plaintiff's Exhibit 49).

DR-H733

The Plaintiff's testimony with regard to being told to stay out of the Defendant's home is likewise less than credible. According to the notes that the Defendant made prior to her divorce from the Plaintiff and which she supplied to Miss Wingler (Court's Exhibit 1), the issue of the Plaintiff entering and walking through the Defendant's home without permission and refusing to leave predates the divorce. On December 16, 2005, the Defendant's prior counsel again raised the issue in a letter to one of the Plaintiff's prior attorneys (Defendant's Exhibit F). The Plaintiff alleged that the statements in the letter were false which, he testified, led him to file ethics charges against the attorney.

In the course of testifying, though, he admitted that at some point he knew that the Defendant did not want him to come into her house, but also mentioned that in 2006-2007 the Defendant would cook dinner for him and that only stopped when she got involved with Mike DeLuca. Since the Defendant married Mr. DeLuca on July 13, 2007 and they had been dating steadily for between two and a half to three years before then and since the Plaintiff intimated in an email that he knew the two had been cohabitating for some time it is simply inconceivable that the Defendant would have been inviting the Plaintiff in and cooking him dinner when, by his own admission, that stopped once the Defendant became involved with Mr. DeLuca.

It is especially difficult to put any stock in the Plaintiff's testimony on this issue in view of his claim he made in the 2007 Florida complaint he filed against the Defendant, her mother and Mr. DeLuca, who he alleged had been cohabitating with the Defendant "for at least two years". If Mr. DeLuca was in the house then, by his own admission, the Plaintiff wasn't eating dinner there. There is simply no way to reconcile the Plaintiff's statements except to conclude that they were created in an effort to justify what he was doing, which was to walk into the Defendant's house without invitation and remain there in spite of her protests.

The Defendant was not the only person to mention the Plaintiff walking into a house without permission. The Defendant's mother testified that the Plaintiff not only walked into her house on occasion without permission, but also went upstairs and looked around. Her testimony along with Diana Ginley's , who testified to the Plaintiff walking into people's homes when she, the Plaintiff the Defendant and their children were trick or treating lends credence to the Defendant's description of the Plaintiff's behavior.

There are numerous other reasons to suspect the Plaintiff's credibility. One of those is his claim that he had Diana Klayman's permission to sign her name to various pleadings as well as complaints that were filed against Magistrate Mills and Judge Russo with the Ohio Disciplinary Counsel. At the time that the complaints were filed with the Ohio Disciplinary Counsel on July 20, 2008 Diana and the Plaintiff had been, by his admission, separated for two months. On August 23, 2008, in an email that was subsequently marked as Defendant's Exhibit KKK and admitted into evidence, Diana Klayman advised the Plaintiff that she was going to stay in Columbia and, more importantly, let him know in no uncertain terms that she though he had serious mental issues and wanted nothing more to do with him.

Given how strongly she expressed her views in that email it is difficult to believe that she would have ever authorized the Plaintiff to sign her name to a complaint against Magistrate Mills and Judge Russo or to documents submitted to the Court of Appeals. It is especially difficult to

DR-H733

believe that she had in view of the letters that she subsequently sent to disciplinary counsel and to Magistrate Mills and Judge Russo informing them that she had not signed her name to those complaints. Rather, she accused the Plaintiff of forging her signature (Defendant's Exhibits NNN). But it was not the Plaintiff who was at fault, it was Ms. Klayman, it was the Defendant, it was Miss Jambe: it was always somebody else who was flawed or at fault, never him.

In one of the more bizarre aspects of that manifestation, the Plaintiff repeatedly accused Miss Jambe of being a homosexual (Defendant's Exhibits DDD, EEE & FFF). In an email sent to Dr. Mark Lovinger who was hired by the Defendant to conduct a custody evaluation, the Plaintiff began by telling Dr. Lovinger:

> I just hope, that as a religious practicing Orthodox Jew, you do what is right when you write your report.

and then added:

> I have not been able to see or be with my children for two and one half years. Neither has my Dad, and my dead mother could not even see the children before she died. From day one after our separation, Stephanie, and now Mike DeLuca, not to mention Gisela Luck, think they have a proprietary right to the children and and that my family and I should just fade away into the sunset.

