UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 5:13-00143-ACC-PRL

LARRY KLAYMAN,

    Plaintiff,

vs.

CITY PAGES *et al.*,

    Defendants.

_____/

## **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL**

Defendants submit their response to Plaintiff's "First Expedited Motion To Compel The Production Of Documents And Appoint A Computer Expert And Motion To Shorten Response Time" (the "Motion") [ECF No. 87]. The Motion should be denied for the following reasons:

### I.     INTRODUCTION

**A.**     **The Ohio Proceedings And The Florida Supreme Court Reprimand.**

During the course of child custody and support proceedings in Ohio between Plaintiff and his former spouse, the presiding magistrate judge entered a ninety-three page Order detailing the allegations made in the proceedings and the evidence submitted by the parties, and setting out the magistrate's various findings on numerous issues (Exhibit 1).

The trial judge rejected Plaintiff's objections to the magistrate judge's order, and adopted the order without modification (Exhibit 2).

The appellate court affirmed, writing: "the magistrate judge heard evidence from the children's pediatrician who reported allegations of sexual abuse to children services, and from a social worker who found that sexual abuse was 'indicated,'" and Plaintiff "refused to answer any

questions, repeatedly invoking his Fifth Amendment rights, about whether he inappropriately touched the children. 'Even more disturbing' to the magistrate was the fact that Klayman would not even answer the simple question regarding what he thought inappropriate touching was," and "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children" (Exhibit 3, ¶¶25-27).

The Ohio Supreme Court declined to accept jurisdiction over Plaintiff's attempt to further appeal (Exhibit 4).

Plaintiff also was the subject of disciplinary proceedings by the Florida Bar. According to the Report of Referee, a former client filed a grievance with the Florida Bar "alleging that [Plaintiff] had had (sic) failed to provide services in her criminal case after she paid him a $25,000 retainer" (Exhibit 5, p. 2). Plaintiff and the former client entered The Florida Bar Grievance Mediation Program, and Plaintiff agreed to pay her $5,000 (*Id.*, pp. 2-3). Plaintiff violated the agreement by failing to make full payment, which resulted in the opening of additional disciplinary proceedings relating to Plaintiff's violation of the settlement agreement (*Id.*, pp. 3-6). After the Florida Bar made a probable cause determination and filed a formal complaint with the Florida Supreme Court, Plaintiff paid the balance owed under the settlement agreement (*Id.*, pp. 5-6). The referee thereafter recommended that Plaintiff be found guilty of various ethics violations, and accepted Plaintiff's "Unconditional Guilty Plea and Consent Judgment for Discipline" (*Id.*, pp. 6-7). The Florida Supreme Court approved the "uncontested referee's report" and reprimanded Plaintiff for ethics violations (Exhibit 6).

Various of the Defendants published articles on September 28, 2012 and February 22, 2013 reporting the entry of the Ohio appellate court opinion and quoting its content, including its

statement: "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children." Copies of those articles can be found at ECF Nos. 52-1 and 52-2, respectively. Various of the Defendants also published an article on June 18, 2013 reporting, among other things, that Plaintiff had been reprimanded by the Florida Supreme Court. A copy of that article can be found at ECF No. 52-3. That article re-reported information contained in an article that was published in the *Miami New Times* newspaper in November 2011 about which Plaintiff did *not* complain. A copy of that article is attached as Exhibit 7.

B.     **Plaintiff's Presuit Notice.**

On November 26, 2013, Plaintiff sent Defendant notice, pursuant to §770.01, Florida Statutes, specifying the statements that he alleged to be false and defamatory (the "770 Notice") [ECF No. 52-4]. Section 770.01 provides that "[b]efore any civil action is brought for publication . . . in a newspaper . . . of a libel . . . the plaintiff shall . . . serve notice in writing on the defendant, *specifying* the article or broadcast and *the statements therein which he or she alleges to be false and defamatory*" (emphasis added).

