# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**LARRY KLAYMAN,**

        **Plaintiff,**

v.                                  **Case No: 5:13-cv-143-Oc-22PRL**

**CITY PAGES, KEN WEINER, AARON
RUPAR, PHOENIX NEW TIMES,
MATHEW HANDLEY and VOICE
MEDIA GROUP,**

        **Defendants.**

_____/

## ORDER

This cause comes before the Court on Defendants City Pages, Mathew Hendley, Phoenix New Times, Aaron Rupar, Voice Media Group, and Ken Weiner's Motion for Summary Judgment, filed on October 20, 2014. (Doc. No. 94). Plaintiff Larry Klayman ("Plaintiff") responded in opposition, (Doc. No. 104), to which Defendants filed a reply. (Doc. No. 109). Based on the reasoning provided herein, the Court grants Defendants' motion.

## I. <u>BACKGROUND</u>[1]

Plaintiff brings this defamation action against six defendants (collectively, "Defendants"). (*See* Doc. No. 52).[2] In general, this case arises from three news articles reporting on events related to two separate judicial proceedings in Ohio and Florida. (*Id.*).

---

[1] This factual background is largely derived from Defendants' motion as Plaintiff's response contains a plethora of irrelevant conjecture and superfluous detail without record citation. Moreover, Plaintiff's response fails to comply with the Court's Case Management and Scheduling Order, which requires that a "memorandum in opposition [to a motion for summary judgment] shall specify the material facts as to which the opposing party contends there exists a genuine issue for trial . . . ." (Doc. No. 36 at pp. 5–6). Nonetheless, the Court provides Plaintiff's relevant facts where appropriate and, of course, views the facts and all reasonable inferences drawn therefrom in a light most favorable to Plaintiff.

A.  The Ohio and Florida Proceedings

In June 2009, Plaintiff and his former spouse were involved in contentious child custody and support proceedings in Cuyahoga County, Ohio. (*See generally* Doc. Nos. 95-2 through 95-4). Following fourteen days of hearings, the presiding state magistrate judge issued a more than ninety-page single-spaced decision in that case. (*Id.*). After the magistrate judge rendered the decision, Plaintiff filed an objection, which the presiding trial judge overruled. (Doc. No. 95-5). In that same order, the trial judge adopted the magistrate's decision without modification. (*Id.* at p. 2).

Plaintiff appealed on various grounds; however, the Court of Appeals of Ohio rejected each and every one of Plaintiff's assignments of error. (Doc. No. 95-6). Of significance to this case, the appeals court wrote:

> {¶23} In his third assignment of error, Klayman argues that the magistrate's finding that he engaged in inappropriate touching of his child was against the manifest weight of the evidence.

> {¶24} A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson*, 66 Ohio St.3d 610, 614 N.E.2d 742 (1993). Where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984).

> {¶25} The issues raised by Klayman involve credibility assessments made by the magistrate. Klayman challenges these findings. The magistrate heard evidence from the children's pediatrician who reported allegations of sexual abuse to children services, and from a social worker at children services who found that

---

[2] All references to the parties' motions, responses, depositions, and declarations are to the actual page number on the CM/ECF docket and not to the page number on the parties' filings.

sexual abuse was "indicated." Although the social worker's finding was later changed to "unsubstantiated" when Klayman appealed, the magistrate explained that the supervisor who changed the social worker's finding did not testify. The magistrate pointed out that he was obligated to make his own independent analysis based upon the parties and the evidence before him. In doing so, the magistrate found

> on more than one occasion [Klayman] act[ed] in a grossly inappropriate manner with the children. His conduct may not have been sexual in the sense that he intended to or did derive any sexual pleasure from it or that he intended his children would. That, however, does not mean that he did not engage in those acts or that his behavior was proper.

{¶26} The magistrate further found it significant that although Klayman denied any allegations of sexual abuse, he never denied that he did not engage in inappropriate behavior with the children. The magistrate further found it notable that Klayman, "for all his breast beating about his innocence * * * [he] scrupulously avoided being questioned by anyone from [children services] or from the Sheriff's Department about the allegations," and that he refused to answer any questions, repeatedly invoking his Fifth Amendment rights, about whether he inappropriately touched the children. "Even more disturbing" to the magistrate was the fact that Klayman would not even answer the simple question regarding what he thought inappropriate touching was. The magistrate stated that he could draw an adverse inference from Klayman's decision not to testify to these matters because it was a civil proceeding, not criminal.

{¶27} After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children.

{¶28} Klayman's third assignment of error is overruled.

(*Id.* at pp. 11–14) (alterations in original).

The Supreme Court of Ohio declined to accept jurisdiction over Plaintiff's subsequent appeal of the appellate court's decision. (Doc. No. 95-7).

Unrelated to the Ohio family law proceedings, in early 2011, the Florida Bar accused Plaintiff of violating various Rules Regulating the Florida Bar. The Report of Referee in that proceeding provides the relevant background: "On or about November 11, 2007, Natalia Humm ("Humm") filed a grievance against [Plaintiff] alleging that he had had [sic] failed to provide

services in her criminal case after she paid him a $25,000 retainer." (Doc. No. 95-8 at p. 3). Thereafter, Plaintiff and Humm agreed to submit the matter to The Florida Bar Grievance Mediation Program. (*Id.*). As a result of the mediation, Plaintiff agreed to pay Humm $5,000 within ninety (90) days from the date of the mediation agreement. (*Id.* at pp. 3–4). However, Plaintiff failed to timely make payments under the terms of the agreement, which resulted in the Florida Bar opening additional proceedings against Plaintiff. (*Id.* at 4–5). After the Florida Bar filed a formal complaint with the Florida Supreme Court, Plaintiff contacted The Florida Bar to advise that he would accept an offer to resolve the matter. (*Id.* at pp. 6–7). Plaintiff then made a payment to Humm in the outstanding amount of $3,000, thereby satisfying in full his obligations from the prior mediation agreement. (*Id.* at p. 7). Plaintiff admitted to violating various Rules Regulating the Florida Bar and consented to a judgment in the form of a public reprimand, to be administered by publication. (Doc. No. 95-17 at p. 6). The Florida Supreme Court approved the uncontested report of the referee and reprimanded Plaintiff. (Doc. No. 95-9 at p. 2).

### B.   The September 28 Article

On September 28, 2012, City Pages published an article, written by Aaron Rupar ("Rupar"), titled "Bradlee Dean's Attorney, Larry Klayman, Allegedly Sexually Abused His Own Children" (the "September 28 Article"). (*See* Doc. No. 95-11 Ex. A at pp. 5–7); (Aaron Rupar Decl. (Doc. No. 95-11) p. 2, ¶¶ 2–4). The full article reads as follows:

> Bradlee Dean has long linked homosexuality and child sexual abuse. For instance, in a blog from June about Larry Brinken's child porn arrest, Dean wrote, "The news about Brinken's horrific child-pornography crimes followed the conclusion of 'Pride Week,' yet again puling [sic] off the mask of the radical homosexual agenda to expose who they are, what they are and who their target really is, showing who is truly under attack."
>
> Well this week brought some uncomfortable news for the tracksuit-wearing homophobic preacher -- his notorious lawyer, the presumably straight Larry Klayman, has allegedly sexually abused his own children.

