**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

CASE NO. 5:13-CV-00143-ACC-PRL

LARRY KLAYMAN,

                Plaintiff,

v.

CITY PAGES, et. al.

                Defendants.

## I.  <u>PLAINTIFF'S MOTION FOR RECONSIDERATION</u>

Pursuant to Federal Rule of Civil Procedure ("FRCP") 59, Plaintiff Larry Klayman ("Plaintiff"), respectfully moves this Court to reconsider the Court's Order and Judgment of April 3, 2015, [Dkt. Nos. 124, 125] on the following grounds, and presents a supporting memorandum of law in connection thereto:

## II.  <u>BACKGROUND</u>

This lawsuit arises from Defendants' willful and wanton publication of false and per se defamatory statements regarding Plaintiff in three, separate, widely circulated articles, which falsely accused Plaintiff of committing a crime and/or being convicted of a crime by sexually abusing his own children, and stealing money from a client he was legally representing. In fact, Defendants intentionally publicized these false statements to harm Plaintiff, his reputation, and his standing as a reputable lawyer, given Plaintiff's legal representation in controversial cases advocating conservative positions contrary to Defendants' political philosophy.

Plaintiff is a lawyer licensed to practice in Florida (and in other jurisdictions) and has at all times been a member in good standing throughout his approximate 37-year career as an

attorney. Plaintiff practices law continuously and extensively, throughout the country and within Florida and resides in and does business in this judicial district.

Defendants are pro-homosexual activists and supporters of the pro-illegal immigration movement and, as a result, sought to punish Plaintiff for his conservative views and legal advocacy of conservative positions by destroying Plaintiff's reputation, both personally and professionally, while perpetuating their own political agenda.  Third Amended Complaint ("TAC") (Exhibit 1) ¶ 9. In order to achieve their goal to harm Plaintiff, Defendants willfully published three, separate and widely circulated defamatory articles, entitled "Bradlee Deans' Attorney, Larry Klayman, Allegedly Sexually Abused his own Children," dated September 28, 2012, "Birther Lawyer Fighting Joe Arpaio Recall was Found to have 'Inappropriately Touched' his Kids," dated February 22, 2013, and "Larry Klayman Under Investigation by Arizona Bar," dated June 18, 2013. TAC ¶¶ 10, 11, 13, 14. In these articles, Defendants deliberately published false statements accusing Plaintiff of committing and/or being convicted of a crime as well as stealing from a client he was legally representing. TAC ¶¶ 10,15.

As a result of Defendants' wide dissemination of the above defamatory accusations, Plaintiff has been harmed in his reputation, particularly as an attorney and civil rights activist, in addition to being injured in his personal, social, official and business relations.

Plaintiff filed this lawsuit in an effort to receive justice for the harm that has been committed against him.  On April 3, 2015, this Court granted summary judgment in favor of the Defendants and entered judgment for Defendants. *See* Docket Nos. 124, 125.  As grounds for granting summary judgment, this Court determined that Plaintiff could not demonstrate, at the summary judgment stage, evidence that the Defendants acted with constitutional malice, that is, knowledge of the falsity or a reckless disregard of the truth. Order at p. 26 ("The Court finds, as

a matter of law, that no jury could find by clear and convincing evidence the existence of actual malice in the publication of any of the statements in question.").

However, this Court respectfully made clear error in its decision.  Plaintiff showed that Defendants had knowledge of the falsity of their statements, and established motives for the Defendants in making these defamatory statements.  Indeed, Defendants' defamatory statements were not unintentional and were done with knowledge of falsity and/or a reckless disregard of the truth.  As shown below, circumstantial evidence is all that was needed for the jury to decide this matter and this Court respectfully made clear error when it took that decision away from the jury.  The granting of summary judgment further represents a manifest injustice to Plaintiff as he has been severely harmed as a result of these widespread and false accusations of child sexual abuse and theft by Defendants. Plaintiff must be given his day in court so that he can receive justice – from members of Plaintiff's community – for all the tortious acts committed against him. For these reasons, this Court must respectfully reconsider its Order of April 3, 2015 (hereafter, "Order"), and allow this case to go to trial.

### III. LEGAL STANDARD

The Court recognizes three grounds justifying reconsideration of an order when there is: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *McGuire v. Ryland Group, Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007); Order at p. 33.

# IV. ARGUMENT

1) Evidence Existed In The Record That They Knew Of Falsity Or Acted With Reckless Disregard of the Truth.

   a. Defendants Admitted On the Record They Had Reviewed Florida Bar Records Prior To Making Defamatory Statements.

This Court erred when it found that Plaintiff had not made a showing of constitutional malice. On June 18, 2013, Defendants published an article, written primarily by Defendant Matthew Hendley (*See* Exhibit 2 -- Deposition of Matthew Hendley at 71:3-5), entitled "Larry Klayman Under Investigation By Arizona Bar," which contained the false statement that "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by The Florida Bar in 2011 for taking money from a client, **and never doing any work**." (Emphasis added).

