Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

CASE NO. 5:13-CV-00143-ACC-PRL

LARRY KLAYMAN,

               Plaintiff,

v.

CITY PAGES, et. al.

               Defendants.

---

**AFFIDAVIT OF LARRY KLAYMAN IN SUPPORT OF MOTION FOR**
**DISQUALIFICATION PURSUANT TO 28 U.S.C. § 144**

1. My name is Larry Klayman and I am over 18 years old. I am an adult citizen of the United States and I am the Plaintiff in the above styled case. I have personal knowledge of the facts stated in this declaration.

2. Because of the harm caused by Defendants, I decided to file suit in order to get justice for their actions.

3. I have been an attorney for over 38 years. Given my experience and national exposure, I have developed a reputation as a distinguished attorney.

4. Over the course of this lawsuit, I have inadvertently made a few filing errors. I have not, in any way, attempted to disregard the Court's local rules.

5. I accidentally filed a 25-page response to Defendants' Motion for Summary Judgment when the page limit was 20 pages. Defendants had filed a 25-page motion and I made a reasonable error, based on what I had asked another lawyer to check, in assuming that the page limitation for an opposition was the same number of pages. My colleague made an inadvertent error in telling me that the page limit was 25 pages.

1

6. I regret this inadvertent mistake and was not aware of the mistake until the Court issued its ruling on the motion for summary judgment.

7. Neither party was prejudiced as a result of this inadvertent error and I had acted entirely in good faith in filing that opposition.

8. After reviewing this Court's Order of April 3, 2015, I was in shock as to the level of disrespect that this Court demonstrated towards me. Never in my 38 years of practice has a judge's order been so mocking towards me.

9. Over the course of this lawsuit, the Court has made several factual and legal errors that further indicate that this Court has an extra-judicial bias and prejudice against me. . . .

". . . The code of judicial conduct does require a judge to "respect and comply with the law," to "be faithful to the law and maintain professional competence in it, " and to "accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to the law." Moreover, it would be incongruous if the principle "ignorance of the law is no excuse" applies to everyone but those charged with interpreting and applying the law to others. Thus, while mere legal error does not constitute misconduct, "[j]udicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review . . ."

Cynthia Gray, The Line Between Legal Error and Judicial Misconduct: Balancing Judicial Independence and Accountability, 32 Hofstra L. Rev. 1245 (2004). (Exhibit A to this Affidavit). As Professor Gray's scholarly review of judicial error makes apparent, not all errors committed by judges, who after all have years of legal training and experience, are innocent.

10. Most notably, this Court disallowed and struck punitive damages from my Third Amended Complaint even though it was demonstrated to the Court that it was properly pled.  The Court even denied my motion to amend even though leave to amend is to be freely granted and I had additionally shown good cause why amendment was necessary.

11. This issue of punitive damages was one of great importance for both the parties as well as the Court. If this issue of punitive damages, and their inclusion, was not taken to appeal, it could have resulted in a massive waste of both parties and court resources in having to retry an entire jury trial should I have prevailed on appeal.  I moved the Court for reconsideration and even asked the Court to certify the question for an interlocutory appeal to the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit").  When the Court denied both of these motions I was left with no option but to file a petition for writ of mandamus with the Eleventh Circuit. The Court took personal offense at the fact that I filed a petition for writ of mandamus, something that I had every legal right to do.

12. As yet another example of extra-judicial bias and prejudice towards me, the Court sat on and did not rule on Defendants' Motion for Summary Judgment for four months, after the pleadings were closed, refusing to issue a ruling until the eve of the trial. Indeed, Defendants' Motion was filed on October 20, 2014.  I opposed the motion on November 19, 2014 and Defendants filed a reply on December 3, 2014.  The Court did not issue its decision until April 3, 2015, exactly four months after the motion was fully briefed.  More importantly, this date was also only three weeks before the trial was set to begin and three days *after* the original trial was set to begin at great time and expense. I performed all pre-trial obligations and had prepared jury instructions, issued subpoenas for witnesses, and performed all other items required for and to intensively prepare for trial.

13. I am representing myself pro se in this matter at great expense to my legal practice and myself. I seek justice for the harm that was done to me as a result of Defendants' false and defamatory comments and I am doing so by pursuing my claims in court.  Defendants, on the other hand, are a large corporation and have substantial resources and money. An insurance

3

carrier apparently covers Defendants' legal expenses and they have hired a powerful Florida law firm to represent them.  The Court simply sat on this motion in order to cause me harm, knowing that the closer it got to trial the more my office and I would be preparing for it. I had a right to believe this case was going to trial and I estimate that I spent over $200,000 in time and expenses in preparation for it between the close of the pleadings on Defendants' summary judgment and the Court's ruling four months later.

14. Even more, it was clear from this Court's Order of April 3, 2015, granting summary judgment in favor of Defendants,' that this Court has an extra-judicial bias and prejudice towards me.

15. For instance, the Court fashions the entirety of the Order in the theme of Alice in Wonderland, a fictional novel by Lewis Carroll.  I have been a distinguished attorney for over 38 years.  This is no way for a judge to act towards a lawyer.

16. The Court makes statements mocking and insulting me and my ability to practice law, referring to me even as a "moron" and "murder[er]."  For example, The Court writes:

*I've been considering words that start with the letter M. Moron. Mutiny. Murder. Mmm-malice.*

*Seventh, and venturing deeper into Wonderland, Plaintiff argues as evidence of actual malice that Avidor and Rupar sought to sell Avidor's "malicious book" featuring "a computer doctored photo maliciously designed to make [Michele] Bachmann look like a deranged lunatic." (Id. at p. 22–23).*

*Because Plaintiff simply hurls various theories of liability without legally supporting his arguments, the Court is forced to spend its limited resources researching issues that Plaintiff fails to.*

*Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional actual malice and "ill will" or "hatred," often referred to as common law malice.*

*Down the Rabbit Hole - "Would you tell me, please, which way I ought to go from here?"   "That depends a good deal on where you want to get to," said the Cat.   "I don't*

*much care where—" said Alice.   "Then it doesn't matter which way you go," said the Cat.   "–so long as I get somewhere," Alice added as an explanation.   "Oh, you're sure to do that," said the Cat, "if you only walk long enough."*

*. . . no amount of repeating the word "malice" will overcome the constitutional requirement that Plaintiff must provide . . .*

*While this line of argument highlights Plaintiff's confusion on the malice standard, this does little to show constitutional actual malice and is hardly "evidence" of the same.*

*The Court learned early on in this case that this approach to litigation is the norm and not the exception for Plaintiff.*

*Plaintiff's response contains a plethora of irrelevant conjecture and superfluous detail without record citation.*

*The Court omitted a paragraph from this article mentioning an alleged derogatory email Plaintiff sent to the chairman of the Joe Arpaio recall organization.*

*Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional malice and "ill will" or "hatred" . . .*

*Plaintiff, while citing a Supreme Court of Kansas case which, in turn, generally cites to an encyclopedia . . .*

*As he is oft to remind the Court, Plaintiff recently prevailed on a defamation claim in the Southern District of Florida where he was required to prove actual malice.*

*If Plaintiff simply disagrees with this Order, which no doubt he will, he may appeal.*

17. Finally, and most tellingly, the Court issued a threat and admonition at the close of the summary judgment order which threatened me, even taking offense to my having filed a petition for writ of mandamus with the Eleventh Circuit.

*While the Court would not ordinarily conclude with an admonition, this is, of course, no ordinary case. Plaintiff's approach to this litigation has been quite suspect, to say the least. As has been made clear in this case, as well as through reviewing the relevant proceedings at issue, when Plaintiff receives unfavorable rulings, **he often plunges into a tirade against whomever he feels has wronged him—here, it has taken the form of motions to reconsider, objections, and even a petition for writ of mandamus with the Eleventh Circuit Court of Appeals**. This is all to say that the Court will review any motion for reconsideration of this Order with a very sharp lens. Should Plaintiff file a motion to reconsider, the Court forewarns Plaintiff that any such motion must at least arguably meet the stringent standard for reconsideration of*

*an Order, at the risk of facing sanctions from the Court. To this end, Plaintiff should keep in mind his obligations under Federal Rule of Civil Procedure 11.*

18. The Court accused me of going on a "tirade" if I disagreed with a ruling. I did nothing more than simply exercise my legal rights by filing motions to reconsider and filing a petition for writ of mandamus. The very fact that the Court would accuse me of engaging in "tirades" and derisively mocks me (i.e., Curiouser and Curiouser) for pursing my rights to seek appellate review and file other pleadings, and in particular seeking appellate review of a ruling potentially putting at risk millions of dollars in recovery for punitive damages, indicates that there is an extra-judicial bias and prejudice that it is harboring against me.

19. Filing a petition for writ of mandamus does not constitute a tirade or any act against the judge for which the Court should take personal offense. My filing a petition or a motion for reconsideration – which I have a right to do – when I believe that the Court made an error is called advocacy. It's my job.

20. All these actions make it clear that the Court has an animus and extra-judicial bias and prejudice against me and sought to punish me rather than conduct a fair trial.

21. The Court's actions in this lawsuit have created much more than an appearance of extrajudicial bias and prejudice and because of that, this Court must respectfully recuse itself or be immediately disqualified from this lawsuit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 20, 2015.

*/s/ Larry Klayman*
Larry Klayman

Exhibit A

GRAY.PRINT.DOC                                                                    10/8/2004 7:02 PM

# THE LINE BETWEEN LEGAL ERROR AND JUDICIAL MISCONDUCT: BALANCING JUDICIAL INDEPENDENCE AND ACCOUNTABILITY

*Cynthia Gray\**

Most of the complaints filed with state judicial conduct commissions—generally more than ninety percent—are dismissed every year.[1] Some dismissed complaints do not allege a violation of the code of judicial conduct. For example, litigants sometimes complain that a judge did not return telephone calls because they do not understand that a judge is required to avoid such ex parte communications. Others are dismissed because the evidence does not support the complaint. For example, a Texas prison inmate alleged that the judge who had presided in his trial had been prejudiced against him because they had once been married; the State Commission on Judicial Conduct dismissed his complaint after its investigation revealed that the judge had never been married to the complainant.[2]

Most of the complaints that are dismissed every year are dismissed as beyond the jurisdiction of the commissions because, in effect, the complainants are asking the commission to act as an appellate court and review the merits of a judge's decision, claiming that a judge made an incorrect finding of fact, misapplied the law, or abused his or her discretion. Correcting errors is the role of the appellate courts, however, and a commission cannot vacate an order or otherwise provide relief for

---

\*   Director of the Center for Judicial Ethics of the American Judicature Society.

1.   Each of the fifty states and the District of Columbia has established a judicial conduct organization charged with investigating complaints against judicial officers. In most states, the judicial conduct organization has been established by a provision in the state constitution; in the other states, the judicial conduct organization has been established by a court rule or by statute. Depending on the state, the judicial conduct organization is called a commission, board, council, court, or committee, and is described by terms such as inquiry, discipline, qualifications, disability, performance, review, tenure, retirement, removal, responsibility, standards, advisory, fitness, investigation, or supervisory. This paper will use the general term "judicial conduct commission" to describe all fifty-one organizations.

2.   ANNUAL REPORT OF THE TEX. STATE COMM'N ON JUDICIAL CONDUCT (1999).

a litigant who is dissatisfied with a judge's decision. In its annual report, the Kansas Commission on Judicial Qualifications explains:

> Appealable matters constitute the majority of the [complaints that are not investigated] and arise from a public misconception of the Commission's function. The Commission does not function as an appellate court. Examples of appealable matters which are outside the Commission's jurisdiction include: matters involving the exercise of judicial discretion, particularly in domestic cases; disagreements with the judge's application of the law; evidentiary or procedural matters, particularly in criminal cases; and allegations of abuse of discretion in sentencing.[3]

On the other hand, the code of judicial conduct does require a judge to "respect and comply with the law,"[4] to "be faithful to the law and maintain professional competence in it,"[5] and to "accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law."[6] Moreover, it would be incongruous if the principle "ignorance of the law is no excuse" applies to everyone but those charged with interpreting and applying the law to others. Thus, while mere legal error does not constitute misconduct, "[j]udicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review . . . ."[7] This article will review both cases in which a finding of misconduct was based on legal error and cases in which legal error was not sanctioned to describe the "something more" that transforms legal error into judicial misconduct.