> This not only extends to me, but my family's background and heritage. It is no accident that Jambe and Stephanie found my and my Dad's bracelet and necklace (which is just silver) "inappropriate" for Isabelle, who is already a young girl. The logo of MontBlanc looks like a Star of David, and they previously confiscated ones I had purchased with a cross on them. They confiscated kids cell phones, failed to allow the children to view innocent e cards, and have tried to freeze me and my family's heritage out of their lives. **Its not unlike pre-World War II Germany, not coincidentally. The anti-semitism is rank and you should consider resigning given your strong religious views, which puts you in a conflict of interest situation.** (Emphasis added) (Defendant's EEE)

How the Plaintiff could have made the leap from the Defendant allegedly cutting off all contact between his children as well as with is his father and his mother, who the Plaintiff admitted suffered from Alzheimer's and who he also admitted they had never met, to accusing the Defendant and her attorney of anti-Semitism and from that to the conclusion that Dr. Lovinger was somehow placed in a "conflict of interest" situation is utterly incomprehensible.

The issue of the silver necklace and bracelet falls into the same category since there is no record of any conversation between the parties concerning those items and no evidence that the Defendant much less Ms. Jambe ever commented on them. The only person who did was

83

Isabelle, who told the Plaintiff in no uncertain terms that she didn't like the way the necklace looked. In the Plaintiff's mind, that wasn't Isabelle's opinion, she was only parroting the thoughts and word put into her head by her mother. As mentioned earlier in this discussion, the undersigned can find no reason to believe that was the case. Even more astounding, though, is the Plaintiff's claim that it was not just the Defendant who allegedly found the jewelry that was sent to Isabelle inappropriate, but it was Ms. Jambe also. It was she, in other words, who is behind Defendant's actions.

She is so corrupt, so venial in his mind that in June 2009 he complained that he wasn't given notice of the status conference at which ten trial dates were set even though he should have been because he was "rightfully pro-counsel" and it was indicative of the Magistrate's "bias and prejudice" because he was barred from participating in the proceeding. He went on to complain that he was not notified by anyone of the status conference when the dates were chosen including by Ms. Jambe:

> ...who likely initiated the secretive status conference with *ex parte* contacts with the court Magistrate... (Defendant's Exhibit VV)

In the pleading, which the Plaintiff captioned Supplement To Motion For Disqualification Motion For Continuance, he indicated that his key witness, Louise Benson, who knew better than anyone else of the Plaintiff's interaction with his children before the Defendant alienated them would be unavailable during the dates set for trial. Although her name appeared on the Plaintiff's witness list and although by his own statement she was his key witness, the Plaintiff never called her to testify. The point is not the promise to produce Ms. Benson was another left unfulfilled by the Plaintiff, but his view of Ms. Jambe.

The idea that she somehow had a duty to notify him of the trial schedule when he was represented by an attorney and after two courts had made it absolutely clear that he was only a litigant, not co counsel is patently absurd. It was his attorney's duty to advise him of the trial schedule, not Ms. Jambe's. She represented the Defendant and so not only had no obligation to the Plaintiff, but was prohibited by the disciplinary rules from contacting him while he was represented. As a lawyer licensed to practice in three jurisdictions the Plaintiff had to know that. Ms. Jambe, however, had become a creature of such malevolence that no crime, no machination, no plot was beneath her. It is an indication of his fixation on Ms. Jambe and her power that he claimed that she had somehow organized the entire enterprise.

While his assaults on everyone but the Defendant were short lived, the Plaintiff's attack on Ms. Jambe was unrelenting. Having decided for whatever reason that she is a lesbian he focused on her alleged sexuality with all of the relentlessness and fervor of a true believer. By the time that he took the witness stand the Plaintiff's fixation on and antipathy to Ms. Jambe had reached the point that in his mind she was in control of the Defendant; manipulating her like some Svengali to the point that she was more responsible for interfering with his ability to see and have a relationship with his children than the Defendant. It is an interesting fantasy, but one for which there is absolutely no support anywhere in the record.

84

The Plaintiff's attacks on Ms. Holecek, Ms. Jambe, Magistrate Mills, Judge Russo, Sister Linda and the Defendant are neither a new nor an unusual tactic for the Plaintiff as evidenced by Justice Tolub's 2007 decision in the matter of Stern v. Burkle, 207 N.Y.Misc. LEXUS 6402; 238 N.Y.L.J. 51. Written in response to Mr. Klayman's application to be admitted *pro hac vice* (which the court denied) Justice Tolub concluded that:

> Mr. Klayman's record demonstrates more than an occasional lapse in judgment, it evidences a total disregard for the judicial process.