With respect to the article published on September 28, 2012, the 770 Notice identified only the following statement:  "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior -- apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps."

With respect to the article published on February 22, 2013, the Notice says "the defamatory statements once again falsely infer that I 'inappropriately touched' children . . . ." It is unclear whether that statement refers to the title of the article, "Birther Lawyer Fighting Joe Arpaio Recall Was Found To Have 'Inappropriately Touched' Kids;" or its first sentence: "What

3

are the chances that a lawyer who was found by a court to have 'inappropriately touched' his children would try to stop the recall of a county sheriff whose agency failed to properly investigate more than 400 sex crimes?"

With respect to the article published on June 18, 2013, the 770 Notice says "the defamatory statements represent and/or give the false impression that I was reprimanded "for taking money from a client, and never doing any work." That is a reference to the following statement from the June 18 article: "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work".

**C.     Plaintiff's Claims Against Defendants.**

Plaintiff's third amended complaint contains six counts [ECF No. 52].

Count I is for defamation, and is premised upon the following statement that was contained in the article published on September 28, 2012: "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior -- apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps" (Third Am. Compl., ¶26).

Count II is for defamation, and is premised upon statements that were contained in the article published on February 22, 2013 and, according to Plaintiff, those statements "once again misleadingly and falsely stated that Plaintiff 'inappropriately touched' children" (*Id.*, ¶32).

Count III is for defamation, and is premised upon the following statement that was contained in the article published on June 18, 2013: "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work" (*Id.*, ¶¶15-22, 40).

4

Counts IV and V are for defamation by implication, and are premised upon the September 28 and February 22 articles, respectively. Plaintiff alleges that those articles omitted to report the arguments that Plaintiff believes show that the Ohio courts were wrong, and that the failure to report those arguments creates a defamatory implication that he inappropriately touched his children (*Id.*, ¶¶50, 56).

Count VI is for defamation by implication, and is essentially indistinguishable from Count III. Specifically, it alleges that the June 18 article defamed Plaintiff by implication because the article incorrectly reported that Plaintiff was reprimanded for taking money from a client without doing any work when, in fact, he actually was reprimanded for failing to honor the terms of the settlement agreement that resolved the client's Bar grievance that Plaintiff took money without doing any work (*Id.*, ¶¶59, 61-62, 64-65).

D.  **Plaintiff's Requests For Production.**

Plaintiff served identical requests for production upon each of the six Defendants. Each Defendant served his/its own responses, and there is some variation in the responses because some documents that are in the possession, custody, or control of one Defendant are not within the possession, custody, or control of other Defendants. Plaintiff did not attach any of the responses to the Motion, and fails to advise the Court whose responses he is quoting at pages 2 through 6 of the Motion. Regardless, all of the responsive documents that exist were within the possession, custody, or control of Defendant Voice Media Group, and a copy of its responses is attached as Exhibit 8.

## II.     ARGUMENT

A.   **Plaintiff's Erroneous View Of What Is Relevant And Discoverable Is Caused By His Misunderstanding Of The Applicable Standard Of Liability And His Misreading Of The Decision Upon Which He Primarily Relies.**

Plaintiff's view of what is relevant and discoverable in this action has been distorted by his misunderstanding both of the applicable standard of liability and the principal decision upon which he relies. Thus, before addressing why the arguments in the Motion fail, it is important to address the actual requirements of Plaintiff's claims.