A court recently ordered Klayman to pay his ex-wife $325,000 in attorney fees. Klayman appealed, but a judge tossed it out. What's interesting, however, are a couple of nuggets buried in the judge's ruling (via Ken Avidor – emphasis his):

> {¶23} In his third assignment of error, Klayman argues that the magistrate's finding that he engaged in inappropriate touching of his child was against the manifest weight of the evidence.

> {¶24} A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co., 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson, 66 Ohio St.3d 610, 614 N.E.2d 742 (1993). Where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court. See Seasons Coal Co. v. Cleveland, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); Cohen v. Lamko, Inc., 10 Ohio St.3d 167, 462 N.E.2d 407 (1984).

> {¶25} The issues raised by Klayman involve credibility assessments made by the magistrate. Klayman challenges these findings. The magistrate heard evidence from the children's pediatrician **who reported allegations of sexual abuse to children services, and from a social worker at children services who found that sexual abuse was "indicated."** Although the social worker's finding was later changed to "unsubstantiated" when Klayman appealed, the magistrate explained that the supervisor who changed the social worker's finding did not testify. The magistrate pointed out that he was obligated to make his own independent analysis based upon the parties and the evidence before him. In doing so, the magistrate found on more than one occasion [Klayman] act[ed] in a grossly inappropriate manner with the children. His conduct may not have been sexual in the sense that he intended to or did derive any sexual pleasure from it or that he intended his children would. That, however, does not mean that he did not engage in those acts or that his behavior was proper.

> {¶26} The magistrate further found it significant that although Klayman denied any allegations of sexual abuse, he never denied that he did not engage in inappropriate behavior with the children. The magistrate further found it notable that Klayman, "for all his

breast beating about his innocence * * * [he] scrupulously avoided being questioned by anyone from [children services] or from the Sheriff's Department about the allegations," and that he refused to answer any questions, **repeatedly invoking his Fifth Amendment rights, about whether he inappropriately touched the children.** "Even more disturbing" to the magistrate was the fact that Klayman would not even answer the simple question regarding what he thought inappropriate touching was. The magistrate stated that he could draw an adverse inference from Klayman's decision not to testify to these matters because it was a civil proceeding, not criminal.

{¶27} After reviewing the record, **we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children.**

Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior -- apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps.

If Dean distances himself from Klayman in light of these allegations, who will help him figure out how to reimburse Rachel Maddow and the now-defunct Minnesota Independent the nearly $25,000 in attorney's fees he owes them?

(Doc. No. 95-11 Ex. A at pp. 5–7) (emphasis and alterations in original).

Rupar states that he relied on his review and understanding of the Ohio appellate court's opinion in writing the September 28 Article, as well as the statement: "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior – apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps." (Aaron Rupar Dep. (Doc. No. 95-10) at pp. 9–10). Rupar used the word "criminal" because he understood the conduct described by the appellate court to be "criminal" behavior. (*Id.* at pp. 13–15). Finally, Rupar states that he believed that statement to be true at the time that he wrote and published it because he had access to the Ohio appellate court order which stated, "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children." (Rupar Decl. ¶ 6).

### C.  The February 22 Article

On February 22, 2013, the Phoenix New Times published an article, written by Defendant Matthew Hendley ("Hendley"), titled "Birther Lawyer Fighting Joe Arpaio Recall Was Found to Have 'Inappropriately Touched' Kids" (the "February 22 Article"). (*See* Doc. No. 95-14 Ex. A at pp. 5–6); (Matthew Hendley Decl. (Doc. No. 95-14) p. 2, ¶¶ 2–4). The February 22 Article states as follows:

> What are the chances that a lawyer who was found by a court to have "inappropriately touched" children would try to stop the recall of a county sheriff whose agency failed to properly investigate more than 400 sex crimes?

> This is quite the, um, *coincidence*, as we stumbled across a judgment from an Ohio appellate court, in a divorce case involving attorney Larry Klayman.

> As we reported yesterday, a group calling itself "Citizens to Protect Fair Election Results LLC" claims it will take action against the attempted recall of Maricopa County Sheriff Joe Arpaio.

> That group was registered by Surprise Tea Party "leaders" Jeff Lichter and James Wise -- the folks credited with getting Arpaio to start the "investigation" into President Obama's birth certificate -- and brought along Klayman to do the legal work.

> Klayman, an attorney for Freedom Watch, happens to be friendly with the conspiracy theorists at *World Net Daily*, and once introduced a "birther" affidavit from Arpaio as evidence in an actual courtroom.

> Thanks to our sister paper in Minneapolis, City Pages, we have an appellate court ruling from Ohio in which Klayman was unsuccessful in appealing a ruling about the terms of his parental rights stemming from his divorce, and a ruling that found him in contempt of court.

> Part of that appeal was Klayman asking the court to review "the trial court's finding that [Klayman] engaged in inappropriate touching of his child is contrary to the manifest weight of the evidence and an abuse of discretion."

> Read the excerpts from the appellate court's ruling below:

> [The article quotes paragraphs twenty-five through twenty-seven of the opinion of the Court of Appeals of Ohio.]

> Obviously, we're talking about civil court matters here, not criminal court or criminal charges.
>
> However, a magistrate judge weighed the evidence and found that Klayman acted "in a grossly inappropriate manner with the children."
>
> Klayman's challenge to the attempted recall of Arpaio probably won't turn out in his favor, either.

(Doc. No. 95-14 Ex. A at pp. 5–6) (emphasis and some alterations in original). Hendley states that at the time he wrote and published the statement that a court found that Plaintiff "inappropriately touched" his children, he believed that statement to be true because he "had an order from a court of appeals in Ohio that said: 'After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children.'" (Hendley Decl. ¶ 6).

### D. The June 18 Article

On June 18, 2013, and after this action originally commenced, the Phoenix New Times published the final article in question: "Larry Klayman Under Investigation by Arizona Bar" (the "June 18 Article"). (*See* Doc. No. 95-14 Ex. B at pp. 9–10). Defendant Michael Hendley wrote the June 18 Article. (Hendley Decl. at ¶¶ 7–9). In material part, the June 18 Article reads:[3]

> Notorious "birther" attorney Larry Klayman is being investigated by the State Bar.
>
> Although Arizona State Bar spokesman Rick DeBruhl confirms to *New Times* that the investigation exists, he says there are no public documents associated with the case at this time.
>
> The investigation seems to stem from Klayman's lawsuit to stop the effort to recall Sheriff Joe Arpaio, although we don't know exactly what the scope of the investigation is.

---

[3] The Court omitted a paragraph from this article mentioning an alleged derogatory e-mail Plaintiff sent to the chairman of the Joe Arpaio recall organization. This email does not appear relevant and the parties do not address it as an issue pertinent to this case.

Sources say that the investigation may be related to Klayman's application to appear *pro hac vice*, which allowed him to work on the case without being licensed to practice law in Arizona.

Klayman's application was approved by Maricopa County Judge Michael Herrod, the husband of right-wing powerhouse lobbyist Cathi Herrod. Judge Herrod eventually recused himself from the case, as Herrod used to be a partner at the law firm that has represented Arpaio in several matters, including the current racial-profiling case, *Melendres v. Arpaio*.