This Court stated the following in its Order of April 3, 2015:

> Hendley's declaration of truth is not sufficient to automatically insure a favorable verdict, the Court finds Hendley's actions (while likely negligent), when also considering the minimal evidence discussed above, still fails to establish sufficient evidence to meet the clear and convincing standard as to Plaintiff's claims on June 18 Article.

**Defendant Hendley admitted that he reviewed the filings in The Florida Bar proceedings**, which were linked in the *Miami New Times* article. Hendley Depo. at 72:6 - 73:7.

> ("Q. And in those documents, were you just simply looking at the New Times article, or did you actually get documents from my Florida Bar file after you -- after it was called to your attention by the Miami New Times? **A. That article had links to Florida Bar documents, and those are the documents I looked at.**") 83:3 - 84:6 ("**Q. BY MR. KLAYMAN: But you did testify you reviewed the documents on the link? A. Yes.** Q. And you made no effort to investigate these mitigating circumstances before writing your article, which is Plaintiff's Exhibit 3. Correct? **A. I investigated it to the extent of reviewing documents related to the case.**").

Defendant Hendley admitted multiple times on the record that he had reviewed the Florida Bar documents. As made clear in the public reprimand **which Defendant Hendley**

**admitted to reviewing**, Plaintiff had entered into a settlement agreement with a former client, Natalia Humm, wherein Plaintiff agreed to pay only a very small part of a non-refundable retainer, at the urging of a Florida Bar mediator to not admit liability but instead to amicably resolve this matter and to put the matter behind him. *See* Exhibit 3 -- Consent judgment with Florida Bar and Complaint.  In fact, Humm's subsequent attorney, as the case was transferred to another district, Mark Solomon stated "[i]t is unlikely that (you) would want to refund a cent so please provide me with an explanation so that I may pass it along to Ms. Humm." *See* Exhibit 4 – Report of Referee and Supreme Court Order. Mr. Solomon was subpoenaed and prepared to attend this trial in order to testify about the fact that Plaintiff had done work for Ms. Humm and that Plaintiff did not just take Ms. Humm's money without doing work.  In addition, Assistant U.S. Attorney Roger Handberg, who was the Assistant U.S. Attorney handing the Humm case who knows of the considerable work Plaintiff did, was also subpoenaed to similarly testify. Plaintiff had made ongoing installment payments in order to fulfill the terms of the mediation but was having financial difficulties and could not make timely payments, as Florida, the nation and the world were going through a financial collapse at that time. Exhibit 3 at p. 6-7. The Florida Bar documents show that the Florida Bar only initiated an investigation after its correspondence, which could have averted the complaint, did not reach Plaintiff due to changes of address and the subsequent confusion this caused. Exhibit 3 at p. 5. Thus the complaint was *only* filed after Plaintiff inadvertently did not timely respond and it had nothing to do with Plaintiff taking money from a client without doing work. *Id.*

> Respondent's next communication with The Bar was on August 23, 2010, when he indicated that he had been in a serious auto accident and that he continued to suffer financial distress, but promised that he would be sending an additional payment to Humm. **Respondent moved during the interim period and he claims that he did not timely receive certain correspondence from The Bar, which ultimately led to a probable cause finding and the filing of a formal complaint with the Florida Supreme Court.**

> With respect to his failure to provide timely responses to The Bar, Respondent submits that he did not timely receive correspondence from The Bar, as his

address had changed and he inadvertently did not immediately change the address with The Florida Bar. **As a result, Respondent claims he did not timely receive notice that the Grievance Committee had made a probable cause finding or that a formal complaint had been filed in this matter, and consequently, that he did not have a timely opportunity to argue against the probable cause finding or to resolve this matter prior to a formal complaint being filed.**

*Id.* at p. 8 (emphasis added).  The consent judgment contained the real reason for the bar complaint: that Plaintiff was suffering through financial hardship and was not able to timely pay the agreed upon amount. As stated in the consent judgment:

In response to The Florida Bar, Respondent indicated that he was facing a very difficult financial situation, but that he had every intention of honoring his agreement with Humm.

Prior to making its final determination, the grievance committee requested that Respondent provide specific evidence of his financial situation, in affidavit form. Respondent provided a supplemental response, which included the financial information requested. In addition, Respondent enclosed a check in the amount of $1,000, payable to Humm, and made a promise to continue making good faith payments of at least $500 per month until the entire $5,000 was paid in full.