## RATIONALE

Part of the justification for the "mere legal error" doctrine is that making mistakes is part of being human and is inevitable in the context in which most judicial decision-making takes place. It is not unethical to

---

3. ANNUAL REPORT OF THE KAN. COMM'N ON JUDICIAL QUALIFICATIONS.

4. MODEL CODE OF JUDICIAL CONDUCT Canon 2A (1990). The American Bar Association adopted the Model Code of Judicial Conduct in 1972 and revised it in 1990. Forty-nine states, the U.S. Judicial Conference, and the District of Columbia have adopted codes based on (but not identical to) either the 1972 or 1990 model codes. (Montana has rules of conduct for judges, but they are not based on either model code.)

5. MODEL CODE OF JUDICIAL CONDUCT Canon 3B(2).

6. *Id.* at Canon 3B(7).

7. *In re* Laster, 274 N.W.2d 742, 745 (Mich. 1979) (public reprimand for judge who granted large number of bond remissions originally ordered forfeited by other judges). *See also In re* Lichtenstein, 685 P.2d 204, 209 (Colo. 1984).

be imperfect, and it would be unfair to sanction a judge for not being infallible while making hundreds of decisions often under pressure.

> [A]ll judges make legal errors. Sometimes this is because the applicable legal principles are unclear. Other times the principles are clear, but whether they apply to a particular situation may not be. Whether a judge has made a legal error is frequently a question on which disinterested, legally trained people can reasonably disagree. And whether legal error has been committed is always a question that is determined after the fact, free from the exigencies present when the particular decision in question was made.[8]

In addition, if every error of law or abuse of discretion subjected a judge to discipline as well as reversal, the independence of the judiciary would be threatened.

> [J]udges must be able to rule in accordance with the law which they believe applies to the case before them, free from extraneous considerations of punishment or reward. This is the central value of judicial independence. That value is threatened when a judge confronted with a choice of how to rule—and judges are confronted with scores of such choices every day—must ask not "which is the best choice under the law as I understand it," but "which is the choice least likely to result in judicial discipline?"[9]

Moreover, the authority to interpret and construe constitutional provisions and statutes resides in a state's trial and appellate court system and in judges chosen by whatever method the state constitution dictates. The conduct commission members are not chosen the same ways judges are; many are not judges, and some are not lawyers. A problem would be created if the commission's legal interpretation differed from that of the appellate courts, although that problem is ameliorated by the possibility of supreme court review of judicial discipline cases in most states. Furthermore, judicial conduct commission proceedings are not the ideal forum for debating whether a judge made an erroneous decision as the parties in the underlying proceeding would not necessarily participate, and the commission does not have the authority to remedy an error by vacating the judge's order.

The appellate and discipline systems have different goals, however, and accomplishing both objectives in some cases requires both appellate

---

8. *In re* Curda, 49 P.3d 255, 261 (Alaska 2002).

9. *Id.*

GRAY.PRINT.DOC                                                                10/8/2004 7:02 PM

review and judicial discipline.[10] Appellate review "seeks to correct past prejudice to a particular party" while judicial discipline "seeks to prevent potential prejudice to future litigants and the judiciary in general."[11] "[A]n individual defendant's vindication of personal rights does not necessarily protect the public from a judge who repeatedly and grossly abuses his judicial power."[12] Moreover, the discipline system's goal of preventing potential prejudice to the judicial system itself cannot depend on "a party's decision in litigation to expend the time and money associated with pursuing a question of judicial conduct that may be examined on review."[13] The possibility of an appellate remedy for a particular judicial act, therefore, does not automatically and necessarily divest the judicial discipline authority of jurisdiction to review the same conduct.

Some courts have even questioned whether the invocation of judicial independence in judicial disciplinary proceedings misapplies the concept because judicial independence "does not refer to independence from judicial disciplinary bodies (or from higher courts)."[14]

> In the traditional sense, the concept of an independent judiciary refers to the need for a separation between the judicial branch and the legislative and executive branches. . . . Judicial independence requires a judge to commit to following the constitution, the statutes, common law principles, and precedent without intrusion from or intruding upon other branches of government.[15]

Even a federal court suggested that the constitutional measures meant to protect judicial independence were not intended to insulate individual judges from accountability to "the world as a whole (including the judicial branch itself)," but "to safeguard the branch's independence from its two competitors."[16]

The extensive involvement of other judges on the conduct commissions and in the review of judicial discipline cases ensures that the perspective of the judiciary and deference to its independence is

---

10.  *In re* Schenck, 870 P.2d 185 (Or. 1993).

11.  *Laster*, 274 N.W.2d at 745. *See also In re* Lichtenstein, 685 P.2d 204, 209 (Colo. 1984).

12.  Harrod v. Ill. Courts Comm'n, 372 N.E.2d 53, 65 (Ill. 1977).

13.  *Schenck*, 870 P.2d at 195 (rejecting judge's argument that his denial of a motion to disqualify was challengeable on mandamus or on appeal, but not sanctionable under the code of judicial conduct).

14.  *In re* Hammermaster, 985 P.2d 924, 936 (Wash. 1999).

15.  *Id* at 935.

16.  McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders, 264 F.3d 52, 65 (D.C. Cir. 2001).

reflected in the decision whether to find misconduct based on legal error.[17] Finally, judicial discipline for legal error does not always or even often result in removal but may simply lead to a reprimand, censure, or suspension.

## APPEALABLE DEMEANOR

Intemperate remarks can result in reversal on appeal, and citing the same concerns with judicial independence underlying the "mere legal error" rule, judges have argued that their in-court statements are entitled to deference and should not subject them to sanction.[18] Courts and conduct commissions generally reject that argument, however, and intemperate remarks can lead not only to reversal but to a finding that the judge violated the code of judicial conduct requirement that "[a] judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity."[19]

In In re *Hammermaster*,[20] the Supreme Court of Washington sanctioned a judge for, among other misconduct, telling 12 defendants he would either impose an indefinite jail sentence or life imprisonment if they did not pay the fines and costs imposed. The judge acknowledged that he knew the law did not allow for life imprisonment for failure to

---

17. To ameliorate concerns that the very nature of judicial discipline for legal error involves viewing a judge's "actions in the cool light of after-the-fact reflection by way perhaps of second-guessing her judicial actions taken in what she perceived to be an emergency situation," the Supreme Court of Mississippi noted that a sitting chancellor had presided over the fact-finding hearing of the Commission on Judicial Performance, that the Commission meeting to consider the case was presided over by a sitting circuit judge, and two county court judges, a chancellor, and one other circuit judge were also present and unanimously voted to find misconduct. *See* Miss. Comm'n on Judicial Performance v. Perdue, 853 So. 2d 85, 97 (Miss. 2003).

18. In *In re* Seraphim, 294 N.W.2d 485 (Wis. 1980), the Supreme Court of Wisconsin rejected the contrary argument and stated, "The fact that none of the cases over which respondent presided were reversed by this court because of judicial misconduct does not mean that no misconduct occurred or that this court condoned that which did occur. It means only that this court found no judicial misconduct that had so seriously affected the trial as to warrant reversal." *Id.* at 500.

19. MODEL CODE OF JUDICIAL CONDUCT Canon 3B(4) (1990). *See, e.g., In re* Jenkins, 503 N.W.2d 425 (Iowa 1993) (public reprimand for ten separate instances of intemperate behavior; the Supreme Court of Iowa had previously twice admonished the judge in its opinions on appeal from his decisions and had once reversed him because of his intemperate actions); *In re* O'Dea, 622 A.2d 507 (Vt. 1993) (rejecting judge's argument that Judicial Conduct Board was reviewing judicial decision-making by considering the charge that he denied a litigant her hearing rights and concluding that Board findings went to a lack of the attributes such as patience and courtesy, not incorrect judicial decision-making).

20. 985 P.2d 924 (Wash. 1999) (censure and six-month suspension without pay).

pay fines and that he had no authority as a municipal court judge to impose such sentences. He claimed that the remarks were a "technique of obvious exaggeration" to alert the defendants to the serious consequences of their actions and defended his conduct "on grounds that a judge is entitled to latitude in dealing with defendants and that his statements were a reasonable exercise of judicial independence."[21]

The court agreed that "a judge must have latitude when speaking with defendants," but concluded that "using threats which exceed judicial authority is unacceptable, even if the judge believes such threats are the only way to coerce compliance."[22] Rejecting the judge's argument that his treatment of the defendants was an exercise of judicial independence, the court held, "[j]udicial independence does not equate to unbridled discretion to bully and threaten, to disregard the requirements of the law, or to ignore the constitutional rights of defendants."[23]

A federal judge argued that the principles of judicial independence incorporated in the United States Constitution barred any sanction for "'anything to do with anything that happened when the judge . . . was acting and deciding cases or in any phase of the decisional function,'" including "'anything that the judge does verbally or physically in the course of adjudication.'"[24] This exemption included, according to his counsel, racist disparagement of or even punching attorneys appearing before him.[25] The United States Court of Appeals for the District of Columbia Circuit rejected that argument. The court, assuming arguendo that disciplinary procedures may not constitutionally be used as a substitute for appeal,[26] stated that the judge's "theory plainly goes well beyond judicial acts realistically susceptible of correction through the avenues of appeal, mandamus, etc."[27] Even when those avenues are available, the court stated, "we are all at a loss to see why those should be the only remedies, why the Constitution, in the name of 'judicial independence,' can be seen as condemning the judiciary to silence in the

---

21.  *Id.* at 935.

22.  *Id.*

23.  *Id.* at 936.

24.  *McBryde*, 264 F.3d at 67.

25.  *See id.*

26.  Complaints against federal judges are filed under the Judicial Conduct and Disability Act of 1980. *See* 28 U.S.C. § 372(c).

27.  *McBryde*, 264 F.3d at 68.

face of such conduct."[28] The court concluded, "we see nothing in the Constitution requiring us to view the individual Article III judge as an absolute monarch, restrained only by the risk of appeal, mandamus and like writs, the criminal law, or impeachment itself."[29]

In In re *Van Voorhis*,[30] the California Commission on Judicial Performance emphasized that its finding of misconduct was based on the judge's treatment of counsel when he ruled that certain evidence should be excluded, not on whether the ruling was correct.[31] A deputy district attorney had attempted to have a police officer testify regarding the horizontal gaze nystagmus test administered to drivers stopped for driving while intoxicated, but the judge rejected her attempt, claiming that expert testimony was necessary. With the jury present and in a condescending and "somewhat hostile tone," the judge engaged in a critique of the prosecutor that was disparaging, mocking, and sarcastic.[32]

---

28.  *Id.* The court described one instance in which the judge had ordered a lawyer to attend a reading comprehension course when she failed to have her client attend a settlement conference as required by the judge's standard pretrial order. The court noted:

> Appeal is a most improbable avenue of redress for someone like the hapless counsel bludgeoned into taking reading comprehension courses and into filing demeaning affidavits, all completely marginal to the case on which she was working. Possibly she could have secured review by defying his orders, risking contempt and prison.

*Id.* at 67-68.

29.  *Id.*

30.  Van Voorhis, Decision and Order (Cal. Comm'n on Judicial Performance Feb. 27, 2003) (removal for eleven instances of improper courtroom demeanor), *available at* http://cjp.ca.gov/pubdisc.htm, *petition for review denied, available at* http://www.courtinfo.ca.gov/courts/supreme/.

31.  The masters had found that the prosecutor's attempt to have a police officer describe the horizontal gaze nystagmus test was reasonable. The incident before Judge Van Voorhis took place in 1999, and in 1995, the California Court of Appeals had held that the gaze nystagmus test was admissible as a basis for an officer's opinion that a defendant was driving under influence of alcohol without requiring expert testimony. *See* People v. Joehnk, 42 Cal. Rptr. 2d 6 (Cal. Ct. App. 1995).