In support of that conclusion Justice Tolub listed a number of cases in which the Plaintiff was cited for misconduct similar to that which he exhibited in this matter. By way of example, Judge Tolub wrote:

> In 2003, Chief Justice John C. Coughenour of the United States District Court for the Western District of Washington rejected Mr. Klayman's request for a new trial and characterized his arguments "regarding the conduct and demeanor of this Court" as "bizarre" and "beyond the far fetched." *"Daly v. Far Eastern Shipping Co., 238 F. Supp. 2d 1231, 1241 [W.D. Wash 2003].*

> In 2001, Judge James Robertson of the United States District Court for the District of Columbia criticized Mr. Klayman and his organization for acting with "malicious glee" and for their "forked tongue response to the Court's order." Judge Robertson concluded that Mr. Klayman's "maneuver is not funny, and is indeed sanctionable." *Judicial Watch of Fla., Inc. v. United States DOJ,*159 F. Supp. 2d 763, 764 [D.D.C. 2001].

> [In] *MacDraw, Inc. v. CIT Group Equip. financing Inc., 994 F. Supp. 447, 455 [SDNY 1997] aff'd 138 F. 3d 33, 37 [2d Cir 1998].* **The court found that Mr. Klayman had advanced "preposterous" claims,** had engaged repeatedly in "abusive and obnoxious" behavior during depositions and had **accused the court of racial and political bias**...(Emphasis added)

> *Baldwin Hardware Corp. v. FrankSu Enterprise Corp., 78 F. 3d 550, 555 [Fed Cir. 1996]* **[noting that Mr. Klayman, in his appellate briefs, accused the trial judge of anti-Asian bias]**...(Emphasis added)

> In 1999, Judge Royce C. Lamberth of the United States District Court for the District of Columbia wrote that he had "grown weary of [Mr. Klayman's] use-and-abuse- of the discovery process. The court has already sanctioned [Mr. Klayman] for making representations in a favorable ruling, and then later contravening

85

those very (mis) representations." *Alexander v. FBI, 186 FRD 188, 190 [D.D.C. 1999].*

... Judge Urbina sharply rebuked Mr. Klayman for **"often highly inappropriate" conduct and stated that his performance "was episodically blighted by rude and unprofessional behavior which was directed toward the presiding judge and opposing counsel."**... (Emphasis added)Material Supply Int'l, Inc v. Sunmatch Indus. Co. Ltd., No. Civ A. 94-1184, 1997 WL 243223

The MacDraw and Baldwin Hardware cases are of particular note because of the Plaintiff's claims that the jurists in those two matters exhibited a political or racial bias, accusations that the courts found to be totally baseless. As noted earlier in this discussion, the Plaintiff repeatedly hurled similar accusations against Sister Linda and the Defendant regarding their alleged anti-Latin bias. This assumes that the Defendant actually said something to the children about Diana Klayman, an assumption that the Magistrate is unwilling to make because there not only is nothing but the Plaintiff's word to support it, but also because it bears a suspicious resemblance to the claim of prejudice that the Plaintiff leveled against Sister Linda.

It is not even clear that the Defendant ever met Diana Klayman. The only evidence of what might be considered some interaction between the two women lies in an email (Defendant's Exhibit EE) in which the Defendant told the Plaintiff that she would appreciate Diana helping Isabelle get dressed for her dance recital. Other than that one document, there is no hint anywhere in the record that the Defendant ever saw Diana Klayman and so was aware of her skin color, whatever it may be.

Since the Plaintiff never testified that his children ever said anything to him about their mother's feelings concerning Diana Klayman, it is more likely that the Plaintiff either made up the allegation as a way of attacking the Defendant or forgot that he had already accused Sister Linda of anti-Latin bias and so laid the misconduct at his ex-wife's feet. After reviewing the record the undersigned can only conclude that those allegations are either pure fantasy or deliberate slurs made up for the purpose of destroying the character of those two women. Whatever the reason might be for the Plaintiff's attacks on Sister Linda and the Defendant, the undersigned can find absolutely no support whatsoever for any of them.