Plaintiff has stipulated that he is a "public figure" for the purposes of the First Amendment (Deposition of Larry Klayman (Exhibit 9), p.114, l.14 – p.115, l.4). Public figures suing for defamation and defamation by implication are required to prove – by clear and convincing evidence – that the ***statements at issue*** were published with <u>constitutional actual malice</u>, which is a subjective standard requiring the defendant to have published the statements with actual knowledge of their falsity or with reckless disregard of the truth. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974); *Mile Marker, Inc. v. Petersen Publishing, LLC*, 811 So.2d 841, 845 (Fla. 4th DCA 2002); *Zorc v. Jordan*, 765 So.2d 768, 771 (Fla. 4th DCA 2000); *Palm Beach Newspapers, Inc. v. Early*, 334 So.2d 50, 51-52 (Fla. 4th DCA 1976); *Garrison v. State of Louisiana*, 379 U.S. 64, 73 (1964); *Jews for Jesus*, 997 So.2d at 1108, 1111 (the "'actual malice' standard [applicable] to suits by public figures against publishers" is one "of the protections of defamation law" that applies to claims for defamation by implication).

"'The test of actual malice . . . focuses on the defendant's state of mind at the time of publication.'" *See Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir. 1983) (quoting *Long v. Arcell*, 618 F.2d 1145 (5th Cir. 1980)); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 261-62, 286 (1964) ("The [defendant's] statement does not indicate malice at the time of

publication . . . .")*; Danwala v. Houston Lighting & Power Co.*, 14 F.3d 251, 255 (5th Cir. 1993) ("The focus is on Wellborn's state of mind at the time of publication.").

Plaintiff's mistakes begin with the fact that he confuses "constitutional actual malice" with "common law malice" and its notions of ill will, hatred, or spite.

> Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one.

*See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-11 (1991) (internal citation omitted); *see also J.F. Straw v. Chase Revel, Inc.*, 813 F.2d 356, 362 (11th Cir. 1987):

> While the above discussion may seem clear-cut, confusion often enters the defamation arena because the word "malice" has two distinct meanings. In order to prevail on a suit for libel, Georgia law requires that the plaintiff show the statement was false and malicious. In this context, "malice" means ill will, and "malicious" denotes statements deliberately calculated to injure. Georgia courts refer to this as "common law malice" and distinguish it from actual or "constitutional" malice. As noted above, the latter term deals only with the speaker's knowledge of the truth or falsity of the allegedly defamatory statements. (internal citations omitted).

*Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) ("Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication.").

With this distinction in mind, attention may now be turned to the decision upon which Plaintiff principally relies, *Herbert v. Lando*, 441 U.S. 153 (1979).

The narrow question at issue in *Herbert* was whether a plaintiff was barred from taking discovery regarding the "editorial processes of those responsible for *the* publication . . . ." *See id.* at 155 (emphasis added). The Supreme Court held that there was no privilege prohibiting discovery into the editorial process regarding the two publications that were the subject of that

7

action. *See id.* at 169. That holding, however, is irrelevant here because Defendants did not assert that their editorial processes with respect to the statements upon which Plaintiff is suing are somehow immune from discovery.

Indeed, Plaintiff does not contend otherwise, and instead relies upon *Herbert* for the proposition that he is entitled to discovery regarding Defendants' "state of mind." Plaintiff, however, wildly overstates the scope of the state of mind evidence that was addressed in *Herbert*. To the extent *Herbert* discussed the discovery of such evidence, it did so in a manner consistent with the contours of constitutional actual malice: the discovery of evidence that the defendant knew of the falsity of *the statements being sued upon* or acted with reckless disregard for the truth of *the statements being sued upon*. Nothing in *Herbert* holds that Plaintiff is entitled to discovery regarding articles and statements upon which he is *not* suing.

More specifically, the plaintiff in *Herbert* sued the defendants for defamation arising from a specific television broadcast and a specific magazine article. *See id.* at 156. The plaintiff conceded he was a public figure required to prove constitutional actual malice. *See id.* To that end, the plaintiff sought discovery relating to the editorial process regarding the *specific* broadcast and article upon which he was suing. *See id.* at 157 n.2.