. . . .

However, Klayman's involvement in this case is somehow not as bizarre as some of his other antics.

Klayman, the founder of Judicial Watch, has sued an incredible amount of people, ranging from the Clinton administration to his own mother, and has also filed a lawsuit against *New Times*, claiming "defamation."

A *New Times* report earlier this year cited an appellate court ruling from Ohio, a public record, affirming a magistrate judge's finding that Klayman "inappropriately touched" his own children.

That lawsuit apparently hasn't satisfied Klayman, who just yesterday announced that he's suing that magistrate judge who made the finding. Klayman thinks the judge -- "who is a liberal Democrat and a Jew," according to Klayman's press release on the matter -- made the ruling just to "destroy him in the media."

As for the current Bar investigation, we'll keep you updated as the details come out. Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work.

(Doc. No. 95-14 Ex. B at pp. 9–10). In writing the June 18 Article, Hendley reviewed an article published by the Miami New Times in November 2011, which stated: "The Florida Bar has issued a public reprimand of Klayman for taking a $25,000 payment to represent a woman in a high-profile criminal case and then allegedly failing to, y'know, do any lawyerin'." (Doc. No. 95-14 Ex. C at pp. 12–13). Hendley also stated that he reviewed the public filings related to the Florida Bar disciplinary proceedings. (Matthew Hendley Dep. (Doc. No. 95-13) at pp. 5–6). Hendley testified that the statement in the June 18 Article—"Klayman's been in trouble with a

Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work"—is a summary of what he drew from the Florida Bar documents and the Miami New Times article. (*Id.* at pp. 9–10, 17). Hendley declares that he believed this statement was true at the time he published it. (Hendley Decl. at ¶ 12).

Defendant Ken Weiner ("Avidor") did not write any of the articles in question. (Kenneth Avidor Decl. (Doc. No. 95-19) at ¶¶ 2–3). According to an Executive Associate Editor of the company, Voice Media Group does not publish any newspapers. (Andrew Van De Voorde Decl. (Doc. No. 95-20) ¶¶ 2–3). Van De Voorde states that City Pages is published by City Pages, LLC, and the Phoenix New Times is published by Phoenix New Times, LLC. (*Id.* at ¶ 4).

In accordance in Florida Statute § 770.01, Plaintiff sent a notice letter to Defendants as a condition precedent to this action.[4] For the September 28 Article, Plaintiff stated:

> The defamatory statements of the September 28, 2012 article represent and/or give the false inference that I committed and was convicted of the crime of child sexual abuse. In the original City Pages publication, which remains on the internet and the outlet's website, authors Aaron Ruper [sic] and Ken Avidor write and represent specifically: "Turns out, gays aren't the only ones capable of disturbing criminal sexual behavior - apparently even conservative straight guys tight with Bradlee Dean (Larry Klayman) turn out to be total creeps."

(Doc. No. 52-4 at p. 2). With respect to the February 22 Article, Plaintiff stated:

> In the article of February 22, 2013, the defamatory statements once again falsely infer that I "inappropriately touched" children, despite the lack of any evidence that I had committed these acts. As the record indicates, I was cleared of all allegations by the Cleveland Department of Children and Families and the Cuyahoga County Sheriff and the District Attorney.

---

[4] In full, Section 770.01 states:

Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

Fla. Stat. § 770.01

(*Id.*). Finally, as to the June 18 Article, Plaintiff stated:

> Further defamatory statements arose from an article published and disseminated nationwide and internationally entitled "Larry Klayman Under Investigation by Arizona Bar," in the June 18, 2013 edition of the Phoenix New Times. Since then these defamatory statements have been republished on a number of websites, blogs, other internet postings and print articles.
>
> The defamatory statements represent and/or give the false inference that I was reprimanded" for taking money from a client, and never doing any work." This is a blatant defamatory statement. The public reprimand, that you specifically reference, made no such findings, and in fact I did a considerable amount of work for the client, which The Florida Bar recognized.

(*Id.*).

The Third Amended Complaint alleges six causes of action under Florida law: Count I is a defamation claim against Defendants Avidor, Rupar, City Pages, and Voice Media Group arising from the September 28 Article (Doc. No. 52 at ¶¶ 25–30); Count II is a defamation claim against Defendants Hendley, Phoenix New Times, and Voice Media Group arising from the February 22 Article (*id.* at ¶¶ 31–37); Count III is a defamation claim against Defendants Hendley, Phoenix New Times, and Voice Media Group arising from the June 18 Article (*id.* at ¶¶ 38–47);[5] Count IV is a defamation by implication claim against Defendants Avidor, Rupar, City Pages, and Voice Media Group arising from the September 28 Article (*id.* at ¶¶ 48–51); Count V is a defamation by implication claim against Defendants Hendley, Phoenix New Times, and Voice Media Group arising from the February 22 Article (*id.* at ¶¶ 52–57); Count VI is a defamation by implication claim against Defendants Hendley, Phoenix New Times, and Voice Media Group arising from the June 18 Article. (*Id.* at ¶¶ 58–69). Plaintiff seeks damages "in excess of $15,000,000." (*Id.* at p. 20).

---

[5] The Third Amended Complaint incorrectly lists Count III as against "Avidor, Rupar, and City Pages." (Doc. No. 52 at p. 13). The June 18 Article makes clear that the proper parties to this claim are Hendley, Phoenix New Times, and Voice Media Group.

## II. <u>LEGAL STANDARD</u>

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)). In the case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential element of the non-movant's case or by demonstrating the absence of evidence to prove a fact necessary to the non-movant's case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (citation omitted). Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Id.* at 1116. If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17 (citation omitted). The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

When analyzing a motion for summary judgment, a court draws all inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Notwithstanding this

inference, "[t]here is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349.

### III.  DOWN THE RABBIT HOLE

"Would you tell me, please, which way I ought to go from here?"
"That depends a good deal on where you want to get to," said the Cat.
"I don't much care where—" said Alice.
"Then it doesn't matter which way you go," said the Cat.
"–so long as I get *somewhere*," Alice added as an explanation.
"Oh, you're sure to do that," said the Cat, "if you only walk long enough."

Lewis Carroll, *Alice's Adventures in Wonderland* (Macmillan and Co. 1865): Chapter 6.