*Id.* at 6-7. The Florida Bar consent judgment, which Defendant Hendley admitted to reviewing, simply and clearly states that the only reason for the complaint was Plaintiff's failure to timely respond, due to his having moved and not having updated his contact information**.  Nowhere in the consent judgment does the record indicate that Plaintiff took money from a client without doing any work.**  Importantly, nowhere in the consent judgment or report of referee does it mention that Plaintiff acted ***dishonestly*** or was at fault because of his ***motives***. The entire reprimand was based on his initial failure to pay back a woman he did indeed do work for but in order to make the problem go away, agreed, at the advice of the mediator and without admitting liability, to refund a small part of her retainer back. In fact, the consent judgment also contained numerous mitigating factors which also considered:

Respondent has been continuously a member of The Florida Bar in good standing for nearly thirty-five (35) years.

> Respondent has been a respected member of The Bar for nearly thirty-five (35) years.
>
> Respondent is remorseful for his delay in satisfying the terms of the Mediation Agreement, which ultimately led to the filing of a formal complaint in this matter. Moreover, Respondent has now fully satisfied his outstanding obligation to Humm and made such payment without conditioning it on any consent judgment.

*Id*. at 7.  The consent judgment thus accurately portrayed the situation for what it was: a remorseful attorney who was undergoing severe financial hardship but nonetheless continued to fulfill his obligation as best as he could. The fact that Defendant Hendley admits that he reviewed the document but then still goes on to publish an article that says Plaintiff took money from a client with "never" doing any work shows that Hendley knew the statement was false or at the very least acted with reckless disregard for the truth.  This clearly establishes the constitutional malice required for this case to go to the jury. Constitutional malice simply requires that a statement is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280 (1964). Defendant Hendley did not make a mistake, as he would like this Court to believe, but knew exactly what he was doing – a hit piece on Plaintiff. Defendant knew what he was publishing was false, but did not care.  The record also contained evidence of "ill will" towards Plaintiff, which established the motive behind these defamatory statements, as discussed below. Indeed, the "ill will" does not necessarily show constitutional malice but it does show the motive needed to show constitutional malice that is required. There is more than sufficient evidence to take this issue to the jury, and that is where this case belongs.

     b.  <u>The Defendants Acted With Reckless Regard For The Truth, Based On The Fact That The Ohio Record Never Found That Plaintiff Had Committed Criminal Acts.</u>

Defendant Rupar posted a blog posting on bradleedeaninfo.blogspot.com entitled, "Bradlee Dean's Lawyer Larry Klayman: Allegations of Sexual Abuse to Children" on September 28, 2012. In this blog, Defendant Rupar quotes several passages from the Court of Appeals of Ohio's decision of July 26, 2012 that affirmed the magistrate's ruling against Plaintiff.  One of these quoted portions contained the following:

> The magistrate further found it notable that Klayman, "for all his breast beating about his innocence * * * [he] scrupulously avoided being questioned by anyone from [children services] or from the Sheriff's Department about the allegations," and that he refused to answer any questions, repeatedly invoking his Fifth Amendment rights, about whether he inappropriately touched the children.

Indeed, **the Court of Appeals of Ohio never once mentioned or ruled that Plaintiff had committed any instances of child sexual abuse** or was capable of committing any crime.  None of the documents, including the Court of Appeals of Ohio decision, even suggests that Plaintiff was capable of criminal sexual conduct.

However, Defendant Rupar uses passages such as this one to proclaim that Plaintiff "Allegedly Sexually Abused his Own Children" and that he was "capable of disturbing, criminal sexual behavior." Any person, let alone a reporter, would have realized that further investigation into the family court's record, including the magistrate's decision that was at issue in this appeal, was proper.

Defendant Avidor also admits to reviewing the Court of Appeals of Ohio's decision. Exhibit 5 -- Deposition of Kenneth Avidor at 88:3-14; Docket No. 130-1. ("I believe, I usually – as is usually my habit in these cases when I blog, is that **I looked for the original, and that's -- that's available, I think it was Ohio Court of Appeals, so I looked at the original document and it appeared to be, since it was on the -- it was a real court decision, it was not in any way fake or otherwise, so I determined that it was for real, and that's all I did was quote that court of appeals document** that was on the state website.") (emphasis added).  Both

Defendants, Rupar and Avidor, admitted, under oath, to reviewing the Court of Appeals of Ohio's ruling and then making their false and defamatory statements about Plaintiff.  The only way that they could have read the ruling and still made the defamatory statements was if they had either made the statements knowing they were false or they made them with reckless disregard for the truth.