32.  *Van Voorhis.* The judge began by asking, "Now we have opened the door to something that really you have no intention of completing. Do we leave the jury with these half-truths?" The judge disparaged the prosecutor's case by noting that although the officer had seen "a person demonstrate some sort of symptom," that did not necessarily connect it to alcohol, continuing "probably everybody she has ever arrested has a smaller finger on the end of their hand. That doesn't mean that everybody with a small finger is a drunk." When the prosecutor attempted to move the proceedings along, the judge responded, "That really doesn't solve the problem completely because you went down a road that you could not complete and now this jury has heard about gaze nystagmus, and they are supposed to wonder what it all means." After the prosecutor asked to approach the bench, the judge, "with a smirk on his face," replied in a condescending and mocking tone, "And what would you tell me up here?" The prosecutor replied that she had questions for the court, and the judge told her "ask me now." The judge then conducted a lengthy colloquy critical of the prosecutor in which he questioned the prosecutor's motives for seeking to introduce the evidence, ridiculed her perspective, and threatened to declare a mistrial if she continued. The masters found that the judge's last comments in the colloquy were made in a "sing-

The commission stated that even if it accepted the judge's explanation that he was concerned that the defendant receive a fair trial, that concern would justify only his ruling, not his deprecation of the prosecutor's motives, his ridiculing of her perception, or his prejudicing of her case. The commission concluded, "It is clear that . . . Judge Van Voohis lost his temper and made comments for the corrupt purpose of venting his anger or frustration."[33]

A judge's comments during sentencing, however, are one type of in-court statement that commissions and courts are hesitant to subject to discipline, a reluctance based on concern that sanctions would discourage judges from articulating the bases for their sentencing decisions.[34]

In In re *Lichtenstein*,[35] the Supreme Court of Colorado rejected the recommendation of the Commission on Judicial Discipline that a judge be publicly reprimanded for his comments in the sentencing of a man who had pled guilty to murdering his wife. Explaining why, for second degree murder, he was imposing a suspended sentence of four years in prison plus one year parole rather than the presumptive sentence of eight to twelve years in prison, the judge referred to "highly provoking acts on the part of the victim."[36] The judge's comments as well as the sentence generated extensive publicity. On appeal, the court overturned the

---

song, sarcastic, and very condescending tone of voice." The commission adopted the masters' finding that the "judge's statements here could not have been meant for any purpose other than to deliberately ridicule [the deputy district attorney] and prejudice her case in front of the jury" and, therefore, the judge made his comments "for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties)."

33. *Id* at 12.

34. *See, e.g.*, Cahill, Majority Decision of Commission Dismissing Charges (Md. Comm'n on Judicial Disabilities 1996) (finding that nothing a judge had said during the sentencing of a husband for the murder of his wife rose to the level of sanctionable conduct); Statement of the Supreme Court of New Hampshire Committee on Judicial Conduct Relating to Complaints Against Judge William J. O'Neil (December 22, 1993) (finding judge's remarks at a sentencing hearing for a man charged with assaulting his estranged wife did not reflect gender bias).

35. 685 P.2d 204 (Colo. 1984).

36. *Id.* at 206. The judge stated:

The Court finds that his mental state, his mental and emotional condition, combined with the sudden heat of passion caused by a series of highly provoking acts on the part of the victim of leaving him without any warning; in fact, based on the testimony that the Court has heard, in a sense deceiving him as to her intentions by being extremely loving and caring up to and through the morning that she left the family home with the full intention of obtaining a divorce and proceeding with a separation from him without even giving him any knowledge of her whereabouts or that of their son, the Court finds that this affected the Defendant sufficiently so that it excited an irresistible passion as it would in any reasonable person under the circumstances and, consequently, would warrant a sentence under the extraordinary mitigating terms of the statute.

*Id.*

judge's sentence as an illegal mix of incarceration and probation and remanded the case for re-sentencing.[37]

In the disciplinary proceedings, however, the court concluded no misconduct was evident. The court noted that a statute required the judge to make specific findings on the record detailing the extraordinary circumstances justifying a sentence outside the presumptive range.[38] The court concluded:

> Although the sentencing comments contain some phraseology which, when read in isolation, might have offended the sensibilities of others, the full context of the sentencing hearing indicates that the choice of words was no more than an awkwardly executed effort to place on record the confused and highly emotional state of the defendant at the time of the killing, which, in the judge's opinion, constituted a mitigating circumstance justifying a sentence below the presumptive range. The judge's comments were not intended to be disrespectful of the law, the victim, or anyone else; nor do they reasonably lend themselves to such a connotation in the full context of the hearing.[39]

Similarly, the Supreme Court of Michigan rejected the recommendation of the Commission on Judicial Tenure that a judge be sanctioned for improper remarks made during a sentencing for rape.[40] The defendant, an attorney, had orally and digitally penetrated a woman he was representing in divorce proceedings. Sentencing guidelines required the judge to impose a prison term of 10 to 25 years or provide adequate justification for deviating downward; the judge imposed concurrent sentences of 18 months to 10 years for each of the three counts.

The court noted that two of the 12 reasons the judge gave to justify the downward deviation became the focus of national media attention.[41] The judge had identified as mitigating factors "evidence that the Defendant helped the victim up off the floor after the occurrence" and the victim's statement to a spouse-abuse agency that the sex had not been forced but that her resistance had been worn down by the defendant's persistent requests. The court noted that the judge also used language that had been

---

37.  *See* People v. District Court of the City & County of Denver, 673 P.2d 991 (Colo. 1983).

38.  *See* COLO. REV. STAT. § 18-1-105(7) (1983) (repealed).

39.  *Lichtenstein*, 685 P.2d at 209.

40.  *See In re* Hocking, 546 N.W.2d 234 (Mich. 1996). The court did suspend the judge for three days without pay for intemperate and abusive conduct toward an attorney.

41.  *See id*. at 239.

interpreted to mean that a lesser sentence was appropriate because the victim had asked for it.[42]

The court emphasized that "the justification for departure—the act of judicial discretion—is not at issue in this case."[43] The court did state that a judge is not immune from discipline for the manner in which a decision is articulated but continued "every graceless, distasteful, or bungled attempt to communicate the reason for a judge's decision cannot serve as the basis for judicial discipline."[44] Although affirming that it was committed to eradicating sexual stereotypes, the court stated it could not "ignore the cost of censoring inept expressions of opinion."[45]

Noting that "[t]he rationale for a severe sentence would inevitably have a negative effect on those who disagree with the verdict, and 'sympathetic' remarks would have a negative effect on those who believed the verdict was correct," the court concluded that "honest explanation of the rationale for tailoring sentences to the offender and the offense" would be discouraged if misconduct were defined from "the perspective of the person most sensitive to such remarks."[46] When a judge's comment during sentencing was based on knowledge acquired during a proceeding, the court held, the comment is misconduct only if, from an objective perspective, it "displays an unfavorable predisposition indicating an inability to impartially determine the facts or when in combination with other conduct . . . it is clearly prejudicial to the fair administration of justice."[47]

Using that objective standard, the court found that the judge's attempt to explain his view of the defendant's lack of malevolent purpose did not constitute misconduct.[48] The court emphasized that the judge did not inject

---

42.   In addressing what he felt was the defendant's lack of culpability, as compared to other offenses and offenders, the judge had stated:

> The fact that the victim agreed to the Defendant's 2:00 a.m., Sunday morning visit is a mitigating circumstance, again with regard to the presence of an evil state of mind on behalf of the Defendant. This is not a perfect world, but as common sense tells me that when a man calls a woman at 2:00 a.m. and says he wants to come over and talk and he's—that's accepted, a reasonable person, whether you want to shake your head or not, Ms. Maas [the prosecuting attorney], I haven't been living in a shell. A reasonable person understands that means certain things. They may be wrong.

*Id.*

43.   *Id.*
44.   *Id.* at 240.
45.   *Id.*
46.   *Id.*
47.   *Id.* (citations omitted).
48.   *See id.*

extraneous matters into the proceedings, make explicitly demeaning remarks, or use abusive language or an abusive manner.[49]

In contrast, accepting the presentment of the Advisory Committee on Judicial Conduct, the Supreme Court of New Jersey publicly reprimanded a judge for making statements in a sentencing proceeding that created the perception of a lack of impartiality.[50] The defendant had pled guilty to second degree sexual assault arising from her relationship with a minor who at the time was her student and 13 years old. Pursuant to a plea agreement, the former teacher had agreed to be sentenced to three years incarceration; the judge sentenced her to probation. The appellate division had reversed the sentence because the judge's emphasis on the victim's harm was an incorrect basis for a non-curatorial sentence.

During sentencing, the judge made several statements that attracted nation-wide media attention. For example, he suggested, "Maybe it was a way of [the victim] to, once this did happen, to satisfy his sexual needs. At 13, if you think back, people mature at different ages. We hear of newspapers and t.v. reports over the last several months of nine-year-olds admitting having sex."[51]

The committee found that the judge's statements expressed stereotypical views regarding the sexual nature of young boys, noting that the views were "problematic and suspect" and "fundamentally inconsistent with the meaning and policy of the law that criminalizes the sexual activities between an adult and a minor, boy or girl."[52] The committee concluded:

> The remarks of Respondent denote more than an honest mistake or inadvertent legal error. They suggest that, as a judge, Respondent was not simply mistaken about the law of sexual assault involving a minor boy. Respondent's remarks imply a bias, that is, a preconception or predetermined point of view about the sexuality of minors that could impugn the impartiality and open-mindedness necessary to make correct and sound determinations in the application of the law.[53]

---

49.  *See id.* at 241.

50.  *See* Gaeta, Order, (N.J. Sup. Ct. May 7, 2003). The judge had waived his right to a hearing and consented to the reprimand. Unfortunately, the court's order does not describe the conduct, but a copy of the Committee's presentment is available at http://www.judiciary.state.nj.us/pressrel/gaeta.pdf.

51.  Gaeta, No. ACJC 2002-171, Presentment at 5-6 (N.J. Sup. Ct. Advisory Comm. on Judicial Conduct).

52.  *Id.* at 9.

53.  *Id.* at 10.

Noting that a judge "may comment on the law and even express disapproval of the law, as long as his or her fairness and impartiality are not compromised," the committee concluded that the judge's "remarks, reasonably understood, constituted the expression of a bias. The reasonable interpretation, public perception and common understanding of those remarks would be indicative of a bias and lack of impartiality."[54]

## FAILURE TO EXERCISE DISCRETION

If a judge fails to exercise judicial discretion, the "mere legal error" rule is not a defense to a charge of misconduct based on the resulting decision. Such a decision is not entitled to the protection of judicial independence principles. Thus, although judicial decisions regarding findings of guilt, sentencing, and child custody are classic examples of decisions usually exempt from review by conduct commissions, judges are considered to have waived that exemption if their decisions were based on the flip of a coin or similar resort to fate rather than an exercise of judgment.[55]

For example, particularly given the compelling arguments on both sides, the Michigan Judicial Tenure Commission would certainly have dismissed a complaint about a judge's decision that children involved in a custody dispute would spend Christmas Eve with their father rather than their maternal grandparents—except that the judge had resolved the

---

54. *Id.* at 11. However, the committee found that the judge's remarks did not reflect any underlying bias and that he was fully capable of avoiding any repetition of his conduct. *See also* Litynski (Minn. Board on Judicial Standards June 26, 1991) (public reprimand for inappropriately injecting personal, religious, and philosophical beliefs in the sentencing of a defendant on a charge of animal abandonment; according to a newspaper account, in fining the defendant $1 for abandoning five puppies in a trash bin in freezing weather, the judge stated, "God ordained the killing of animals. He himself killed animals to provide skins for Adam and Eve after they sinned. [Animal rights activists] are not concerned about the millions of unborn babies that are slaughtered each year, many of whom, like these puppies are tossed into dumpsters after being killed.")