It bears repeating that the Plaintiff failed to establish that Sister Linda behaved in other than an appropriate manner toward Diana Klayman or that she evidenced any hint of bias because of the color of Diana Klayman's skin or her county of origin. As noted earlier in this discussion, the Plaintiff undercut the basis for that claim in his suit against Baker & Hostetler when he wrote that Diana Klayman "...is not dark skinned" (Defendant's Exhibit IIII). If she is not dark skinned then there was no reason for Sister Linda to have made a distinction on the basis of skin color, even if she was so inclined.

Likewise, there is absolutely no truth to the Plaintiff's claim that Sister Linda confiscated the suitcases and gifts that he brought to Gesu School. He knew that she hadn't because the children had rejected them while he stood there. Further, he admitted that Sister Linda returned

DR-H733

the items to him at a second meeting. Like his claim of her prejudice, the Plaintiff's oft repeated allegation that Sister Linda confiscated the suitcases and gifts not only lacks any foundation in reality, but says more about the Plaintiff and his mental process than it does about Sister Linda and hers.

By the same token, there is absolutely no support for the proposition that Ms. Jambe engaged in secret or *ex parte* talks with the Magistrate. The allegation that she did is somehow tied up in the Plaintiff's claim that the trial was scheduled at times when neither he nor his key witness, Louise Benson, would be available. In a supplemental motion to reschedule the trial the Plaintiff's counsel acknowledged that he failed to check with his client when the dates were chosen or notify him of the dates he, the Court and the other attorneys agreed on to resume the trial of this matter. Ms. Jambe had absolutely nothing to do with setting the trial dates other than to check her schedule.

Her role was no different that that of the Guardian or the Plaintiff's counsel. Yet, even though the Plaintiff probably knew at that point that the fault lay with his own counsel, he blamed Ms. Jambe. Even if he was not aware that his attorney had failed to notify him of the trial dates by then, there is absolutely no reason for him to have assumed that Ms. Jambe and the Court had secretly manipulated the trial schedule in order to defeat him. That he would harbor such thoughts much less broadcast them again says more about the Plaintiff's personality and mental state than it does Ms. Jambe's.

For those and the other reasons already mentioned in this decision, the Magistrate finds that the Plaintiff's testimony is entitled to no weight. He is simply not credible. If anything, the record reveals that he deliberately misstated facts, misinterpreted emails and conversations and made allegations about the Defendant, her husband, her mother and Ms. Jambe that were utterly without foundation. The Magistrate finds from the timing of the accusations that the Plaintiff leveled against Mr. DeLuca and the total lack of any evidence to support them that the Plaintiff made them with the intention of interfering with the Defendant's wedding. The unrelenting attack that he launched against the Defendant was made for another purpose; to paint her in the worst possible light while at the same time projecting himself as an innocent victim of a carefully orchestrated plot to destroy his relationship with his children. As discussed in the preceding sections of this decision, the effort to demonstrate that the Defendant was a "bad mother" failed miserably.

The core of the Plaintiff's argument with regard to the Defendant's plot to destroy his relationship with the children is that she falsely accused him of sexual abuse and along with Ms. Jambe continued to perpetuate the claim in spite of overwhelming evidence of his innocence. The Magistrate finds no such evidence. Instead, the Magistrate finds that the Plaintiff deliberately manipulated the process in order to avoid answering questions about his behavior. As noted earlier in this discussion, the Plaintiff was never interviewed by Ms. Wingler. Her records (Court's Exhibit 1) reveal that she repeatedly attempted to speak with the Plaintiff, only to be put off by one excuse after another. He also, by his own testimony, never said a word during the appeal process even though he was present.

87

The Defendant and her counsel were not part of that procedure so the individual who conducted the review was denied their input. That individual didn't testify so there is no way to know what factors she considered or what weight she gave to them in reaching her decision The assistant prosecuting attorney also didn't testify, so again the Court was denied the opportunity to determine what lead him to the conclusion that he came to. The only thing that the Magistrate knows for certain is that the Plaintiff did not speak with the detective who investigated the abuse allegation involving Lance. Finally, there are the results of the polygraph, which the Magistrate finds, for the reasons already discussed, are not entitled to any weight.

And as noted earlier in this discussion the Plaintiff chose to invoke his Fifth Amendment privilege against self-incrimination during his deposition (rather than answer whether he had ever touched Lance's private parts while the child was in the bath or when he was in bed or if he ever showered with the children or slept naked with them or whether the children protested that he kissed them too much. He also raised the same defense when he was asked to define what constituted inappropriate touching.