In the course of analyzing whether the defendants had an absolute privilege to refuse to disclose information regarding the editorial process for that broadcast and that publication, the Court addressed the requirements of constitutional actual malice and the proof necessary to meet the standard. Specifically, the Court wrote:

> *New York Times* and its progeny made it essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant. To be liable, the alleged defamer of public officials or of public figures must know to have reason to suspect that his publication is false. . . . It is untenable to conclude from our cases that . . . plaintiffs may not inquire

8

>directly from defendants whether they knew or had reason suspect that their *damaging publication* was in error.

*See id.* at 160 (emphasis added). Thus, as this makes clear, a public figure may conduct discovery into a publisher's state of mind as it relates to the allegedly defamatory statement *upon which the suit has been brought*. Nothing in that passage – or anywhere else in *Herbert* – makes relevant or discoverable information relating to publications or statements upon which the plaintiff is <u>not</u> suing.

Plaintiff chooses to ignore that, and instead quotes a passage (Motion, p. 8) where the Court noted that an award of punitive damages (more on that below) in a prior decision was affirmed based upon evidence of the publisher's state of mind.[1] *See id.* at 161-62. That is true, as far as it goes, but it says nothing about the permissible *scope* of discovery into a journalist's state of mind in the course of a public figure's defamation claim. There is no question that a publisher's state of mind, *as it relates to the statement being sued upon*, is relevant to a public figure's defamation claim. However, nothing in the passage Plaintiff quotes – or in any other passage in *Herbert* – provides that the publisher's state of mind, as it relates to *other* publications upon which the plaintiff is *not* suing, is relevant. Instead, and as Defendants quoted above, the Supreme Court said what is relevant is evidence of the publisher's state of mind relating to the "damaging publication" upon which suit has been brought.

Additionally, nothing in the passage Plaintiff quotes says or even implies that evidence of common law malice is relevant to constitutional actual malice. In that passage, the Court noted that, under "the common-law, *predating* the First Amendment" evidence of ill will, hatred, spite,

---

[1] The point the Court was making was that if there was no privilege protecting the "editorial process" at the time of the prior decision, then there was no basis to find the existence of one at the time *Herbert* was decided.

9

and intent to injure was sufficient to support an award of punitive damages.[2] *See id.* at 161-62 (emphasis added). [3] Those issues relate to common law malice, not constitutional actual malice. Indeed, the principles of Georgia law cited by the Court in that passage are the same principles of Georgia law that the Eleventh Circuit cited eight years later to explain the difference between constitutional actual malice and common law malice. *See Chase Revel*, 813 F.2d at 362. Nothing in the passage Plaintiff quotes holds that evidence of common law malice is relevant to establishing constitutional actual malice.

With that, attention may now be turned to the reasons the Motion fails.

**B.     The Motion Violates Local Rule 3.04(a).**

Local Rule 3.04(a) required Plaintiff to quote each request and response at issue and, "immediately follow[ing]" *each* one, state the reasons a better or different answer should be compelled for *that* request. Here, Plaintiff spends four pages quoting all of the requests at issue (pp. 2-6), then lumps all of his argument together (pp. 6-14) with no indication of which parts of his argument relate to which requests. The Motion should be denied because it does not comply with the Local Rules.

**C.     Request Nos. 1-7 Are Overbroad As To Scope And Seek Irrelevant Information.**

Plaintiff argues in separate sections on pages 7 through 9 of the Motion that the Court should overrule Defendants' objections as to breadth and relevance. These arguments appear to

---

[2] The Court has already ruled that Plaintiff's Third Amended Complaint does ***not*** include a claim for punitive damages [ECF No. 70, ECF No. 82]. Thus, even if evidence of common law malice were relevant to a claim for punitive damages – which, as discussed in note 3, it is not – it still would be of no use to Plaintiff.