#### A.  Preliminary Issues

The Court first addresses two preliminary issues presented in Defendants' motion. First, Voice Media Group argues that summary judgment should be granted on each Count in its favor because it does not publish *any* newspapers, let alone the two newspapers at issue in this case. (Doc. No. 94 at p. 8). Voice Media Group produced evidence showing that limited liability companies not parties to this action published the articles at issue here. (Van De Voorde Decl. at ¶ 4).[6] In response,[7] Plaintiff argues, in conclusory fashion, that Voice Media Group is liable for

---

[6] This revelation at summary judgment reeks of sandbagging. Although Defendants do not outright argue that summary judgment is improper against "City Pages" and "Phoenix New Times" because Plaintiff sued the incorrect entities, Defendants do use this fact to argue that summary judgment is improper against Voice Media Group. Counsel in this case appeared on behalf of "all Defendants," (Doc. Nos. 8, 9), and up until this point, counsel has referred to "Defendants" collectively. Further, counsel made no mention at the motion to dismiss stage (despite two motions to dismiss) that "City Pages" and "Phoenix New Times" are actually published by "parties who are not defendants in this action." (Doc. No. 94 at p. 8). This begs the question—who have Defendants' counsel been representing? Counsels' representations throughout this case show that they have been acting on behalf of, as well as defending and taking depositions for representatives and employees for, some entity. (*See, e.g.*, Defendants' Answer and Affirmative Defenses (Doc. No. 56) at ¶¶ 5, 6) ("Defendants admit that City Pages publishes news in Minnesota and that there is an affiliation between City Pages and Voice Media Group, but otherwise deny the allegations contained in this paragraph."); (Defendants admit that Phoenix New Times publishes news in Phoenix, Arizona and that there is an affiliation between

the actions of City Pages and the Phoenix New Times. (Doc. No. 104 at p. 26). Plaintiff recites

the standard for "piercing the corporate veil" under Florida law and then argues that Voice

Media Group "wholly owns" City Pages and the Phoenix New Times. (*Id.*). Plaintiff further

argues, without record citation, that City Pages and the Phoenix New Times are "mere

instrumentalities" under this theory and that these parties "collaborate with each other, under the

direction of Defendant Voice Media Group, to promote [its] agenda." (*Id.* at p. 26 n.16). By way

of reply, Defendants argue that Plaintiff failed to allege that Voice Media Group's liability is

based on such a theory and that, in any event, Plaintiff's citation to the record evidence does not

establish the requisite elements for liability. (Doc. No. 109 at pp. 2–3).

---

Phoenix New Times and Voice Media Group, but otherwise deny the allegations contained in this paragraph.")). Perhaps this was intended as some kind of gamesmanship, but it stings of poor judgment at best, negligence at worst. The Court will enter judgment as to the parties present in this action; the res judicata and collateral estoppel effects of a judgment against a non-party entity are not before the Court and therefore remain to be seen. "It would be so nice if something made sense for a change." Alice in Wonderland (Walt Disney Pictures 1951).

[7] To date, Plaintiff has routinely shown a disregard for this Court's Local Rules—Plaintiff's response in opposition to Defendants' motion for summary judgment being no exception. Plaintiff's filing is twenty-five pages of written text, which is five pages more than the Court affords a responding party. *See* M.D. Fla. Loc. R. 3.01(b) ("Each party opposing a motion or application shall file . . . a response that includes a memorandum of legal authority in opposition to the request, all of which the respondent shall include in a document not more than twenty (20) pages."); (Doc. No. 36 at pp. 5–6) ("Each party opposing a motion for summary judgment shall serve . . . a legal memorandum with citation of authorities in opposition to the relief requested as required by Local Rule 3.01(b) of not more than twenty pages."). Even more, Plaintiff, appearing to believe that the page limit is actually twenty-five pages, crams an absurd amount of text into footnotes to fit even more argument into his already violative filing. (*See, e.g.*, Doc. No. 104 at pp. 25–26 n.15). The amount of text in footnote fifteen alone would ordinarily take up almost a full page; yet, Plaintiff is able to squeeze this argument into half the amount of space by using single-spaced footnotes, apparently hoping the Court would not notice. The Court has become quite frustrated with Plaintiff's various tactics to avoid Court rules throughout the course of this litigation. Unfortunately, the Court learned early on in this case that this approach to litigation is the norm and not the exception for Plaintiff. While the Court should strike Plaintiff's filing as not in compliance with the Local Rules and Court Order, such a draconian punishment would be more in line with the Queen of Hearts' disproportionate sentencing guidelines. Despite a flagrant violation of the Local Rules, the Court has considered Plaintiff's violative filing in its entirety.

To be sure, the first mention of liability based on a "piercing the corporate veil" theory in this case appears in Plaintiff's response in opposition to Defendants' motion for summary judgment—on the very last page, no less. (Doc. No. 104 at p. 26). Nowhere in any version of Plaintiff's various complaints did Plaintiff plead or otherwise put Voice Media Group on notice that Plaintiff sought to hold Voice Media Group liable under this theory. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."). As such, Voice Media Group did not have the opportunity to engage in any discovery to disprove this theory. A sister court in this Circuit addressed and rejected a similar argument:

> Abundant authority crisscrossing a broad swath of jurisdictions holds that a plaintiff wishing to pierce the corporate veil to hold a particular defendant liable must set forth that intention in the complaint, and must do so in a manner that, at a minimum, satisfies the notice pleading requirements of Rule 8(a), Fed. R. Civ. P. [citing, among others, *Raber v. Osprey Alaska, Inc.*, 187 F.R.D. 675, 679 (M.D. Fla. 1999) ("Under Florida law, the corporate veil will not be pierced unless the party requesting that the corporate veil be pierced pleads instrumentality and improper conduct.") (citations and internal quotation marks omitted).]

> . . . Courts around the country have consistently, emphatically required that a veil-piercing claim or theory of liability must be presented in the plaintiff's pleading in some form or fashion. Northstar did not do so. Of course, a summary judgment brief is not a proper, permissible vehicle for a *de facto* amendment to the pleadings. *See, e.g.*, *Am. Fed'n of State, Cnty. & Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). Accordingly, defendants' objection to plaintiff's attempt to inject the concept of piercing the corporate veil in this action via its summary judgment brief, when it is not set forth in the Complaint as required under Rule 8(a), is well founded.

- 15 -

*Northstar Marine, Inc. v. Huffman*, Case No. 13–0037–WS–C, 2014 WL 4854843, at *9 (S.D. Ala. Sep. 29, 2014) (Steele, J.) (some citations altered).[8] As discussed above, this same analysis applies with full force here.

Even indulging the argument, Plaintiff's reliance on this theory does not persuade. "The corporate veil cannot be pierced unless the plaintiff can establish '*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant*, and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation.'" *WH Smith, PLC v. Benages & Assocs.*, 51 So. 3d 577, 581 (Fla. 3d DCA 2010) (quoting *Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. 2d DCA 1998) (emphasis in original)). Here, Plaintiff appears to assert that merely because Voice Media Group "wholly owns" Defendants City Pages and Phoenix New Times, those two companies are "mere instrumentalities" of Voice Media Group. (Doc. No. 104 at p. 26 n.16). Plaintiff provides no, and the Court is not aware of any, authority for this proposition. Moreover, assuming *arguendo* that Plaintiff could establish the mere instrumentality prong, Plaintiff makes no argument and directs the Court to no record evidence to prevent summary judgment as to the second prong—that Defendants engaged in improper conduct in the formation or use of the corporations. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) ("Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." (internal quotations marks omitted)).

Accordingly, summary judgment is appropriate on all Counts in favor of Voice Media Group.

---

[8] That this case addresses Alabama corporate law is of no distinction.