Defendant Hendley was specifically asked during deposition about what documents he reviewed before writing the false and defamatory articles. When asked about the magistrate's decision from the lower Ohio court, Defendant Hendley admitted that he reviewed several documents. Hendley Depo. at 105:18-21; Docket No.130-2 (Q. BY MR. KLAYMAN: Okay. Did you go back to the magistrate's findings to see whether, in fact, he ruled that I inappropriately touched the children? **A. I reviewed several documents related to this.**).  The Ohio family court extensively reviewed the evidence, or lack thereof, of child sexual abuse. Importantly, the magistrate judge reviewing the evidence, came to the conclusion that there was no evidence of child sexual abuse in his decision of June 9, 2010.  In this decision of June 9, 2010, the magistrate judge stated as follows:

> the Assistant Prosecuting Attorney to whom the matter had been referred by the detective from the County Sheriff's Department who was investigating the alleged incident that in the prosecutor's opinion there was insufficient evidence to present a case to the Grand Jury

Exhibit 6 -- Magistrate's decision at p. 18. **Upon reviewing the record, it was clear that after the false accusations of child sexual abuse, the Cuyahoga County Prosecutor and the Cuyahoga Department of Children of Families, could find no evidence of any child sexual abuse or other related wrongdoing by Plaintiff.** Indeed, the magistrate never made a finding that Plaintiff had sexually abused his children.  When Defendants reviewed the record they would have come to the realization that there were no charges ever brought against Plaintiff and

that it was clear that he had not committed any criminal or any other inappropriate acts towards

his children.  That the Defendants reviewed this information and still went on to make false and

defamatory statements about Plaintiff shows that the Defendants acted with knowledge of the

falsity of the statements that they were making, or in the very lease were reckless.

2)  <u>A Plaintiff Need Only Show Circumstantial Evidence Of "Constitutional Malice" In
    Order For The Case To Go To A Jury.</u>

The Court further erred in determining that Plaintiff was required to show clear and

convincing evidence of constitutional malice at the summary judgment level.  This Court held in

its Order of April 3, 2015 that:

> because the proof presented to show actual malice lacks the convincing clarity
> which the constitution demands, summary judgment is due to be granted in favor
> of Defendants on all Counts.

Order at p. 31.  However, state and federal courts have undoubtedly recognized that "it would .  .

. be rare for a defendant . . . to admit to having had serious, unresolved doubts . . . <u>Requiring</u>

<u>proof of recklessness "without being able to adduce proof of the underlying facts from which a</u>

<u>jury could infer recklessness . . . would limit successful suits to those cases in which there is</u>

<u>direct proof by a party's admission of the ultimate fact."</u>  *Eastwood v. Nat'l Enquirer, Inc*., 123

F.3d 1249, 1253 (9th Cir. 1997) (emphasis added) ("As we have yet to see a defendant who

admits to entertaining serious subjective doubt about the authenticity of an article it published,

<u>we must be guided by circumstantial evidence. By examining the editors' actions we try to</u>

<u>understand their motives.</u>"); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir.

1984) ("The plaintiff need not obtain any admission of fault from the defendant."), *vacated on*

*other grounds,* 477 U.S. 242 (1986); *Goldwater,* 414 F.2d at 343. If this were not the law, "mere

swearing could, as a matter of law, defeat any action to which the *New York Times* principles are

applicable." *Guam Fed'n of Teachers v. Israel,* 492 F.2d 438, 439 (9th Cir. 1974), *cert. denied,*

419 U.S. 872 (1974). This case was at summary judgment, where the Court accepted the truth of

the statements made by Defendants in their affidavits and depositions. However, a jury was not

given the opportunity to examine the credibility of the Defendants and come to a determination

as to the truth. This Court wrongly took that decision away from the jury, even after Plaintiff had

presented circumstantial evidence that the Defendants acted with constitutional malice.

Indeed, as shown below, Plaintiff demonstrated, with great detail, circumstantial evidence

with which a jury could find, with clear and convincing evidence, that the Defendants were

acting with constitutional malice when they made the defamatory remarks about Plaintiff.

    a.   <u>Plaintiff Demonstrated Malicious Motive Which Is Circumstantial Evidence That Defendants Knew Their Statements Were False Or Acted With Reckless Disregard Of The Truth.</u>

The Court respectfully erred in finding that Plaintiff confused ill will with constitutional

malice. For example, the Court holds the following:

> Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional actual malice and "ill will" or "hatred," often referred to as common law malice.

Order at p. 24.

> Again, this argument confuses actual malice with common law malice. Even still, this is not evidence of even ill will, and nothing about these facts show that Defendants knew the statements at issue were false or that they entertained serious doubts about the truth of those statements.

Order at p. 28.  However, as shown below, Plaintiff was using evidence of ill will or common

law malice as circumstantial evidence in order to prove that Defendants acted with the requisite

constitutional malice. And this is the legal standard.

In proving constitutional malice, a plaintiff may use evidence of all of Defendants' acts

in order to establish that constitutional malice existed. *Goldwater v. Ginzburg*, 414 F.2d 324, 342

(2d Cir. 1969) ("the court properly instructed the jurors that they should consider all the evidence

concerning appellants' acts and conduct in publishing Fact in deliberating upon whether the defendants published with actual malice"); *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 668 (1989).

In *Harte-Hanks*, the U.S. Supreme Court held that "it is clear that the conclusion concerning the newspaper's departure from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of [defendant]'s allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. Although courts must be careful not to place too much reliance on such factors, **a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry**." *Harte-Hanks*, 491 U.S. at 668 (internal citations omitted) (emphasis added).