55. *See In re* Daniels, 340 So. 2d 301 (La. 1976) (censure for giving the appearance of deciding the guilt or innocence of various defendants by flipping a coin); Turco, Stipulation (Wash. Comm'n on Judicial Conduct Oct. 2, 1992) (censure for a judge who had tossed a coin to decide a traffic infraction and entered a finding against the defendant when the defendant lost the coin toss). *See also* DeRose, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 13, 1979) (admonition for judge who had dismissed a case based on his decision, made in advance, to dismiss the first case to come before him upon his ascending the bench), *available at* http://www.scjc.state.ny.us/determinations/d/de_rose.htm; Aaron (Cal. Comm'n on Judicial Performance July 8, 2002) (censure with agreement to resign for, among other misconduct, on numerous occasions, remanding defendants based on his "smell test" of the defendants' hair and/or his examination of their eyes), *available at* http://cjp.ca.gov/pubdisc.htm.

question by flipping a coin.[56] Another judge, who had taken a straw poll of the courtroom audience regarding the guilt of a defendant on a charge of battery—asking "If you think I ought to find him not guilty, will you stand up?"—argued that his conduct was not sanctionable because his verdict was not based on the audience vote but on the evidence presented at trial and that he only called for an audience vote to "involve the public in the judicial process."[57] However, the Supreme Court of Louisiana held:

> Whether or not Judge Best actually based his verdict on the audience's vote does not determine whether or not his conduct is sanctionable. The mere fact that he asked the courtroom audience to vote on the guilt of the defendant gave the impression that Judge Best based his verdict on something other than the evidence presented at trial. This type of behavior destroys the credibility of the judiciary and undermines public confidence in the judicial process.[58]

Sentencing decisions reflecting pre-judgment also illustrate an abdication of discretion that makes a judicial decision vulnerable to sanction even if the sentence is otherwise legal. This exception includes both a policy of imposing the same sentence on all persons convicted of a particular offense[59] and a policy of failing to consider sentencing options

---

56. *See In re* Brown, 662 N.W.2d 733 (Mich. 2003) (censure for this and other misconduct). The judge was assigned to a divorce case in which one of the issues was the custody of two minor children. After the mother moved out of the state, custody was temporarily awarded to the maternal grandparents. On December 14, 2001, the maternal grandparents and the father, both with counsel, appeared before the judge for an evidentiary hearing to determine if the house purchased by the father was a suitable residence for the children and to confirm that the father had begun working a day shift so he could care for them. During the hearing, the attorney for the grandparents raised the issue of where the children would spend the Christmas holidays. The judge encouraged the parties to resolve the matter themselves, but when they were unable to agree, she told the parties it was nothing more than a coin flip. Although the grandparents' attorney and the father protested, the judge produced a coin, allowed the father to call heads or tails, and flipped it. The father called heads, which is the side of the coin that ended face up after the flip, and the judge ordered that the children would spend Christmas Eve with the father. *See id.*

57. *In re* Best, 719 So. 2d 432, 435 (La. 1998).

58. *Id.* at 435-36 (censure for this and other misconduct).

59. *See* Velasquez, Decision and Order (Cal. Comm'n on Judicial Performance Apr. 16, 1997) (censure for, among other misconduct, making it known publicly what specific sentences he would impose on DUI offenders); Tracy, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) (publicly announcing and following a policy concerning the sentence he would impose in certain types of drunk-driving cases), *available at* http://www.scjc.state.ny.us/determinations/t/tracy,_edward.htm.

allowed by law.[60] As the New York State Commission on Judicial Conduct stated, "Judicial discretion, which is at the heart of a judge's powers, is nullified when a judge imposes a 'policy' that will dictate sentences in future cases."[61] Pre-determined sentences may also suggest that the judge is acting in bad faith for political reasons or to pander to the public rather than making an independent determination.[62]

Imposing a sentence to teach a lesson to someone other than the defendant also constitutes judicial misconduct rather than an abuse of discretion not subject to sanction.[63] For example, at issue in In re *Hill* was a city judge's order providing that "all fines are $1 plus $21 court costs."[64] The order was issued ten days after the mayor had notified the city's health plan that the city would no longer pay premiums for the judge. Before the judge lifted the order, nineteen cases were disposed of with $1 fines—including charges for assault, assault on a police officer, resisting arrest, disturbance of the peace, stealing under $15, and various traffic violations. The Commission on Retirement, Removal and Discipline charged that the judge's orders were an "effort to use Respondent's office for his private gain," were "unfaithful and disrespectful to the law," and "excluded judicial discretion," concluding that the judge ordered the blanket reduction in fines to compel the

---

60.   *See In re* Whitney, 922 P.2d 868 (Cal. 1996) (censure for, among other misconduct, as a matter of routine practice, failing to consider probation or concurrent sentencing for defendants pleading guilty or no contest at arraignment).

61.   Tracy, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) *available at* www.scjc.state.ny.us/determinations/t/tracy,_edward.htm.

62.   *See* Velasquez, Decision and Order Imposing Public Censure (Cal. Comm'n on Judicial Performance Apr. 16, 1997) (noting judge's policy for sentencing persons convicted of DUI had been adopted out of political considerations arising from the judge's dispute with other judges); Tracy, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) (noting the expression of "a blanket 'policy' against drunk drivers may pander to popular sentiment that all such defendants should be treated harshly"), *available at* http://www.scjc.state.ny.us/ Determinations/T/tracy,_edward.htm.

63.   *See, e.g, In re* Justin, 577 N.W.2d 71 (Mich. 1998) (censure for judge who had assessed fines, fees, and costs in ordinance cases involving the City of Jackson in a way that reduced the city's revenues following a dispute involving pension benefits for court employees); Warnke, Hanna, Moseley, Evans (Tex. State Comm'n on Judicial Conduct June 25, 1996) (public admonitions for four judges who reduced virtually all traffic fines in their courts to $1 plus court costs to send a message to the county commissioners regarding the impropriety of treating courts as revenue-generating agencies).

64.   *In* re Hill, 8 S.W.2d 578 (Mo. 2000).

payment of his health insurance.[65] The Supreme Court of Missouri agreed that the judge should be sanctioned.[66]

## CLEAR LEGAL ERROR

In most cases in which a state's highest court applied the mere legal error rule to reject a conduct commission's recommendation of discipline, the weakness in the commission's case arose from the unsettled nature of the law, at least at the time the judge made the challenged decision. Thus, an appellate court's reversal of a judge's decision alone is not sufficient proof that the judge committed a legal error justifying sanction.

For example, on direct appeal, the Supreme Court of Alaska had reversed a trial judge who, in an ex parte proceeding, had ordered the complaining witness in an assault case imprisoned to ensure that she would appear to testify the next day and would be sober.[67] In contrast, when it considered the Commission on Judicial Conduct recommendation that the judge be privately reprimanded for imprisoning the intoxicated witness, the court held that the judge's legal errors, which violated the rights of the witness and defendant, did not constitute ethical misconduct.[68] The court emphasized that the judge was faced with "a unique situation for which there was no available legal template."[69] Noting that, although it had overturned the judge's decision in the underlying criminal case, the court of appeals had unanimously

---

65. *Id.* at 583.

66. *Id.* at 584 (suspension until the end of term for this and other misconduct). The court found that none of the judge's asserted justifications for the orders—"reducing his caseload, better controlling his docket, avoiding congestion in the courts, exercising his discretion over fine schedules and prisoner releases, and responding to public and aldermanic complaints about the amount of fines"—had any support in the record.

67. *See* Raphael v. State, 994 P.2d 1004 (Alaska 2000). I.W. had been subpoenaed to testify in the criminal trial of Wilfred Raphael, her former domestic companion who had been indicted for a series of serious attacks upon her. When she arrived in court on the day she was scheduled to give testimony, she was intoxicated. In an ex parte meeting, the assistant district attorney expressed concern to the judge that I.W. would either fail to appear a second time or would not be able to stay sober. After a brief hearing, the judge imprisoned I.W. for contempt. In reversing the defendant's conviction, the court concluded that the judge violated I.W.'s right to notice and a meaningful hearing by giving her no advance notice that she stood accused of contempt and questioning her while she was intoxicated. The court also held that the judge violated Raphael's due process rights and right to be present at every stage of his trial by holding the hearing ex parte and allowing the impression that I.W.'s freedom and continued custody of her children was contingent upon the nature of her testimony against him. *Id.*

68. *See In re* Curda, 49 P.3d 255 (Alaska 2002).

69. *Id.* at 261.

upheld it, the court stated that "reasonable judges could and did differ over whether the ex parte proceedings violated [the defendant's] rights [underscoring] the difficulty and uncertainty of the situation with which [the judge] was presented."[70] The court emphasized that the judge had "committed a single deprivation of an individual's constitutional rights, motivated by good faith concerns for orderly trial proceedings and the affected individual's well-being."[71]

The Maine Supreme Judicial Court adopted a similar objective standard for considering whether legal error constitutes judicial conduct in In re *Benoit*.[72]

> The reasonable judge of our standard must be reasonable both in prudently exercising his judicial powers and in maintaining his professional competence. But the standard must be further restricted to recognize that every error of law, even one that such a reasonable judge might avoid making, is not necessarily deserving of disciplinary sanction. A judge ought not be sanctioned . . . for an error of law that a reasonable judge would not have considered obviously wrong in the circumstances or for an error of law that is *de minimis*.[73]

The court held that a judicial decision constitutes a violation "if a reasonably prudent and competent judge would consider that conduct obviously and seriously wrong in all the circumstances."[74] On the other hand, the court stated, an erroneous decision is not misconduct if it was not obviously wrong or there was confusion or a question about its legality.[75]

---

70. *Id.*

71. *Id.* The court stated that it was aware of "'no contested American case approving the disciplining of a judge for a single incident of good faith legal error when the judge acted without animus.'" *Id.* (quoting the judge's argument). That claim overlooks numerous cases. *See* discussion *infra* notes 132-61. Moreover, the commission in *Curda* was requesting a private reprimand, and it is quite possible that commissions in other states have privately reprimanded judges for single incidents of good faith legal error, but the court would not be aware of such actions.

72. 487 A.2d 1158 (Me. 1985).

73. *Id.* at 1163.

74. *Id.*

75. In the case before it, the court held that the judge's decision to incarcerate a creditor was not obviously wrong, although it was judicial error, because there was confusion as to the remedies that were available to a judgment creditor. *Id.* at 1168-69. Similarly, the court concluded that the judge's decision to deny defendants' motions for stay of sentence pending appeal was not misconduct because there was some question whether anyone other than a superior court judge could stay the execution of a district court fine pending appeal. *Id.* at 1170.

In In re *Quirk*,[76] the Supreme Court of Louisiana held that a judge's legal ruling may be found to have violated the code of judicial conduct only if the action is contrary to clear and determined law about which there is no confusion or question as to its interpretation and the legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error.[77] Applying that standard to the case before it, the court dismissed the recommendation of the Judiciary Commission that a judge be sanctioned for sentencing hundreds of defendants to attend church once a week for a year as a condition of probation.[78] Rejecting the commission finding that the judge's church sentences were "clearly" unconstitutional, the court noted that there were cases from other jurisdictions that lent support to both the judge's and the commission's interpretations of the establishment clause.[79] The court concluded that a finding of judicial misconduct where the law is "not clear, is 'rife with confusion' and is subject to varying interpretations, and where no court in a jurisdiction binding on Judge Quirk has spoken directly on the issue, would strike to the very heart" of the direction in Canon 1 of the code of judicial conduct that a judge "must be protected in the exercise of judicial independence."[80]

In New York, the standard provides that discipline is inappropriate if the correctness of the judge's decision is "sufficiently debatable." Dismissing a State Commission on Judicial Conduct finding that a judge had engaged in misconduct by committing 16 defendants to jail without bail, the New York Court of Appeals held that the commission's interpretation of the relevant statute was not clearly erroneous, but that an ambiguity in the statute provided some support for the judge's position that he had discretion to determine whether a defendant should

---

76.  705 So. 2d 172 (La. 1997).

77.  *See id.* at 181.

78.  *See id.*

79.  *Id.*

80.  *Id.* at 183. The court did acknowledge, in a footnote, that there was a decision from the Louisiana *first* circuit court of appeal that making church attendance a condition of probation violated the state and federal constitutions. *See* State v. Morgan, 459 So.2d 6 (La. Ct. App. 1984). Noting the judge's court was within the jurisdiction of the *third* circuit court of appeal, the court concluded, "although a trial court's decision may constitute legal error under the jurisprudence of the first circuit, this is irrelevant from the viewpoint of the trial judge, for it may not constitute legal error in the third circuit should the third circuit choose an interpretation different from its sister circuit." *Quirk*, 705 So. 2d at 181 n.17.

       At least three times since the decision in *Quirk*, the court has found that standard to have been met and sanctioned a judge for legal error. *See* discussion of *In re* Aucoin, 767 So. 2d 30 (La. 2000) *infra* notes 134-35; *In re* Fuselier, 837 So. 2d 1257 (La. 2003) *infra* notes 107-08; *In re* Landry, 789 So. 2d 1271 (La. 2001) *infra* note 149.