These were simple questions; ones that the Plaintiff should have had no difficulty answering, especially since he had "passed" the polygraph months earlier and also because he maintained that the allegation that he touched Lance's private parts was made up by the Defendant. The Plaintiff, however, refused to take advantage of the opportunity to declare under oath that he had never engaged in any of the behaviors that he was questioned about.

He had no problem declaring a number of times during the course of this proceeding that the Defendant and her counsel at the time of the divorce had tried to smear him. The statement is an apparent reference to the entries in the "diary" that the Defendant kept leading up to the time of the first divorce. The Plaintiff's however, was careful not to speak to those allegations or to speak to Ms. Wingler, to the detective who investigated this matter or to the CCDCFS supervisor who conducted the review of the indicated finding or speak under oath while he was being deposed concerning the specific allegation that he had touched Lance's private parts. Even more disturbing, the Plaintiff refused to even speak to what he considered inappropriate touching. The Magistrate finds under the circumstances that it is reasonable to draw an adverse inference from the Plaintiff's decision to "take the Fifth Amendment".

The Plaintiff's strategy of silence must be measured against Lance's disclosure and subsequent behavior when questioned about the Plaintiff as well as the Defendant's actions. The Plaintiff sees no need for any such inquiry because for him there is a perfect correlation between Magistrate Mill's declaration that the Plaintiff had a right to visit with the children and Lance's disclosure. The Plaintiff left no doubt that in his mind, at least, there was no disclosure. The Defendant made up the story as soon as Magistrate Mills told her that she had to allow the Plaintiff access to the children. The undersigned finds the Plaintiff's argument unpersuasive.

What is missing from the Plaintiff's timetable, but what cannot be overlooked is the incident at Gesu School on September 10, 2007 when the Plaintiff tried to give a suitcase full of gifts to both Isabelle and Lance. Sister Linda had to cajole Lance to leave class to see his father with the promise that she would not leave him alone with the Plaintiff. By the time of the meeting Lance may not have spoken to his father since he threw the phone across the room on

DR-H733

July 4th because the Plaintiff was attempting to convince him that the diving board accident was his mother's fault and that she did not care about him. If Lance wasn't happy about that conversation, the confrontation between Sister Linda and the Plaintiff further upset him. He had no problem expressing those feelings to Ms. Wingler or Detective Bonnette (Court's Exhibit 1 and Defendant's Exhibit OO).

It was against that backdrop that Lance, according to the Defendant's testimony, told her the next day that he did not want to talk to the Plaintiff and wished that he was not part of the family. It was only after he made that statement that he told the Defendant that the Plaintiff had "played with my privates in the bath". The Defendant further testified that Lance was angry while he talked to her and that he crumpled up his pillow, pulled his legs up and was moving his hands a lot. Although these were not the exact same behaviors that Ms. Wingler, Dr. Joyce or Detective Bonnette witnessed, all three reported that Lance was ill at ease discussing the matter and that he was upset with his father who he declared was mean and hurt people. Before those individuals ever became involved the Defendant called two of her friends to tell them what Lance had disclosed to her as well as her attorney and the child's pediatrician. She did not call the police or, like the Plaintiff, 696-KIDS.

For all of the foregoing reason including the description of Lance's behavior when he was questioned, the negative inference drawn from the Plaintiff's decision to refuse to answer questions regarding whether he had ever engaged in inappropriate behavior with the children or even to define the term, his repeated demonstrated lack of boundaries coupled with his failure to acknowledge that he has ever engaged in any inappropriate behavior lead the Magistrate to find that the Defendant neither fabricated the allegation that the Plaintiff touched Lance's private parts or induced him to say the words. Rather, the Magistrate finds that Lance uttered the words without any prompting from the Defendant.

For all of the same reasons as well as all of the others discussed in this decision, especially the Plaintiff's utter lack of credibility, the Magistrate finds that the Defendant's Motion to Modify Divorce Decree, Motion No. 249314, (denominated as her Motion to Modify Existing Order of Court) should be granted. The Magistrate further finds that pending further order of Court the Plaintiff shall have supervised parenting time with the minor children every other weekend, except when the children are out of the town for vacation, from Saturday at 10:00 a.m. to 7:00 p.m. and on Sunday from 10:00 a.m. to 7:00 p.m. with a supervisor to be selected by the Defendant and paid for by the Plaintiff. In addition, the Plaintiff shall have supervised visitation with the children from 10:00 a.m. to 7:00 p.m. on the holidays specified in the parties' Virginia divorce decree.