[3] As the Court went on to explain, although at one time a defamation plaintiff could recover punitive or enhanced damages upon a showing of common law malice, the decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) changed things and limited the availability of punitive damages to situations where a plaintiff establishes constitutional actual malice. *See Herbert*, 441 U.S. at 161-62 & n.7.

relate to Defendants' responses to Request Nos. 1 through 7. Those requests sought the production of *everything* Defendants have published during the last five years regarding Plaintiff (No. 1), Plaintiff's friend, Bradlee Dean (No. 2), Mr. Dean's foundation (No. 3), Plaintiff's friend, Sheriff Joe Arpaio (No. 4), and a lawsuit between Mr. Dean and NBC, in which Plaintiff apparently represented Mr. Dean (Nos. 5-7). None of those requests seeks information that is discoverable in this action, and the Motion should be denied.

Plaintiff concedes, as he must, that his lawsuit arises from "three publications" (Motion, p.8). Citing and quoting *Herbert*, Plaintiff argues that a "journalist's state of mind is of central importance to the issue of malice," and it is appropriate for a plaintiff "'to discover whether [a journalist] had any reason to doubt the veracity of certain of his sources, or, equally significant, to prefer the veracity of one source over another'" (Motion, pp. 7-8). This argument fails.

First, Defendants' sources for statements upon which Plaintiff is *not* suing have nothing to do with whether Defendants acted with constitutional actual malice in publishing the statements at issue. Defendants' "sources" for prior publications regarding Plaintiff – and whatever Defendants published about Sheriff Arpaio, Mr. Dean, and Mr. Dean's foundation and litigation with NBC – have nothing to do with whether Defendants published the *statements at issue* with knowledge of their falsity or with reckless disregard for their truth.

Second, Plaintiff filed the Motion after deposing the journalists who wrote and published the statements at issue, and he *knows* those statements were not premised upon "sources," as that word was used in *Herbert*.[4] Regardless, Defendants have produced to Plaintiff all of the

---

[4] The June 18 article reported that Plaintiff was being investigated by the Arizona Bar [ECF No. 52-3]. Defendant Hendley, who wrote that article, testified that he received from confidential sources information regarding the Arizona Bar investigation (Hendley Depo., p.90, 1.12 – p.93, 1.10). Plaintiff, however, is not suing on any of the statements relating to the Arizona Bar investigation.

11

materials upon which the journalists relied in writing the statements upon which Plaintiff is suing.

Defendant Rupar wrote the September 28 article. He testified that he learned of the Ohio appellate court's opinion through an e-mail he received from Defendant Avidor, which contained a link to a blog post Avidor wrote regarding the court opinion (Deposition of Aaron Rupar, (Exhibit 10), p.32, l.5 – p.39, l.17). Defendants produced to Plaintiff a copy of Avidor's e-mail and blog post in response to Request Nos. 27 and 31 (Exhibit 11). Rupar also conducted an e-mail chat with one of his colleagues as Rupar was writing the September 28 article, and Defendants produced to Plaintiff a copy of the chat in response to Request No. 23 (Exhibit 12). *Plaintiff makes no mention of the fact that these materials were produced to him.*

Defendant Hendley wrote the June 18 article, which contained the statement: "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work." Hendley testified that he wrote that statement based on what he read in an article that had been published in the *Miami New Times* newspaper in November 2011 (which says the same thing Hendley wrote) as well as the Florida Bar documents that were linked in the *Miami New Times* article (Deposition of Matthew Hendley (Exhibit 13), p.72, ll.6-23, p.75, l.2 – p.76, l.1, p.114, l.11 – p.115, l.17;). Defendants produced to Plaintiff the *Miami New Times* article and the linked Florida Bar documents in response to Request No. 29 (Exhibit 14). *Plaintiff makes no mention of the fact that these materials were produced to him.*

In apparent recognition of the futility of his position on overbreadth, Plaintiff addresses relevance (Motion, pp. 8-9). Evidence need not be admissible to discoverable, but it must be relevant to an issue in the action, and relevant evidence is that which "has any tendency to make

12

a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." *See* Fed.R.Civ.P. 26(b)(1); Fed.R.Evid. 401.