Second, Avidor argues that summary judgment should be entered in his favor on Counts I and IV because he did not write or publish the September 28 Article. (Doc. No. 94 at p. 9). One of the elements of a defamation claim in Florida is publication. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). It does not appear to be in dispute that Avidor did not publish that article. Instead, Plaintiff argues that Avidor should be held liable because it was "reasonably foreseeable" that Rupar would "republish the defamatory statements" because Avidor emailed Rupar a link to Avidor's blog posting. (Doc. No. 104 at pp. 24–25). Plaintiff cites to *Granda-Centeno v. Lara*, 489 So. 2d 142, 143 n.3 (Fla. 3d DCA 1986), for the proposition that a defendant can be held liable for defamation if the republication by a third party was "reasonably foreseeable." (Doc. No. 104 at p. 24). However, as recognized by the District Court for the Southern District of Florida in another case involving Plaintiff, "[a]t least one other court has discussed that legal standard, declining to follow a theory of liability based on reasonable foreseeability." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1251 (S.D. Fla. 2014) (citing *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08–cv–466–Orl–28GJK, 2010 WL 1408391, at*12 n.16 (M.D. Fla. Apr. 6, 2010) (Antoon, J.)). In *Pierson*, Judge Antoon rejected the argument Plaintiff advances outright:

> Plaintiff also argues that the law of Florida is that a defendant can be liable for defamation based on third-party republication if that republication was "reasonably foreseeable." However, the only authority cited by Plaintiff on this point is dicta in a footnote in a 1986 Florida appellate court case and citation of that dicta by a federal district court in New Jersey. *See Granda–Centeno v. Lara*, 489 So. 2d 142, 143 n.3 (Fla. 3d DCA 1986); *Pellullo v. Patterson,* 788 F. Supp. 234, 238 (D.N.J. 1992). This Court does not find the Lara dicta sufficient to establish the law of Florida on this point, and thus this portion of Plaintiff's argument is rejected.

*Pierson*, 2010 WL 1408391, at*12 n.16. The Court is persuaded by *Pierson* and therefore declines to rely on dicta from *Lara* to permit Plaintiff to proceed on this theory of liability. Summary judgment is therefore granted to Defendant Avidor on Counts I and IV.

### B.  Defamation Claims and Actual Malice

"The elements of a claim for defamation are as follows: '(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory.'" *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214 n.8 (Fla. 2010) (quoting *Rapp*, 997 So. 2d at 1106). Plaintiff has also asserted claims for "defamation by implication," which is a tort recognized under Florida law. *See Rapp*, 997 So. 2d at 1108. "[I]f the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Id.* (citing *Prosser & Keeton on the Law of Torts* § 116, at 117 (5th ed. Supp. 1988)).[9]

Importantly, "[a]ll of the protections of defamation law that are afforded to the media and private defendants are [] extended to the tort of defamation by implication." *Id.* (alteration added; citation and footnote omitted).

---

[9] *See also Rapp*, 997 So. 2d at 1106 (citing *Stevens v. Iowa Newspapers, Inc.*, 728 N.W. 2d 823, 827 (Iowa 2007) ("Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication . . . .") (internal quotations omitted) (alterations in original)).

Defendants move for summary judgment, *inter alia*, because they claim that some of the statements at issue are true and that Plaintiff cannot prove actual malice. The Court addresses these arguments in turn.[10]

1.     The September 28 Article – Count I

Count I is based on the statement, "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior – apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps." Defendants seek summary judgment on this claim because they argue that the statement is true. (Doc. No. 94 at p. 17–18). Plaintiff responds that this statement is false because he has never been found to have committed any criminal acts. (Larry Klayman Aff. (Doc. No. 104-1) at ¶ 14).

Although the parties fail to articulate this point with clarity, the question the Court must decide is whether or not the use of the word "criminal" in the September 28 Article is reasonably susceptible to the meaning that Plaintiff ascribes to it. If so, Defendants' arguments as to the truth of this statement miss the point because they are directed at their own interpretation—that Plaintiff engaged in "criminal sexual behavior"—and not Plaintiff's interpretation of the statement. In line with the Court's findings at the motion to dismiss stage, the Court finds that this statement, when taken in context with the entire article, *Brown v. Tallahassee Democrat, Inc.*, 440 So. 2d 588, 589 (Fla. 1st DCA 1983) (stating the "allegedly defamatory publication must be considered in its entirety rather than with an eye constrained to the objectionable feature alone."), and drawing all inferences Plaintiff's favor, could reasonably be viewed as implying

---

[10] The Court finds that Defendants' substantial truth arguments cannot be resolved at summary judgment and therefore denies summary judgment on this defense as to all Counts. *See, e.g.*, Restatement (Second) of Torts § 617 (1977) ("[T]he question of whether the defamatory imputations are true . . . is ordinarily for the jury . . . .").

Plaintiff had been convicted of a crime, (*see* Doc. No. 50 at p. 9). Therefore, summary judgment is denied on this ground.[11]

2.      The February 22 Article – Count II

Count II presents a different story. In this Count, Plaintiff alleges that "the defamatory statements once again misleadingly and falsely stated that Plaintiff 'inappropriately touched' children, despite the lack of any evidence that Plaintiff had committed these acts . . . ." (Doc. No. 52 at ¶ 25). The February 22 Article is titled, "Birther Lawyer Fighting Joe Arpaio Recall Was Found to Have 'Inappropriately Touched' Kids" and contains this statement: "What are the chances that a lawyer who was found by a court to have 'inappropriately touched' children would try to stop the recall of a county sheriff whose agency failed to properly investigate more than 400 sex crimes." However, this is exactly what the Ohio appellate court found: "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children." Thus, the statement published in the February 22 Article is true, which defeats Plaintiff's defamation claim in this Count.[12]

Inasmuch as Plaintiff argues that the February 22 Article "linked and reincorporated" the September 28 Article, and therefore "republished" that article, (Doc. No. 104 at pp. 8–9), the Court rejects this argument. Plaintiff provides the Court with no authority for the proposition that a hyperlink to a previously published statement constitutes republication. As a federal court sitting in diversity, the Court is required to apply the law as declared by the Florida Supreme

---

[11] However, for the reasons set forth in the next section, Plaintiff's claims ultimately fail.

[12] Plaintiff also takes issue with the fact the Defendants did not publish other information about Plaintiff's child support proceedings; namely, arguments Plaintiff presented to the Ohio courts, which those courts summarily rejected. However, these arguments do nothing to make the statement in the February 22 Article anything less than truthful.

Court. *CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 790 (11th Cir. 1999) (per curiam). In the absence of authority on point, the Court follows "relevant decisions of Florida's intermediate appellate courts" and attempts "to determine the issues of state law as [it] believe[s] the Florida Supreme Court would." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004). Because Plaintiff simply hurls various theories of liability without legally supporting his arguments, the Court is forced to spend its limited resources researching issues that Plaintiff fails to. This is an exceedingly frustrating practice of Plaintiff's when the Court makes every possible effort to fairly resolve the claims before it. *DeLauro v. Porto (In re Porto)*, 645 F.3d 1294, 1304 (11th Cir. 2011) ("The failure to cite the proper legal authority for a proposition is a failure of legal pleading; at most it is bad lawyering . . . ."). This is also a violation of the Court's Local Rules. *See* M.D. Fla. Loc. R. 3.01(b),

It should go without saying that counsel should support arguments with citations to relevant authority. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party who aspires to oppose a . . . motion must spell out his arguments squarely and distinctly, or else forever hold his peace."); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it . . . ."). "[T]he onus is upon the parties to formulate arguments." *Resolution Trust*, 43 F.3d at 599. Entirely out of an abundance of caution, the Court researched the issue and could not find any Florida authority for the proposition that providing links to statements already published, without more, republishes those statements.[13]

---

[13] While certainly not binding on the Court, other courts have rejected Plaintiff's theory. *In re Phila. Newspapers, LLC,* 690 F.3d 161, 174 (3d Cir. 2012) (providing a new link to original article "may allow for easy access" to the article, but does "not amount to the

Summary judgment shall therefore be granted on Count II.