Indeed, following this U.S. Supreme Court precedent, relying on circumstantial evidence to prove constitutional malice has become the proper method throughout the country. *See*, *e.g.*, *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards."), *cert. denied,* 526 U.S. 1114 (1999); *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. Ct. 1995) ("Any competent evidence can be used to establish actual malice."), *Appeal denied,* 670 A.2d 142 (Pa. 1996).

Thus, for this Court to hold that Plaintiff had only shown ill will and not constitutional malice is error.  It is specifically the finding of ill will through the use of circumstantial evidence that will lead a plaintiff to demonstrate that a defendant published false statements either knowingly or with reckless disregard for the truth.

On point is *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969). In *Goldwater*, the defendant had falsely published that Senator Barry Goldwater, a huge public figure and presidential candidate, was suffering from paranoia and was mentally ill. In this case, the U.S. Court of Appeals for the Second Circuit found that the defendants "were very much aware of the possible resulting harm" and that "the seriousness of the charges called for a thorough investigation but the evidence reveals only the careless utilization of slipshod and sketchy investigative techniques." *Id*. at 339. In confirming the jury's funding of liability, the Court held that, "[t]here is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."

Indeed, constitutional malice is subjective but may be evidenced by objective data and proof of common law malice. *St. Amant v. Thompson*, 390 U.S. 727 (1968). In *St. Amant*, the U.S. Supreme Court held that there need only be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." The U.S. Supreme Court continued by holding that it was the responsibility of the finder of fact, in this case a jury, to determine whether that constitutional malice existed:

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson*, 390 U.S. at 732. Further, to gather the necessary proof of malice, plaintiffs may use discovery to delve into the editorial process. *Herbert v. Lando*, 441 U.S. 153

(1979). The First Amendment imposes *no restrictions* on the types of evidence admissible to prove constitutional malice, with the Court repeatedly affirming the utilization of circumstantial evidence in proving this "critical element." *Id.* Importantly, the "finder of fact" in this case is the jury and this analysis and "finding" should not have been taken away from it by the judge.

> b. The Court Erred in Determining Evidence of the Editorial Process Was Not Relevant.

The Court further erred in finding that evidence of the editorial process was not relevant to the showing of constitutional malice. With regard to the editorial process, this Court found as follows:

> Plaintiff attacks Defendants' editorial practices and argues that Defendants "have no method to edit or correct defamatory material before it is published or even thereafter" and that Defendants have no ombudsman to review and correct articles. (Doc. No. 104 at p. 19). Plaintiff also complains that Defendants do not attend seminars on journalistic ethics. (*Id.* at pp. 19–20). Yet, Plaintiff fails to explain how this shows in any way that Defendants published the statements in question with knowledge that they were false or with reckless disregard of whether they were false or not.

Here Plaintiff similarly explored the editorial process of each of the publications. Through discovery it was determined that Defendant City Pages has no ombudsman, does not have an editorial process, and does not run background checks on people they hire, which as set forth above, includes convicted felons, drug addicts and pornographers. Exhibit 7 -- Deposition of Andrew Nicholas Van De Voorde ("Van De Voorde Depo.") at 88:10; Docket No. 130-4. Importantly, Defendants hired "reporters" who were drug users and/or convicted criminals; persons who had nothing to lose to take risks and defame others to earn a living, as they were of questionable employability. Defendants were not interested in the truth but rather hired people with no respect for laws or ethical standards of journalism.

The Court erred in finding that this was not relevant in the determination of constitutional malice. Evidence of a lack of editorial process is used as objective evidence that collectively

supports a finding of constitutional malice. *See Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758 (Ky. 1990), *cert. denied,* 498 U.S. 1047 (1991). The *Warford* case demonstrates an example of "the well-constructed collage" that plaintiffs may construct to prove constitutional malice. David A. Elder, Defamation: A Lawyer's Guide § 7:5, At 64-65 & N.25 (1993).

In *Warford,* the court delineated numerous items of objective evidence that collectively supported a finding of constitutional malice in the case of a college basketball recruiter defamed by charges of recruiting improprieties. *Warford,* 789 S.W.2d at 772. The defendant reporters made minimal efforts to verify the credibility of their source, a student athlete, despite the plaintiff's denials just prior to publication and the plaintiff's request that the reporter contact several individuals, including the source's parents, friends, and high school coaches. *Id.* The defendants also failed to contact anyone at the plaintiff's university, including his boss, prior to the original publication. *Id.* Moreover, the defendants failed to conduct any further investigation prior to publication of the reprint, despite denials by the plaintiff and others. *Id.* In addition, the defendants conceded they were aware of the seriousness of the charge and the potential harm to the plaintiff from the pervasive dissemination to all future college and university employers. *Id.* Furthermore, the defendants delayed in contacting the plaintiff until just prior to the original publication despite the absence of a time deadline, permitting a jury to conclude the defendants "were committed to running the story without regard to its truth or falsity." *Id* Finally, the defendants transformed the source's ambiguous statement into "the most potentially damaging alternative" creating a "jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 772-73 (quoting *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 382 (5th Cir.)).