GRAY.PRINT.DOC                                                                     10/8/2004 7:02 PM

be granted bail.[81] The court concluded that the ambiguity "cannot and need not be resolved" in judicial discipline proceedings but must "await a proper case and the proper parties," and the ambiguity precluded the judge's reading of the statute one way from constituting misconduct.[82] The Supreme Court of Indiana also adopted a "sufficiently debatable" standard.[83]

The Supreme Court of Illinois held that the Courts Commission exceeded its constitutional authority when it applied "its own independent interpretation and construction" of a statute to evaluate a judge's conduct.[84] Thus, the court overturned a commission decision to suspend a judge for ordering male defendants to obtain haircuts as part of their sentences and ordering persons placed on probation to carry a card identifying them as probationers.[85] The court noted that at the time of the judge's actions, no appellate court had interpreted the phrase "in addition to other conditions" in the relevant statute, although one of the judge's orders regarding a haircut had subsequently been reversed.[86] The court did hold that "where the law is clear on its face, a judge who repeatedly imposes punishment not provided for by law is subject to discipline."[87]

Several tests for determining when legal error constitutes judicial misconduct have been adopted in California. In one case, the Supreme Court of California held that a judge's view that he had discretion to curtail a deputy district attorney's cross-examination had discretion to do so "had at least enough merit to prevent the holding of it from

---

81. *See In re* LaBelle, 591 N.E.2d 1156, 1161 (N.Y. 1992). The judge believed that the defendants were in need of a psychiatric examination to determine their fitness to proceed, their behavior indicated that they could not be relied upon to attend such an examination, and there was no responsible person who could ensure that the defendants would attend. The judge had argued that he had discretion to confine a defendant without bail, either in jail or in a hospital, pending a psychiatric report. *See id.*

82. *Id.*

83. *See In re* Spencer, 798 N.E.2d 175, 183 (Ind. 2003).

84. Harrod v. Ill. Courts Comm'n, 372 N.E.2d 53, 66 (Ill. 1977).

85. The court issued a writ of mandamus against the members of the Courts Commission directing them to expunge the suspension order against the judge from their records "regardless of whether he believes the form of punishment will have a beneficial corrective influence." *Id.* at 65. *See also* State Comm'n on Judicial Conduct v. Gist, No. 3-88-252-CV, 1990 Tex. App. LEXIS 2729 (Tex. App. Ct. 1990) (voiding the public reprimand of a judge by the Texas Commission on Judicial Conduct for a sentencing practice involving back-dating because the legality of the sentencing practice had not yet been decided by the court of criminal appeals).

86. *Harrod*, 372 N.E.2d at 66. *See* People v. Dunn, 356 N.E.2d 1137 (Ill. App. Ct. 1976).

87. *Harrod*, 372 N.E. at 65.

constituting misconduct."[88] The California Commission on Judicial Performance dismissed formal charges it had brought against an appellate judge for failing to follow the law after finding that the judge's argument was not "so far-fetched as to be untenable."[89]

Taking a different approach in *Oberholzer v. Commission on Judicial Performance*,[90] the court declined to debate whether a case in which a judge had dismissed criminal charges when the prosecution refused to proceed was distinguishable from a previous case in which his dismissal under similar circumstances had been reversed. Instead, the court focused on whether there were "additional factors that demonstrate more than legal error, alone."[91] The court stated that the critical inquiry was whether the judge's action "clearly and convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty."[92]

## PATTERN OF LEGAL ERROR

Although there are cases in which misconduct has been found based on one erroneous decision,[93] most cases in which judicial error was elevated to the level of judicial misconduct involved more than one example of legal error, and a pattern is one of the identified exceptions to the "mere legal error" rule. Judges have been sanctioned for patterns of failing to advise defendants of their rights (both statutory and constitutional) during criminal proceedings;[94] imposing sentences in

---

88.  Kennick v. Comm'n on Judicial Performance, 787 P.2d 591, 604 (Cal. 1990).

89.  Kline, Decision and Order of Dismissal (Cal. Comm'n on Judicial Performance, Aug. 19, 1999) *available at* http://cjp.ca.gov./pubdisc.htm. In a dissent, the judge had refused to follow state supreme court precedent, arguing he could do so under an exception to the *stare decisis* principle.

90.  975 P.2d 663 (Cal. 1999).

91.  *Id.* at 680.

92.  *Id.* (citations omitted). A concurring opinion disagreed with this approach, stating "[w]hen, as here, the Commission has no extrinsic evidence of bad faith or improper motive—no evidence, that is, apart from the nature of the ruling itself—the Commission generally should not pursue an investigation into, or impose discipline for, a legal ruling that has reasonably arguable merit." *Id.* at 682. (Werdegar, J. concurring).

93.  *See* discussion *infra* notes 132-61.

94.  *See, e.g.*, Shannon, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) (admonition for, among other misconduct, failing to advise defendants of right to assigned counsel and failing to assign counsel to eligible defendants charged with non-vehicle and traffic infractions as required by statute), *available at* http://www.scjc.state.ny.us/determinations/ s/shannon.htm; Henne, Decision and Order Imposing Public Censure (Cal. Comm'n on Judicial Performance Oct. 13, 1999) (censure for, among other misconduct, reinstating and modifying the terms of probation for two defendants without advising probationers that they had the constitutional

excess of statutory authority;[95] accepting guilty pleas using a form that did not comply with statutory requirements;[96] holding trials in absentia;[97] violating procedural requirements when conducting arraignments;[98] disregard of and indifference to fact or law in criminal and juvenile cases;[99] illegally incarcerating individuals in non-criminal matters to satisfy a civil fine;[100] accepting guilty pleas without obtaining proper written plea statements;[101] a practice of stating, for the record, that defendants had waived their rights to have a speedy preliminary examination or timely trial without obtaining the defendants' personal waivers of these rights;[102] requiring pro se defendants who requested jury trials to answer an in-court "jury trial roll call" once a week and to discuss plea bargains with the prosecutor;[103] and failing to advise

---

right in probation revocation proceedings to an attorney, a hearing, and to subpoena and examine witnesses); Pemrick, Determination (N.Y. State Comm'n on Judicial Conduct Dec. 22, 1999) (failing to advise defendants of constitutional and statutory rights), *available at* http://www.scjc.state.ny.us/determinations/p/pemrick.htm; Cox, Determination (N.Y. State Comm'n on Judicial Conduct Dec. 30, 2002) (admonition for a non-lawyer town court justice who, in 18 cases, had re-sentenced to jail defendants who had not paid fines without holding a re-sentencing hearing or advising the defendants of their right to apply for such a hearing as required by statute), *available at* http://www.scjc.state.ny.us/determinations/c/cox.htm; Bauer, Determination (N.Y. State Comm'n on Judicial Conduct Mar. 30, 2004) (removal for, in addition to other misconduct, failing to advise defendants of the right to counsel and to take affirmative action to effectuate that right), *available at* http://www.scjc.state.ny.us/determinations/b/bauer.htm.

95.  *See* Comm'n on Judicial Performance v. Neal, 774 So. 2d 414 (Miss. 2000) (public reprimand for, among other misconduct, imposing fines and sentences in excess of statutory authority); Reid, Determination (N.Y. State Comm'n on Judicial Conduct May 17, 2002) (censure for, among other misconduct, in 16 cases after accepting guilty pleas, imposing fines that were $20 to $70 in excess of the statutorily authorized maximum fine for the specific convictions), *available at* http://www.scjc.state.ny.us/determinations/r/reid.htm; Bauer, Determination (N.Y. State Comm'n on Judicial Conduct Mar. 30, 2004) (removal for, in addition to other misconduct, imposing illegal sentences in four cases), *available at* http://www.scjc.state.ny.us/determinations/b/bauer.htm.

96.  *See In re* Hammermaster, 985 P.2d 924 (Wash. 1999); Reid, Stipulation, Agreement, and Order of Admonishment (Wash. State Comm'n on Judicial Conduct Oct. 5, 2001) (admonition for, among other misconduct, a pattern or practice of accepting guilty pleas using forms that did not contain space for listing the elements of the crime or the factual basis for the plea, as required by statute), *available at* http://www.cjc.state.wa.us.

97.  *See In re* Hammermaster, 985 P.2d 924 (Wash. 1999) (censure and six-months suspension for this and other misconduct).

98.  *See In re* Holien, 612 N.W.2d 789 (Iowa 2000) (removal for this and other misconduct).

99.  *See In re* Scott, 386 N.E.2d 218 (Mass. 1979) (public reprimand).

100.  *See In re* Benoit, 487 A.2d 1158, 1166 (Me. 1985) (censure and suspension for this and other misconduct).

101.  *See In re* Michels, 75 P.3d 950 (Wash. 2003) (censure and 120-day suspension for this and other misconduct).

102.  *See* Roeder (Cal. Comm'n on Judicial Performance Dec. 16, 2003), *available at* http://cjp.ca.gov./pubdisc.htm.

103.  *In re* Walsh, 587 S.E.2d 356, 357 (S.C. 2003) (removal for this and other misconduct).

litigants in family court cases of their statutory rights to counsel, a hearing, and the assistance of counsel.[104] Of course, because those cases involved more than one instance of legal error, whether a single example of the same error would be considered egregious enough to justify sanction is not clear.[105] Moreover, none of the cases discuss how many errors are required for a finding of a pattern.

Furthermore, the Supreme Court of Louisiana held that judicial misconduct can be established by a pattern of repeated legal error even if the errors are not necessarily the same.[106] The court found such a pattern in In re *Fuselier*.[107] The pattern in that case involved three distinct types of legal error—abuse of the contempt power, conducting arraignments and accepting guilty pleas with no prosecutor present, and establishing a worthless checks program that did not meet statutory requirements. The court stated that the errors were not egregious or made in bad faith but that together, they were part of the same pattern or practice of failing to follow and apply the law.[108]

## DECISIONS MADE IN BAD FAITH

The presence of bad faith can render an exercise of legal judgment judicial misconduct. "Bad faith" in this context means "acts within the lawful power of a judge which nevertheless are committed for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties."[109] Even just a single error can lead to a finding of misconduct if the judge was acting in bad faith or intentionally failed to follow the law.[110]

For example, if a judge acts out of pique or to exact revenge, the judge's decision loses the protection of the "mere legal error" rule. Thus, a judge's sentence—usually unreviewable by a conduct commission—

---

104.  *See In re* Reeves, 469 N.E.2d 1321 (N.Y. 1984) (removal for this and other misconduct).

105.  *See* discussion *infra* notes 132-61.

106.  *See generally In re* Quirk, 705 So. 2d 172, 178 (La. 1997).

107.  837 So. 2d 1257 (La. 2003).

108.  *See id.* at 1268.

109.  Cannon v. Comm'n on Judicial Qualifications, 537 P.2d 898, 909 (Cal. 1975).

110.  *See* Comm'n on Judicial Performance v. Lewis, 830 So. 2d 1138 (Miss. 2002) (public reprimand for ordering a handgun that had been seized from a minor forfeited to the court even after charges against the minor were dismissed in violation of a statute; the court found that a specific intent to use the powers of the judicial office to accomplish a purpose that the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith and gives the Commission on Judicial Performance jurisdiction); Judicial Inquiry and Review Comm'n v. Lewis, 568 S.E.2d 687 (Va. 2002) (censure for enforcing an order that the judge knew had been stayed by another court).

becomes the basis for a sanction if a judge imposes an unusually severe sentence on a defendant who refused the standard plea bargain[111] or demanded a jury trial[112] or if a judge imposed a higher than usual traffic fine to retaliate against a former employer.[113]

Similarly, a judge's bail decision becomes reviewable in discipline proceedings if the judge acts out of bias or revenge. In In re *King*,[114] the Massachusetts Commission on Judicial Conduct found that Judge Paul H. King, brother of Governor Edward J. King, had set unusually high bail for four black defendants shortly after learning that large numbers of black voters in Boston voted for his brother's opponent in the 1982 gubernatorial primary election, announcing to a clerk "[t]hat's what blacks get for voting against my brother."[115]

The judge argued that the commission could not consider his bail decisions because they were based on the exercise of his legal judgment and reviewable on appeal. Acknowledging that "[t]he Judge is correct that, generally, judges are immune from sanctions based solely on appealable errors of law or abuses of discretion," the court held:

> In this case, the implication of the Judge's argument is that a judge can make a single judicial decision for expressly racist and vindictive reasons and, so long as he does not make a habit of it, neither the Commission nor this court (outside of the usual avenues of appeal) can respond to that action. That is an implication that we will not countenance. It may be that the defendants in these cases had valid grounds on which to challenge the Judge's decisions as to the amount of bail. It does not follow, however, that there was no judicial misconduct in the Judge's setting the amount of their bail.[116]

---

111. *See* Ryan v. Comm'n on Judicial Performance, 754 P.2d 724 (Cal. 1988) (removal for this and other misconduct).