In regard to the issue of attorney fees Section 3105.73 (B) O.R.C. states:

> In any post-decree motion or proceeding that arises out of an action for divorce, dissolution, legal separation or annulment of marriage or an appeal of that motion or proceeding, that court may award all or part of reasonable attorney fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider

DR-H733

89

the parties' income, the conduct of the parties, and any other
relevant factors the court deems appropriate, but it may not
consider the parties' assets.

In determining the amount of reasonable attorney fees in this case the undersigned considered
whether all of the legal services rendered were necessary and whether under the facts of this case
the amount of time expended on those services was fully compensable. The Magistrate also
considered all of the factors set forth in Local Rule 21 as well as those established in <u>Swanson v.
Swanson</u> (1976), 48 Ohio App. 2d 85, 89-90.

   The Magistrate finds that while the issues presented, i.e. the modification of parental
rights and responsibilities and modification of parenting time, are commonplace in this Court;
the Plaintiff's actions made this matter anything but routine and straightforward. He not only
filed numerous motions in this Court, but also battled the release of his financial records here as
well as in Alabama and Florida. In addition, he filed a petition for a writ of mandamus and four
interlocutory appeals in the Eighth Appellate District Court of Appeals as well as an action in the
Federal District Court and one in Miami, Florida against the Defendant and her counsel. He also
repeatedly interfered with the Defendant's legitimate discovery requests to the point that the
Court of Appeals noted in one decision that:

   Appellant obstructed reasonable discovery requests by filing
   countless motions to quash and by failing to produce documents.

The Plaintiff also refused to accept and adhere to the decisions of this Court and the Court of
Appeals regarding his status.

   His actions required that the Defendant's counsel spend considerable time fighting on
multiple fronts before this matter even came to trial in June 2009. The ensuing fifteen days of
hearing required considerable time and effort. The result was that the Defendant ran up an
enormous legal bill, which obviously caused the Plaintiff no concern because during one of the
depositions he asked the Defendant's mother, who the Plaintiff indicated was the engine of the
case, if she wanted to settle the case or go through years of litigation and spend hundreds of
thousands of dollars. While he didn't deny that he made the statement, the Plaintiff protested that
it was taken out of context. The Magistrate finds that the Plaintiff's protestations of innocence
aside, he was very well aware of exactly what he was doing and deliberately embarked on a
course of action designed to use the legal process to punish the Defendant, her husband and her
mother.

   The Magistrate further finds that the Defendant's counsel, Suzanne Jambe, is a partner at
Baker & Hostetler where her practice is almost exclusively in the area of domestic relations. She
further stated that at present her hourly rate is $ 395.00 per hour, up from $ 340.00 per hour
when she stared representing the Defendant in 2007. She went on to say that this is the most
atypical domestic relations case that she has ever been involved in. She also testified to some of
the work that was required because of the Plaintiff's actions. In support of that testimony she
submitted copies of the pleadings from the actions filed in the Court of Appeals as well as the
Florida action, all of which the undersigned has reviewed (Defendant's Exhibits CCCC through I

DR-H733

I I I). Except for the Florida action against the Defendant and her counsel, which was still pending when the trial in this matter concluded, none of the Plaintiff's other actions were successful. All, however, required that the defendant incur fees and costs to contest them.

The Defendant did not submit any evidence in support of her Motion To Show Cause, Motion No. 260457, which was filed for the Plaintiff's alleged failure to comply with the expert witness nor did she press the issue of sanctions.