To prevail upon his claims for defamation (Counts I through III), Plaintiff must establish five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public [figure] … ; (4) actual damages; and (5) statement must be defamatory." *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). To prevail upon his claims for defamation by implication (Counts IV through VI), Plaintiff must establish that Defendants, acting with constitutional actual malice, created a defamatory implication by omitting facts from the three articles.[5]

Plaintiff does not and cannot explain how any of the information sought in Request Nos. 1 through 7 is relevant to any of those elements. Indeed, how are prior articles upon which Plaintiff is *not* suing relevant to any of those elements? The answer is that they are not, and, tellingly, Plaintiff makes no attempt to address the elements of his claims or how any of the requested information is relevant to any of the facts relating to those elements.

Instead, Plaintiff says *only* that "[t]he need for blog postings and other documentation is all the more evident in light of Defendant Ken Avidor's intentional concealment of certain records after learning he had been sued" (Motion, p. 9). That is comical. Defendant Avidor did not write any of the three articles [ECF Nos. 52-1, 52-2, 52-3], but he wrote a blog post about the Ohio appellate court's opinion, and, after this action was commenced, he changed the settings on the post so that it was no longer accessible to the public, and could be accessed only with his permission (Deposition of Kenneth Avidor (Exhibit 15), p.63, l.19 – p.65, l.2, p.78, l.19 – p.80, l.15, p.131, l.16 – p.132, l.7)). That is not the concealment (or destruction) of evidence and, as

---

[5] A prior order form the Court limited Plaintiff to this theory of defamation by implication [ECF No. 50, pp.11-12.

13

mentioned above, the blog post was produced to Plaintiff in response to Request Nos 27 & 31 (Exhibit 11). Thus, the *one and only* prior publication for which Plaintiff makes any argument of relevance was *already produced to him*. The Motion should be denied.

### D.    Plaintiff's Argument Regarding Burden Is Misplaced.

Plaintiff argues that there is no evidentiary basis for Defendants' objections that producing information in response to certain requests would be unduly burdensome (Motion, pp. 9-10). This argument appears to relate to Request Nos. 2 through 4, which sought the production of everything Defendants have published in the last five years relating to Mr. Dean, his foundation, and Sheriff Arpaio. In addition to objecting to those requests for the reasons discussed above, Defendants objected to the requests because Mr. Dean, his foundation, and Sheriff Arapaio are prominent figures in the Minneapolis and Phoenix communities covered by the *City Pages* and *Phoenix New Times* newspapers, and searching for and collecting everything that has been published about them during the last five years would be unduly burdensome. Plaintiff argues that the objections as to burden should be overruled because Defendants did not submit an affidavit attesting to the burden involved. His argument is disingenuous.

Plaintiff deposed Defendants Rupar and Hendley before the responses to the requests for production were served and, obviously, before Plaintiff filed the Motion. Rupar testified that he, alone, has written approximately forty to fifty articles relating to Bradlee Dean, which does not include the articles that have been written by other journalists at *City Pages* (Rupar Depo., p.43, ll.4-10). The witness Plaintiff deposed pursuant to Rule 30(b)(6) testified that *Phoenix New Times* has published so many articles relating to Sheriff Arpaio that he could not possibly remember them all (Deposition of Andrew Van De Voorde (Exhibit 16), p.61, l.10 – p.63, l.19).

14

Thus, Plaintiff has been given much more than an affidavit; he deposed and examined witnesses on this issue. Moreover, Plaintiff makes no attempt to explain why he is unable to visit the *City Pages* and *Phoenix New Times* Internet websites, himself, and collect all of the articles that he finds relating to Mr. Dean, his foundation, and Sheriff Arpaio. The Motion should be denied.