3.   There is No Clear and Convincing Evidence of Actual Malice

"I've been considering words that start with the letter M. Moron. Mutiny. Murder. Mmm—malice." Alice in Wonderland (Walt Disney Pictures 2010).

As a compromise to the First Amendment's protections of free speech and press, the Supreme Court has held that "public officials" and "public figures" must prove that a defendant's allegedly defamatory statement was made with "actual malice," meaning that it was made "with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) (concerning a "public official"); *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 162, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in the result) (concerning a "public figure"); *see also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334–37, 342–43, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974). Under this standard, it is not enough for a plaintiff to prove simply that the defendant failed to investigate or to check the accuracy of a false statement. *Gertz,* 418 U.S. at 332, 334–35 n.6, 94 S. Ct. 2997. Instead, the actual malice standard requires that a defendant have a "subjective awareness of probable falsity" of the publication. *Id.* (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968)). A defendant acts with "reckless disregard" if he or she "in fact entertain[s] serious doubts as to the truth of [the] publication," *St. Amant,* 390 U.S. at 731, 88 S. Ct. 1323, "with a high degree of awareness of the probable falsity

---

restatement or alteration of the allegedly defamatory" content); *Salyer v. S. Poverty Law Ctr., Inc.,* 701 F. Supp. 2d 912, 918 (W.D. Ky. 2009) (holding that a link and reference to an allegedly defamatory article did not amount to a republication of the article.); *accord Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,* No. 02-CV-2258-JM(AJB), 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (in case applying California law, "Plaintiff cites no authority holding that providing links to statements already published on the Web, without more, republishes those statements").

of the statements involved." *Cape Publ'ns, Inc., v. Adams*, 336 So. 2d 1197, 1200 (Fla. 4th DCA 1976), *rev. denied*, 348 So. 2d 945 (Fla.), *cert. denied*, 434 U.S. 943, 98 S. Ct. 440, 54 L. Ed. 2d 305 (1977). Even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" does not establish actual malice. *Harte-Hanks*, at 666, 109 S. Ct. 2678.

Furthermore, "actual malice" in this context must be proven by clear and convincing evidence. *Gertz*, 418 U.S. at 342, 94 S. Ct. 2997.[14] The standard for actual malice therefore is a rather daunting one for public-figure plaintiffs.

Here, Plaintiff has conceded that he is a public figure. (Larry Klayman Dep. (Doc. No. 95-1) at pp. 7–8). As noted by the magistrate judge earlier in this case, as well as above, "[t]his is a significant concession because public figures suing for defamation and defamation by implication are required to prove, by clear and convincing evidence, that the statements at issue were published with actual malice." (Doc. No. 100 at p. 5) (citations omitted). As further noted by the Magistrate Judge, "[d]espite its name, the actual malice standard does *not measure malice in the sense of ill will or animosity*, but instead the speaker's subjective doubts about the truth of the publication." (*Id.* (citing *Church of Scientology, Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (emphasis added))). In this context, ill will is different than actual malice. *See Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967) (stating that instructing a jury that actual malice can be established if the jurors found that editorials were published with ill

---

[14] "Clear and convincing evidence" is evidence that "produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC*, 139 So. 3d 869, 872 (Fla. 2014); *see also Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 286 n.11 (1990) (quoting *In re Jobes*, 108 N.J. 394, 529 A.2d 434, 441 (1987)).

will was an incorrect statement of the law). Subjective ill-will does not establish actual malice, nor does a malevolent motive for publication. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). Moreover, ill will alone, cannot establish actual malice; however, ill will or motive, combined with other evidence, may suffice to show actual malice. *Harte-Hanks*, 491 U.S. at 668, 109 S. Ct. 2678 (noting that a plaintiff may prove the defendant's state of mind through circumstantial evidence, such as evidence of motive).

Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional actual malice and "ill will" or "hatred," often referred to as common law malice. Of course, this is not the first time a litigant has failed to appreciate this distinction: "[t]he word 'malice' . . . has plagued the law of defamation from the beginning." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 115, at 833–34 (5th ed. 1984). As explained by the Eleventh Circuit in discussing Georgia law,

> confusion often enters the defamation arena because the word "malice" has two distinct meanings. In order to prevail in a suit for libel, Georgia law requires that the plaintiff show the statement was false *and* "malicious." O.C.G.A. § 51–5–1. In this context "malice" means ill will, and "malicious" denotes statements deliberately calculated to injure. Georgia courts refer to this as "common law malice," and distinguish it from actual or "constitutional" malice. *See Williams v. Trust Co. of Georgia*, 140 Ga. App. 49, 56, 230 S.E. 2d 45 (1976). As noted above, the latter term deals only with the speaker's knowledge of the truth or falsity of the allegedly defamatory statements. To give the jury a choice between common law malice and actual malice where the constitution requires that actual malice be shown is reversible error. *Greenbelt Coop. Publ'g Assoc. Inc. v. Bresler*, 398 U.S. 6, 10, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970).

*Straw v. Chase Revel, Inc.*, 813 F.2d 356, 362 (11th Cir. 1987) (alterations in original); *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510–11, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will . . . . But the term can confuse as

well as enlighten. In this respect, the phrase may be an unfortunate one."); *Harte-Hanks*, 491 U.S. at 667 n.7, 109 S.Ct. 2678 ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will.").[15]

While discussed more fully below, Plaintiff's argument mostly focuses on Defendants' ill will towards Plaintiff. Plaintiff emphasizes how Defendants "intende[ed] to maliciously smear and destroy the reputation and credibility of Plaintiff," (Doc. No. 104 at p. 20), how the articles at issue "drip with malice and bitter intent," (*id.*), how it was Defendants' "rabid, malicious desire to destroy Plaintiff and his clients and friends," (*id.* at p. 21), and how Defendants "maliciously linked" and "maliciously wrote" various articles, (*id.* at pp. 21–22). However, no amount of repeating the word "malice" will overcome the constitutional requirement that Plaintiff must provide evidence that Defendants made the statements at issue with knowledge as to their falsity or with reckless disregard to their truth—the standard of actual malice—with convincing clarity.[16]

While the Court can understand where the confusion stems from, Plaintiff's focus on "ill will" and "hatred" as actual malice is somewhat perplexing for multiple reasons. As he is oft to remind the Court, Plaintiff recently prevailed on a defamation claim in the Southern District of Florida where he was required to prove actual malice. *See, e.g., Klayman v. Judicial Watch, Inc.*,

---

[15] Plaintiff's attempt to argue that malice is presumed when a statement is "per se defamatory" fails because the cases Plaintiff directs the Court to all predate *New York Times*, or concern common law malice and not constitutional actual malice. (*See* Doc. No. 104 at pp. 12–13). In the case of the latter, Plaintiff must still establish actual malice by clear and convincing evidence. *See, e.g., Madison v. Frazier*, 539 F.3d 646, 653–54 (7th Cir. 2008) ("[T]he statement [at issue] was defamatory *per se.* But even assuming the same, Madison cannot prevail. Madison concedes that he is a public figure, therefore he cannot maintain a suit for defamation unless he can prove that the Defendants' acted with 'actual malice.'"). As the Eleventh Circuit has stated, "[a]ctual malice may not be presumed." *Straw*, 813 F.2d at 363 n.7 (citing *New York Times*, 376 U.S. at 284, 84 S. Ct. 710).