Here, Plaintiff similarly correctly and legitimately used evidence of the editorial process

as circumstantial evidence that Defendants were acting with constitutional malice.  Defendants

Hendley and Rupar did not call Plaintiff to ask for a comment prior to making the false and

defamatory statements about him.  Hendley Depo. at 78:1-5 (Q. And, in fact, you never bothered

to call me for a comment before you wrote your article, which is Plaintiff's Exhibit 3 to

defendants' depositions, did you? A. That is correct."); Rupar Dept. at 84:17-20 ("Q. In fact, you

never bothered to get a comment from me about this article before you published it, did you? A. I

did not.").  These were not the actions of honest reporters who were seeking to find the truth in

writing articles about Plaintiff.  These were instead the actions of two individuals hoping to

cause harm to Plaintiff by knowingly publishing false statements about Plaintiff or publishing

them with reckless disregard for the truth.  The truth was never Defendants' concern.

>            c.   The Court Erred In Determining That a Failure to Correct Was Not Relevant.

This Court respectfully erred as a matter of law when it found that Defendants' failure to

issue a correction was not relevant to the issue of constitutional malice.  This Court held:

> Plaintiff argues there is evidence of actual malice because Defendants ignored
> Plaintiff's letter demanding a correction to the articles. (*Id.* at p. 19). While there
> is no dispute that Defendants have yet to issue any corrections, (Klayman Aff. at ¶
> 28), the Supreme Court has explicitly rejected Plaintiff's argument and stated that
> actual malice cannot be inferred from a publisher's failure to retract a statement
> once it learns it to be false. *New York Times,* 376 U.S. at 286, 84 S. Ct. 710
> ("[F]ailure to retract upon respondent's demand . . . [is] not adequate evidence of
> malice for constitutional purposes.").

Order at p. 27. However, the Court once again errs as it does not recognize that the failure to

retract is circumstantial evidence of constitutional malice. Indeed, "most authorities suggest that

a failure to retract, in conjunction with other circumstances, may be used to establish the

requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in

Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993); accord, e.g., *Tavoulareas v. Piro*, 817

F.2d 762, 794, 260 U.S. App. D.C. 39 (D.C. Cir. 1987) (*en banc*) (refusal to retract can be

evidence of actual malice); *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir 1983), abrogated on other grounds by *Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514, 1520-21 (5th Cir. 1995); Restatement (Second) of Torts § 580A, cmt. d (1977) ("Under certain circumstances **evidence [of a refusal to retract a statement after it has been demonstrated to be false] . . . might be relevant in showing recklessness at the time the statement was published**.")(emphasis added).

Defendants' failure to retract is yet another form of circumstantial evidence that goes to prove that Defendants either knowingly published false and defamatory statements about Plaintiff or acted with reckless disregard for the truth. Defendants failed to retract because it was their intention all along to harm Plaintiff and his reputation and they did not care, either before or after the publication of the false and defamatory statements, about the truth.

3) <u>Plaintiff Presented More Than Enough For a Finding of Defamation by Implication</u>

"Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . . ." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Defendants committed both forms of defamation by implication.

First, Defendant Avidor, whose blog is linked to Defendant Rupar's blog of September 28, 2012, quotes Bradlee Dean's statement about a teacher who was accused of feeding semen to his students. *See* Exhibit 8. Defendant Avidor's blog was the basis for Defendant Rupar's blog of September 28, 2012, and is therefore an integral part of Defendant Rupar's blog posting. Ruper incorporated Avidor's blog and integrated it to the point that these postings must be considered jointly and in conjunction with one another. The Court could find no law in Florida stating otherwise and this is the logical and reasonable legal conclusion.

Defendant Rupar pushed the readers of his blog to visit Defendant Avidor's blog posting. The teacher at issue in Defendant Avidor's blog was charged with "52 counts of child sex abuse." Then, Defendant Avidor immediately juxtaposes Plaintiff with this statement about a teacher who was charged with 52 criminal acts. *Id.* Plaintiff was mentioned right after this teacher in order to create the false impression that Plaintiff also committed acts of child sexual abuse. *Id.* It is true that the teacher was charged with sexually abusing children. It is also true that the Court of Appeals of Ohio released a ruling in a *civil* lawsuit regarding Plaintiff. However, to place them together in the manner that Defendant Avidor did is done specifically in order to imply a defamatory connection between Plaintiff and the teacher. Quite simply, **Defendants put these two statements together to make the readers believe that Plaintiff was the same as an alleged criminal with 52 charges against him when in fact there have never been any criminal charges brought against Plaintiff**. However, this was the impression that Defendants wanted to create, even though they knew it was false or they wanted to believe it was true so badly that they acted with reckless disregard for the truth. For this reason, Defendants committed defamation by implication.