112. *See In re* Cox, 680 N.E.2d 528 (Ind. 1997) (30-day suspension without pay for this and other misconduct).

113. *See* Lindell-Cloud, Determination (N.Y. Comm'n on Judicial Conduct July 14, 1995) (censure), *available at* http://www.scjc.state.ny.us/determinations/l/lindell-cloud.htm.

114. 568 N.E.2d 588 (Mass. 1991).

115. *Id.* at 594 (censure for this and other misconduct).

116. *Id.*

Other bad faith abuses of the bail power have also led to discipline.[117] The New York State Commission on Judicial Conduct sanctioned a judge for misusing bail to attempt to coerce guilty pleas in three cases.[118] For example, in one case, when a defense attorney in one case declined the court's plea offer, the judge set bail at $500, although the prosecution was silent on bail. When the attorney asked why the judge was setting bail, she replied, "Because the way I see it is because he won't plea. That's why."[119] The commission found that the judge's "statements during the proceedings convey the explicit message that she was using bail as a coercive tactic when defendants appeared reluctant to accept the plea that was offered."[120]

---

117.  *See, e.g., In re* Perry, 641 So. 2d 366 (Fla. 1994) (holding that bonds of $10,000 for a traffic offense and $5,000 for a contempt offense were arbitrary, unreasonable, and designed to punish the defendants rather than to assure their presence for trial; judge was reprimanded for this and other misconduct, *see* discussion *infra* notes 164-67); *In re* Yengo, 371 A.2d 41 (N.J. 1977) (removal for, among other misconduct, using bail as an arbitrary weapon for harassment of defendants); McKevitt, Determination (N.Y. Comm'n on Judicial Conduct Aug. 8, 1996) (censure for refusing to set bail because he had been required to get out of bed to conduct the arraignment), *available at* http://www.scjc.state.ny.us/determinations/m/mckevitt1.htm; Jutkofsky, Determination (N.Y. State Comm'n on Judicial Conduct Dec. 24, 1985) (removal for, among other misconduct, threatening defendants with high bail and jail for minor offenses, coercing guilty pleas from defendants who were often unrepresented and, on occasion, youthful), *available at* http://www.scjc.state.ny.us/determinations/j/jutkofsky.htm; Ellis, Determination (N.Y. State Comm'n on Judicial Conduct July 14, 1982) (removal for among other misconduct, in 23 cases, abusing the bail process by deliberately incarcerating certain defendants for indefinite periods of time in order to coerce them to plead guilty; deliberately failing to appoint counsel for indigent defendants), *available at* http://www.scjc.state.ny.us/determinations/e/ellis,_anthony_(2).htm; Bauer, Determination (N.Y. State Comm'n on Judicial Conduct Mar. 30, 2004) (removal for, in addition to other misconduct, coercing guilty pleas by setting exorbitant, punitive bail), *available at* http://www.scjc.state.ny.us/determinations/b/bauer.htm; Disciplinary Counsel v. O'Neill, No. 2004-0809, 2004 Ohio LEXIS 1965, at *1 (Ohio Sept. 7, 2004) (suspending judge from practice of law for two years, with one year stayed conditionally, for, in addition to other misconduct, forcing pleas from defendants by threatening to revoke or actually revoking their bonds because the defendants wanted to exercise their rights to refuse an offered plea and go to trial).

118.  Recant, Determination (New York Commission on Judicial Conduct Nov. 19, 2001) (censure, pursuant to agreement, for this and other misconduct), *available at* http://www.scjc.state.ny.us/determinations/r/recant.htm.

119.  *Id.*

120.  *Id.* In a second case, the judge denied the defense attorney's oral motion to dismiss the complaint for facial insufficiency and asked whether his client wanted time served, noting the defendant had a warrant on which she could keep him in, and asked him if he wanted to be heard on bail. When the defense attorney responded, "You would hold my client in?" the judge replied, "Not if he pleads to the disorderly conduct, I won't." When the defendant refused to plead guilty, the judge set $500 bail on the warrant and $1 bail on the instant matter. In a third case in which the judge earlier in the day had issued a bench warrant and ordered bail forfeited when the defendant was not in court on time, the judge advised the defense attorney that the defendant had two choices: to "acknowledge responsibility" for his crime or she was "likely to increase his bail." When the

*HOFSTRA LAW REVIEW*

An intentional failure to follow the law, even with a benign motive, constitutes bad faith and consequently judicial misconduct. In In re *LaBelle*,[121] the Court of Appeals of New York sanctioned a judge for failing to set bail for defendants in twenty-four cases although he knew that the law required that bail be set. Nine of those cases involved defendants who were homeless and in many cases suffering from the effects of drug or alcohol abuse, and the judge indicated that he did not set bail because, based on his knowledge of the defendants and in some cases pursuant to their explicit requests, he believed that they preferred to remain in jail and were more comfortable, safer, and better cared for there than if they were returned to the streets. Conceding it could not "find fault with these concerns," the court concluded that "they do not justify petitioner's failure to abide by the statutory requirement that he at least set bail, if only in a nominal amount."[122]

Similarly, in In re *Duckman*, the judge explained that he had dismissed cases "in the interests of justice, using the guise of facial insufficiency" to dispose of a case when he "thought it was right to do it."[123] However, the judge had not given the prosecution notice, an opportunity to be heard, or an opportunity to redraft charges and had not required written motions, or, in the case of adjournments in contemplation of dismissal, the consent of the prosecutor.

The Court of Appeals of New York concluded that what was significant was both that the judge had dismissed the cases in knowing disregard of the law and the abusive, intemperate behavior he manifested while dismissing the cases.[124] The court emphasized:

> This matter does not involve "second-guessing" the adjudicative work of Judges, nor does it open a new avenue for Commission intrusion into that work . . . . Here the issue is not whether petitioner's decisions were right or wrong on the merits, but rather repeated, knowing disregard of the law to reach a result and courtroom conduct proscribed by the rules governing judicial behavior.[125]

---

attorney informed the court that the defendant was unable to pay the mandatory fine, the judge replied, "If he wants to fight it, that's fine. I'm telling you now, I'm likely to set bail. I'm giving you a heads up." *Id.*

121.   591 N.E.2d 1156 (N.Y. 1992) (censure).

122.   *Id.* at 1162.

123.   *In re* Duckman, 699 N.E.2d 872, 875 (N.Y. 1998).

124.   *See id.* at 874.

125.   *Id.* at 881 n.7.

The interesting feature of the *Duckman* case was the question about judicial independence raised by the way Judge Duckman came to the commission's attention and his ultimate removal from office. As the court described, "[t]he investigation was triggered not by appeals or complaints of wronged litigants or lawyers, but by a firestorm of public criticism generated by a separate tragedy."[126] Three weeks after the judge had released on bail a defendant charged with stalking his former girlfriend, the defendant had located the former girlfriend, shot her, and then shot himself. The incident had produced "lurid newspaper coverage" and calls for the judge's removal by political leaders.[127] However, as the court noted, the commission had found that the judge's bail decision was "a proper exercise of judicial discretion, not a basis for discipline" and dismissed the complaints against him arising from that case, instead proceeding on other conduct that came to light.[128]

The court acknowledged its concern with the threat to judicial independence "posed by unwarranted criticism or the targeting of Judges" and noted that "[j]udges must remain free to render unpopular decisions that they believe are required by law."[129] However, the court concluded:

> Valid and vital though these concerns surely are, the difficult issue that confronts us in this matter is how to sanction the serious misconduct—now fully documented before us—that the firestorm has exposed. . . . We are satisfied that in this particular case removal, rather than censure, does not imperil the independence of the judiciary. Indeed, on the merits of this case, the judiciary, the Bar, and the public are better served when an established course of misconduct is appropriately redressed and an unfit incumbent is removed from the Bench.[130]

Even the two dissenting judges did not claim that the judge should not be sanctioned at all, but argued censure was sufficient. The dissents argued that a removal implied

> that Judges whose rulings displease the political powers that be may be subjected to a modern-day witch hunt in which their records are combed for indiscretions, their peccadillos strung together to make out

---

126.  *Id.* at 880.
127.  *Id.* at 881 (Titone, J., dissenting).
128.  *Id.* at 880.
129.  *Id.*
130.  *Id.* at 880-81.

a "substantial record" of misconduct and their judicial "sins" punished with the ultimate sanction of removal from office.[131]

## EGREGIOUS LEGAL ERRORS

"Egregious" legal errors have been identified as a type of error that justifies disciplinary as well as appellate review.[132] "Egregious" implies something different than bad faith or a pattern of error as those are listed as separate grounds for departing from the mere legal error rule. Although "egregious" is a subjective term, the most obvious example of an egregious error is a denial of constitutional rights.

The Supreme Court of Louisiana adopted egregious legal error as one of the exceptions to its general rule that legal error is not sanctionable, stating that even a single instance of serious legal error, particularly one involving the denial to individuals of their basic or fundamental rights, may amount to judicial misconduct.[133] The court found egregious legal error in In re *Aucoin*.[134] In that case, the court held that a disciplinary penalty was appropriate for a judge who had, among other misconduct, ordered "instanter trials" in criminal neglect of family cases immediately after the defendants pleaded not guilty. Agreeing with the Judiciary Commission finding that the judge's misconduct constituted egregious legal error, the court concluded that the judge had "failed to comply with the law and disregarded the right of the accused to present a defense, as well as the basic tenets of due process."[135] (Of course, as *Aucoin* involved eighteen cases, it might also fall within the pattern of legal error exception.)

There are judicial discipline decisions in which legal error in one or two criminal cases was egregious enough to justify discipline (although the term "egregious" was not necessarily used). Those errors included finding a defendant guilty without a guilty plea or trial,[136] revoking a

---

131.   *Id.* at 882-82 (Titone, J., dissenting). *See also id.* at 884-88 (Bellacosa, J., dissenting).

132.   The term apparently did not originate from a case but from a treatise. *See* JEFFREY SHAMAN, ET AL., JUDICIAL CONDUCT AND ETHICS, § 2.02 (3d ed. 1995).

133.   *See Quirk*, 705 So. 2d at 178.

134.   767 So. 2d 30 (La. 2000).

135.   *Id.* at 33. (censure for this and other misconduct).

136.   *See, e.g.*, Henne, Decision and Order Imposing Public Censure (Cal. Comm'n on Judicial Performance Oct. 13, 1999) (censure for this and other misconduct); Comm'n on Judicial Performance v. Wells, 794 So. 2d 1030 (Miss. 2001) (public reprimand for convicting a defendant based on affidavits alone); Hise, Determination (N.Y. State Comm'n on Judicial Conduct May 17, 2002) (relying on the defendant's incriminating statements at arraignment to convict an unrepresented defendant and impose a jail sentence without a trial and without the defendant

defendant's probation without the defendant's attorney being present,[137] accepting a defendant's guilty plea without an attorney present and adjudicating a criminal matter for which there was no formal case opened,[138] sentencing a defendant under the wrong statute,[139] failing to follow proper procedures when a defendant failed to pay a fine,[140] refusing to allow a self-represented defendant to cross-examine a police officer in a trial on a speeding ticket,[141] knowingly convicting a defendant of an offense that had not been charged and was not a lesser included offense,[142] refusing to set appeal bonds for misdemeanor defendants when clearly obligated by law to do so,[143] issuing bench warrants for the arrests of misdemeanor defendants when their attorneys had been late even though the defendants themselves had been in court,[144] forcing a defendant to enter a plea of guilty in the absence of his counsel,[145]

---

changing his plea to guilty or waiving his guaranteed right to a trial), *available at* http://www.scjc.state.ny.us/determinations/h/hise.htm.