Ms. Jambe did, however, testify to the sums that the defendant was billed (Defendant's Exhibits VVV through BBBB), which establish that through November 16, 2009 the Defendant was charged $ 464,041.25 in fees and an additional $ 17,207.78 for expenses for a total of $ 481,249.03. That sum does not include any fees and expenses incurred from November 17th through the end of trial. The undersigned has reviewed the bills, which include charges for two other attorneys who assisted Ms. Jambe in this matter as well as for a paralegal and finds that attorney fees in the amount of  $ 325,000.00 are reasonable and necessary and that the amount of time expended on such services was fully compensable

## THE MAGISTRATE'S DECISION IS TO ORDER:

Petitioner/Plaintiff's Motion For Allocation of Parental Rights & Responsibilities, Motion No. 246178, and Petitioner/Plaintiff's Motion to Show Cause, Motion No. 247721, are dismissed with prejudice. Respondent/Defendant's Motion to ModifyDivorce Decree, Motion No. 249314, is granted. Pending further order of Court the Petitioner/Plaintiff shall have supervised parenting time with the minor children every other weekend, except when the children are out of the town for vacation, from Saturday at 10:00 a.m. to 7:00 p.m. and on Sunday from 10:00 a.m. to 7:00 p.m. with a supervisor to be selected by the Respondent/Defendant and paid for by the Petitioner/Plaintiff. In addition, the Petitioner/Plaintiff shall have supervised visitation with the children from 10:00 a.m. to 7:00 p.m.on the holidays specified in the parties' Virginia divorce decree

The Petitioner/Plaintiff shall not move this Court to modify the supervised parenting time and the Court shall not consider a  motion to modify supervised parenting time or modify the supervised parenting time schedule set forth in the preceeding paragraph until the Petitioner/Plaintiff submits to a full psychiatric or psychological evaluation to be conducted by a psychiatrist or psychologist in the Greater Cleveland area acceptable to the Respondent/Defendant. The Petitioner/Plaintiff shall sign releases for the individual conducting the evaluation to have full access to any and all medical and/or psychological records and/or records of any counselor with whom the Petitioner/Plaintiff has consulted for any reason and for any other records that the person conducting the evaluation may deem necessary in order to compete the evaluation. The Respondent/Defendant shall have full access to the person conducting the evaluation and may provide the evaluator with whaterver documents she believes the person conducting the evaluation may need in order to complete his/her evaluation.  The cost of the evaluation shall be borne by the Petitioner/Plaintiff.

Petitioner/Plaintiff's Motion for Attorney Fees, Motion No. 246180, is denied. Respondent/Defendant's Motion for Sanctions, Motion No. 253121, is denied.

DR-H733

Respondent/Defendant's Motion to Show cause, Motion No. 260457, is denied. Respondent/Defendant's Motions for Attorney Fees, Motion No. 288236, Motion No. 290239, Motion No. 253120, and the motion she filed for Attorney Fees at the same time that she filed her Motion to Modify Decree are granted. The Respondent/Defendant is hereby awarded attorney fees in the anmout of $ 325,000.00 for which judgement is rendered and execution shall issue.

Costs adjudged against Petitioner.

_____

MAGISTRATE  LAWRENCE R. LOEB

Counsel and parties will take notice that under the provisions of Rules 75 and 53 of the Ohio Rules of Civil Procedure, this matter will be held fourteen (14) days from the date on which this decision is filed. If no objections to this decision are filed prior to said date, the preceding decision will be adopted by the Court, subject to Civil Rule 53(D)(4)(c).

**A PARTY SHALL NOT ASSIGN AS ERROR ON APPEAL THE COURT'S ADOPTION OF ANY FINDING OF FACT OR CONCLUSION OF LAW IN THIS MAGISTRATE'S DECISION UNLESS THE PARTY TIMELY AND SPECIFICALLY OBJECTS TO THE FINDING OR CONCLUSION AS REQUIRED BY CIVIL RULE 53(D)(3)(b).**

### CERTIFICATE OF SERVICE

Copies of the foregoing Magistrate's Decision were mailed by the Clerk of Courts by ordinary U.S. mail to the following parties or their counsel of record:

JENNIFER L. MALENSEK, GUARDIAN AD LITEM
1220 WEST 6TH STREET
SUITE 502
CLEVELAND, OH 44113-0000

WILLIAM WHITAKER, ATTORNEY FOR PLAINTIFF
190 NORTH UNION STREET
SUITE 30
AKRON, OHIO 44304

SUZANNE M. JAMBE, ATTORNEY FOR Respondent
3200 NATIONAL CITY CENTER
1900 EAST 9TH STREET
CLEVELAND, OH 44114-3485

92

DR-H733

LARRY ELLIOT KLAYMAN, Petitioner
201 MASSACHUSETTS AVENUE NE
SUITE 2 C
WASHINGTON, DC 20002-0000

Copies were mailed by the Clerk of Court on _____.


_____

**DEPUTY CLERK OF COURT**