E.  **There Is Nothing To Compel In Connection With Requests For Which There Are No Responsive Documents.**

It was an understandably important event in Plaintiff's life when the appellate court in Ohio published an opinion stating: "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children." It was an understandably important event in Plaintiff's life when he was publicly reprimanded by the Florida Supreme Court because he violated the ethical rules governing attorney conduct. The reporting of those happenings, however, were *not* so important to Defendants' lives and roles as journalists. It is this difference that is driving the argument at pages 10 through 12 of the Motion, which ostensibly relates to the responses to Request Nos. 21, 22, 24, and 25.[6]

Those requests sought the production of all "documents, discussions, and/or publications" relating to the statements and articles upon which Plaintiff is suing. Defendants responded that there were no documents responsive to those requests (Ex. 8). Unhappy and angry with that response – and apparently believing these articles must have been the subject of extensive communications – Plaintiff demands that the Court order Defendants "to demonstrate to this

---

[6] Plaintiff included Request Nos. 26 and 28 in his quotation of the requests and responses that are at issue. As mentioned above, it is unclear whose responses he quoted, but Defendant Voice Media Group responded that to the extent responsive documents existed, it was producing them along with its responses and, as stated in the response, it produced what there is.

15

honorable Court and Plaintiff how and in what world these documents do not exist" (Motion, p.11). Not surprisingly, Plaintiff cites no authority supporting any notion that Defendants' responses to these requests were somehow inappropriate or inadequate. How were Defendants supposed to respond when there were no documents responsive to those requests?

As an example of why he does not believe that there are no responsive documents, Plaintiff argues that Defendant Avidor admitted to destroying an e-mail he sent to Defendant Rupar, and that Rupar "acknowledged the deletion" of the e-mail (Motion, p.11). Plaintiff "supports" that contention by citing a page of the transcript of Rupar's deposition, but that is not even what is discussed on that page because Rupar was asked about a blog post, not an e-mail.

More importantly, Rupar said he was "aware" that Avidor "deleted" a blog "post" relating to the Ohio appellate court's opinion, but *Plaintiff chose not to mention* the part of the transcript where Rupar testified that although he used the word "delete," he did not know whether the post was deleted or whether Avidor simply restricted access to it – Rupar said he had "no knowledge of what Ken [Avidor] did with that post" (Rupar Depo., p.140, l.9 – p.142, l.1).

Additionally, this is the blog post that, as cited above, Avidor testified that he did not delete, but simply removed from public view, and that was *produced to Plaintiff* (Ex. 11). As also cited above, the e-mail Plaintiff mentions on page 11 of the Motion – the one he says was forever deleted – was *produced to Plaintiff* (Ex. 11). *Plaintiff makes no mention of the fact that these materials were produced to him.*

Plaintiff next argues that Defendant Avidor wrote a book about Michele Bachmann that "featured" Plaintiff, but the book was not produced to him in response to Request Nos. 21, 22, 24, or 25 (Motion, p. 11). This argument fails at the threshold because the book is not responsive to those requests. Regardless, to the extent the book is responsive to *any* of Plaintiff's requests

16

for production, it is responsive to Request No. 1 and, as addressed above, Defendants objected to producing documents responsive to that request. Thus, the fact that the book was not produced to Plaintiff is not "evidence" that Defendants are improperly withholding responsive documents.

Finally, Plaintiff launches into a rant about improper political agendas, attempts to destroy fundraising efforts for the various political causes with which Plaintiff is associated, and the fact that Defendant Hendley was previously convicted for assaulting a police officer[7] (Motion, pp.11-12). Plaintiff makes no attempt to explain how any of that changes the fact that there are no documents responsive to Request Nos. 21, 22, 24, and 25. The Motion should be denied.

F.     **Plaintiff's Request For A Forensic Examination Is Untimely And Unsupported.**

Plaintiff asks the Court to appoint an expert to conduct a forensic examination of Defendants' computers (Motion, pp. 13-14). There are two reasons this request must be denied.