[16] Indeed, some form of the word "malice" appears no less than sixty (60) times in Plaintiff's opposition brief. (*See* Doc. No. 104).

22 F. Supp. 3d at 1240. In fact, the presiding judge in *Judicial Watch* noted the parties' confusion on the issue in that case as well. *Id.* at 1252 n.6 ("Despite this definition [of actual malice], the parties' arguments regarding proof of actual malice center around whether [the defendants] harbored animosity against Klayman. This interpretation of the element as requiring a showing of ill will or hatred is largely misguided given the standard set forth in *New York Times* . . . ." (internal citations omitted)). Moreover, as discussed above, the Magistrate Judge in this case identified that Plaintiff's stipulation as a public figure is "significant" because it means he must prove actual malice. (Doc. No. 100 at p. 5). Finally, Plaintiff's opposition brief, in fact, recites the correct standard. (Doc. No. 104 at p. 12).

Regardless, in the context of a motion for summary judgment in this public-figure defamation case, the burden is on Plaintiff to "present record evidence sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice on the part of the defendant." *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 846–47 (Fla. 4th DCA 2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2515, 91 L. Ed. 2d 202 (1986) (stating that a court must determine "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity."). Plaintiff's failure to focus on whether or not the statements at issue were published with actual malice proves fatal to his claims. The Court finds, as a matter of law, that no jury could find by clear and convincing evidence the existence of actual malice in the publication of any of the statements in question.

Plaintiff makes a variety of arguments in an attempt to overcome Defendants' motion for summary judgment on the issue. None succeed.

First, Plaintiff argues there is evidence of actual malice because Defendants ignored Plaintiff's letter demanding a correction to the articles. (*Id.* at p. 19). While there is no dispute that Defendants have yet to issue any corrections, (Klayman Aff. at ¶ 28), the Supreme Court has explicitly rejected Plaintiff's argument and stated that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false. *New York Times,* 376 U.S. at 286, 84 S. Ct. 710 ("[F]ailure to retract upon respondent's demand . . . [is] not adequate evidence of malice for constitutional purposes."). Thus, the fact that Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice.

Second, Plaintiff attacks Defendants' editorial practices and argues that Defendants "have no method to edit or correct defamatory material before it is published or even thereafter" and that Defendants have no ombudsman to review and correct articles. (Doc. No. 104 at p. 19). Plaintiff also complains that Defendants do not attend seminars on journalistic ethics. (*Id.* at pp. 19–20). Yet, Plaintiff fails to explain how this shows in any way that Defendants published the statements in question with knowledge that they were false or with reckless disregard of whether they were false or not.

Third, Plaintiff argues that the articles are "hit pieces" intended to "maliciously smear and destroy the reputation and credibility" of Plaintiff, Bradlee Dean, and Michele Bachmann. (*Id.* at p. 20). Plaintiff continues, "If Plaintiff and his clients and friends, like Dean, Sheriff Joe Arpaio, and Bachmann can be attacked through defaming their lawyer, Plaintiff Larry Klayman, Defendants will continue to use this convenient vehicle of attacking others to further their political agenda" (*Id.*). According to Plaintiff, "[t]his explains [Defendants'] malice and business decisions to defame these persons intentionally and maliciously." (*Id.*). While this line of

argument highlights Plaintiff's confusion on the malice standard, this does little to show constitutional actual malice and is hardly "evidence" of the same.

Fourth, Plaintiff argues that actual malice can be shown because Defendant Hendley was previously convicted of crimes and used drugs. (*Id.*). By Plaintiff's account, "[t]his shows the malicious intent to defame Plaintiff Klayman through Sheriff Joe Arpaio, who is the chief police officer in the region that Defendant Hendley resides and works. Indeed, the articles at issue written by Defendant Hendley drip with malice and bitter intent." (*Id.*). Again, this argument confuses actual malice with common law malice. Even still, this is not evidence of even ill will, and nothing about these facts show that Defendants knew the statements at issue were false or that they entertained serious doubts about the truth of those statements.

Fifth, Plaintiff argues that Defendants did not contact Plaintiff before publishing the articles. (*Id.* at p. 21). However, even assuming this breaches relevant journalistic standards or practices (and the Court is not making any determination about this), the Supreme Court has made clear that even an extreme departure from professional standards, without more, will not support a finding of actual malice. *See Harte-Hanks*, 491 U.S. at 665, 109 S. Ct. 2678. Likewise, a failure to investigate, standing alone, does not constitute actual malice. *See St. Amant v. Thompson*, 390 U.S. at 730–31, 88 S. Ct. 1323. While the Court must draw all reasonable inferences in Plaintiff's favor, this fact at most presents very minimal evidence of actual malice.

Sixth, "there is the malicious blog post of Defendant Ken Avidor." (Doc. No. 104 at p. 21). Plaintiff argues that Avidor brought his blog post to Rupar's attention "which was then maliciously linked" to Avidor's blog. (*Id.*). Later, Avidor removed his blog posting, which Plaintiff also appears to claim is evidence of actual malice because Avidor was attempting to

"conceal" the blog from Plaintiff. (*Id.* at pp. 21–22).[17] However, as Defendants correctly point out, Avidor unquestionably did not publish or write any of the articles or statements at issue. Therefore, any evidence about Avidor's blog posting and what he did or did not do with it fail to show in any way that the Defendants published statements or articles at issue with actual malice.

Seventh, and venturing deeper into Wonderland, Plaintiff argues as evidence of actual malice that Avidor and Rupar sought to sell Avidor's "malicious book" featuring "a computer doctored photo maliciously designed to make [Michele] Bachmann look like a deranged lunatic." (*Id.* at p. 22–23). Plaintiff, while citing a Supreme Court of Kansas case which, in turn, generally cites to an encyclopedia, argues that "the showing of reckless indifference to the rights and reputations of others may furnish a basis for an inference that the publications in question were malicious." (*Id.*). Without more, the Court is not so convinced. Again, this is irrelevant to the question presented here—whether this shows that Defendants published *the statements at issue* with knowledge of their falsity or reckless disregard for their truth.

The only arguments Plaintiff advances that could arguably show evidence of actual malice concern the September 28 Article and the June 18 Article. However, the evidence still does not rise to the level where a jury could reasonably find actual malice by clear and convincing evidence.