Further, both Defendant Avidor and Defendant Rupar quote a selected portion of the Court of Appeals of Ohio's ruling, which they use to maintain that Plaintiff Klayman was found to have sexually abused his children. *See* Exhibits 8 and 9. However, Defendants omits any reference to the record that Plaintiff was not charged with any crimes. Defendants Rupar and Avidor further omit the fact that this is not a criminal lawsuit but is only a civil matter relating to the custody of Plaintiff's children. *Id*. By omitting the fact that this was a civil lawsuit, and not a criminal lawsuit, Defendants imply that Plaintiff was found to have committed crimes of child

sexual abuse by a criminal court, since a criminal court is ordinarily where such a matter would be taken.

By titling the column as he did by referencing now dismissed child sexual abuse allegations concerning the Plaintiff, false charges that were long since disposed of, and equating Plaintiff Klayman with the convicted school teacher who fed semen to his students and committed other perverted acts as well as the Penn State football coach Jerry Sandusky, both Defendants Avidor and Rupar are maliciously defaming Plaintiff Klayman and making him out to be a sick pervert.

False allegations of sexual abuse ruin lives.[1] Defendants knew of the seriousness of these allegations and made them knowing that they were false or acted with reckless disregard for the truth. In addition, Defendants linked stories related to confirmed child molesters in order to ensure that the audience fully believed that Plaintiff was also one of them.

4) The Determination of Constitutional Malice Should Have Been Left for the Jury
   to Decide

Whether there was a clear and convincing showing of constitutional malice is a matter for the jury to decide. *See SCo Group, Inc. v. Novell, Inc.,* 439 Fed. Appx. 688, 695 (10th Cir. Utah 2011)("the jury was instructed to consider slanderous only those statements uttered with constitutional malice"). Recognizing the role of the jury in determining constitutional malice, the U.S. Court of Appeals for the Ninth Circuit has held:

> We must attempt to discharge our constitutional responsibility to protect First
> Amendment values without unduly trenching on the fact-finding role of the jury

---

[1] See, e.g., Richardson, Darrell W., The Effects of a False Allegation of Child Sexual Abuse on an Intact Middle Class Family available at: http://www.ipt-forensics.com/journal/volume2/j2_4_7.htm  ("The Schulz (1989) and Tyler and Brassard (1984) surveys indicate that both convicted and nonconvicted families in which there are accusations of sexual abuse face similar problems.  High percentages reported separation and or divorce, losing their homes, losing their jobs, becoming dependent on the state for financial and other assistance, and losing their social support network of friends and extended family members.")

> and trial judge. We are mindful that in *New York Times, Bose*, and *Harte-Hanks*, the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due deference to the fact-finding role of juries, and particularly the jury's opportunity to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir. 1990). Indeed, the jury's observation of the Defendants' credibility is precisely what is needed here.  Defendants falsely claim that they did not knowingly post false and defamatory information about Plaintiff.  It is up to the jury to determine whether these Defendants are credible. *See also St. Amant*, 390 U.S. at 732, supra ("The finder of fact must determine whether the publication was indeed made in good faith.").

Here, the Court erred because it took this decision away from the jury. Plaintiff had demonstrated, with direct and circumstantial evidence, that Defendants had ill will towards Plaintiff, which gave rise to a motive for knowingly publishing false and defamatory statements about him, or making the statements with reckless disregard for the truth. Plaintiff further showed that no editorial process existed, nor did the Defendants make any attempt to correct the record.  Based on all this evidence on the record, Plaintiff properly established that Defendants were acting with constitutional malice.  It was then up to the jury to make the final determination as to the liability of the Defendants.

5) <u>Defendants' Linking of Previous Defamatory Articles Reincorporated and Republished The Previous Articles</u>

The article of February 22, 2013 linked and reincorporated the article of September 28, 2012 which stated falsely that Plaintiff committed and was convicted of the crime of child sexual abuse and thus Defendants have also again defamed Plaintiff Klayman through this republication, compounding the damage to Plaintiff Klayman. TAC¶ 9; Exhibit 10.  The article stated, "Thanks to our sister paper in Minneapolis, *City Pages*,…"  and incorporated the

September 28, 2012 article by providing a link to it. *Id.* The hyperlink specifically pushed the readers to another defamatory article about Plaintiff, in an attempt to compound the injury to Plaintiff's reputation and credibility.  At this point time the September 28, 2012 was four months old.  However, the February 22, 2013 brought the article back to the readers' attention.  It specifically brought this article back to life and gave it new readership, thus republishing it.

The Court ruled that:

> Entirely out of an abundance of caution, the Court researched the issue and could not find any Florida authority for the proposition that providing links to statements already published, without more, republishes those statements.