137. *See* EnEarl, Findings of Fact, Conclusions of Law and Imposition of Discipline (Nev. Comm'n on Judicial Discipline Sept. 18, 2003) (public reprimand), *available at* http://www.judicial.state.nv.us/enearldecision.htm.

138. *See* Delgado (Tex. State Comm'n on Judicial Conduct Apr. 12, 2001) (admonition for this and other misconduct).

139. *See* Comm'n on Judicial Performance v. Byers, 757 So. 2d 961 (Miss. 2000) (public reprimand and fine for, among other misconduct, sentencing defendant under wrong statute and doing nothing to correct error); Office of Disciplinary Counsel v. Karto, 760 N.E.2d 412 (Ohio 2002) (six-month suspension for, among other misconduct, relying on an outdated statute book, incorrectly sentencing a juvenile); Driver (Tex. State Comm'n on Judicial Conduct Dec. 17, 1999) (ordered payment of fines for violation of ordinances after authorization for penalties had been repealed).

140. *See, e.g.*, Nichols, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) (committing defendant to jail after defendant stated that he was unable to pay $100 fine for traffic infraction and failing to advise defendant of his right to be resentenced), *available at* http://www.scjc.state.ny.us/determinations/n/nichols.htm; *In re* Hamel, 668 N.E.2d 390 (N.Y. 1996) (removal for two incidents in which the judge improperly jailed individuals for their purported failure to pay fines and restitution obligations that he had imposed); *In re* Roberts, 689 N.E.2d 911 (N.Y. 1997) (removal for, in addition to other misconduct, directing the arrest and summarily ordering an individual to eighty-nine days in jail, without affording constitutional and procedural safeguards for failure to pay a mandatory $90 surcharge following her guilty plea to theft of services for a $1.50 cab fare); Bartie (Tex. State Comm'n on Judicial Conduct June 28, 2000) (among other misconduct, failing to conduct indigency hearing before committing defendant to jail to pay off fine, failing to offer the options of paying fine in installments or performing community service in lieu of jail).

141. *See* Henne, Decision and Order Imposing Public Censure (Cal. Comm'n on Judicial Performance Oct. 13, 1999).

142. *See In re* Brown, 527 S.E.2d 651 (N.C. 2000).

143. *See In re* Vaughn, 462 S.E.2d 728 (Ga. 1995) (removal for this and other misconduct).

144. *See id.*

145. *See id.*

using the criminal process to collect a civil debt,[146] and detaining a juvenile for nearly six weeks before he had the assistance of counsel and without taking any evidence,[147] and twice convicting a defendant in the defendant's absence and without a guilty plea.[148]

Findings of judicial misconduct have also been made where a judge conducted a single civil case in a manner that departed completely from the usual procedures required by the adversary system. For example, the Supreme Court of Louisiana found that a judge had committed an egregious legal error by rendering a default judgment against a defendant in a small claims case without serving the defendant with notice, convening a hearing, or receiving competent evidence from the plaintiff to make a prima facie case.[149]

Similarly, the California Commission on Judicial Performance sanctioned a judge for denying due process in a civil trial.[150] Without stating that he was going to follow an alternative procedure nor offering the parties a traditional trial if they wanted one, the judge simply asked the parties to tell him what the case was about. After the plaintiff spoke, the defendant's attorney gave a version of his opening statement, and the defendant made a statement. The judge then alternated asking the parties questions; no one was placed under oath. After questioning the plaintiff and the defendant, the judge asked if either of them had anything else to add and told them that he was taking the case under submission. He asked the defendant's attorney to prepare a statement of decision and judgment and subsequently signed the document prepared in favor of the defendant.

The judge conceded that he was wrong to conduct the trial the way he did but argued that this was merely legal error, not ethical misconduct, and thus not a ground for discipline. Rejecting that argument, the commission noted that "[n]o legal question was presented

---

146.  *See* Comm'n on Judicial Performance v. Willard, 788 So. 2d 736 (Miss. 2001) (removal for this and other misconduct).

147.  *See In re* Benoit, 487 A.2d 1158, 1167 (Me. 1985).

148.  Bauer, Determination (N.Y. State Comm'n on Judicial Conduct Mar. 30, 2004) (removal for this and other misconduct), *available at* http://www.scjc.state.ny.us/determinations/b/bauer.htm.

149.  *See In re* Landry, 789 So. 2d 1271 (La. 2001) (six-month suspension without pay). *See also* Williams, Determination (N.Y. State Comm'n on Judicial Conduct Nov. 19, 2001) (admonition for, among other misconduct, holding a summary proceeding on a landlord's petition for eviction and back rent and signing the judgment without a hearing on contested issues or according pro se defendants full opportunity to be heard), *available at* http://www.scjc.state.ny.us/ determinations/w/williams,_edward_(1).htm.

150.  *See* Broadman, Decision and Order (Cal. Comm'n on Judicial Performance Feb. 26, 1999) (admonition for this and other misconduct), *available at* http://www.cjp.ca.gov/pubdisc.htm.

to the parties or briefed. Rather, [the judge] proceeded as he was wont, apparently focused on his vision of efficiency with little regard for the values that underlie the usual procedures for presenting evidence and cross-examining witnesses."[151] The commission noted the masters' finding that "no judge, much less a judge with [his] experience and intelligence, would reasonably believe that in proceeding in this truncated way that he was affording the parties the trial they were entitled to."[152]

A "parody of legal procedure" conducted by a state judge led the United States Court of Appeals for the Seventh Circuit to refer the judge to the Illinois Judicial Inquiry Board after vacating an injunction entered by the judge (the case had been removed to federal court).[153] The court found that the state court injunctive proceeding had "violated so many rules of Illinois law—not to mention the due process clause of the fourteenth amendment—that it is not worth reciting them."[154] As part of an FBI undercover investigation into the use of video poker machines for illegal gambling, Bonds Robinson, a special agent of the Illinois Liquor Control Commission, was soliciting bribes from Thomas Venezia, who ran a vending and amusement business. Venezia filed a petition requesting injunctive relief that was heard by Judge James Radcliffe.

Judge Radcliffe permitted Venezia's attorney, Amiel Cueto, to ask Robinson questions about the confidential FBI investigation. Without making any findings of fact or conclusions of law, the judge then enjoined Robinson from extorting bribes from Venezia or unlawfully seizing his video poker machines even though Robinson had not been served with summons or a copy of the petition and had not been given an opportunity to consult with an attorney, present witnesses, ask questions, or say anything in his own behalf. Venezia and his company were eventually convicted of racketeering, illegal gambling, and conspiracy arising out of the operation of the illegal gambling business, while Cueto was eventually convicted of conspiracy to defraud the United States and obstruction of justice for his conduct throughout the investigation of Venezia, including the petition filed against Robinson.[155]

---

151.  *Id.* at 4.

152.  *Id.*

153.  Venezia v. Robinson, 16 F.3d 209, 210 (7th Cir. 1994).

154.  *Id.*

155.  *See* United States v. Cueto, 151 F.3d 620 (7th Cir. 1998).

Based on a stipulation of facts and joint recommendation by the Judicial Inquiry Board and Judge Radcliffe, the Illinois Courts Commission suspended him for three months without pay for the way he conducted the proceedings.[156] Even though it noted there was no evidence that the judge had an improper motive, the commission concluded that "even the most broad assessment of respondent's failure to observe basic due process in conducting the hearing, causes us to conclude his conduct undermined confidence in the integrity and impartiality of the judiciary." The commission also stated that "while the conduct was confined to a single hearing in a single case," it "was egregious and deserving of discipline."[157] The court, however, reassured "busy and dedicated trial judges" that they did not need to fear disciplinary review of their decisions.

> This is not a case of a judge having a bad day or committing errors in judgment, or issuing an ex parte temporary restraining order later determined to have been improvidently granted. This is not a case where appellate review would have sufficed or been the more appropriate procedure to address respondent's conduct. This is a case where even though Robinson was made a party to the litigation and was present in respondent's court, Robinson was stripped of the right to notice and his right to be heard. Applicable law was totally ignored.[158]

One member of the commission dissented, arguing that the matter was completely outside the commission's jurisdiction. The dissent stated, "What Judge Radcliffe lacked was the prescience to divine that Robinson, in fact, was a legitimate federal mole wearing a wire, attempting to obtain evidence against Cueto and Venezia."[159]

What the dissent overlooks is that the judge did not need prescience to know what procedures should be followed and that in an adversarial system the due process procedures the judge ignored are designed to protect litigants from a judge's lack of infallibility. The dissent's argument displays an error inherent in an automatic, unquestioning application of the "mere legal error" doctrine. A decision in a single case—entering an ex parte order that awarded a father temporary custody of a minor child without a petition being filed, evidence being taken, or an official court file being established—led to sanction for a

---

156. *See* Radcliffe, Order (Ill. Cts. Comm'n Aug. 23, 2001).
157. *Id.*
158. *Id.*
159. *Id.*

Mississippi judge.[160] The judge's actions violated several statutes, and her order was eventually vacated by a different judge. The court noted it was convinced that the judge's actions were not taken in bad faith but emphasized that through her actions, the proper parent was deprived of the custody of a minor child for two and one-half months and had to incur attorneys fees in excess of $13,000 to have custody restored. Stressing that the exercise of judicial discretion is a very appropriate duty of a judge, the court stated it was not implying by its decision to sanction the judge

> that our learned judges are subjecting themselves to judicial performance complaints in exercising judicial discretion, or even when there is a subsequent determination on appellate review that there has been an abuse of judicial discretion. Judicial complaints are not the appropriate vehicle to test a possible abuse of judicial discretion. This case is not about abuse of judicial discretion. This case is about clear violations of our judicial canons and our statutes.[161]

### CONTEMPT

Although courts and commissions are generally reluctant to second-guess a judge's decision to control the courtroom through use of the contempt power,[162] failure to adhere to proper procedures when exercising the contempt power is cognizable in the judicial discipline process given the liberty interests at stake.[163]

---

160.  *See* Miss. Comm'n on Judicial Performance v. Perdue, 853 So. 2d 85 (Miss. 2003) (thirty-day suspension without pay).

161.  *Id.* at 97.

162.  *See*, Hinton v. Judicial Retirement and Removal Comm'n, 854 S.W.2d 756 (Ky. 1993) (setting aside a finding of misconduct and holding that, in light of judge's duty and the discretion to control the courtroom, the proper remedy was by appeal and the judicial exercise of contempt power cannot be subject to disciplinary proceeding).

163.  *See, e.g.*, Cannon v. Comm'n on Judicial Qualifications 537 P.2d 898 (Cal. 1975) (removal for, among other misconduct, completely ignoring proper procedures in punishing for a contempt committed in the immediate presence of a court; court rejected judge's argument that the Commission was seeking to hold the judge accountable for erroneous judicial rulings); *In re* Jefferson, 753 So. 2d 181 (La. 2000) (removal for, among other misconduct, abuse of contempt authority by failing to follow any of the procedures for punishment of contempt and imposing a sentence that far exceeded the legally permissible punishment); Comm'n on Judicial Performance v. Willard, 788 So. 2d 736 (Miss. 2001) (removal for, among other misconduct, holding court clerk in contempt without following due process); Teresi, Determination (N.Y. State Comm'n on Judicial Conduct Feb. 8, 2001) (censure, pursuant to agreement, for, in addition to other misconduct, finding both parties in a divorce case guilty of contempt and sentencing them to jail based on the other party's unsworn statements, without holding hearing required by law), *available at* http://www.scjc.state.ny.us/determinations/t/teresi.htm; Recant, Determination (N.Y. State Comm'n

For example, the Supreme Court of Florida sanctioned a judge for abuse of the contempt power in In re *Perry*.[164] After the judge had cautioned six defendants with suspended licenses not to drive, they were arrested when they drove away from the courthouse and were brought back to the judge, who was waiting to hold them in contempt of court for driving with a suspended license. One of the defendants was unable to post bond (which the judge had set at $20,000) and, as a result, was incarcerated for twenty-six days.