First, it is too late. The Court's Case Management and Scheduling Order set September 22, 2014 as the deadline for completing all discovery [ECF No. 36]. If Plaintiff wanted to conduct a forensic examination of Defendants' computers, then he needed to make that discovery request sufficiently in advance of the discovery deadline. Not almost two weeks *after* the deadline.

---

[7] Plaintiff also mentions the fact that Hendley invoked his privilege under the First Amendment, §90.5015, Florida Statutes, and Arizona Statute 12-2237 not to divulge confidential sources (Hendley Depo., p.90, 1.12 – p.93, 1.10). Notwithstanding the fact that those sources supplied information in connection with statements upon which Plaintiff is *not* suing (*Id.*), Plaintiff has not made any attempt to overcome Hendley's constitutional and statutory privileges not to disclose confidential sources. *See Price v. Time, Inc.*, 416 F.3d 1327, 1343 (11th Cir. 2005) (quoting *Miller v. Transamerican Press, Inc.*, 628 F.2d 932, 932 (5th Cir. 1980)) (listing the three elements that a party seeking to compel a reporter to identify confidential sources bears the burden of establishing by "substantial evidence"); *see also* §90.5015, Florida Statutes (Florida's journalist's privilege); *WTVJ-NBC 6 v. Shehadeh*, 56 So.3d 104, 105-06 (Fla. 3d DCA 2011) (applying Florida's journalist's privilege).

17

Second, there simply is no support for Plaintiff's request. The lone decision Plaintiff cites in this regard, *Wynmoor Community Council, Inc. v. QBE Insurance Corp.*, 280 F.R.D. 681 (S.D. Fla. 2012), is inapposite. There, the party upon whom a request for production was served did not serve responses to the requests and did not produce any documents in response to the requests, and there was evidence before the court that the party was unwilling or unable to conduct any search for potentially responsive documents. *See id.* at 686-87. None of those circumstances exists here. Plaintiff reverts to his argument about Defendant Avidor's supposed deletion of "evidence," but, as addressed above, nothing was deleted and, not only was nothing deleted, but that specific evidence was *produced to Plaintiff*. The Motion should be denied.

### G. Defendants Should Be Awarded The Attorneys' Fees And Costs Incurred In Responding To The Motion.

Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure provides that if a motion to compel is denied, then the Court "must" order the movant to pay reasonable attorneys' fees and costs to the party who opposed the Motion. The only exception is if the Court determines that "the motion was substantially justified or other circumstances make an award of expenses unjust." *See id.* The Motion was not substantially justified, and there are no "other circumstances" making an award of expenses unjust.

Defendants have successfully moved four times for the entry of protective orders [ECF Nos. 59 (granted by No. 66), 62 (granted by No. 82), 65 (granted by No. 74), and 78 (granted by No. 82)]. Defendants chose not to seek awards of fees under Rule 26(c)(3) in connection with those motions, hoping the fact that the Court thoroughly and summarily rejected every position Plaintiff took would be enough to dissuade him from taking frivolous positions in the future. The Motion shows that Plaintiff's penchant for taking frivolous positions regarding discovery is

continuing unabated. As permitted by Rule 37(a)(5)(B), Defendants should be awarded the attorneys' fees and costs they incurred in responding to the Motion.

## III. CONCLUSION

For these reasons, the Motion should be denied and Defendants should be awarded the attorneys' fees and costs they incurred in opposing the Motion.

    Respectfully submitted,

    HOLLAND & KNIGHT LLP
    Attorneys for Defendants
    701 Brickell Avenue, Suite 3300
    Miami, Florida 33131
    (305) 374-8500 (telephone)
    (305) 789-7799 (facsimile)

    By: /s/ Scott D. Ponce
    Sanford L. Bohrer (FBN 160643)
    Scott D. Ponce (FBN 0169528)
    Email: sbohrer@hklaw.com
    Email: sponce@hklaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of October 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System.

    /s/ Scott D. Ponce

#33432955_v1