As to the September 28 Article, Plaintiff argues that the title of and the language used in the article is itself evidence of actual malice. (Doc. No. 104 at p. 21). The September 28 Article is titled, "Bradlee Dean's Attorney, Larry Klayman, Allegedly Sexually Abused His Own Children" and contains the statement, "Turns out, gays aren't the only ones capable of

---

[17] Ironically, this is likely part of the remedy Plaintiff sought in issuing his correction letters to Defendants—removal of the articles. Thus, according to Plaintiff, leaving the articles on-line is evidence of actual malice and removing the articles would likely also evidence actual malice.

disturbing, criminal sexual behavior – apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps." (Rupar Dep. at pp. 8–9). Again, Plaintiff argues that this is false because he "has never been found to have committed any criminal acts on his children." (Doc. No. 104 at p. 15). Rupar states that he used the word "criminal" because he understood the conduct described by the appellate court to be "criminal" behavior. (Rupar Dep. at pp. 13–15). Rupar also states that he believed that statement to be true at the time that he wrote and published it because he had access to the Ohio appellate court order which stated, "After reviewing the record, we find no abuse of discretion on the part of the trial court in overruling Klayman's objections regarding the magistrate's finding that Klayman inappropriately touched the children." (Rupar Decl. ¶ 6). However, the Supreme Court has made clear that a party cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant,* 390 U.S. at 732, 88 S. Ct. 1323.

Nonetheless, because there is such a lack of other evidence, the Court finds that the language in the title and text of the September 28 Article, along with the minimal evidence discussed above, still fails to establish that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice sufficient to establish Plaintiff's claims on the September 28 Article. *See id.* at 731, 88 S. Ct. 1323.

Lastly, as to the June 18 Article, there is some evidence to support a finding of actual malice. Defendants appear to concede that the statement in the June 18 Article is false (Doc. No. 94 at p. 15); indeed, the statement—"Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work"—is not entirely accurate. In actuality, the Florida Supreme Court reprimanded Plaintiff for violating the terms of the settlement agreement Plaintiff made in

resolving his former client's complaint against him that Plaintiff had "failed to provide services in her criminal case after she paid him a $25,000 retainer."

Hendley stated that he reviewed the public filings related to the Florida Bar disciplinary proceedings. (Hendley Dep. at pp. 5–6). Hendley further testified that the statement in the June 18 Article is a summary of what he drew from the Florida Bar documents and the Miami New Times article. (*Id.* at pp. 9–10, 17). Hendley declares that he believed this statement was true at the time he published it. (Hendley Decl. at ¶ 12). Again, while Hendley's declaration of truth is not sufficient to automatically insure a favorable verdict, the Court finds Hendley's actions (while likely negligent), when also considering the minimal evidence discussed above, still fails to establish sufficient evidence to meet the clear and convincing standard as to Plaintiff's claims on June 18 Article.

Finally, even though Defendants argued that Plaintiff could not show actual malice as to the defamation by implication claims (Doc. No. 94 at pp. 10–17), Plaintiff failed to directly address these arguments in his response. *See Rapp*, 997 So. 2d at 1108 ("All of the protections of defamation law that are afforded to the media and private defendants are [] extended to the tort of defamation by implication." *Id.* at 1108 (alteration added; citation and footnote omitted)). For the above reasons, the Court also finds a reasonable jury could not make a finding of actual malice by convincing clarity as to those claims.

Accordingly, because the proof presented to show actual malice lacks the convincing clarity which the constitution demands, summary judgment is due to be granted in favor of Defendants on all Counts.[18]

---

[18] These findings should moot any of Plaintiff's arguments about punitive damages. *See Straw*, 813 F.2d at 361 ("In addition to promulgating the public/private figure distinction, in *Gertz* the Supreme Court held that punitive or presumed damages may not be awarded in a

## IV.  CURIOUSER AND CURIOUSER

While the Court would not ordinarily conclude with an admonition, this is, of course, no ordinary case. Plaintiff's approach to this litigation has been quite suspect, to say the least. As has been made clear in this case, as well as through reviewing the relevant proceedings at issue, when Plaintiff receives unfavorable rulings, he often plunges into a tirade against whomever he feels has wronged him—here, it has taken the form of motions to reconsider, objections, and even a petition for writ of mandamus with the Eleventh Circuit Court of Appeals. This is all to say that the Court will review any motion for reconsideration of this Order with a very sharp lens. Should Plaintiff file a motion to reconsider, the Court forewarns Plaintiff that any such motion must at least arguably meet the stringent standard for reconsideration of an Order, at the risk of facing sanctions from the Court. To this end, Plaintiff should keep in mind his obligations under Federal Rule of Civil Procedure 11.[19]

---

defamation case unless the plaintiff can show that the defendant acted with actual malice."). Further, because the foregoing disposes of Plaintiff's claims, the Court need not reach Defendants' arguments on the defense of fair and accurate reporting. Finally, Defendants fail to provide the Court with authority establishing that the "libel-proof plaintiff" defense exists in Florida and further do not provide the Court with argument as to why the Florida Supreme Court would adopt this defense as the law in Florida. Without more, the Court will not make that finding.

[19] In full, Federal Rule of Civil Procedure 11(b) provides:

**Representations to the Court.** By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for

Lest there be any confusion, the Court recognizes three grounds justifying reconsideration of an order: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *McGuire v. Ryland Group, Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007). The Court will not reconsider a ruling based on arguments "which could, and should, have been previously made." *Scelta v. Delicatessen Support Servs., Inc.*, 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000) (internal brackets, citations and quotations omitted); *see also Lussier v. Dugger*, 904 F.2d 661, 667 (11th Cir. 1990) (motions for reconsideration in the district court "should not be used 'to raise arguments which could, and should, have been made before the judgment is issued.'"). A "party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration." *Villaflores v. Royal Venture Cruise Lines, LTD.*, No. 96–2103–Civ–T–17B, 1997 WL 728098, at *2 (M.D. Fla. Nov. 17, 1997) (internal citations omitted). The Court will also not reconsider a previous ruling when the plaintiff seeks to relitigate "what has already been found lacking." *McGuire*, 497 F. Supp. 2d at 1358. As the Court has stated on many occasions, a motion for reconsideration must meet a stringent standard. *See id.* (articulating high standard).

The Court has considered and rejected Plaintiff's arguments. If Plaintiff simply disagrees with this Order, which no doubt he will, he may appeal.

Based on the foregoing, it is **ORDERED** as follows:

---

further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

1.  Defendants City Pages, Mathew Hendley, Phoenix New Times, Aaron Rupar, Voice Media Group, and Ken Weiner's Motion for Summary Judgment, filed on October 20, 2014 (Doc. No. 94), is **GRANTED**.

2.  The Clerk is **DIRECTED** to enter judgment in favor of Defendants City Pages, Mathew Hendley, Phoenix New Times, Aaron Rupar, Voice Media Group, and Ken Weiner, and against Plaintiff Larry Klayman. The judgment shall further provide that Defendants shall recover their costs of action.

3.  The Clerk is **DIRECTED** to close this file.

**DONE** and **ORDERED** in Orlando, Florida on April 3, 2015.


ANNE C. CONWAY
United States District Judge


Copies furnished to:

Counsel of Record
Unrepresented Parties