Order at p. 21. However, this Court erred in its finding. This Court cited to cases which stood for the proposition that a simple link to another website did not republish it. *See*, *e.g.*, *In re Phila. Newspapers, LLC*, 690 F.3d 161 (3d Cir. 2012).  This was not the case here.

In the June 18, 2013 article, Defendant Hendley published descriptive hyperlinks that not only linked to other articles about Plaintiff, but did so in a prominent matter in the middle of the article. Exhibit 11.[2]  Indeed, Hendley was not simply citing to these other blogs but was instead featuring and promoting them right in the middle of his blog. One of the links was once again to the February 22, 2013.  However, instead of simply placing the link there, Defendant made the link say "Judge: Klayman Inappropriately Touched: Kids."  These words were specifically picked in order to draw the reader to this other article, where Defendant could do more harm to Plaintiff's reputation.  In addition, these words created the defamatory implication that that was the entirety of the Court of Appeals of Ohio's ruling.  This was not the case as this descriptive headline does not indicate the entirety of the situation. Specifically omitted was any mention about the biased and prejudiced remarks by the magistrate judge who made the alleged finding

---

[2] Defendant Phoenix New Times has a pattern and practice of posting descriptive links in the middle of their blog postings.  *See* Exhibit 12. These descriptive hyperlinks are intended to promote and direct readers to other blog postings.

that Plaintiff had "inappropriately touched" his children, and how this bias and prejudice was one

of the major issues being appealed.  By omitting this and other facts Defendants republished blog

postings and thus created both defamation and defamation by implication and this Court erred in

finding otherwise.

The September 28, 2012 article employed similar tactics. This time, Defendants not only

linked a defamatory blog posting, linking it to Ken Avidor's blog, but also quoted not directly

from the Ohio Court of Appeals but instead from Avidor's blog posting. Exhibit 8. This is

evidenced by the fact that the September 28, 2012 states, "(Via Ken Avidor – emphasis his)." *Id.*

The Avidor blog had already emphasized particular portions of the Ohio Court of Appeals'

ruling and Defendant Rupar repeated this same emphasis. *See* Exhibits 8 and 9. Thus,

Defendants were republishing a large portion of the Avidor blog and were not simply providing a

link to it.

For these reasons, the Court respectfully erred in finding that the Defendants' linking to

previous blog postings did not constitute republication.

6)   Plaintiff is Facing Manifest Injustice If Summary Justice Is Not Reconsidered

In order for a court to reconsider a decision due to "manifest injustice," the record

presented must be so patently unfair and tainted that the error is manifestly clear to all who view

it. *In re Titus*, 479 B.R. 362, 367-68 (Bankr. W.D. Pa. 2012) (quoting *In re Roemmele*, 466 B.R.

706, 712 (Bankr. E.D. Pa. 2012)). Here, Plaintiff's life and livelihood have been severely harmed

as a result of Defendants' actions.  Plaintiff is seeking justice for the terrible acts that have been

committed against him.  For this Court to grant summary judgment would be a manifest injustice

towards Plaintiff.  It is so patently unfair, based on the entire record of circumstantial evidence

against Defendants, to take this decision away from the jury.  Indeed, it is only for the jury to

decide whether the Defendants have acted with constitutional malice and this case must respectfully go to trial so that the jury can make that determination.  Because of the manifest injustice that is being caused to Plaintiff this Court must respectfully reconsider its decision to grant summary judgment.

## V.  <u>CONCLUSION</u>

For these reasons, Plaintiff hereby moves for reconsideration of the Court's Judgment and Order of April 3, 2015.  This Court clearly erred in determining that Plaintiff did not show constitutional malice.  Plaintiff had demonstrated with circumstantial evidence that Defendants were knowingly making false and defamatory statements or making them with reckless disregard for the truth. Granting summary judgment was improper because it was for the jury to determine whether constitutional malice was present. *See*, *e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) ("**Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care**.") (emphasis added).  This decision must respectfully be reconsidered as it was made in clear error and it is now creating a manifest injustice to Plaintiff.

Plaintiff has conferred with Defendants' counsel and they oppose this Motion.

Dated: May 1, 2015

Respectfully Submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Florida Bar No. 246220
2775 NW 49th Ave., Suite 205-346
Ocala, FL 34483
(310) 595-0800

Email: leklayman@gmail.com

Plaintiff Pro Se

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of May, 2015, a true and correct copy of the foregoing Motion For Reconsideration (Case No. 5:13-cv-00143) was submitted electronically to the U.S. District Court for the Middle District of Florida and served via CM/ECF upon the following:

**Sanford Lewis Bohrer**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/374-8500
Fax: 305/789-7799
Email: sbohrer@hklaw.com

**Scott D. Ponce**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/789-7575
Email: sponce@hklaw.com

*Attorneys for Defendants*

*/s/ Larry Klayman*

Larry Klayman, Esq.