The court held that it was clear that the judge had failed to follow the statutory procedures for indirect criminal contempt, emphasizing that it did not condone the defendants' conduct.[165] The court rejected the judge's contention that his alleged transgressions were nothing more than errors of law that should not be subject to disciplinary proceedings. Acknowledging that "one of the most important and essential powers of a court is the authority to protect itself against those who disregard its dignity and authority or disobey its orders," the court concluded that the contempt power is "a very awesome power" and "one that should never be abused."[166]

> [B]ecause trial judges exercise their power of criminal contempt to punish, it is extremely important that they protect an offender's due process rights, particularly when the punishment results in the

---

on Judicial Conduct Nov. 19, 2001) (censure, pursuant to agreement, for, in addition to other misconduct, holding two defendants in custody without complying with summary contempt procedures and excluding two Legal Aid Society attorneys from the courtroom without complying with the requirements of a summary contempt), *available at* http://www.scjc.state.ny.us/determinations/r/recant.htm.

164. 641 So. 2d 366 (Fla. 1994).

165. *See id.* at 368. Similarly, the Indiana Commission on Judicial Qualifications has disciplined several judges for issuing ex parte change of custody orders without meeting statutory requirements. *See, e.g.*, Spencer (Ind. Comm'n on Judicial Qualifications Dec. 28, 1999) (granting ex parte petition for change of custody without notice to the custodial father and failing to communicate with the Florida judge who had assumed jurisdiction). In addition, in response to the substantial number of complaints it was receiving about judge's granting ex parte temporary child custody petitions, the Commission issued an advisory opinion reminding judges to be "as cautious with the rights of the opposing party as with scrutinizing the merits of the petition." Ind. Comm. on Judicial Qualifications, Advisory Opinion 1-01 at 3, *available at* http://www.in.gov/judiciary/admin/judqual/opinions.html. In the opinion, the commission stated it did not intend "to curtail the proper exercise of broad judicial discretion" nor to substitute its "judgments for that of a judge who finds on some rational basis that circumstances warrant emergency relief." *Id.* at 2. The commission did state it hoped "to improve and promote the integrity of our judiciary, and to help promote the public's confidence in the judiciary, by alerting judges, and lawyers, to the stringent and imposing ethical duties judicial officers undertake when considering whether to affect custodial rights *ex parte*." *Id.*

166. *Perry*, 641 So. 2d at 368-69.

imprisonment of the offender. As such, it is critical that the exercise of this contempt power never be used by a judge in a fit of anger, in an arbitrary manner, or for the judge's own sense of justice. . . . It is also extremely important to recognize that this discretionary power of criminal contempt is not broad or unregulated.[167]

In another case involving abuse of the contempt power, the Supreme Court of Nevada held that the Commission on Judicial Discipline had not functioned as an appellate body when it concluded that a judge's long-standing abuse of the contempt power was sanctionable misconduct.[168] The court noted the commission's finding that the judge's contempt rulings on eight separate occasions resulted from his "inaccurate perception of his role as a judge, and from his unwillingness to tolerate actions by others which are not in harmony with his apparent belief that those who do not meet or respond to his demands and expectations are subject to imprisonment and punishment under the court's contempt power."[169]

The court also emphasized that the judge "was an experienced judge who continued to ignore binding precedent reversing his contempt rulings and emphasizing the importance of a district court's strict adherence to [statutory provisions governing contempt]."[170] Other cases involving abuse of the contempt power also note that the judge knew or should have known what the correct procedures were due to the judge's experience, training, or available reference works or checklists.[171] Thus, these cases do not involve hapless judges unfairly sanctioned for inadvertent legal errors attributable to human fallibility.

PROVISIONS DEFINING THE DIFFERENCE

In addition to case law, efforts to describe the distinction between legal error and judicial misconduct can be found in state codes of judicial conduct and rules governing conduct commissions.

---

167. *Id.*

168. Goldman v. Nev. Comm'n on Judicial Discipline, 830 P.2d 107 (Nev. 1992).

169. *Id.* at 133.

170. *Id.*

171. *See* Cannon v. Comm'n on Judicial Qualifications, 537 P.2d 898, 909 (Cal. 1975) (noting when disciplining judge for contempt that judge was an experienced judge, with more than nine years on the bench and had at hand reference works that dealt with proper contempt procedures); *Perry*, 641 So. 2d at 369 (noting that all judges in Florida receive training on the appropriate procedures for applying their contempt powers and are provided with a checklist to follow in holding a defendant in contempt).

Some of the measures limit the application of the code of judicial conduct, which is the starting point for findings of judicial misconduct. For example, the Arizona Code of Judicial Conduct provides, in the commentary to Canon 1, that, "A judicial decision or administrative act later determined to be incorrect as a matter of law or as an abuse of discretion is not a violation of this code unless done repeatedly or intentionally."[172] Similarly, Commentary to Canon 1 of the Kentucky Code of Judicial Conduct states, "This Code is intended to apply to every aspect of judicial behavior except purely legal decisions made in good faith in the performance of judicial duties. Such decisions are subject to judicial review."[173] The reporter's notes to Canon 3B(2) of the Vermont Code of Judicial Conduct explain that, "This section, like Section 2A, is not intended to make a judge's error of law the basis for discipline. . . . To show lack of faithfulness to the law or lack of professional competence, a pattern of decisions willfully or blatantly ignoring or misstating established legal principles would be necessary."[174]

Other definitions of the distinction between judicial misconduct and judicial error depend on limits to the role of judicial conduct commissions. For example, a comment to Canon 1 of the Wisconsin Code of Judicial Conduct notes that the statute creating the Judicial Commission states that "[t]he commission may not function as an appellate court to review the decisions of a court or judge or to exercise superintending or administrative control over determinations of courts or judges." The comment emphasizes that "[i]t is important to remember this concept as one interprets this chapter, particularly in light of the

---

172. ARIZ. CODE OF JUDICIAL CONDUCT Canon 1 cmt.; *see also* CAL. CODE OF JUDICIAL ETHICS Canon 1 ("A judicial decision or administrative act later determined to be incorrect legally is not itself a violation of this Code."); MASS. CODE OF JUDICIAL CONDUCT, Canon 1A cmt. ("A judicial decision or action determined by an appellate court to be incorrect either as a matter of law or as an abuse of discretion is not a violation of this Code unless the decision or action is committed knowingly and in bad faith.").

173. KY. CODE OF JUDICIAL CONDUCT.

174. VT. CODE OF JUDICIAL CONDUCT; *see also* R.I. CODE OF JUDICIAL CONDUCT, Canon 1 ("This Code . . . is intended to apply to every aspect of judicial behavior except purely legal decisions. Legal decisions made in the course of judicial duty are subject solely to judicial review. The provisions of this Code are to be construed and applied to further that objective."); W. VA. CODE OF JUDICIAL CONDUCT, Canon 2A cmt. ("Errors in finding facts or in interpreting or applying law are not violations of this canon unless such judicial determinations involve bad faith or are done willfully or deliberately."); WIS. CODE OF JUDICIAL CONDUCT, Supreme Court Rule 60.02 ("This chapter applies to every aspect of judicial behavior except purely legal decisions. Legal decisions made in the course of judicial duty on the record are subject solely to judicial review.").

practice of some groups or individuals to encourage dissatisfied litigants to file simultaneous appeals and judicial conduct complaints."[175]

Many states have a provision in their rules or enabling provisions, similar to that found in Rule 9B of the Arkansas Judicial Discipline and Disability Commission, that states, "[i]n the absence of fraud, corrupt motive or bad faith, the Commission shall not take action against a judge for making findings of fact, reaching a legal conclusion or applying the law as he understands it. Claims of error shall be considered only in appeals from court proceedings."[176]

---

175.  WIS. CODE OF JUDICIAL CONDUCT SCR 60.02 cmt; *see also* RULES OF THE MICH. JUDICIAL TENURE COMM'N R. 9.203 ("The commission may not function as an appellate court to review the decisions of the court or to exercise superintending or administrative control of the courts, except as that review is incident to a complaint of judicial misconduct. An erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct."); R.I. CODE OF JUDICIAL CONDUCT Canon 1 cmt. ("The role of the judicial conduct organizations like the Commission on Judicial Tenure and Discipline . . . is not that of an appellate court. The commission shall not function as an appellate court to review the decisions of a court or judge or to exercise superintending or administrative control over determinations of courts or judges.")

176.  ARK. JUDICIAL DISCIPLINE & DISABILITY COMM'N RULES R. 9B; *see also* RULES OF THE ARIZ. COMM'N ON JUDICIAL CONDUCT R. 7 ("The commission shall not take action against a judge for making erroneous findings of fact or conclusions of law in the absence of fraud, corrupt motive, or bad faith on the judge's part, unless such findings or conclusions constitute such an abuse of discretion as to otherwise violate one of the grounds for discipline described in these rules or the code."); COLO. RULES OF JUDICIAL DISCIPLINE R. 5 ("In the absence of fraud, corrupt motive, bad faith, or any of the above grounds, the commission shall not take action against a judge for making erroneous findings of fact or legal conclusions which are subject to appellate review."); Reg. of Conn. State Agencies § 51-51k-4(h) ("Although complaints regarding issues which are subject to appellate review are not within the jurisdiction of the [Judicial Review] Council, any complaint which contains allegations of prohibited conduct separate from issues which are subject to appellate review shall be investigated as to such prohibited conduct only."); RULES OF PROC. OF THE CT. OF THE JUDICIAL OF THE STATE OF DEL. R. 3(b)(3) ("The Chief Justice may decline to refer to the Committee, and may dismiss, sua sponte, any complaint which, upon its face, is (1) frivolous, (2) lacking in good faith, (3) based upon a litigant's disagreement with the ruling of a judge, or (4) is properly a matter subject to appellate review."); RULES OF THE KY. JUDICIAL RETIREMENT AND REMOVAL COMM'N R. 4.020(2) ("Any erroneous decision made in good faith shall not be subject to the jurisdiction of the Commission."); MASS. STATUTES, Ch. 211C § 2(4) ("In the absence of fraud, corrupt motive, bad faith, or clear indication that the judge's conduct violates the code of judicial conduct, the commission shall not take action against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it. Commission proceedings shall not be a substitute for an appeal."); RULES OF THE MINN. BD. ON JUDICIAL STANDARDS R. 4C ("In the absence of fraud, corrupt motive or bad faith, the board shall not take action against a judge for making findings of fact, reaching a legal conclusion or applying the law as understood by the judge. Claims of error shall be left to the appellate process."); RULES OF THE MISS. COMM'N ON JUDICIAL PERFORMANCE R. 2 ("In the absence of fraud, corrupt motive, or bad faith, the Commission shall not consider allegations against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it."); RULES OF THE NEV. COMM'N ON JUDICIAL DISCIPLINE R. 9 ("In the absence of fraud or bad faith occurring in the commission of an act constituting a ground for discipline set forth in Rule 11, the commission must take no action against a judge for making

CONCLUSION

The primary responsibility for protecting judicial independence from the threat of unacceptable discipline lies with the judicial conduct commissions as they screen complaints received about a judge's decision, dismissing those that are more properly left to the appellate authorities. The case law does not support any suggestion that judges should fear scrutiny by the judicial conduct commissions when they are faced with making an unpopular decision or one in an unsettled area of the law. To avoid sanction for legal error, judges do not have to worry about avoiding mere oversights or misreadings of the law but only need to comply with clear due process requirements and avoid bullying and patently unfair conduct. That the possibility of discipline for legal error may induce those types of second thoughts before judicial decision-making is not a threat to judicial independence.

The commissions' vigilance in dismissing the many complaints outside their jurisdiction results in very few state supreme court decisions rejecting sanction recommendations based on the "mere legal error" rule, and the rule is usually announced in the course of a decision in which an exception to the rule is applied to allow for sanction. The rule allows for the protection of judicial independence while the many exceptions allow the commissions and reviewing courts to hold judges accountable for decisions that are clearly contrary to law, that were reached without following the procedures that confer legitimacy and credence upon judicial actions, that represent an exercise of discretion motivated by bad faith, or that reflect repeated legal error that cannot be attributed to an honest mistake.

---

findings of fact, reaching a legal conclusion, expressing views of law or policy in a judicial opinion, or otherwise declaring or applying the law in the course of official duties. The commission has no jurisdiction to review or to base charges upon differences of opinion between judges as to matters of law or policy, or as to other issues committed to judicial or administrative discretion. Claims of error must be left to the appellate process."); RULES OF THE N.H. SUP. CT. R. 39(9) (The Committee on Judicial Conduct "shall not consider complaints against a judge or master or referee related to his rulings. Such matters should be left to the appellate process.").